1  Shannon L. Gustafson (SBN 228856)
   sgustafson@lynberg.com
2  Amy R. Margolies (SBN 283471)
   amargolies@lynberg.com
3  Anita K. Clarke (SBN 321015)
   aclarke@lynberg.com
4  **LYNBERG & WATKINS**
   A Professional Corporation
5  1100 W. Town & Country Road, Suite #1450
   Orange, California 92868
6  (714) 937-1010 Telephone
   (714) 937-1003 Facsimile
7
8  Attorneys for Defendants, COUNTY OF SAN BERNARDINO,
   ROBERT VACCARI and JAKE ADAMS

9           **UNITED STATES DISTRICT COURT**

10          **CENTRAL DISTRICT OF CALIFORNIA**

11  JONATHAN WAYNE BOTTEN, SR.;          CASE NO. 5:23-cv-00257-KK-(SHKx)
    TANJA DUDEK-BOTTEN;
12  ANNABELLE BOTTEN; and J.B., a        *Assigned for All Purposes to:*
    minor by and through his guardian    *Hon. Kenly Kiya Kato– Courtroom #3*
13  JONATHAN WAYNE BOTTEN, SR.,
                                         **DEFENDANTS' SEPARATE**
14          Plaintiffs,                  **STATEMENT OF UNDISPUTED**
                                         **MATERIAL FACTS IN SUPPORT**
15      vs.                              **OF MOTION FOR SUMMARY**
                                         **JUDGMENT, OR**
16  STATE OF CALIFORNIA; COUNTY          **ALTERNATIVELY, SUMMARY**
    OF SAN BERNARDINO; ISAIAH            **ADJUDICATION**
17  KEE; MICHAEL BLACKWOOD;
    BERNARDO RUBALCAVA;                  *[Filed Concurrently Defendants' Motion*
18  ROBERT VACCARI; JAKE ADAMS;          *for Summary Judgment; Exhibits;*
    and DOES 1-10  inclusive,            *Proposed Judgment]*
19
                                         Date:       March 20, 2025
20          Defendants.                  Time:       9:30 a.m.
                                         Courtroom:  3
21
                                         *Trial:  July 28, 2025*
22
                                         *Complaint filed:  02/16/23*
23                                       *FAC filed:  06/08/23*
24
25
26
27
28

                                         **1**
       **DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that, Defendants COUNTY OF SAN BERNARDINO, SERGEANT ROBERT VACCARI, and DEPUTY JAKE ADAMS (collectively, "County Defendants"), pursuant to Central District Local Rule 56-1 and this Court's Standing Order hereby submit the following Separate Statement of Uncontroverted Facts and Conclusions of Law in support of their concurrently filed Motion for Summary Judgment, or in the alternative summary adjudication:

## STATEMENT OF UNDISPUTED MATERIAL FACTS
## AND CONCLUSIONS OF LAW

| Def.'s SUF No. | Fact | Supporting Evidence |
| --- | --- | --- |
| 1. | Deputy Adams went to the Academy from March to September 2018. | Clarke Decl. ¶ 14, Ex. X__ – Adams Depo. 5:24-25. |
| 2. | After graduation from the Academy Deputy Adams was assigned to the West Valley Detention Center for the San Bernardino County Sheriff's Department | Clarke Decl. ¶ 14, Ex. X – Adams Depo. 6:1-3. |
| 3. | Deputy Adams was assigned to patrol starting May 2020 with the San Bernardino County Sheriff's Department. | Clarke Decl. ¶ 14, Ex. X – Adams Depo. 6:6-16. |
| 4. | From May through September 2020 Deputy Adams was in field training. | Clarke Decl. ¶ 14, Ex. X – Adams Depo. 6:6-16. |
| 5. | Sergeant Vaccari graduated from the Academy in 1997. | Clarke Decl. ¶ 15, Ex. Y – Vaccari Depo. 10:8-14. |
| 6. | After graduation from the Academy | Clarke Decl. ¶ 15, Ex. Y – |

|  |  | Sergeant Vaccari was assigned to West Valley Detention Center for the San Bernardino County Sheriff's Department. | Vaccari Depo. 10:18-22. |
|---|---|---|---|
| 7. | | Sergeant Vaccari went to patrol in 2000. | Clarke Decl. ¶ 15, Ex. Y – Vaccari Depo. 10:21-11:3. |
| 8. | | Sergeant Vaccari was promoted to Sergeant in January 2012. | Clarke Decl. ¶ 15, Ex. Y – Vaccari Depo. 11:4-7. |
| 9. | | On February 16, 2021, CHP received reports that a white Ford SUV was involved in a shooting with another vehicle on the freeway during the evening. | Clarke Decl. ¶ 16, Ex. Z - Sgt. Kee Depo. 14:6-9, 75:3-76:19; Clarke Decl. ¶ 17, Ex. AA - Officer Rubalcava Depo. 77:18-78:9. |
| 10. | | The Ford SUV had a funeral sticker on the back window. | Clarke Decl. ¶ 16, Ex. Z - Sgt. Kee Depo. 76:14-19; Clarke Decl. ¶ 17, Ex. AA - Officer Rubalcava Depo. 78:4-9. |
| 11. | | CHP Officers Blackwood and Rubalcava located the vehicle and attempted a traffic stop. | Clarke Decl. ¶ 18, Ex. BB - Officer Blackwood Depo. 51:1-10; Clarke Decl. ¶ 17, Ex. AA - Officer Rubalcava Depo. 23:21-24:6, 77:13-17; *see* Clarke Decl. ¶ 19, Ex. CC – AG0811 Blackwood MVARs. |
| 12. | | The driver of the White SUV was later identified as Hector Puga. | Clarke ¶ 2, Ex. L - First Amended Complaint (Dkt. 27) |

| | | ¶ 28. |
|---|---|---|
| 13. | Hector Puga led CHP Officers Rubalcava and Blackwood on a pursuit. | Clarke Decl. ¶ 17, Ex. AA - Officer Rubalcava Depo. 23:21-24:6; Clarke Decl. ¶ 18, Ex. BB - Officer Blackwood Depo. 51:1-10; *see* Clarke Decl. ¶ 19, Ex. CC – AG0811 Blackwood MVARs. |
| 14. | Sergeant Kee later joined the pursuit of the white SUV. | Clarke Decl. ¶ 16, Ex. Y - Sgt. Kee Depo.17:14-24; 75:3-21. |
| 15. | At some point San Bernardino County Sheriff's deputies Sergeant Vaccari and Deputy Adams joined the pursuit of Mr. Puga. | Clarke Decl. ¶ 14, Ex. X - Deputy Adams Depo. 9:12-10:13. |
| 16. | The pursuit terminated at the intersection of Peach Avenue and Catalpa Street in Hesperia, CA. | Clarke Decl. ¶ 14, Ex. X - Deputy Adams Depo. 10:14-18. |
| 17. | The pursuit terminated because Puga's vehicle became disabled. | Clarke ¶ 2, Ex. L - First Amended Complaint (Dkt. 27) ¶ 26. |
| 18. | The pursuit ended just south of Catalpa Street. | Clarke Decl. ¶ 16, Ex. Z - Sgt. Kee Depo. 16:22-24. |
| 19. | The white SUV had a passenger in the vehicle. | Clarke Decl. ¶ 14, Ex. X - Deputy Adams Depo 13:4-25. |
| 20. | The passenger complied with commands. | Clarke Decl. ¶ 14, Ex. X - Deputy Adams Depo 13:4-25. |
| 21. | The passenger was taken into custody. | Clarke Decl. ¶ 14, Ex. X - |

| | | |
|---|---|---|
| | | Deputy Adams Depo 13:4-25. |
| 22. | Hector Puga refused to exit the vehicle for over an hour. | Clarke Decl. ¶ 17, Ex. AA - Rubalcava Depo 27:14-19. |
| 23. | Numerous repeated commands were given for Hector Puga to exit the vehicle. | Clarke Decl. ¶ 16, Ex. Z - Sergeant Kee 19:10-13; Clarke Decl. ¶ 15, Ex. Y - Sergeant Vaccari Depo. 23:15-24:14; Clarke Decl. 13, Ex. W - Botten Jr. Depo. 30:20-31:9. |
| 24. | Pepper balls were deployed into Puga's vehicle to get him to exit the vehicle. | Clarke Decl. ¶ 15, Ex. Y - Sergeant Vaccari Depo. 27:1-9, 30:10-24 |
| 25. | Eventually Puga exited the vehicle from the driver's side. | Clarke Decl. ¶ 17, Ex. AA - Rubalcava Depo. 39:18-40:2 |
| 26. | Puga ran to the front of his vehicle. | Clarke Decl. ¶ 17, Ex. AA - Rubalcava Depo. 39:18-40:2 |
| 27. | Because Puga was near the front of his vehicle, law enforcement officers could no longer see Puga's waistband. | Clarke Decl. ¶ 16, Ex. Z - Sergeant Kee Depo. 80:18-81:11 |
| 28. | Puga's waistband while he was at the front of his vehicle was concealed by the front of his vehicle. | Clarke Decl. ¶ 16, Ex. Z - Sergeant Kee Depo. 80:18-81:11; Clarke Decl. ¶ 17, Ex. AA - Rubalcava Depo. 53:12-15, 80:11-19; Clarke Decl. ¶ 15, Ex. Y - Vaccari Depo. 63:23-64:3 |

**DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS**

| 29. | Sergeant Kee and Deputy Rubalcava approached Puga from the driver's side of Puga's vehicle to apprehend Puga. | Clarke Decl. ¶ 17, Ex. AA - Rubalcava Depo. 41:1-7; Clarke Decl. ¶ 14, Ex. X - Adams Depo. 26:21-27:3 |
|---|---|---|
| 30. | Sergeant Vaccari and Deputy Adams approached from the passenger side of Puga's vehicle to apprehend Puga. | Clarke Decl. ¶ 14, Ex. X - Adams Depo. 26:17-27:11, 32:5-25; Adams Decl. ¶ 5, Ex. A - Kee MVARs; Clarke Decl. ¶ 5, Ex. O – Screenshot of Mangerino Neighbor Video. |
| 31. | During the approach towards Puga, Sergeant Kee was armed with a rifle. | Clarke Decl. ¶ 16, Ex. Z - Sergeant Kee Depo. 8:2-3. |
| 32. | Officer Rubalcava approached with his duty weapon drawn. | Clarke Decl. ¶ 17, Ex. AA - Rubalcava Depo. 79:14-18. 80:4-6. |
| 33. | During the approach, Sergeant Vaccari was armed with a less lethal 40 mm launcher. | Clarke Decl. ¶ 15, Ex. Y - Vaccari Depo. 50:25-51:10. |
| 34. | The 40 mm launcher that Sergeant Vaccari had only shot less-lethal projectiles. | Clarke Decl. ¶ 15, Ex. Y, Vaccari Depo. 51:11-52:13; Hubbs ¶¶ 11-12. |
| 35. | Deputy Adams approached with his duty weapon drawn. | Clarke Decl. ¶ 14, Ex. X, Adams Depo. 31:18-32:2, 64:7-65:4. |
| 36. | Officer Blackwood remained positioned behind the passenger door of his own patrol vehicle. | Clarke Decl. ¶ 18, Ex. BB - Blackwood Depo. 12:22-13:10, 18:1-21. |

**DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS**

| 37. | Officer Blackwood had his rifle drawn. | Clarke Decl. ¶ 18, Ex. BB - Blackwood Depo. 12:22-13:10, 18:1-21. |
| 38. | Officer Blackwood did not approach Puga. | Clarke Decl. ¶ 18, Ex. BB - Blackwood Depo. 12:22-13:610, 18:1-21. |
| 39. | As law enforcement officers approached, Puga's right hand went from above his head towards his waistband. | Clarke Decl. ¶ 14, Ex. X - Adams Depo. 36:5-11, 63:1-9; Clarke Decl. ¶ 16, Ex. Z - Kee Depo. 10:4-7; Adams Decl. ¶ 6, Ex. B – Mangerino Neighbor Video. |
| 40. | Deputy Adams testified he saw Puga draw his firearm from his waistband as he approached Puga. | Clarke Decl. ¶ 14, Ex. X - Adams Depo. 63:1-9. |
| 41. | Sergeant Kee testified he saw Puga draw his firearm from his waistband as he approached Puga. | Clarke Decl. ¶ 16, Ex. Z - Kee Depo. 30:2-6, |
| 42. | Officer Rubalcava testified Puga fired his gun during their approach. | Clarke Decl. ¶ 17, Ex. AA - Rubalcava Depo. 80:20-22, 85:13-16. |
| 43. | Sergeant Vaccari testified he saw Puga draw his firearm from his waistband as he approached Puga. | Clarke Decl. ¶ 15, Ex. Y - Vaccari Depo. 64:4-12. |
| 44. | Sgt. Kee testified that he believes he fired first. | Clarke Decl. ¶ 16, Ex. Z - Kee Depo. 9:4-9. |
| 45. | Sergeant Kee continued to fire as | Clarke Decl. ¶ 16, Ex. Z - Kee |

**DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS**

| | | Puga ran. | Depo 34:12-35:4, 60:19-21 |
|---|---|---|---|
| 46. | | Officer Rubalcava fired at Puga. | Clarke Decl. ¶ 17, Ex. AA - Rubalcava Depo. 17:10-24. |
| 47. | | Officer Blackwood fired at Puga. | Clarke Decl. ¶ 18, Ex. BB - Blackwood Depo. 28:5-29:13. |
| 48. | | Deputy Adams fired at Puga. | Clarke Decl. ¶ 14, Ex. X - Adams Depo. 36:5-11. |
| 49. | | As the officers fired, Puga ran in a northwestern direction away from them. | Clarke Decl. ¶ 14, Ex. X - Adams Depo. 47:10-14. |
| 50. | | Puga then fell to the ground. | Clarke Decl. ¶ 14, Ex. X - Adams Depo. 51:15-17. |
| 51. | | Puga ultimately died from his injuries. | Clarke Decl. ¶ 14, Ex. X - Adams Depo. 55:23-56:5. |
| 52. | | A handgun was located underneath Puga's body. | Clarke Decl. ¶ 17, Ex. AA - Rubalcava Depo. 86:10-16. |
| 53. | | Sergeant Vaccari was not aware whether any rounds were ejected from his less lethal launcher. | Clarke Decl. ¶ 15, Ex. Y - Vaccari Depo. 52:1-6 |
| 54. | | Sergeant Vaccari did not fire any rounds from his service weapon during the incident. | Clarke Decl. ¶ 15, Ex. Y - Vaccari Depo. 42:17-21, 50:25-51:10; Haag Decl. ¶ 11 |
| 55. | | The Plaintiffs' house is located on the northeast corner of the intersection of Peach and Catalpa | Clarke Decl. ¶ 11, Ex. U - Tanja Dudek-Botten Depo. 91:23-92:8, Ex. 40 to Depo., 98:4-13, Ex. 41 to Depo.; Haag Decl. ¶ |

| 56. | The Plaintiffs' house is pushed back slightly from the street. | Haag Decl. ¶ 23, Ex. H; Haag Decl. ¶ 24, Ex. I. |
|---|---|---|
| 57. | A deputy shooting at the Botten house from where Puga stopped his vehicle would have to shoot in a northeastern direction. | Haag Decl. ¶ 15. |
| 58. | From the time Puga's vehicle became disabled until the shooting, Sergeant Vaccari nor Deputy Adams contacted the Botten family. | Clarke Decl. ¶ 6, Ex. P - Botten Sr. Depo. 62:13-19; Clarke Decl. ¶ 8, Ex. R - Annabelle Botten Depo. 83:5-8; Clarke Decl. ¶ 7, Ex. Q - Tanja Dudek-Botten Depo. 134:17-19; Botten Jr. 98:23-25. |
| 59. | From the time Puga's vehicle became disabled until the shooting, no law enforcement officer on scene gave any commands to the Plaintiffs. | Clarke Decl. ¶ 6, Ex. P - Botten Sr. Depo. 62:13-19; Annabelle Botten Depo. 83:5-8; Clarke Decl. ¶ 7, Ex. Q - Tanja Dudek-Botten Depo. 134:17-19; Botten Jr. 98:23-25. |
| 60. | Jonathan Botten Sr. saw the white Expedition outside of his house with 2-3 police cars behind it. | Clarke Decl. ¶ 6, Ex. P, Botten Sr. Depo. 25:24-26:4 |
| 61. | Jonathan Botten Sr. saw the driver did not get out of the Puga vehicle when given commands. | Clarke Decl. ¶ 6, Ex. P - Botten Sr. Depo. 28:21-29:3 |

**DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS**

| | | |
|---|---|---|
| 62. | Periodically Botten Sr. would look out the front door to observe what was occurring. | Clarke Decl. ¶ 6, Ex. P - Botten Sr. Depo. 33:2-6 |
| 63. | Tanja Dudek-Botten saw there was a white SUV broken down in the street and a lot of police presence. | Clarke Decl. ¶ 7, Ex. Q - Tanja Dudek-Botten Depo. 95:19-96:6. |
| 64. | Tanja Dudek-Botten saw an officer near the utility pole in the corner. | Clarke Decl. ¶ 7, Ex. Q - Tanja Dudek-Botten Depo. 106:6-11. |
| 65. | Annabelle Botten saw flashing lights and a white vehicle outside of her house. | Clarke Decl. ¶ 8, Ex. R - Annabelle Botten Depo. 45:12-18. |
| 66. | Annabelle did not see officers outside of their vehicles. | Clarke Decl. ¶ 8, Ex. R - Annabelle Botten Depo. 49:14-17. |
| 67. | Jonathan Botten Jr. saw police vehicles outside of his window. | Clarke Decl. ¶ 9, Ex. S – Botten Jr. Depo. 27:9-24. |
| 68. | Jonathan Botten Jr. just saw police standing there. | Clarke Decl. ¶ 9, Ex. S - Botten Jr. Depo. 29:20-30:1. |
| 69. | The Bottens did not know who Puga was. | Clarke Decl. ¶ 6, Ex. P - Botten Sr. Depo. 41:17-42:2; Clarke Decl. ¶ 8, Ex. R - Annabelle Depo. 11:18-19; Clarke Decl. ¶ 7, Ex. Q - Tanja Dudek-Botten Depo. 168:17-169:9; Clarke Decl. ¶ 9, Ex. S - Botten Jr. Depo. |

| | | 12:22-13:11. |
|---|---|---|
| 70. | Jonathan Botten Sr. was 6 inches behind his front door when the shooting occurred. | Clarke Decl. ¶ 6, Ex. P - Botten Sr. Depo. 63:4-9, 63:18-22. |
| 71. | When the shooting occurred, the security door was shut and the front door was open. | Clarke Decl. ¶ 6, Ex. P - Botten Sr. Depo. 63:4-9 |
| 72. | Tanja Dudek-Botten was roughly in the same area as Botten Sr. near the front entrance when the shooting occurred. | Clarke Decl. ¶ 6, Ex. P - Botten Sr. Depo. 63:23-64:2, Clarke Decl. ¶ 7, Ex. Q - Tanja Dudek-Botten Depo. 127:3-20. |
| 73. | Jonthan Botten Jr. was several feet away from the front door when the shooting occurred. | Clarke Decl. ¶ 9, Ex. S - Botten Jr. Depo. 32:9-20, 40:22-43:3. |
| 74. | Jonathan Jr. was somewhere behind his mother in the house. | Clarke Decl. ¶ 7, Ex. Q - Tanja Dudek-Botten Depo. 129:4-15. |
| 75. | Annabelle Botten was in between the front door and the kitchen at the time of the shooting. | Clarke Decl. ¶ 6, Ex. P - Botten Sr. Depo. 64:16-19; Clarke Decl. ¶ 8, Ex. R - Annabelle Botten Depo 60:24-61:11; Clarke Decl. ¶ 7, Ex. Q - Tanja Dudek-Botten Depo. 127:22-128:3. |
| 76. | Plaintiffs' home is in the northeast corner from where Puga's vehicle | Clarke Decl. ¶ 7, Ex. Q - Tanja Dudek-Botten Depo.: |

| | | |
|---|---|---|
| | was located and the shooting began. | 91:23-92:8, Ex. 40 to Depo., 98:4-13, Ex. 41 to Depo.; Clarke Decl. ¶ 16, Ex. Z - Kee Depo. 93:14-20. |
| 77. | Sergeant Kee was armed with AR-15 rifles with .223 Remington caliber bullets. | Clarke Decl. ¶ 16, Ex. Z - Kee Depo 8:2-3, 53:22-23; Haag Decl. ¶ 11 |
| 78. | Officer Blackwood as armed with AR-15 rifles with .223 Remington caliber bullets. | Clarke Decl. ¶ 18, Ex. BB - Blackwood Depo. 10:11-13, Haag Decl. ¶ 11 |
| 79. | Officer Rubalcava was armed with a Smith & Wesson M&P pistol with .40 Smith & Wesson caliber bullets. | Clarke Decl. ¶ 17, Ex. AA - Rubalcava Depo. 12:19-22; Haag Decl. ¶ 11. |
| 80. | CHP Officer Rubalcava approached Puga from the driver's side of Puga's vehicle. | Clarke Decl. ¶ 17, Ex. AA - Rubalcava Depo. 41:1-11; Clarke Decl. ¶ 14, Ex. X - Adams Depo. 26:17-27:7. |
| 81. | Officer Rubalcava fired approximately 10-15 shots. | Clarke Decl. ¶ 17, Ex. AA - Rubalcava Depo. 12:25-13:2. |
| 82. | Officer Rubalcava fired in a northeastern direction while Puga was in front of his own vehicle. | Clarke Decl. ¶ 17, Ex. AA - Rubalcava Depo. 21:16-19, 26:15-17. |
| 83. | Officer Rubalcava continued firing while Puga was running away. | Clarke Decl. ¶ 17, Ex. AA - Rubalcava Depo. 45:14-46:7. |
| 84. | CHP Sergeant Kee was also on the driver's side of Puga's vehicle. | Clarke Decl. ¶ 16, Ex. Z - Kee Depo. 25:22-26:3. |
| 85. | Officer Rubalcava was to Sergeant | Clarke Decl. ¶ 16, Ex. Z - Kee |

| | | |
|---|---|---|
| | Kee's right. | Depo. 29:6-19. |
| 86. | Sergeant Kee discharged 18 rounds at Puga from his AR-15 as Puga ran. | Clarke Decl. ¶ 16, Ex. Z - Kee Depo. 7:25-8:6. |
| 87. | CHP Officer Blackwood fired 20 shots with his AR-15 at Puga | Clarke Decl. ¶ 18, Ex. BB - Blackwood Depo. 10:7-13. |
| 88. | Officer Blackwood was discharging his firearm at Puga while Puga was in front of him. | Clarke Decl. ¶ 18, Ex. BB - Blackwood Depo. 13:7-13. |
| 89. | Officer Blackwood discharged his firearm at Puga while Puga turned to run away. | Clarke Decl. ¶ 18, Ex. BB - Blackwood Depo. 21:13-23. |
| 90. | Deputy Adams and Sergeant Vaccari approached Puga from the eastern side of Puga's vehicle on the passenger side. | Adams Decl. ¶ 5, Ex. A – Kee Dashcam Video; Adams Decl. ¶ 6, Ex. B – Mangerino Neighbor Video; Clarke Decl. ¶ 14, Ex. X - Adams Depo. 26:17-20. |
| 91. | Deputy Adams was armed with a Glock (9mm caliber). | Clarke Decl. ¶ 14, Ex. X - Adams Depo. 31:24-32:2; Haag Decl. ¶ 11. |
| 92. | Sergeant Vaccari's 40 mm less lethal shot sponge rounds. | Hubbs Decl. ¶¶ 11-12. |
| 93. | Deputy Adams' gun was pointed towards Puga during this approach. | Adams Decl. ¶ 5, Ex. A – Kee Dashcam Video; Adams Decl. ¶ 6, Ex. B – Mangerino Neighbor Video; |
| 94. | Deputy Adams' gun was pointed | Adams Decl. ¶ 5, Ex. A – Kee |

| | | |
|---|---|---|
| | away from the Botten house during the approach. | Dashcam Video; Adams Decl. ¶ 6, Ex. B – Mangerino Neighbor Video; |
| 95. | Deputy Adams testified that upon seeing Puga draw a gun and hearing shots he returned fire at Puga. | Adams Decl. ¶ 5, Ex. A – Kee Dashcam Video; Adams Decl. ¶ 6, Ex. B – Mangerino Neighbor Video; Clarke Decl. ¶ 14, Ex. X - Adams Depo. 36:5-11. |
| 96. | Deputy Adams continued firing at Puga as Puga ran in a northwestern direction. | Adams Decl. ¶ 5, Ex. A – Kee Dashcam Video; Adams Decl. ¶ 6, Ex. B – Mangerino Neighbor Video; Clarke Decl. ¶ 14, Ex. X – Adams Depo. 47:10-23. |
| 97. | Adams moved closer to the front passenger side of the vehicle to gain cover | Adams Decl. ¶ 5, Ex. A – Kee Dashcam Video; Clarke Decl. ¶ 14, Ex. X – Adams Depo. 50:6-10. |
| 98. | Adams returned fire with Puga while he was getting cover. | Adams Decl. ¶ 5, Ex. A – Kee Dashcam Video; Clarke Decl. ¶ 14, Ex. X – Adams Depo. 50:6-10. |
| 99. | Adams continued returning fire with Puga while Puga was in the northwest corner in a dirt area. | Adams Decl. ¶ 5, Ex. A – Kee Dashcam Video; Adams Decl. ¶ 6, Ex. B – Mangerino Neighbor Video; Clarke Decl. |

**DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS**

| | | ¶ 14, Ex. X -Adams Depo. 37:23-38:4, 38:8-11, 50:15-21 |
|---|---|---|
| 100. | Adams fired a total of 10 shots from his 9mm. | Clarke Decl. ¶ 14, Ex. X - Adams Depo 37:13-14; Haag Decl. ¶ 13. |
| 101. | All rounds Adams discharged from the passenger side of Puga's vehicle. | Clarke Decl. ¶ 14, Ex. X - Adams Depo. 38:8-11, 39:13-16, 47:10-14, 50:15-21, 55:16-18, Haag Decl. ¶ 13. |
| 102. | All rounds Adams' discharged were in a northwesterly direction as Puga ran in the same northwesterly direction. | Clarke Decl. ¶ 14, Ex. X - Adams Depo. 38:8-11, 39:13-16, 47:10-14, 50:15-21, 55:16-18, Haag Decl. ¶ 13 |
| 103. | Sergeant Vaccari did not discharge his firearm. | Clarke Decl. ¶ 15, Ex. Y - Vaccari Depo. 50:25-51:10; Haag Decl. ¶ 11. |
| 104. | Botten Sr. was shot and only shrapnel and bullet fragments were recovered from his injuries. | Clarke Decl. ¶ 6, Ex. P - Botten Sr. Depo. 71:20-73:7, 74:7-14. |
| 105. | Only shrapnel and bullet fragments were recovered from Tanja Dudek-Botten's injuries. | Clarke Decl. ¶ 6, Ex. P - Botten Sr. Depo 85:25-86:6, 110:7-13; Clarke Decl. ¶ 7, Ex. Q - Tanja Depo. 40:2-6, 79:2-24. |
| 106. | Jonathan Botten Jr. likewise testified he believes he was injured by bullet fragments. | Clarke Decl. ¶ 9, Ex. S - Botten Jr. 105:21-106:7. |

| 107. | A review of the injuries suffered by the Botten Plaintiffs are all consistent with rifle bullet fragments | Haag Decl. ¶ 19. |
|---|---|---|
| 108. | The injuries to Plaintiffs were not as a consequence of direct projectile strikes, such as the 9mm bullets fired by Deputy Adams. | Haag Decl. ¶¶ 17, 19-22. |
| 109. | The 9mm pistol bullets fired by Deputy Adams can be excluded as the source of the Botten family's injuries. | Haag Decl. ¶ 20. |
| 110. | 9mm bullets have a relatively velocity. | Haag Decl. ¶ 17. |
| 111. | The 9mm bullets have a propensity to remain intact following shallow incident angle strikes and subsequent ricochet from ground and roadway (asphalt) impacts. | Haag Decl. ¶ 17. |
| 112. | The injuries sustained by the Botten family are therefore consistent with the ammunition fired by the AR-15 rifle used by either Sergeant Kee and/or Officer Blackwood, and not the 9mm bullets utilized by Deputy Adams. | Haag Decl. ¶¶ 11, 17-22. |
| 113. | Sergeant Kee was the only officer shooting in a northeastern direction with a rifle. | Adams Decl. ¶ 6, Ex. B. |

**DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS**

| | | |
|---|---|---|
| 114. | Puga ran in a northwestern direction away from the Botten house. | Adams Decl. ¶ 5, Ex. A – Kee Dashcam Video; Adams Decl. ¶ 6, Ex. B – Mangerino Neighbor Video; Clarke Decl. ¶ 14, Ex. X – Adams Depo. 47:10-23; Haag Decl. ¶ 23, Ex. H; Haag Decl. ¶ 25, Ex. J. |
| 115. | Even if his bullets were to have ricocheted, they would remain intact. | Haag Decl. ¶ 17. |
| 116. | Intact bullets could not have caused the injuries sustained by the Botten family. | Haag Decl. ¶¶ 19-21. |
| 117. | No intact 9mmm bullets were recovered from Plaintiffs or their residence. | Haag Decl. ¶¶ |
| 118. | Law enforcement officers are trained to be aware of and clear their background prior to using deadly force. | Clarke Decl. ¶ 15, Ex. Y - Vaccari Depo. 17:5-13; Clarke Decl. ¶ 16, Ex. Z - Kee Depo. 54:16-25; Clarke Decl. ¶ 17, Ex. AA - Rubalcava Depo. 20:20-21:1 |
| 119. | On April 6, 2021, Jonathan Botten Sr. submitted a Tort Claim to the County of San Bernardino. | Clarke Decl. ¶ 10, Ex. T – Botten Sr. Tort Claim. |
| 120. | On April 6, 2021, Tanja Dudek-Botten submitted a Tort Claim to the County of San Bernardino. | Clarke Decl. ¶ 11, Ex. U – Botten Sr. Tort Claim. |

**DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS**

| 121. | On April 6, 2021, Annabelle Botten submitted a Tort Claim to the County of San Bernardino. | Clarke Decl. ¶ 12, Ex. V – Annabelle Botten Tort Claim. |
|------|---------------------------------------------------------------------------------------------|----------------------------------------------------------|
| 122. | On April 6, 2021, Jonathan Botten Jr. submitted a Tort Claim to the County of San Bernardino. | Clarke Decl. ¶ 13, Ex. W – Botten Jr. Tort Claim. |
| 123. | Jonathan Botten Sr.'s tort claim recited the following as the basis of the claim: "On or about February 17, 2021, various police agencies including the California Highway Patrol were in pursuit of and apprehending an alleged suspect at or about the roadway near the home of claimants.  There were shots fired by the police agency employees.  Respondent family members were at their home located at 17944 Catalpa Street, Hesperia, Ca 92395.  The bullets shot and fired in the course of the pursuit and apprehension struck claimant resulting in serious injury and damage." | Clarke Decl. ¶ 10, Ex. T – Botten Sr. Tort Claim. |
| 124. | Tanja Dudek-Botten's tort claim recited the following as the basis of the claim: "On or about February 17, 2021, various police agencies | Clarke Decl. ¶ 11, Ex. U – Tanja Dudek-Botten Tort Claim. |

**DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS**

| | | including the California Highway Patrol were in pursuit of and apprehending an alleged suspect at or about the roadway near the home of claimants.  There were shots fired by the police agency employees.  Respondent family members were at their home located at 17944 Catalpa Street, Hesperia, Ca 92395.  The bullets shot and fired in the course of the pursuit and apprehension struck claimant resulting in serious injury and damage." | |
| 125. | | Annabelle Botten's tort claim recited the following as the basis of the claim: "On or about February 17, 2021, various police agencies including the California Highway Patrol were in pursuit of and apprehending an alleged suspect at or about the roadway near the home of claimants.  There were shots fired by the police agency employees.  Respondent family members were at their home located at 17944 Catalpa Street, Hesperia, Ca 92395.  The bullets shot and fired in the course of | Clarke Decl. ¶ 12, Ex. V – Annabelle Botten Tort Claim. |

**DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS**

| | | | |
|---|---|---|---|
| | | the pursuit and apprehension struck claimant resulting in serious injury and damage." | |
| | 126. | Jonathan Botten Jr.'s tort claim recited the following as the basis of the claim: "On or about February 17, 2021, various police agencies including the California Highway Patrol were in pursuit of and apprehending an alleged suspect at or about the roadway near the home of claimants.  There were shots fired by the police agency employees. Respondent family members were at their home located at 17944 Catalpa Street, Hesperia, Ca 92395.  The bullets shot and fired in the course of the pursuit and apprehension struck claimant resulting in serious injury and damage." | Clarke Decl. ¶ 13, Ex. W – Botten Jr. Tort Claim. |
| | 127. | Jonathan Botten Sr. was inside of the residence while Puga was inside of his vehicle. | Clarke Decl. ¶ 6, Ex. P 25:5-15 |
| | 128. | Tanja Dudek-Botten was inside of the residence while Puga was inside of his vehicle. | Clarke Decl. ¶ 7, Ex. Q 90:14-91:10. |
| | 129. | Annabelle Botten was inside of the | Clarke Decl. ¶ 8, Ex. R 42:3- |

| | | residence while Puga was inside of his vehicle. | 21 |
|---|---|---|---|
| | 130. | Jonathan Botten Jr. was inside of the residence while Puga was inside of his vehicle. | Clarke Decl. ¶ 9, Ex. S 98:2-99:5. |
| | 131. | Plaintiffs have no admissible evidence to support any of the claims Plaintiff has alleged against the County Defendants. | As summarized by the Ninth Circuit, "the Celotex 'showing' can be made by pointing out through argument – the absence of evidence to support plaintiff's claim." *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc); *see*, *Celotex Corp.*, *supra*, 477 U.S. at 323. (There is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponents claim"). |

## CONCLUSIONS OF LAW

### I.    FOURTH CLAIM FOR NEGLIGENCE

"To establish negligence, it must be shown that (1) the defendant owed the plaintiff a legal duty, (2) the defendant breached that duty, and (3) the breach was a proximate or legal cause of the plaintiff's injuries." *Gilmer v. Ellington*, 159 Cal. App. 4th 190, 195 (2008).

**A. No Duty**

"The existence of a duty of care is a question of law to be determined by the court alone." *Hernandez v. KWPH Enterprise,* 116 Cal. App. 4th 170, 176 (2004); *Kentucky Fried Chicken of Cal, Inc. v. Superior Court,* 14 Cal. 4th 814, 819 (1997)("the existence of a duty is a question of law for the court.").

Plaintiffs appear to argue here that because there was a law enforcement encounter in the intersection, the County Defendants had some type of affirmative duty to evacuate the Botten Plaintiffs or take some other action in case they were harmed. However, law enforcement officers may not be held liable merely for failing to take affirmative steps to prevent injury to another. *Zelig v. County of Los Angeles*, 27 Cal.4th 1112, 1128 (2002). "'As a rule, one has no duty to come to the aid of another. A person who has not created a peril is not liable in tort merely for failing to take affirmative action to assist or protect another unless there is some relationship between them which gives rise to a duty to act.'" *Zelig*, 27 Cal.4th at 1129 quoting *Williams v. State of California*, 34 Cal.3d 18, 23 (1983). Officers like members of the public generally do not have a duty to aid another. *Zelig*, 27 Cal.4th at 1129 citing *Lugtu v. California Highway Patrol*, 26 Cal.4th at 717. As such, the duty to protect only exists where there is a "special relationship between the parties or some other set of circumstances giving rise to an affirmative duty to protect." *Golick v. State of California,* 82 Cal. App. 5th 1127, 1144 (2022). "First, the court must determine whether there exists a special relationship between the parties or some other set of circumstances giving rise to an affirmative duty to protect. Second, if so, the court must consult the factors described in *Rowland* to determine whether relevant policy considerations counsel limiting that duty." *USA Taekwondo*, at p. 209, citing *Rowland, supra*, 69 Cal.2d 108, 70 Cal.Rptr. 97, 443 P.2d 561.

**B. No Special Relationship Exists**

1    Generally, there is no legal "duty," and hence no liability for negligence, unless

2  there is a special relationship between the police and either the victim or the third

3  person which gives rise to a responsibility to control the third person's conduct. *See*

4  *generally Tarasoff v. Regents of University of California* 17 Cal.3d 425, 435 (1976).

5  In the case of law enforcement officers, a special relationship has been found only in

6  a "***few narrow circumstances***." *M.B. v. City of San Diego* (1991) 233 Cal.App.3d

7  699, 704–705, 284 Cal.Rptr. 555 (emphasis added). Absent a special relationship

8  creating a special duty, the police have no legal duty to control the conduct of others.

9  *Von Batsch v. American Dist. Telegraph Co.*   175 Cal.App.3d 1111, 1122.

10    Law enforcement officers have been found to establish a special relationship

11  where they voluntarily assume a duty to provide a particular level of protection and

12  fail to do so or where the officer undertakes an affirmative act that increases the risk

13  of harm to the plaintiff. *Zelig*, 27 Cal.4th at 1129.  For example, a special relationship

14  has been found to exist between an officer and an arrestee. *Frausto v. Department of*

15  *California Highway Patrol*, 53 Cal.App.5th 973, 993 (2020).  Likewise, "a police

16  officer who exercises his or her authority to ***direct*** another person to proceed to—or

17  to stop at—a particular location, owes such a person a duty to use reasonable care in

18  giving that direction, so as not to put the person in danger or to expose the person to

19  an unreasonable risk of harm." *Lugtu v. CHP*, 26 Cal.4th 703, 716 (2001)(emphasis

20  added).   On the other hand, officers have not been found to have created a special

21  relationship simple for performing their duties. *Lopez v. City of San Diego,* 190

22  Cal.App.3d 678, 681 (1987)(no special relationship between police responding to

23  restaurant massacre scene and victims of massacre where police delayed acting on

24  plan to " 'neutralize' " murderer); *Von Batsch, supra,* 175 Cal.App.3d at p. 1122, 222

25  Cal.Rptr. 239 (no special relationship between county and decedent's surviving wife

26  when county's officers responded to a burglar alarm, searched the premises, and

27  erroneously advised decedent's co-employees that no intruders were on the premises);

28

1   *William v. State of California,* 34 Cal.3d 18, 24 (1983)(no special relationship

2   between stranded or injured motorist and police based on fact that police stopped to

3   aid her); s*ee e.g. Kockelman v. Segal*, 61 Cal. App. 4th 491, 499 (1998)("It has been

4   observed that a typical setting for the recognition of a special relationship is where

5   "the plaintiff is particularly vulnerable and dependent upon the defendant who,

6   correspondingly has some control over the Plaintiffs welfare.").

7       Likewise, none of the affirmative acts taken by Deputy Adams and/or Sergeant

8   Vaccari to apprehend Puga, increased the harm Plaintiffs were already exposed to vis

9   a vis the pursuit terminating in their neighborhood. *Zelig v. Cnty. of Los Angeles*, 27

10  Cal. 4th 1112, 1129 (2002) ("Liability may be imposed ... if an officer undertakes

11  affirmative acts that increase the risk of harm to the plaintiff."); *cf. Ikeda v. City &*

12  *Cnty. of Honolulu*, No. 19-cv-00009-DKW-KJM, 2019 WL 4684455, at *8 (D. Haw.

13  Sept. 25, 2019) ("police officers are under a duty to avoid any affirmative acts which

14  worsen the situation of the plaintiff") (cleaned up); *Lopez, supra*, 190 Cal. App. 3d at

15  681 (special relationship has been found in cases where "the representations or

16  conduct by the police which case the victim(s) to detrimentally rely on the police such

17  that the risk of harm as the result of police negligence is something more than that to

18  which the victim was already exposed.").

19      **C. The Rowland Factors do not Support a Duty Here**

20      As stated by the California Supreme Court ". . . a court might conclude that

21  duty should not be imposed because, for example, the type of harm the plaintiff

22  suffered was ***unforeseeable***, or because there was no moral blameworthiness

23  associated with the defendant's conduct, notwithstanding the defendant's special

24  relationship to the plaintiff. Put differently, even when a special relationship gives

25  rise to an affirmative duty to protect, a court must still consider whether the policy

26  considerations set out in *Rowland* warrant a departure from that duty in the relevant

27  category of cases." *USA* at p. 222. (emphasis added).

28

**DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS**

The policy considerations in *Rowland* are:

- the foreseeability of harm to the plaintiff,

- the degree of certainty that the plaintiff suffered injury,

- the closeness of the connection between the defendant's conduct and the connection between the defendant's conduct and the injury suffered,

- the moral blame attached to the defendant's conduct,

- the policy of preventing future harm,

- the extent of the burden to the defendant,

- and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.

*Rowland*, 69 Cal.2d at 112-113.

### 1. Foreseeability

Moreover, defendants only owe a legal duty to prevent injuries that were reasonably foreseeable or damage that would likely occur. *See, Osborn v. City of Whittier,* 103 Cal. App. 2d 609, 615-16 (1951). "Foreseeability supports a duty only to the extent the foreseeability is reasonable." *Sturgeon v. Curnutt* (1994) 29 Cal. App. 4th 301, 306. "As a general principle, a 'defendant owes a duty of care to all persons who are foreseeably endangered by his conduct, with respect to all risks which make the conduct unreasonably dangerous.'" *Golick v. State of California*, 82 Cal. App. 5th 1127, 1138 (2022) quoting *Tarasoff v. Regents of University of California*, 17 Cal. 3d 425, 434-35 (1976). "Foreseeability involves three considerations: 'the [general] foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, [and] the closeness of the connection between the defendant's conduct and the injury suffered.'" *Huang v. The Bicycle Casino, Inc.*, 4 Cal.App.5th 329, 341 (2d Cal. 2016) citing *Parsons v. Crown Disposal Co.*, 15 Cal.4th 456, 473 (1997). Further, "when the avoidance of foreseeable harm

1    requires a defendant to control the conduct of another person, or to warn of such

2    conduct, the common law has traditionally imposed liability only if the defendant

3    bears some special relationship to the dangerous person or to the potential victim."

4    *Tarasoff v. Regents of Univ. of California*, 17 Cal. 3d at 435.  Where the court

5    "determines that the defendant's conduct clearly falls outside the community's

6    conception of fault, the issue of foreseeability must be withdrawn from the jury."

7    *Cunningham v. Happy Place, Inc.*, 157 Or. App. 334, 337 (1998).

8        "As a consequence, the analysis of foreseeability for purposes of assessing the

9    existence or scope of a duty is different, and more general, than it is for assessing

10   whether any such duty was breached or whether a breach caused a plaintiff's injuries

11   . . . '[I]n analyzing duty, the court's task 'is not to decide whether a *particular*

12   plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's

13   conduct, but rather to evaluate more generally whether the *category* of negligent

14   conduct at issue is sufficiently likely to result in the *kind* of harm experienced that

15   liability may appropriately be imposed on the negligent party.'"  *Staats v. Vintner's*

16   *Golf Club, LLC*, 25 Cal. App. 5th 826, 837 (2018) (emphasis in original) quoting

17   *Laabs v. Southern California Edison Co.*, 175 Cal. App. 4th 1260, 1272-73 (2009).

18   "Foreseeability supports a duty only to the extent the foreseeability is reasonable."

19   *Sturgeon v. Curnutt* (1994) 29 Cal. App. 4th 301, 306.

20                            **2.  Proximate Cause**

21       "'Proximate cause' means that the injury or damage was the natural and

22   probable consequence of the wrongful or negligent act or omission and the ability on

23   the part of a person of ordinary intelligence reasonably to have foreseen or anticipated

24   the harmful consequence of his act or omission.  *Osborn v. City of Whittier*, 103

25   Cal.App.2d 609, 615 (2d, 1951) citing *Chutuk v. Southern Counties Gas Co.*, 21

26   Cal.2d 372, 380; *Weck v. L. A. County Flood Control Dist.*, 80 Cal.App.2d 182, 189;

27   *Johnson v. Union Furniture Co.*, 31 Cal.App.2d 234, 238.  "The question is whether

28

it was reasonably foreseeable that injury or damage would likely occur." *Osborn*, 103 Cal.App.2d at 615-16. "'[T]he closeness of the connection between the defendant's conduct and the injury suffered[,] [citation] is strongly related to the question of foreseeability itself' and generally is relevant when intervening third party conduct caused the injury." *Staats v. Vintner's Golf Club, LLC*, 25 Cal. App. 5th 826, 839 (2018) quoting *Kesner v. Superior Court*, 1 Cal. 5th 1132, 1148 (2016).

The law is clear, "a public employee is not liable for an injury caused by the act or omission of another person." Government Code § 820.8.

### 3. Superseding Cause

"'A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his *antecedent* negligence is a substantial factor in bringing about.'" *Farr v. NC Mach. Co.*, 186 F.3d 1165, 1169 (9th Cir. 1999) quoting Restatement 2d Torts § 440; *Brewer v. Teano*, 40 Cal. App. 4th 1024, 1031. "Where, subsequent to the defendant's negligent act, an independent intervening force actively operates to produce the injury, the ***chain of causation*** must be broken." 6 Witkin, Summary of California Law (11th ed. 2017) Torts § 1348.

"'It is usually said that if the risk of injury might have been reasonably foreseen, the defendant is liable, but that if the independent intervening act is ***highly unusual or extraordinary***, not reasonably likely to happen and hence not foreseeable, it is a *superseding cause*, and the defendant is not liable.'" *Ash v. North American Title Co.*, 223 Cal.App.4th 1258, 1274 (Cal. 2014) (emphasis added) *quoting* 6 Witkin, Summary of Cal. Law (10th ed. 2005) Torts § 1197, p. 574. "A superseding cause generally has to happen ***after*** the negligence of the defendant. *Sofec* describes superseding intervening cause as 'a later cause of independent origin that was not foreseeable.'" *Farr v. NC Mach. Co.*, 186 F.3d 1165, 1168 (9th Cir. 1999)(emphasis added) quoting *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837 (1996); s*ee e.g.,*

1  *Lucas v. City of Long Beach*, 60 Cal. App. 3d 341, 351 (Cal. 1976) ("The intentional

2  act of a third person is a superseding cause of harm and relieves the original actor of

3  liability unless such act was reasonably foreseeable or the failure to foresee such act

4  was a factor in the original negligence."); *Tate v. Canonica,* 180 Cal. App. 2d 898

5  (1960)("the intervening act of a third person does not relieve the original wrongdoer

6  of liability if the intervening act was a reasonably foreseeable result of the original

7  actor's wrongdoing.").

8   **II.    FIFTH CLAIM FOR NEGLIGENT INFLICTION OF EMOTIONAL**

9         **DISTRESS**

10       As an initial matter, Plaintiffs must prove they are (1) closely related to the

11  injury victim, (2) present at the scene of the injury-producing event at the time it

12  occurred and was then aware that it was causing injury to the victim and, (3) as a

13  result suffered emotional distress beyond that which would be anticipated.  *Spates v.*

14  *Dameron Hospital Assn.*, 114 Cal.App.4th 208, 213 (2003).

15       To the extent that Plaintiffs are claiming they suffered emotional distress from

16  witnessing the physical injuries of other family members, this is merely an off shoot

17  of their negligence claim as there is no stand alone claim for negligent infliction of

18  emotional distress under California law. *See, Gu v. BMW of N. Am., LLC*, 132

19  Cal.App.4th 195, 204 (2005) ("[T]he California Supreme Court has emphasized that

20  '***there is no independent tort of negligent infliction of emotional distress***.'")

21  (emphasis added); *Potter v. Firestone Tire & Rubber Co.,* 6 Cal. 4th 965, 984 (1993)

22  ("[T]here is no independent tort of negligent infliction of emotional distress.")

23  (internal citation omitted); *Christensen v. Superior Court*, 54 Cal. 3d 868, 884 (1991)

24  ("Negligent infliction of emotional distress is not an independent tort…."). As a result,

25  for claims involving emotional distress a plaintiff must still plead and prove

26  negligence by alleging the "traditional elements of duty, breach of duty, causations

27  and damages." *Burgess v. Superior Court*, 2 Cal. 4th 1064, 1072 (1992).

28

**DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS**

### III.   GOVERNMENT CODE IMMUNITIES APPLY

Even if the Court were to find that there was a legal duty and a triable issue on proximate cause, Plaintiff's claims are still barred by a host of state law immunities under the facts and circumstances here.  *See, Steinle v. City and County of San Francisco,* 919 F.3d 1154,1162 (9th Cir. 2019) (finding "courts routinely answer questions of immunity" where facts are not in dispute).

### Government Code § 820.2

Government Code § 820.2 provides "[e]xcept as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused."

The Court defines discretionary acts as "'those wherein there is no hard and fast rule as to the course of conduct that one must or must not take and, if there is a clearly defined rule, such would eliminate discretion.'"  *Johnson v. State*, 69 Cal.2d 782, 788 (1968).  A "' discretionary act is one which requires 'personal deliberation, decision and judgment' while an act is said to be ministerial when it amounts 'only to the performance of a duty in which the officer is left no choice of his own." *Johnson*, 69 Cal.2d at 788 citing *Morgan v. County of Yuba*, 230 Cal.App.2d 938, 942 (1964); *see*, Government Code § 815.2(b)(*"*Except as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability.").

### IV.   PLAINTIFFS DID NOT COMPLY WITH TORT CLAIM PRESENTATION REQUIREMENTS

Compliance with the tort claim presentation requirements is a condition precedent to suit and the failure to comply bars suit for money damages.  Cal. Govt. Code § 945.4; *see e.g.*, *DiCampli-Mintz v. County of Santa Clara*, 55 Cal.4th 983, 991 (2012).  The requirements are mandatory and strict compliance is required.  *Wood v.*

*Riverside Gen. Hosp.*, 25, Cal. App 4th 1113, 1119 (1994).    Further, these requirements apply equally where state law claims are brought in federal court.  *See*, *Karhim-Panahi v. LA Police Dept.*, 839. F.2d 621, 627 (9th Cir. 1988).

Govt. Code § 910 requires: "the facts constituting the causes of action pleaded in the complaint must substantially correspond with the circumstances described in the claims as the basis of the plaintiff's injury."  *Connelly v. State of California*, 3 Cal.App.3d 744, 743 (1970).  Where there has been an attempt to comply but the compliance is defective, the test of substantial compliance controls.  Under this test, the court must ask whether sufficient information is disclosed on the face of the filed claim "to reasonably enable the public entity to make an adequate investigation of the merits of the claim and to settle it without the expense of a lawsuit."  *City of San Jose v. Superior Court*, 12 Cal.3d 447, 456 (1974).  The doctrine of substantial compliance, however, cannot cure total omission of an essential element from the claim or remedy a plaintiff's failure to comply meaningfully with the statute.  *Hall v. City of Los Angeles*, 19 Cal.2d 198 (1941); *Loehr v. Ventura County Community College Dist.*, 147 Cal.App.3d 1071, 1082-83 (Cal. 2d 1983).

DATED: January 30, 2025

**LYNBERG & WATKINS**
A Professional Corporation


By:  */s/ Anita K. Clarke*
_____
Shannon L. Gustafson
Amy R. Margolies
Anita K. Clarke
Attorneys for Defendants, COUNTY OF SAN BERNARDINO, ROBERT VACCARI and JAKE ADAMS