# EXHIBIT X

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3

 4   JONATHAN WAYNE BOTTEN, SR.; TANJA      )
     DUDEK-BOTTEN; ANNABELLE BOTTEN; and   )
 5   J.B., a minor by and through his      )
     guardian JONATHAN WAYNE BOTTEN, SR.,  )
 6                                         )
                   Plaintiffs,             )
 7                                         )
                   vs.                     ) Case No.
 8                                         ) 5:22-CV-00949-JGB-KK
     STATE OF CALIFORNIA; COUNTY OF SAN    )
 9   BERNARDINO; ISAIAH KEE; MICHAEL       )
     BLACKWOOD; BERNARDO RUBALCAVA; ROBERT )
10   VACCARI; JAKE ADAMS; and DOES 1-10,   )
     inclusive,                            )
11                                         )
                   Defendants.             )
12   _____)

13

14

15

16            REMOTE VIDEOCONFERENCE DEPOSITION OF

17                         JAKE ADAMS

18                TUESDAY, NOVEMBER 12, 2024

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  116769
```

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

Page 2

```
 1                    UNITED STATES DISTRICT COURT

 2                    CENTRAL DISTRICT OF CALIFORNIA

 3

 4    JONATHAN WAYNE BOTTEN, SR.; TANJA      )
      DUDEK-BOTTEN; ANNABELLE BOTTEN; and    )
 5    J.B., a minor by and through his       )
      guardian JONATHAN WAYNE BOTTEN, SR.,   )
 6                                           )
                       Plaintiffs,           )
 7                                           )
                       vs.                   ) Case No.
 8                                           ) 5:22-CV-00949-JGB-KK
      STATE OF CALIFORNIA; COUNTY OF SAN     )
 9    BERNARDINO; ISAIAH KEE; MICHAEL        )
      BLACKWOOD; BERNARDO RUBALCAVA; ROBERT  )
10    VACCARI; JAKE ADAMS; and DOES 1-10,    )
      inclusive,                             )
11                                           )
                       Defendants.           )
12    _____)

13

14

15

16          The remote videoconference deposition of JAKE ADAMS,

17    taken on behalf of the Plaintiffs, beginning at 10:10 a.m.,

18    and ending at 12:27 p.m., on Tuesday, November 12, 2024,

19    before Jinna Grace Kim, Certified Stenographic Shorthand

20    Reporter No. 14151.

21

22

23

24

25
```

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

0339

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

```
                                                              Page 3
 1    APPEARANCES OF COUNSEL:


 2
      For the Plaintiffs:
 3
              LAW OFFICES OF DALE K. GALIPO
 4            BY:  DALE K. GALIPO, ESQ.
              BY:  HANG D. LE, ESQ.
 5            21800 Burbank Boulevard, Suite 310
              Woodland Hills, California 91367
 6            Tel:  818-347-3333
              Fax:  818-347-4118
 7            E-mail:  dalekgalipo@yahoo.com
              E-mail:  hle@galipolaw.com
 8

 9    For the Defendants:

10            DEPUTY ATTORNEY GENERAL
              BY:  DIANA ESQUIVEL, ESQ.
11            1300 I Street, Suite 125
              P.O. Box 944255
12            Sacramento, California 94244
              E-mail:  diana.esquivel@doj.ca.gov
13

14            LYNBERG & WATKINS
              BY:  SHANNON L. GUSTAFSON, ESQ.
15            1100 W. Town & Country Road, Suite 1450
              Orange, California 92868
16            E-mail:  sgustafson@lynberg.com


17

18    Also Present:  Plaintiffs (previously stated on the record)

19

20

21

22

23

24

25
```

0340

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

```
                                                          Page 4
 1                           INDEX

 2   WITNESS:                                       PAGE

 3   JAKE ADAMS

 4      BY: MR. GALIPO                              5

 5

 6                         EXHIBITS

 7   MARKED FOR IDENTIFICATION                      PAGE

 8   Exhibit 1          Photograph                  23

 9   Exhibit 8          Photograph 1500             30

10   Exhibit 9          Photograph 1557             30

11   Exhibit 10         Photograoh 1499             31

12   Exhibit 11         Video Clip COSB009200       72
```

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

13

14

15

16

17

18

19

20

21

www.huseby.com        Huseby Global Litigation        800-333-2082

22

23

24

25

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

Page 5

```
1                      CALIFORNIA

2              TUESDAY, NOVEMBER 12, 2024

3                      10:10 A.M.

4                     JAKE ADAMS,

5   called as a witness on behalf of the Plaintiffs, having been

6   first duly sworn remotely via videoconference, was examined

7   and testified as follows:

8                     EXAMINATION

9   BY MR. GALIPO:

10      Q.   Can you please state your name.

11      A.   Jake Adams, A-d-a-m-s.

12      Q.   Are you able to hear okay so far?

13      A.   Yes, sir.

14      Q.   Okay.  Keep your voice up mainly for the court

15   reporter.  She has to take all the words you're saying down.

16   So your voice is just a little soft, but I think if you keep

17   your voice raised slightly, it will help us all.

18           Okay?

19      A.   Yes, sir.

20      Q.   Who do you currently work for?

21      A.   Currently for San Bernardino Sheriff's Department.

22      Q.   What is your current assignment?

23      A.   Currently assigned to the Hesperia Station.

24      Q.   When did you go to the police academy?

25      A.   In 2018 from March to September.
```

0342

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

Page 6

```
 1        Q.   And where were you initially assigned after the
 2   academy?
 3        A.   West Valley Detention Center.
 4        Q.   What time period were you there?
 5        A.   From 2018 until 2020.
 6        Q.   At that point were you assigned to patrol?
 7        A.   Yes, sir.  In May of 2020 I was assigned to patrol
 8   at the Hesperia Station.
 9        Q.   Did you have a period of field training?
10        A.   I did.
11        Q.   How long was that for, approximately?
12        A.   Approximately 15 weeks, 16 weeks.
13        Q.   So would that take us to like September,
14   approximately, of 2020?
15        A.   Yes, sir.  I believe it was towards the end of
16   August or early September.
17        Q.   I'm assuming you graduated from high school?
18        A.   Yes, sir.
19        Q.   Did you play sports in high school?
20        A.   Yes, sir.
21        Q.   What did you play?
22        A.   Played baseball and soccer and football.
23        Q.   What positions did you play in baseball?
24             MS. GUSTAFSON:  I'm going to object as relevancy on
25   this line of questioning.
```

0343

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

Page 9

1    A.    Being no other separate or circumstances

2    around it, I -- what would have to happen is more on the

3    situation, sir.

4    Q.    The previous individuals that you saw with guns in

5    their hand, did you shoot any of those individuals?

6    A.    I've only been in one -- involved in one lethal

7    force encounter which is the one that occurred on February

8    17, 2021.

9    Q.    On the date of the incident, were you partnered up

10   in a vehicle or solo in a vehicle?

11   A.    I was solo in a vehicle, sir.

12   Q.    And were you part of the vehicle pursuit?

13   A.    Yes, sir.

14   Q.    And do you know where your vehicle was in line

15   during the vehicle pursuit?

16   A.    During the pursuit there were multiple turns and

17   avenues taken throughout the city, and I was not part of the

18   initial pursuit.

19        But when one of the deputy's vehicle became

20   disabled, I was able to join the pursuit as it already had

21   been going on.  At that point in time I was directly behind

22   my supervisor at that time which was also behind two CHP

23   vehicles.

24   Q.    Who was your supervisor at the time?

25   A.    Sergeant Vaccari.

0344

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL. Page 10
Jake Adams on 11/12/2024

1    Q.    And once you got in that position behind Sergeant

2    Vaccari, how much longer did the pursuit go on?

3    A.    I don't have the call log in front of me.

4          I would have to estimate which I could be off on a

5    number.  I know there is specifics of when I joined in, we

6    would be able to see on a call log.

7          So I don't want to misspeak.

8    Q.    Okay.  I am entitled to an estimate.

9          It's not a big deal.  You can even give a range if

10   you're comfortable.  You know, 15 to 30 minutes, whatever

11   your're comfortable with.  It's only an estimate.

12   A.    Sure.  If I had to guess, sir, or estimate, it was

13   somewhere between 20 minutes and an hour, approximately.

14   Q.    And where did the pursuit come to an end?

15   A.    At the intersection of Peach Avenue and Catalpa

16   Street in the City of Hesperia.

17   Q.    Do you know when way Peach runs?

18   A.    Yes, sir, I do.

19   Q.    Which way?

20   A.    It is a north and south street through the City of

21   Hesperia.

22   Q.    And was the vehicle, the suspect vehicle, a white

23   vehicle?

24   A.    Yes, sir.

25   Q.    And do you recall what type of vehicle it was

0345

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

Page 13

1    Q.   During the pursuit.

2    A.   During the pursuit I was not aware of how many

3    people may have been inside of the vehicle.

4    Q.   At some point did it come to your attention that

5    there was more than one person in the vehicle?

6    A.   Yes, sir.

7    Q.   And at some point was a female either taken out, or

8    did she exit the vehicle?

9    A.   Yes, sir.

10   Q.   Did you have any conversation with the female after

11   she exited the vehicle?

12   A.   Yes, sir.

13   Q.   Can you tell me about that, please.

14   A.   Yes.  She exited the vehicle and was given commands

15   to walk back towards deputies, and I made contact with her,

16   placed her in handcuffs, patted her down for weapons, and I

17   asked her if anybody else was inside the vehicle, and she

18   told me Mr. Puga was inside.

19        She referred to him as Hector.  She wasn't sure on

20   his last name.  I also asked her if there were other weapons

21   inside the vehicle and if there was anything for me to know

22   about, and she said she didn't know.

23        And she informed me that she -- he wanted to call

24   his wife, and he was a new father.  That was about the extent

25   of the conversation I had with her.

0346

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

Page 26

1    Q.   And who was that?

2    A.   Sergeant Vaccari, sir.

3    Q.   And do you know what type of less-lethal he had?

4    A.   He had a 40-millimeter munitions less-lethal.

5    Q.   Did you yourself have a Taser on you?

6    A.   I did, sir.

7    Q.   What type of Taser was it?

8    A.   I don't know the exact model.  It's a standard

9    issued San Bernardino Sheriff's Department Taser that we are

10   all issued and carry on our Sam Brownes.

11   Q.   Do you recall if the Taser that you had was such

12   that you could fire a cartridge, and if you needed to fire a

13   second cartridge, you can do that without loading a new one

14   in, or whether you had to load a second cartridge in?

15   A.   The Taser I had is capable of firing two cartridges

16   without having to go through a reload process.

17   Q.   Were you aware at the time frame that you and your

18   sergeant were approaching on -- I take it the passenger side

19   of the white car would have been your approach?

20   A.   That's correct, sir.

21   Q.   Were you aware that the CHP officers during that

22   time frame were also approaching?

23   A.   Yes, sir.  I could see them also moving slightly

24   north, and they were moving on to the -- I want to say the

25   west side of the vehicle, and we were on the east side.

0347

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

1    So that they can maintain a better line of sight or

2    observation of the suspect's hands and movement while he was

3    in front of the vehicle.

4        Q.    Between you and your sergeant in your approach on

5    the east side, I think the passenger side would be the east

6    side of the vehicle?

7        A.    That's correct, sir.

8        Q.    Do you recall who was first and who was behind

9    between you and your sergeant as you started your approach?

10       A.    I would have been just in front of my supervisor,

11   sir.

12       Q.    Okay.  So Sergeant Vaccari would have been slightly

13   behind you?

14       A.    That's correct.

15       Q.    And did you have a sense between yourself and the

16   CHP officers who was further north as the approach was going

17   on?

18       A.    I think we were in similar positions, give or take a

19   few feet, but we were approaching in a walking pace similar.

20           I don't know if I was more north or if they were

21   more north of position.

22       Q.    And could you tell how many CHP officers were

23   approaching, whether it was one or more than one?

24       A.    I do not know, sir.

25       Q.    Was there any discussion you heard about someone

0348

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

1    A.    Yes, sir.

2    Q.    And if my angles are right, is this looking like

3    northwest?

4    A.    Yes, sir.

5         MR. GALIPO:  And lastly, if we can find Exhibit 1499

6    or I should say Bates stamp 1499 we'll mark as Exhibit 10.

7         (Exhibit 10 was marked for identification.)

8    BY MR. GALIPO:

9    Q.    Are you able to see this on your screen as well?

10   A.    Yes, sir.

11   Q.    And this shows a portion of the CHP vehicle that you

12   were at initially?

13   A.    That's correct.

14   Q.    Okay.

15        MR. GALIPO:  Thank you, Hang.

16        We'll get back to those in a little bit.

17   BY MR. GALIPO:

18   Q.    So as you're approaching on the passenger side if

19   I'm understanding correctly, your sergeant is slightly behind

20   you?

21   A.    Yes, sir.

22   Q.    And do you have anything in your hands?

23   A.    Yes, sir.

24   Q.    What do you have in your hand?

25   A.    I had my firearm which is a Glock 17, sir.

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

Page 32

```
 1      Q.   What caliber is that?

 2      A.   9-millimeter.

 3      Q.   Are you right-handed or left?

 4      A.   Right-handed, sir.

 5      Q.   As you were approaching, did you hear any commands

 6  being given to Mr. Puga?

 7      A.   I knew there were consistent commands for Mr. Puga

 8  to keep his hands up and to walk back towards the CHP

 9  officers.  The hands up commands were repeated extensively

10  and that that's ongoing.

11      Q.   And did you hear those type of commands being given

12  by the CHP officers as you were approaching?

13      A.   I don't recall exactly what was being said during my

14  approach.

15      Q.   Did you give any command at any time during your

16  approach to Mr. Puga?

17      A.   No, sir.  Not that I recall.

18      Q.   Did you ever hear anyone tell him to get down on the

19  ground?

20      A.   Yes.  That was said to Mr. Puga.

21           I know it started when he exited the vehicle and was

22  getting to the driver side of the vehicle.  He was told to

23  keep his hands up.  I believe he was told to get on the

24  ground, walk backwards towards the CHP officers.

25           I do believe that was said.
```

0350

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

Page 36

1  fired before I fired.

2     Q.   Were you looking at Mr. Puga when you heard the

3  shots starting?

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

4     A.   Yes, sir.

5     Q.   And did you ever see any muzzle flash coming from

6  Mr. Puga?

7     A.   When I approached on the east side of the vehicle,

8  Mr. Puga looked at me, and I saw his hands dive down into his

9  waistband area.  I don't know if it was waistband or pockets.

10 And I saw a gun, and then I heard shots, and then I returned

11 fire.

12    Q.   I think my question was, did you ever see any muzzle

13 flash coming from Mr. Puga?

14    A.   At what point in time, sir?

15    Q.   When he was in front of the vehicle before you

16 fired?

17    A.   When I saw the gun and heard the shots, I did not

18 specifically see a muzzle flash at that point in time.

19    Q.   Is one of the documents that you reviewed in

20 preparation for the deposition your statement or interview

21 you gave?

22    A.   Yes, sir.

23    Q.   And when was the last time you reviewed that?

24    A.   This past weekend, sir.

25    Q.   Do you recall in your statement indicating you heard

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 37

1  the shots before you saw anything in Mr. Puga's hand?

2      A.   I do not recall that, sir.

3      Q.   Do you recall in your statement saying that you

4  yelled at Mr. Puga to get on the ground and simultaneously

5  you heard gunshots?

6      A.   I believe that's accurate, sir.

7      Q.   And do you recall saying after you heard the

8  gunshots is when you saw his arm or hand come up?

9      A.   I don't specifically recall that, sir.

10      Q.   Had you fired your first shot when Mr. Puga already

11  starting to run?

12      A.   I believe so.

13      Q.   And how many shots did you fire altogether?

14      A.   I believe it was ten rounds that I fired, sir.

15      Q.   Was there any pause in your sequence?

16      A.   Yes, sir.  There were two extended or distinct

17  pauses over the course of what I would describe as three

18  volleys of fire.

19      Q.   What would you estimate the number of shots in your

20  first volley?

21      A.   I believe it was three.  I believe that's what it

22  was in my first volley, sir.

23      Q.   And Mr. Puga was already starting to run away at the

24  time of your first volley of shots?

25      A.   Yes, sir.  It was very fluid and dynamic.

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 38

```
1              It happened within a couple of seconds.  After I saw

2    the gun and heard the shots, I remember ducking and having to

3    step over a high curb that was right there and having to

4    return fire.

5         Q.   And then your second volley of shots, how many did

6    you fire in your second volley?

7         A.   I fired four rounds at that time, sir.

8         Q.   And was Mr. Puga still running away at that point?

9         A.   Yes, sir.  Also, during that time as he was running,

10   I remember seeing the gun again as he turned towards me and

11   the other officers.

12        Q.   Which hand did you see the gun in?

13        A.   I believe it was his right hand, sir.

14        Q.   And how far was he from you when you fired your

15   first volley of shots?

16        A.   I'm going to have to estimate.  I didn't do any of

17   the measurements.

18             I would estimate he was probably between 15 to 25

19   feet away during my first volley.

20        Q.   How about your second volley, what would you

21   estimate the distance?

22        A.   I would estimate he was probably from 10 to 20 or 25

23   feet further.  So maybe somewhere between 25 to 40 feet away

24   from me at the time.

25        Q.   And how about your third volley, what would you
```

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

1    estimate the distance?

2        A.   I would probably guess that to be somewhere between

3    45 to 60, 65 feet.  I'm not

4        Q.   How many rounds -- I'm sorry.

5        A.   I'm not good with numbers or math like that.

6             It's just my guess.

7        Q.   That's okay.  You're just trying to give an

8    estimate; is that fair?

9        A.   Yes, sir.

10       Q.   And how many rounds did you fire in your last volley

11   of shots?

12       A.   I believe the last volley was also three rounds.

13       Q.   And in your first volley what part of his body were

14   you aiming at?

15       A.   In my first, second, and third volleys, I was aiming

16   at his center mass or the torso of Mr. Puga.

17       Q.   And with him running away, would that be his back

18   essentially?

19       A.   His back and his side as he turned towards deputies,

20   yes, sir.

21       Q.   Did you ever give any verbal warning you were going

22   to shoot?

23       A.   No, sir.  There was not ample time to give verbal

24   warning or anything like that.

25             I was already fired at, and I needed to act.

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

Page 47

```
 1      A.   It looked like he was facing me; I saw the gun and
 2   heard gunshots.  That situation unfolded very rapidly, and
 3   all of those things were going on almost what felt like from
 4   what I remember to be simultaneously.
 5      Q.   And you indicate here on Line 20 that you remember
 6   yelling, "Get on the ground," and it sounds like almost
 7   immediately after that you heard the gunshots; is that
 8   fair?
 9      A.   Yes, sir.
10      Q.   And then you saw Mr. Puga at some point running
11   northbound; is that right?
12      A.   After the first shots were fired, and I was
13   returning fire, yes, Mr. Puga was running in a northwestern
14   direction.
15      Q.   And I just want to make sure I'm understanding the
16   chronologically because you referenced I think both in your
17   statement and your testimony today, that at some point you
18   either stepped over a curb or almost tripped on a curb or
19   something like that; is that correct?
20      A.   Yes, sir.
21      Q.   But am I correct that you didn't fire any shots
22   until after you stepped over the curb?
23      A.   I believe that's accurate, sir.
24      Q.   Okay.  So did Mr. Puga go out of your view for some
25   period of time when you were going over the curb?
```

0355

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

Page 50

```
 1    direction or not, but I believe that's true.

 2    BY MR. GALIPO:

 3        Q.   Okay.  So you kind of were in a different position

 4    for your second volley of shots; is that true?

 5        A.   Yes, sir.

 6        Q.   Where were you positioned during your second volley

 7    of shots?

 8        A.   I had moved closer to the passenger side of the

 9    vehicle in attempt to gain some level of cover while still

10    engaged in returning fire with Mr. Puga.

11        Q.   And was Mr. Puga running towards the northwest

12    corner of that intersection when you fired your second volley

13    of shots?

14        A.   Yes, sir.

15        Q.   And then after he got to the northwest corner, you

16    think you fired another three rounds?

17        A.   When I fired my last volley, Mr. Puga was still --

18    well, I think he had reached the northwest corner and was

19    headed in more of a direct northern north direction I should

20    say instead of directly towards the house that's on that

21    corner the way he had started to run straight north.

22        Q.   So when you fired your first volley of rounds,

23    Mr. Puga would have been on the asphalt?

24        A.   Yes, sir.

25        Q.   And when you fired your second volley of rounds, he
```

0356

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

1    would have been on the asphalt?

2        A.   Yes, sir.

3        Q.   And when you fired your last volley, he would have

4    been on the dirt area?

5        A.   I don't know specifically where he would have been

6    standing or where he would have been running for my last

7    three.  It would have been near where those two on that

8    excuse me -- on that north corner.  I don't know if he had

9    actually gotten to the dirt, or if he was on the dirt when

10   I had fired that last volley.

11       Q.   But if I'm understanding you, he was running

12   northwest on your second volley of shots and more due north

13   on your last volley?

14       A.   Yes, sir.

15       Q.   And at some point did you see him go to the

16   ground?

17       A.   Yes, sir, I did.

18       Q.   And were any shots fired if you know when he was on

19   the ground?

20            MS. GUSTAFSON:  By anyone or by him?

21            MR. GALIPO:  By anyone.

22            THE WITNESS:  Did I -- are you asking if I knew that

23   then or now?

24   BY MR. GALIPO:

25       Q.   Let's break it down.  Let's go back to then.

0357

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

1    Q.    Did you approach Mr. Puga at some point after all

2    the shots had ended?

3    A.    Yes, sir, I did.

4    Q.    Did you hear some screaming coming from the

5    residence at the northeast corner?

6    A.    Yes, sir, I did.

7    Q.    And at some point did you become aware that some

8    innocent bystanders were struck by gunfire?

9    A.    I do recall hearing somebody saying somebody had

10   been shot.  I did not know who.  I did not know exactly

11   where, but it did sound like it was coming from the residence

12   on the northeast corner.

13        But I overheard that as I was approaching the

14   suspect, and I never made contact again for clarification by

15   anybody at that residence.

16   Q.    When Mr. Puga was running northwest, were you firing

17   generally in a northwest direction?

18   A.    Yes, sir.

19   Q.    One of your concerns, obviously, being in a

20   residential neighborhood with a lot of shots being fired is

21   innocent people potentially being struck; is that fair?

22   A.    Yes, sir.

23   Q.    And when you approached Mr. Puga, did you notice his

24   chest cavity rising still, and it appeared initially he was

25   still alive?

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

Page 56

1    A.    Upon initial approach, there was a rise

2    and fall of the chest cavity.  That did not last very long.

3    When medical arrived I would say within approximately one

4    minute from the time shots were fired, Mr. Puga did show

5    obvious signs of death.

6    Q.    But you initially believed he was alive because you

7    could see him still breathing; is that fair?

8    A.    Yes.  Initially, that was -- he was still able to

9    breathe.

10    Q.    And after that he was tased two times, wasn't he?

11    A.    After what, sir?

12    Q.    After you saw him still breathing, initially.

13    A.    Yes, sir.  When we approached, we saw the rise and

14    fall of the chest cavity as he was faced-down.  We attempted

15    several more verbal commands to gain compliance.  When he had

16    fallen, he had fallen on his hands in a prone position.

17        And so that's why we were giving the verbal

18    commands, and then at that point in time because there was no

19    imminent lethal force threat posed towards us, we used a

20    less-lethal option of a Taser in hopes to gain compliance at

21    that time.

22    Q.    You're saying there was no lethal or no imminent

23    threat when he was down on the ground as you described?

24        MS. GUSTAFSON:  Objection.  Misstates the testimony.

25        Go ahead.

0359

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

Page 63

1      Q.   Right.  But it sounds like you made this observation

2   of him turning towards you before you stepped over the curb;

3   is that correct?

4      A.   Sir, I don't know if I can distinguish within tens

5   or hundreds of seconds of how I stepped or what.  I know that

6   when I approached, he get on the ground, there was an

7   aggressive reach downward motion towards the waistband or a

8   pocket area of the pants by Mr. Puga and coming up with a gun

9   pointed point at me.  I heard shots, and I returned fire.

10      Q.   I get that.  But if I'm understanding your statement

11   and your testimony correctly, you started shooting at

12   Mr. Puga when he was running northbound?

13          MS. GUSTAFSON:  Objection.  Asked and answered;

14   misstates testimony.

15          Go ahead.

16   BY MR. GALIPO:

17      Q.   Is that part correct?

18      A.   Can you restate your question, sir?

19      Q.   Sure.  I thought you told me earlier when we went

20   over your statement where you indicated you started shooting

21   at Mr. Puga when he started running northbound.

22          MS. GUSTAFSON:  Objection.  Misstates the testimony.

23          Go ahead?

24          THE WITNESS:  So when I approached, yelled get on

25   the ground, Mr. Puga -- everything was within, again, it

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

Page 64

1  happened so fast.  I don't know what my reaction time was,

2  but yes, all of those things happened.

3         The reach down for the gun, the pointed at me, shots

4  fired, me returning fire, him running northbound, all of that

5  happened.

6  BY MR. GALIPO:

7     Q.   Yes.  I guess what the point I was just trying to

8  make, is that if your gun was pointed at him, you did not

9  shoot him initially when he was facing you; is that

10  correct?

11    A.   I think there is a very plausible explanation.

12         I don't have the science behind it.  I know there's

13  the four signs to account for what I see versus my reaction

14  time which --

15    Q.   No.  I get all that --

16         MS. GUSTAFSON:  Let him finish the answer, please,

17  before you interrupt.

18         MR. GALIPO:  I'm sorry.  Go ahead.

19         THE WITNESS:  Sir, I'm not trying to dodge your

20  question.  I'm answering you the best of my ability that I

21  saw the gun; shots fired; I know I ducked and had to step

22  over a curb, and return fire.

23         And all of that happened what felt like

24  simultaneously.  My return fire happened after he fired,

25  pointed the gun at me, yes.  I returned fire afterwards.

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

Page 65

1          If that's when he was running northbound, that's the

2    sequence of the events.  No, I would not pull the trigger

3    immediately upon seeing him reach down and seeing a gun

4    pointed at me.

5    BY MR. GALIPO:

6          Q.   If hypothetically he had not pointed a gun at you,

7    based on your training, do you think it would have been

8    appropriate to shoot him?

9               MS. GUSTAFSON:  Objection.  Overbroad; incomplete

10   hypothetical; speculation.

11              You can answer.

12              THE WITNESS:  Sir, honestly, I don't know if I can

13   answer that question.  It's a hypothetical.  Every situation

14   is different; every -- the totality of the circumstances are

15   different in every incident.  There is a lot leading up to

16   this incident and just before the shooting.  A couple hours'

17   worth of information, trying to process everything while

18   trying to deal with the situation directly at hand.

19              So to try to compare or have an answer that would

20   apply to this and/or hypothetical, I don't think it's fair,

21   no.

22              I just can't answer it if I don't have all the other

23   information I would have to.

24   BY MR. GALIPO:

25         Q.   Okay.  I was just asking if everything else was

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

Page 79

```
1                       CERTIFICATE

2                           OF

3            CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

4

5          I, JINNA GRACE KIM, CSR No. 14151, a Certified

6   Stenographic Shorthand Reporter of the State of California,

7   do hereby certify:

8          That the foregoing proceedings were taken before me

9   at the time and place herein set forth;

10         That any witnesses in the foregoing proceedings,

11  prior to testifying, were placed under oath;

12         That a verbatim record of the proceedings was made

13  by me, using machine shorthand, which was thereafter

14  transcribed under my direction;

15         Further, that the foregoing is an accurate

16  transcription thereof.

17         I further certify that I am neither financially

18  interested in the action, nor a relative or employee of any

19  attorney of any of the parties.

20

21         IN WITNESS WHEREOF, I have subscribed my name, this

22  date:  November 12, 2024.

23
                    _____
24
                    Jinna Grace Kim, CSR No. 14151
25
```