# EXHIBIT Y

```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3

 4   JONATHAN WAYNE BOTTEN, SR.; TANJA      )
     DUDEK-BOTTEN; ANNABELLE BOTTEN; and    )
 5   J.B., a minor by and through his       )
     guardian JONATHAN WAYNE BOTTEN, SR.,   )
 6                                          )
                    Plaintiffs,             )
 7                                          )
                 vs.                        ) Case No.
 8                                          ) 5:23-CV-00257-JGB-SHK
     STATE OF CALIFORNIA; COUNTY OF SAN     )
 9   BERNARDINO; ISAIAH KEE; MICHAEL        )
     BLACKWOOD; BERNARDO RUBALCAVA; ROBERT  )
10   VACCARI; JAKE ADAMS; and DOES 1-10,    )
     inclusive,                             )
11                                          )
                    Defendants.             )
12   _____)

13

14

15

16          REMOTE VIDEOCONFERENCE DEPOSITION OF

17                      ROBERT VACCARI

18             THURSDAY, NOVEMBER 14, 2024

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  112656
```

Page 2

1                UNITED STATES DISTRICT COURT

2                CENTRAL DISTRICT OF CALIFORNIA

3

4   JONATHAN WAYNE BOTTEN, SR.; TANJA      )
    DUDEK-BOTTEN; ANNABELLE BOTTEN; and    )
5   J.B., a minor by and through his       )
    guardian JONATHAN WAYNE BOTTEN, SR.,   )
6                                          )
              Plaintiffs,                  )
7                                          )
              vs.                          ) Case No.
8                                          ) 5:23-CV-00257-JGB-SHK
    STATE OF CALIFORNIA; COUNTY OF SAN     )
9   BERNARDINO; ISAIAH KEE; MICHAEL        )
    BLACKWOOD; BERNARDO RUBALCAVA; ROBERT  )
10  VACCARI; JAKE ADAMS; and DOES 1-10,    )
    inclusive,                             )
11                                         )
              Defendants.                  )
12  _____)

13

14

15

16        The remote videoconference deposition of ROBERT

17   VACCARI, taken on behalf of the Plaintiffs, beginning at

18   10:04 a.m., and ending at 12:04 p.m., on Thursday, November

19   14, 2024, before Jinna Grace Kim, Certified Stenographic

20   Shorthand Reporter No. 14151.

21

22

23

24

25

Page 3

```
 1   APPEARANCES OF COUNSEL:

 2
     For the Plaintiffs:
 3
                LAW OFFICES OF DALE K. GALIPO
 4              BY:  DALE K. GALIPO, ESQ.
                BY:  HANG D. LE, ESQ.
 5              21800 Burbank Boulevard, Suite 310
                Woodland Hills, California 91367
 6              Tel:  818-347-3333
                Fax:  818-347-4118
 7              E-mail:  dalekgalipo@yahoo.com
                E-mail:  hle@galipolaw.com
 8

 9   For the Defendants:

10              DEPUTY ATTORNEY GENERAL
                BY:  DIANA ESQUIVEL, ESQ.
11              1300 I Street, Suite 125
                P.O. Box 944255
12              Sacramento, California 94244
                E-mail:  diana.esquivel@doj.ca.gov
13

14              LYNBERG & WATKINS
                BY:  SHANNON L. GUSTAFSON, ESQ.
15              1100 W. Town & Country Road, Suite 1450
                Orange, California 92868
16              E-mail:  sgustafson@lynberg.com

17

18   Also Present:  Plaintiffs (previously stated on the record)

19

20

21

22

23

24

25
```

1   A.   Yes.
2   Q.   And what year did you do that in?
3   A.   1987.
4   Q.   Did you go to any college after high school?
5   A.   No.
6   Q.   Any military experience?
7   A.   No.
8   Q.   When did you first go to the academy?
9   A.   I went to the academy for some reserve training, I
10  believe in 1993, but that fell by the way side, but I wasn't
11  actually going to the academy until 1997, the full-blown
12  Sheriff's Academy.
13  Q.   And did you graduate from the academy in 1997?
14  A.   Yes.
15  Q.   What type of work were you generally doing before
16  you went to the academy?
17  A.   I was a photographer.
18  Q.   And after graduating from the academy, where were
19  you first assigned?
20  A.   West Valley Detention Center.
21  Q.   And what time frame were you there?
22  A.   From 1997 to approximately April of 2000.
23  Q.   And where were you assigned at that time?
24  A.   To Apple Valley Sheriff's Station.
25  Q.   So you had a patrol assignment as of that time?

Page 11

1  A.  Yes.

2  Q.  And then you would have had some field training?

3  A.  Yes.

4  Q.  Now, at some point you were promoted to sergeant?

5  A.  Yes.

6  Q.  And when was that, approximately?

7  A.  January of 2012.

8  Q.  And before being promoted to sergeant, were you 9 essentially or generally assigned to patrol?

10  A.  No.

11  Q.  What other assignments did you have?

12  A.  When I was promoted to detective, I worked as a 13 detective at the Barstow Station and at the Apple Valley 14 Station.  In addition to being a station detective, I also 15 worked as a watch commander.  They'll have the detectives or 16 corporals cover watch commander duties.

17      And I also worked Specialized Investigations as a 18 detective.

19  Q.  And then after becoming a sergeant, were you 20 assigned back to the jails for some period?

21  A.  Yes.

22  Q.  And what period was that?

23  A.  From 2012 until sometime in 1013.

24  Q.  And then were you assigned back to patrol as a 25 sergeant, a patrol sergeant?

Page 17

1    A.    When feasible.

2    Q.    And are officers generally trained that when using

3    deadly force, they're responsible to justify each shot?

4    A.    Yes.

5    Q.    Are officers trained to assess during a shooting

6    sequence if they can?

7    A.    Yes.

8    Q.    Are they trained to consider their background or

9    backdrop when using deadly force?

10   A.    Yes.

11   Q.    And is that in part to prevent the risk of innocent

12   by standers being shot?

13   A.    Yes.

14   Q.    Are officers trained on the concept of crossfire?

15   A.    Yes.

16   Q.    And what essentially is crossfire?

17   A.    As it relates to this case, or just in general?

18   Q.    Just in general.

19   A.    If you had officers using a clock as a -- if the

20   suspect was at the center where the hands, and you had

21   officers at the 12 o'clock and the 6 o'clock position, both

22   shooting at the same target.

23   Q.    And then have you had any training on the concept of

24   contagious fire?

25   A.    Yes.

Page 23

1   Q.   And was it your understanding that one of them was
2   the sergeant for the CHP officers?
3   A.   Yes.
4   Q.   Did you learn at some point that there were two
5   people in the vehicle?
6   A.   Yes.
7   Q.   And that one of them was a female?
8   A.   Yes.
9   Q.   Had you had training before with high-risk felony
10  stops?
11  A.   Yes.
12  Q.   Had you participated as either a sergeant or a
13  patrol officer in high-risk felony stops before?
14  A.   Yes.
15  Q.   And is that a situation where generally the law
16  enforcement units position themselves at a position of some
17  advance, and the officer stay behind cover behind the open
18  doors and issue a series of commands hoping that the
19  occupants of the vehicle would follow the commands?
20  A.   Yes.
21  Q.   And there could be commands like, throw the keys out
22  the window, show us your hands, open the door from the
23  outside, get out, hands up, hands on the back of your head,
24  walk backwards, things like that?
25  A.   Yes.

```
 1    Q.   Was that ever attempted, to your knowledge, in this
 2   situation?  In other words, were the officers initially
 3   behind cover when they were issuing commands?
 4    A.   Yes.
 5    Q.   And who was issuing the commands initially, if you
 6   recall?
 7         And if you don't recall their names, it's okay.
 8         You can tell me whether it was a CHP officer or
 9   yourself or whatever applies.
10    A.   Thank you.  I don't know any of the CHP officer's
11   names, but it was CHP.
12    Q.   Now, I take it one of the goals was to get the
13   occupants out of the vehicle?
14    A.   Yes.
15    Q.   And at some point did the female come out of the
16   vehicle?
17    A.   Yes.
18    Q.   And was that before the pepper balls were
19   deployed?
20    A.   Yes.
21    Q.   And did you have any conversation with the female
22   when she came out?
23    A.   I did not.
24    Q.   Where was the female placed if you recall after she
25   came out of the vehicle?
```

```
 1   more or less with the front door on the passenger side, but
 2   like ten feet from it; I guess it would be ten feet east of
 3   it?
 4        A.   Correct.
 5        Q.   And that's when you heard the shots?
 6        A.   Yes.
 7        Q.   And at some point you saw Mr. Puga turn and start
 8   running north or northwest?
 9        A.   Yes.
10        Q.   And you thought you had dropped your 40-millimeter
11   weapon and unholstered your firearm; that's what you thought
12   initially?
13        A.   Yes.
14        Q.   And but then when you saw the video, you realized
15   that something slightly different happened?
16        A.   Correct.
17        Q.   And when you watched the video, although you thought
18   you dropped your 40-millimeter and unholstered your firearm,
19   you saw that you actually did not unholster your firearm at
20   that initial time frame?
21        A.   Correct.
22        Q.   Did you drop your 40-millimeter initially?
23        A.   No.
24        Q.   How many shots did you hear approximately before
25   Mr. Puga started running away?
```

Page 50

1  effect, having Mr. Puga step out of the vehicle, he said he
2  had a shield and considered using the shield to go block him
3  inside of the car and try to pull him out of that car.
4       And I shook my head no, and told him -- I didn't
5  tell him. I just shook my head no. That wasn't what we were
6  going to do.
7       Q. So would it be fair to say there were some
8  respectful disagreements to how best to proceed between
9  yourself and the CHP sergeant?
10      A. I believe just in that one aspect.
11      Q. Okay. Now, let's get back to you because it sounds
12  like you initially thought that you had dropped the
13  40-millimeter, pulled out your firearm, and came up on target
14  of Mr. Puga.
15      That was your initial what you believed happened; is
16  that fair?
17      A. Correct.
18      Q. And you in that scenario you coming up on target
19  with your firearm, decided not to shoot; is that also
20  correct?
21      A. Yes.
22      Q. And but then when you watched the video, it appeared
23  something different had actually happened?
24      A. Yes.
25      Q. And what did you see when watching the video that, I

```
 1   guess, refreshed your recollection, if you will, that it
 2   actually happened differently in terms of you and your
 3   weapon?
 4       A.   That I had remained on target with the 40-millimeter
 5   as Mr. Puga ran away, and then I moved -- I turned away from
 6   the -- from what was going on and dropped the 40-millimeter
 7   on the ground.  I had unholstered my duty firearm, but as I
 8   watched what was unfolding, Mr. Puga had already -- he was
 9   either going down or already down, and I reholstered my
10   firearm.
11       Q.   And with respect to the 40-millimeter, was there
12   some issue as to whether the safety was on or not?
13       A.   Yes.
14       Q.   Can you explain that, please.
15       A.   Yes.  I had only received brief training at the
16   academy with respect to the 40-millimeter, and it has a
17   safety, and the safety has a red dot and a white dot.
18            I still to this day don't know if the white dot
19   means fire or the white dot means safe and red dot means
20   fire.  I can't recall at this point in time which way I had
21   the selector switch.
22            But if I remember the weapon system properly,
23   regardless of which way you put that safety switch, the
24   trigger pulls.  It's just whether or not it actually fires a
25   projectile or not.
```

1  Q.  Do you remember if you ever pressed the trigger or
2  attempted to press the trigger on the 40-millimeter?
3  A.  Yes, I did.
4  Q.  And do you know if anything came out of the
5  40-millimeter when you pressed it?
6  A.  I have no idea.
7  Q.  How did you become aware of the issue of the
8  safety?
9  A.  When I took the one -- I loaded the 40-millimeter
10 up, and I even had a conversation with Deputy Adams, is red
11 fire or white fire.
12       And so, yes.  Even to this day I don't know if the
13 40-millimeter fired.
14 Q.  Did Deputy Adams know or appeared to know whether it
15 was white or red?
16 A.  He did not.
17 Q.  It might have been easier to do red and green.
18 A.  I would have just assumed it had words.
19 Q.  Okay.  Now, your impression when you were watching
20 Mr. Puga running is that he had been struck by gunfire; is
21 that fair?
22 A.  Yes.  Just prior to him going to the ground.
23 Q.  And what did you see in observing him led you to
24 believe he had been struck prior to going to the ground?
25 A.  It looked more like he was staggering as opposed to

Page 64

1  waistband area?

2   A.  No.  It was below the body line of the hood of the
3  car that he was standing in front of.

4   Q.  Before you heard the shots, based on your position
5  were you able to see him lower his hand and grab at anything
6  in his waist and waistband area?

7   A.  Yes.

8   Q.  Did you see anything in his hand after he made that
9  motion?

10   A.  Yes.  He drew a firearm.

11   Q.  And you saw the firearm?

12   A.  Yes.

13   Q.  And did you see if he lifted it and pointed it in
14  any particular direction after you were able to see the
15  firearm in his hand?

16   A.  I didn't see him point it at any specific
17  direction.

18   Q.  To the best that you can estimate, how soon after
19  that you observed the firearm in Mr. Puga's hand did you hear
20  a shot, the first shot?

21       MR. GALIPO:  I'm going to object.  It assumes facts
22  potentially not in evidence that the shots didn't happen,
23  start beforehand.

24       THE WITNESS:  And I couldn't make that -- I can't
25  make that -- what would I say -- distinction.  I don't know

Page 67

1      DECLARATION UNDER PENALTY OF PERJURY

2

3   Case Name:  Jonathan Wayne Botten, et al. vs. State of

4   California, et al.

5   Date of Deposition:  November 14, 2024

6   Job No.:  112656

7

8            I, _____, hereby certify

9   under penalty of perjury under the laws of the State of

10  California that the foregoing is true and correct.

11          Executed this _____ day of _____,

12  20____, at _____, California.

13

14

15

16

17

18                              _____
                                     ROBERT VACCARI
19

20

21

22

23

24

25

```
 1                      CERTIFICATE

 2                           OF

 3          CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5          I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6   Stenographic Shorthand Reporter of the State of California,

 7   do hereby certify:

 8          That the foregoing proceedings were taken before me

 9   at the time and place herein set forth;

10          That any witnesses in the foregoing proceedings,

11   prior to testifying, were placed under oath;

12          That a verbatim record of the proceedings was made

13   by me, using machine shorthand, which was thereafter

14   transcribed under my direction;

15          Further, that the foregoing is an accurate

16   transcription thereof.

17          I further certify that I am neither financially

18   interested in the action, nor a relative or employee of any

19   attorney of any of the parties.

20

21          IN WITNESS WHEREOF, I have subscribed my name, this

22   date:  November 14, 2024.

23

24                          _____
                             Jinna Grace Kim, CSR No. 14151
25
```