# EXHIBIT Z

**JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3

 4   JONATHAN WAYNE BOTTEN, SR.; TANIA      )
     DUDEK-BOTTEN; ANNABELLE BOTTEN; and    )
 5   J.B., a minor by and through his       )
     guardian JONATHAN WAYNE BOTTEN, SR.,   )
 6                                          )
                  Plaintiffs,              )
 7                                          )
                  vs.                       )  Case No.
 8                                          )  5:23-CV-00257-JGB-SHK
     STATE OF CALIFORNIA; COUNTY OF SAN    )
 9   BERNARDINO; ISAIAH KEE; MICHAEL        )
     BLACKWOOD; BERNARDO RUBALCAVA; ROBERT  )
10   VACCARI; JAKE ADAMS; and DOES 1-10,    )
     inclusive,                             )
11                                          )
                  Defendants.              )
12   _____)

13

14

15

16          REMOTE VIDEOCONFERENCE DEPOSITION OF

17                      ISAIAH KEE

18             TUESDAY, NOVEMBER 5, 2024

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  113704
```

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

Page 2

```
1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4    JONATHAN WAYNE BOTTEN, SR.; TANIA    )
     DUDEK-BOTTEN; ANNABELLE BOTTEN; and  )
5    J.B., a minor by and through his     )
     guardian JONATHAN WAYNE BOTTEN, SR., )
6                                         )
7                    Plaintiffs,          )
                                          )
8                    vs.                  ) Case No.
                                          ) 5:23-CV-00257-JGB-SHK
     STATE OF CALIFORNIA; COUNTY OF SAN   )
9    BERNARDINO; ISAIAH KEE; MICHAEL      )
     BLACKWOOD; BERNARDO RUBALCAVA; ROBERT )
10   VACCARI; JAKE ADAMS; and DOES 1-10,  )
     inclusive,                           )
11                                        )
                     Defendants.          )
12   _____)

13

14

15

16        The remote videoconference deposition of ISAIAH KEE,

17   taken on behalf of the Plaintiffs, beginning at 9:38 a.m.,

18   and ending at 12:39 p.m., on Tuesday, November 5, 2024,

19   before Jinna Grace Kim, Certified Stenographic Shorthand

20   Reporter No. 14151.

21

22
                  www.huseby.com      Huseby Global Litigation      800-333-2082
23

24

25
```

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

**Page 3**

```
 1    APPEARANCES OF COUNSEL:

 2

      For the Plaintiffs:
 3
              LAW OFFICES OF DALE K. GALIPO
 4            BY:  DALE K. GALIPO, ESQ.
              BY:  HANG D. LE, ESQ.
 5            21800 Burbank Boulevard, Suite 310
              Woodland Hills, California 91367
 6            Tel:  818-347-3333
              Fax:  818-347-4118
 7            E-mail:  dalekgalipo@yahoo.com
              E-mail:  hle@galipolaw.com
 8

 9    For the Defendants:

10            DEPUTY ATTORNEY GENERAL
              BY:  DIANA ESQUIVEL, ESQ.
11            1300 I Street, Suite 125
              P.O. Box 944255
12            Sacramento, California 94244
              E-mail:  diana.esquivel@doj.ca.gov
13

14            LYNBERG & WATKINS
              BY:  AMY R. MARGOLIES, ESQ.
15            1100 W. Town & Country Road, Suite 1450
              Orange, California 92868
16            E-mail:  mmargolies@lynberg.com

17

18    Also Present:  Plaintiffs (previously stated on the record)

19

20

21

22

23

24

25
```

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

0383

**JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

|  |  |  | Page 4 |
|---|---|---|---|
| 1 | INDEX | | |
| 2 | WITNESS: | | PAGE |
| 3 | ISAIAH KEE | | |
| 4 | BY: MR. GALIPO | | 5 |
| 5 | BY: MS. MARGOLIES | | 73 |
| 6 | BY: MS. ESQUIVEL | | 75 |
| 7 | BY: MR. GALIPO | | 92 |
| 8 | | | |
| 9 | EXHIBITS | | |
| 10 | MARKED FOR IDENTIFICATION | | PAGE |
| 11 | Exhibit 5 | Photograph | 17 |
| 12 | Exhibit 1 | Photograph | 26 |
| 13 | Exhibit 2 | Photograph | 26 |
| 14 | Exhibit 6 | Photograph 650 | 63 |
| 15 | Exhibit 3 | Video | 67 |
| 16 | Exhibit 4 | Cell Phone Vidoe | 69 |
| 17 | Exhibit 7 | Cell Phone Video 0241 | 70 |

18
19
20
21
22
23
24
25

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

0384

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

Page 5

```
1                       CALIFORNIA

2                  TUESDAY, NOVEMBER 5, 2024

3                       9:38 A.M.

4                  ISAIAH KEE
```

5    called as a witness on behalf of the Plaintiffs, having been

6    first duly sworn remotely via videoconference, was examined

7    and testified as follows:

```
8                       EXAMINATION
```

9    BY MR. GALIPO:

10       Q.   Can you please state your name.

11       A.   My name is Isaiah Kee, K-e-e.

12       Q.   Are you able to hear me okay so far?

13       A.   Yes, sir.

14       Q.   If you any trouble hearing me at any time, will you

15    please let me know?

16       A.   Yes, sir.

17       Q.   And as I told you off the record, I usually go about

18    an hour and take a break, but if you need to take a break for

19    any reason at any time, you let me know and we'll talk a

20    break at that time.

21            Okay;

22       A.   Yes, sir.

23       Q.   Have you reviewed any documents to help prepare for

24    the deposition?

25       A.   Yes.

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

Page 7

1    Q.    And would the MVARS video have been from one of the

2    CHP units?

3    A.    Yes, sir.

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

4    Q.    Was that the unit that belonged to Rubalcava and

5    Blackwood?

6    A.    Both.  Rubalcava and Blackwood, and they allowed me

7    to review the MVARS to my patrol cars.

8    Q.    As of the time of your initial interview, were you

9    aware of any other videos?

10    A.    Yes.  They did show another video that was taken by

11    a cell phone of a residence.

12    Q.    So before you gave your initial interview, you were

13    able to see the two MVARS videos and also the one cell phone

14    video?

15    A.    Yes.

16    Q.    Did any of those videos show on the video Mr. Puga

17    with a gun in his hand?

18    A.    No.

19    Q.    Did any of those videos actually show Mr. Puga

20    firing a gun?

21    A.    No.

22    Q.    Did any of those videos show Mr. Puga pointing a gun

23    at anyone?

24    A.    No.

25    Q.    Did you fire some rounds during this incident?

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

Page 8

1    A.    Yes.

2    Q.    What type of weapon did you fire the rounds from?

3    A.    I fired a round from my rifle.

4    Q.    How many rounds did you fire altogether if you

5    know?

6    A.    Based off the records that I read, it was 18.

7    Q.    Do you know how many rounds that particular weapon

8    holds?

9    A.    Each magazine at that time held 20.

10    Q.    Did you change magazines, or did you fire all 18

11    rounds from one magazine?

12    A.    I fired all 18 from one magazine.

13    Q.    And is that weapon a semiautomatic weapon, or was it

14    at the time?

15    A.    Yes, sir.

16    Q.    So you have to press the trigger for each shot?

17    A.    Yes, sir.

18    Q.    Did you hear any shots being fired before you fired

19    your first shot?

20    A.    I didn't hear.  I just saw muzzle flash.

21    Q.    You're saying --

22    A.    Well, let me -- I apologize.  I'm Sorry.

23          For that question, no.

24    Q.    Yeah.  I'm trying to be very specific.

25    A.    Yes, yes.

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

Page 9

1    Q.   Let me ask you again just to make sure we're on the

2    same page.

3    A.   Okay.

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

4    Q.   What I asked you is, did you hear any rounds or

5    shots being fired before your first shot?

6    A.   No.

7    Q.   Did you have the impression you were the first

8    police officer to fire?

9    A.   Yes.

10    Q.   How far were you from Mr. Puga when you fired your

11    first shot, approximately?

12    A.   About 20 to 30 feet.

13    Q.   Prior to firing your first shot did you see a

14    handgun in Mr. Puga's waistband?

15    A.   Yes.

16    Q.   And how much time would you estimate passed between

17    you seeing the handgun in his waistband and you firing your

18    first shot?

19    A.   I'll say about three seconds.

20    Q.   Did you fire your first shot as you saw Mr. Puga's

21    hands going towards the gun?

22    A.   Yes.

23    Q.   Had he touched the gun before your first shot?

24    A.   No.

25    Q.   How many shots approximately did you fire in the

**JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 10

1    first volley?

2        A.    From what I can recall, like five, five to eight

3    shots.

4        Q.    It's my understanding from reading your statement

5    that you initially fired when you saw Mr. Puga's hands moving

6    towards the handgun in his waistband; is that correct?

7        A.    Yes.

8        Q.    And are you saying in that first volley as his hand

9    was moving towards the waistband, you fired approximately

10   five to eight shots?

11       A.    Yes.

12       Q.    Would you have been aiming center mass?

13       A.    Yes.

14       Q.    Was that essentially from your perspective the

15   chest-abdomen area?

16       A.    Yes.

17       Q.    You more or less were aiming at his chest; is that

18   your recollection?

19       A.    Yes.

20       Q.    And from that distance your impression of these was

21   that you were striking him with some of your shots; is that

22   fair?

23       A.    Yes.

24       Q.    Do you recall if Mr. Puga had a shirt on or not at

25   the time?

0389

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

Page 14

1   and I graduated May of 2001.

2       Q.   And at some point you were promoted to sergeant?

3       A.   Yes.

4       Q.   And when were you promoted to sergeant?

5       A.   That was in May of 2017.

6       Q.   Do you recall the date of the incident we're here to

7   talk about?

8       A.   It was February 16 -- technically, the 17th, and

9   that was in 2021.

10      Q.   Prior to that date had you yourself in your work as

11  a law enforcement officer ever seen a suspect with a gun in

12  their hand before?

13      A.   Yes.

14      Q.   On how many occasions, approximately?

15      A.   Maybe I would say three times.

16      Q.   Were you trained that you could shoot someone merely

17  for seeing a gun in their hand, that fact alone?

18      A.   Yes.

19      Q.   How about a gun in the waistband, had you ever seen

20  that before?

21      A.   Yes -- no.  As far as on a suspect?

22      Q.   Yes.

23      A.   Yes.

24      Q.   On how many occasions, approximately?

25      A.   Maybe twice.

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

Page 16

1    Q.   Do you recall which officers appeared in that

2    particular incident?

3    A.   Yes.

4    Q.   And who were they?

5    A.   Sergeant Fredericks, Officer Lugo, Officer

6    Blackwood, and I can't recall the last officer's name because

7    he was from a different area.

8    Q.   Were you involved in the vehicle pursuit in this

9    case we're here to talk about today?

10   A.   Yes.

11   Q.   And how long was the pursuit for, approximately?

12   A.   From what I recall, it was maybe 30 minutes.

13   Q.   And during the pursuit were any shots fired, to your

14   knowledge?

15   A.   No, sir.

16   Q.   Did you see any weapon in Mr. Puga's vehicle during

17   the pursuit?

18   A.   No, sir.

19   Q.   Were you aware at some point that there were at

20   least two people in the vehicle?

21   A.   No.

22   Q.   And what street did the pursuit end on?

23   A.   It was on Peach, northbound on Peach, south of

24   Catalpa.

25   Q.   And can you spell Catalpa?

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

Page 17

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

1    A.    It's C-a-l-t-a-Baiah.

2    Q.    Thank you.

3          MR. GALIPO:  Can we, Hang, put up for the sergeant

4    Exhibit 5 from yesterday's deposition.

5          (Exhibit 5 was marked for identification.)

6    BY MR. GALIPO:

7    Q.    Are you able to see it on your screen?

8    A.    Yes.

9    Q.    And does that appear to be the general location of

10   where the shooting incident took place?

11   A.    Yes, sir.

12   Q.    Have you seen photos like this or similar photos?

13   A.    Yes.

14   Q.    The white car facing northbound on Peach furthest

15   north, would that be Mr. Puga's vehicle?

16   A.    Yes.

17   Q.    And the CHP vehicle closest to that vehicle also

18   facing northbound in the southbound lane, would that be the

19   vehicle that belonged to Rubalcava and Blackwood?

20   A.    Yes.

21   Q.    And then there is another CHP vehicle facing

22   northbound in the northbound lane.

23         Would that be your vehicle?

24   A.    Yes.

25   Q.    And the two white vehicles, to your knowledge, were

0392

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

Page 19

1    Q.   You were the only sergeant on-scene, to your
2  knowledge?
3    A.   No.  There was another sergeant from the Sheriff's
4  Department on-scene as well.
5    Q.   Do you know the name of that individual?
6    A.   No, sir.
7    Q.   At some point did a female come out of the white
8  vehicle?
9    A.   Yes.
10    Q.   And I take it for a period of time you were
11  attempting to get Mr. Puga out of the vehicle, but he was not
12  coming out of the vehicle; is that fair?
13    A.   Yes.
14    Q.   And at that point you were considering what
15  different options you had?
16    A.   Yes.
17    Q.   At some point did you consider calling in the SWAT
18  Team or the equivalent?
19    A.   Yes.
20    Q.   Did you make that request to somebody?
21    A.   Yes.
22    Q.   Who did you make the request to?
23    A.   I spoke to the Sheriff's sergeant.
24    Q.   And did you just generally inquire that you thought
25  that's something that should be considered, maybe calling

0393

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

1    Q.   Did you assign any of your officers to be

2    less-lethal, either bean bag or Taser?

3    A.   No.

4    Q.   Do you know if the sergeant for the Sheriff's

5    Department assigned anyone to be less-lethal on his side?

6    A.   That, I do not know.

7    Q.   Did you see anybody with less-lethal out at any

8    point after Mr. Puga got out of the vehicle?

9    A.   No, sir.

10   Q.   And do you have an estimate as to how long he was on

11   the driver's side of the vehicle before he went to the

12   front?

13   A.   I would say maybe about five to seven minutes.

14   Q.   And how long was he at the front of the vehicle

15   approximately before you fired your first shot?

16   A.   Maybe about eight to ten minutes.

17   Q.   You decided to approach at some point?

18   A.   Yes.

19   Q.   Prior to approaching, did you ever see any gun

20   either in his hand or in his waistband?

21   A.   No.

22   Q.   What position did you approach to relative to the

23   vehicles?

24   A.   Well, I'm trying not to confuse anyone using you

25   know tactical terms.  So I guess to keep it simple, there was

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

1   the electrical pole located on the west of Mr. Puga's

2   vehicle.  So I was in general terms -- I was making my way

3   towards that pole.

4        Q.   Okay.  Let's see if we can look at Exhibit 1 from

5   yesterday.  I think one of these exhibits might show the

6   pole.

7             (Exhibit 1 was marked for identification.)

8             MR. GALIPO:  I don't think that one shows it, but

9   put that back up for just a second, Hang.

10  BY MR. GALIPO:

11       Q.   Obviously, this is a view looking south; is that

12  correct?

13       A.   Yes.

14       Q.   And we could see Mr. Puga's vehicle, a portion of

15  your vehicle, and the other CHP vehicle?

16       A.   Yes.

17       Q.   And am I understanding you correctly, that the pole

18  you're referring to would be on the right side of this

19  photo?

20       A.   Yes.

21       Q.   Okay.

22            MR. GALIPO:  Let's look at Exhibit 2 and see if that

23  might show the pole.

24            (Exhibit 2 was marked for identification.)

25  BY MR. GALIPO:

0395

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

1  approximately before you saw the handgun in Mr. Puga's

2  waistband area?

3      A.   I would say maybe three to five seconds.

4      Q.   So a short period of time?

5      A.   Yes.

6      Q.   So just so I'm understanding you, before you got to

7  the pole, so as you're moving forward towards the pole, did

8  you observe any other officers, either CHP or Sheriffs, also

9  advancing forward?

10     A.   No.  The only person that -- that remember advancing

11 was Officer Rubalcava who was actually with me as we was

12 moving towards the pole.

13     Q.   And where was he in relation to you?

14          Were you side-by-side, or in some other

15 configuration?

16     A.   Pretty much side-by-side.

17     Q.   And do you recall if he was to your right or to your

18 left?

19     A.   To the right.

20     Q.   As you were approaching the area of the pole, could

21 you see at least a portion of Mr. Puga's body in front of the

22 vehicle?

23     A.   Yes.

24     Q.   And were there times as you were approaching the

25 pole where you saw Mr. Puga's hands up?

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

Page 30

```
1       A.   Yes.

2       Q.   And am I understanding you correctly that within

3   approximately three to five seconds of you getting to the

4   area of the pole, is when you saw the handgun in Mr. Puga's

5   right hand going down towards it?

6       A.   Yes.

7       Q.   And that would be when you fired your first volley

8   of shots?

9       A.   Yes.

10      Q.   And I think we covered this, but you did not hear

11  any shots being fired before your first shot; is that fair?

12      A.   That's correct, sir.

13      Q.   After you fired your first five to eight shots, did

14  you hear any other shots being fired?

15      A.   Yes.

16      Q.   Could you tell if any of those shots were coming

17  from law enforcement officers?

18      A.   Not really.  I just was assuming they were coming

19  from the other officers.

20      Q.   For example, Rubalcava, I think was to your -- would

21  it be to your right?

22      A.   Yes.

23      Q.   Did you have the impression he was firing at some

24  point?

25      A.   The issue is when I started firing, it just seemed
```

0397

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

1          Have you heard that concept before?

2      A.   Yes.

3          MS. ESQUIVEL:  Objection.  Vague.

4   BY MR. GALIPO:

5      Q.   Is it referred to by something other than contagious

6   fire or sympathetic fire, or you're not sure?

7      A.   Yes, it is.  I just can't think of the term right

8   now, but yes, there is another term they use for it.

9      Q.   But that's been part of your training as a law

10  enforcement officer, to try to avoid that?

11     A.   Yeah.

12     Q.   Now, at some point did you see Mr. Puga start moving

13  or running away from your position or his position?

14     A.   Yes.

15     Q.   And which direction was he running, if you know?

16     A.   Northwest.

17     Q.   And what position were you in when he started

18  running?

19          Were you in that prone position you described?

20     A.   Yes.

21     Q.   And when he was running, at some point were you

22  looking at the backside of his body?

23     A.   Yes.

24     Q.   And did you fire any shots from the prone

25  position?

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

Page 35

```
 1     A.   Yes.

 2     Q.   And how many shots would you estimate you fired from

 3   the prone position?

 4     A.   I recall three.

 5     Q.   I think -- I'm trying to remember.

 6          I think you told me in the beginning how many shots

 7   altogether you fired.

 8          Was that 18?

 9     A.   Yes.  That was the -- the 18 was the number I got

10   from the report that CHP did, but I had estimated that I only

11   fired maybe like 12, but ultimately, they told me that it was

12   18 that I fired.

13     Q.   I see.  You thought it was about 12 shots?

14     A.   Yes.

15     Q.   So do you think now that you probably fired more

16   than three shots in that second volley?

17          MS. ESQUIVEL:  Objection.  Calls for speculation.

18   BY MR. GALIPO:

19     Q.   You may answer.

20     A.   Yes.

21     Q.   What you're saying is that your estimates at the

22   time were a little bit less than what they actually found?

23     A.   That's correct.

24     Q.   And when you fired the second volley of shots, what

25   part of Mr. Puga's body were you aiming at?
```

0399

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

Page 53
JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

1   vehicle -- well, the object was to use the vehicle, for

2   cover.

3          So tactically speaking, yes, we were using his

4   vehicle as we approached as some sort of cover.

5       Q.   When you say we, you and Officer Rubalcava?

6       A.   Yes.

7       Q.   You didn't have any prior contact with Mr. Puga, did

8   you?

9       A.   No.

10      Q.   Have you ever been shown a picture of Mr. Puga

11  before the time you shot him?

12      A.   No.

13      Q.   Is part of the goal in taking someone into custody

14  to do it safely as possible?

15      A.   Yes.

16      Q.   With the least amount of force if feasible?

17      A.   Yes.

18      Q.   And safety is a concern in these situations I take

19  it for everyone, the law enforcement officers, the public,

20  and even the suspect?

21      A.   Yes.

22      Q.   And the AR-15, does that have 223 ammunition?

23      A.   Yes.

24      Q.   And you picked that particular weapon because you

25  thought it could give you a tactical advantage?

0400

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

1      A.   Yes.

2      Q.   And you described in your interview two separate

3  volley of shots; is that fair?

4      A.   Yes.

5      Q.   And how much time do you think passed between your

6  first volley where you were near the light pole and your

7  second volley after you retreated, went down into the prone

8  position and started firing?

9      A.   Maybe about five to eight seconds, I guess.

10     Q.   How far would you estimate Mr. Puga was from you

11  when you fired your second volley of shots?

12     A.   Close to maybe 50 to 60 feet in that second.

13          MR. GALIPO:   Could we put up Page 50 of the

14  interview, please, Hang, Bates stamp I think ends in 700.

15  BY MR. GALIPO:

16     Q.   Do you have training with respect to considering the

17  background or backdrop when you're firing?

18     A.   Yes.

19     Q.   And is part of that training to be careful because

20  obviously, if there is residences or businesses in the

21  background, then innocent people could get shot?

22     A.   Yes.

23     Q.   And that's a factor you're trained that should be

24  taken into consideration?

25     A.   Yes.

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

Page 60

1    Q.    What did you say?

2    A.    I told him to keep his hands up where I could see

3    them.

4    Q.    Anything else?

5    A.    Command-wise, no.  I did -- I know a couple times I

6    told him to step out under the streetlight which is the same

7    electrical pole that I pointed to before in the photo.

8          I told him to step out from in front of the vehicle

9    under the streetlight where I could see him.

10    Q.    When you -- at the time you fired your first shot,

11    could you see both of his hands?

12    A.    Yes.

13    Q.    One was up and one was moving towards the

14    waistband?

15    A.    Yes.

16    Q.    At the exact moment you fired the first shot, was

17    anything in either one of his hands?

18    A.    No.

19    Q.    Did you fire your first volley of shots in rapid

20    succession?

21    A.    Yes.

22    Q.    Do you have experience with that weapon that you

23    fired at the shooting range, the AR-15?

24    A.    Yes.

25    Q.    Is that weapon capable of firing four or five shots

**JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 76

1  So I actually responded to the scene along with two officers

2  from that particular shift.

3        I spoke to the victim, and he showed me pictures of

4  the vehicle of the suspect's vehicle which ended up being

5  Mr. Puga's vehicle.

6    Q.   And did you see -- did the victim ever show you any

7  evidence of him or his vehicle being shot during that freeway

8  road rage incident?

9    A.   Yes.  I noticed he pointed -- he directed my

10  attention to the right passenger side door, and when I

11  inspected it, it had a bullet hole in the door, and when you

12  looked on the inside of the door, the bullet penetrated

13  through the door and the passenger seat.

14    Q.   And what kind of BOLO, if any, was put out

15  following this freeway shooting?

16    A.   We pull out BOLO for a white SUV with 22 inch rims

17  that were all black, and the thing that was very distinctive

18  is the left-rear corner of the rear window, it had Funeral in

19  the left rear window.  It was a little sticker.

20    Q.   Was there any information put out about the

21  driver?

22    A.   Yes.  The victim did describe the driver as a male

23  with bald head, and so we put out the description that the

24  victim gave.

25    Q.   Was there any little of -- I don't know what you

0403

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

Page 80

1    A.    It's the perception of the officer or sergeant,

2    whoever is engaged with the person at the time.  So if a

3    person has a gun, and I'm in fear for my life, then I can use

4    deadly force to protect myself or others.

5    Q.    Now, taking this situation where you answered yes to

6    Mr. Galipo's questions, but putting it  in context of what

7    was occurring with Mr. Puga, what did Mr. Puga do that you

8    then felt that you felt justified in shooting him?

9    A.    Well, there was two major things.  One, he had

10   already -- we can't say concretely, but the vehicle was

11   involved in a shooting earlier in the freeway where a person

12   was fired upon.

13          The second thing is that in this situation I saw the

14   gun in a waistband, and it was only when he -- what I felt

15   was he was reaching for the gun, that's when I was felt that

16   he was going to possibly do serious bodily injury or even

17   death upon myself and/or my officers.

18   Q.    You testified earlier in response to Mr. Galipo's

19   questions that you observed Mr. Puga exit the vehicle.

20   A.    Yes.

21   Q.    Based on the view that you had of Mr. Puga exiting

22   the vehicle, were you able to see his waist or his

23   waistband?

24   A.    No.

25   Q.    When he was standing on the driver's side of the

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

Page 81

```
 1    vehicle which you testified was -- about five to seven
 2    minutes before he moved to the front of the vehicle, during
 3    that five to seven minutes, at any time did you -- were you
 4    able to have a view or see his waist or waistband?
 5        A.   No.
 6        Q.   Once he moved to the front of the vehicle where you
 7    said he was there for about eight to ten minutes before you
 8    first shot, during that eight to ten minutes, did he ever
 9    turn to you towards you such that you could see his waist or
10    his waistband?
11        A.   No.
12        Q.   At what point then did you first see the gun in his
13    waistband?
14        A.   Once I had moved forward of his vehicle.
15             So once I was past his vehicle, because his vehicle
16    was blocked from the waist down, so when he was standing up
17    in front of his vehicle, I could only see his chest up.
18             So once I had passed his vehicle, that's when I was
19    able to see his waistband.
20        Q.   And is this when you were still on the southwest
21    corner of the intersection?
22        A.   Yes.
23        Q.   And were you still on the dirt portion?
24        A.   Yes.
25        Q.   Once you could see his waistband, was there anything
```

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

Page 96

```
 1                        CERTIFICATE

 2                            OF

 3            CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5            I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6   Stenographic Shorthand Reporter of the State of California,

 7   do hereby certify:

 8            That the foregoing proceedings were taken before me

 9   at the time and place herein set forth;

10            That any witnesses in the foregoing proceedings,

11   prior to testifying, were placed under oath;

12            That a verbatim record of the proceedings was made

13   by me, using machine shorthand, which was thereafter

14   transcribed under my direction;

15            Further, that the foregoing is an accurate

16   transcription thereof.

17            I further certify that I am neither financially

18   interested in the action, nor a relative or employee of any

19   attorney of any of the parties.

20

21            IN WITNESS WHEREOF, I have subscribed my name, this

22   date:  November 5, 2024.

23

24            _____
              Jinna Grace Kim, CSR No. 14151
25
```

0406