# EXHIBIT AA

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

```
 1              UNITED STATES DISTRICT COURT

 2             CENTRAL DISTRICT OF CALIFORNIA

 3

 4   JONATHAN WAYNE BOTTEN, SR.; TANIA     )
     DUDEK-BOTTEN; ANNABELLE BOTTEN; and  )
 5   J.B., a minor by and through his     )
     guardian JONATHAN WAYNE BOTTEN, SR., )
 6                                         )
                 Plaintiffs,               )
 7                                         )
                 vs.                       ) Case No.
 8                                         ) 5:23-CV-00257-JGB-SHK
     STATE OF CALIFORNIA; COUNTY OF SAN    )
 9   BERNARDINO; ISAIAH KEE; MICHAEL       )
     BLACKWOOD; BERNARDO RUBALCAVA; ROBERT )
10   VACCARI; JAKE ADAMS; and DOES 1-10,   )
     inclusive,                            )
11                                         )
                 Defendants.               )
12   _____)

13

14

15

16        REMOTE VIDEOCONFERENCE DEPOSITION OF

17               BERNARDO RUBALCAVA

18             MONDAY, NOVEMBER 4, 2024

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  112646
```

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 2

```
 1                  UNITED STATES DISTRICT COURT

 2                  CENTRAL DISTRICT OF CALIFORNIA

 3

 4   JONATHAN WAYNE BOTTEN, SR.; TANJA      )
     DUDEK-BOTTEN; ANNABELLE BOTTEN; and   )
 5   J.B., a minor by and through his      )
     guardian JONATHAN WAYNE BOTTEN, SR.,  )
 6                                          )
                    Plaintiffs,            )
 7                                          )
                    vs.                    ) Case No.
 8                                          ) 5:23-CV-00257-JGB-SHK
     STATE OF CALIFORNIA; COUNTY OF SAN    )
 9   BERNARDINO; ISAIAH KEE; MICHAEL       )
     BLACKWOOD; BERNARDO RUBALCAVA; ROBERT )
10   VACCARI; JAKE ADAMS; and DOES 1-10,   )
     inclusive,                            )
11                                          )
                    Defendants.            )
12   _____)

13

14

15

16        The remote videoconference deposition of BERNARDO

17   RUBALCAVA, taken on behalf of the Plaintiffs, beginning at

18   10:06 a.m., and ending at 1:19 p.m., on Monday, November 4,

19   2024, before Jinna Grace Kim, Certified Stenographic

20   Shorthand Reporter No. 14151.

21

22

23

24

25
```

www.huseby.com          Huseby Global Litigation          800-333-2082

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 3

```
 1    APPEARANCES OF COUNSEL:

 2

      For the Plaintiffs:
 3
              LAW OFFICES OF DALE K. GALIPO
 4            BY:  DALE K. GALIPO, ESQ.
              BY:  HANG D. LE, ESQ.
 5            21800 Burbank Boulevard, Suite 310
              Woodland Hills, California 91367
 6            Tel:  818-347-3333
              Fax:  818-347-4118
 7            E-mail:  dalekgalipo@yahoo.com
              E-mail:  hle@galipolaw.com
 8

 9    For the Defendants:

10            DEPUTY ATTORNEY GENERAL
              BY:  DIANA ESQUIVEL, ESQ.
11            1300 I Street, Suite 125
              P.O. Box 944255
12            Sacramento, California 94244
              E-mail:  diana.esquivel@doj.ca.gov
13

14            LYNBERG & WATKINS
              BY:   SHANNON L. GUSTAFSON, ESQ.
15            1100 W. Town & Country Road, Suite 1450
              Orange, California 92868
16            E-mail:  sgustafson@lynberg.com

17

18

19

20

21

22

23

24

25
```

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

```
                                                              Page 4
 1                          INDEX

 2   WITNESS:                                          PAGE

 3   BERNARDO RUBALCAVA

 4      BY: MR. GALIPO                                 5

 5      BY: MS. ESQUIVEL                               76

 6      BY: MR. GALIPO                                 91

 7      BY: MS. ESQUIVEL                               98

 8      BY: MR. GALIPO                                 102

 9

10                        EXHIBITS

11   MARKED FOR IDENTIFICATION                         PAGE

12   Exhibit 1            Photograph 1561             25

13   Exhibit 2            Photograph 1570             26

14   Exhibit 3            MVARS:  COSB 001465          71

15   Exhibit 4            Civilian Cell Phone Footage 74

16

17

18

19

20

21

22

23

24

25
```

0411

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 5

```
 1                      CALIFORNIA

 2                 MONDAY, NOVEMBER 4, 2024

 3                     10:06 A.M.

 4            BERNARDO RUBALCAVA,
```

5    called as a witness on behalf of the Plaintiffs, having been

6    first duly sworn remotely via videoconference, was examined

7    and testified as follows:

8                           EXAMINATION

9    BY MR. GALIPO:

10       Q.   Can you please state your name and spell it for the

11   record.

12       A.   Bernardo Rubalcava, R-u-b-a-l-c-a-v-a.

13       Q.   Have you ever had your deposition taken before?

14       A.   For -- as far as?

15       Q.   Like in another case, for example?

16       A.   Yes.

17       Q.   How many other times have you had your deposition

18   taken?

19       A.   Once.

20       Q.   Have you testified in court before?

21       A.   Yes.

22       Q.   How many times have you done that, approximately?

23       A.   Approximately five times.

24       Q.   Are you able to hear me okay so far?

25       A.   Yes.

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 12

```
1    Q.   How old are you currently?

2    A.   39.

3    Q.   How tall are you?

4    A.   Five-eight.

5    Q.   How much do you currently weigh, approximately?

6    A.   190.

7    Q.   Was that about your approximate weight at the time

8    of the this incident?

9    A.   No.

10   Q.   You weighed less or more?

11   A.   About 185, about the same.

12   Q.   Maybe a little more?

13   A.   Just slightly less.

14   Q.   Okay.  Slightly less.

15        Now, did you fire any shots in the incident?

16   A.   Yes.

17   Q.   How many shots did you fire?

18   A.   From my recollection 10 to -- about 10 to 15.

19   Q.   What type of weapon did you fire the shots from?

20   A.   My Smith&Wesson M&P 40.

21   Q.   Is that a semiautomatic weapon?

22   A.   Yes.

23   Q.   You have to press the trigger for each shot?

24   A.   Yes.

25   Q.   So your recollection is you would have pressed the t
```

0413

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 13

1   trigger between 10 and 15 times?

2   A.   Yes.

3   Q.   How many rounds does the magazine hold on that

4   weapon?

5   A.   16.

6   Q.   Do you normally load it with one in the chamber?

7   A.   Yes.

8   Q.   So normally you would have 17 rounds altogether?

9   A.   15, plus one in the chamber.

10   Q.   So 16 altogether?

11   A.   Yes.

12   Q.   And do you know how many rounds were left in your

13   weapon after the shooting?

14   A.   No.

15   Q.   Was a round count done on your weapon, if you

16   know?

17   A.   Yes.

18   Q.   Do you know what the results of that round count

19   were?

20   A.   No.

21   Q.   Do you think that it's possible that you fired all

22   16 shots?

23        MS. ESQUIVEL:  Objection.  Calls for speculation.

24        You can answer.

25        THE WITNESS:  I reloaded after the first volley of

0414

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 17

1    during the first volley?

2            Or was he generally in the same position?

3        A.   He turned away and started running.

4        Q.   And how soon after you started firing did he turn

5    away and started running?

6        A.   Immediately.

7        Q.   So do you believe some of your shots were being

8    fired as he turned away from you and started running?

9        A.   I don't -- I don't know.

10       Q.   Okay.  Because you said he immediately turned away

11   from you and started running; correct?

12       A.   Correct.

13       Q.   So you're saying you're not sure if some of your

14   first volley of shots were fired after he turned?

15       A.   No.  It's -- as soon as he turned around and fired

16   at us, that's when I returned -- I returned fire.

17       Q.   Let me just make sure I'm understanding.

18            Did he turn away from you before you before you

19   fired your first shot?

20       A.   He turned towards us before I shot my first round of

21   shots.

22       Q.   And then you're saying you were shooting at his

23   chest-abdomen area; is that correct?

24       A.   Yes.

25       Q.   Did you have your weapon in one hand or two?

0415

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 20

1    shot?

2        A.   I don't recall.

3        Q.   In between your first shot and your last shot, did

4    you give any commands to Mr. Puga?

5        A.   No.

6        Q.   What was in your background when you were firing

7    your first group of shots at him?

8        A.   It was dark.

9        Q.   You were aware there was a residential

10   neighborhood?

11       A.   I was not aware there were houses in the

12   background.

13       Q.   Were you aware that there was a residential

14   neighborhood, though, that there were some homes somewhere in

15   the area?

16       A.   Yes.

17       Q.   You're just saying you were not aware specifically

18   there were houses in the background?

19       A.   Correct.

20       Q.   Were you trained that you have to -- you should

21   consider your background or backdrop when you fire?

22       A.   Yes.

23       Q.   And were you trained that the reason that's

24   important is because if your bullets miss, innocent people

25   could get shot?

0416

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 21

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

1    A.   Yes.

2    Q.   And do you know what your background was when you

3    fired your second group of shots?

4    A.   Yes.

5    Q.   What was it?

6    A.   Just a roadway.

7    Q.   Do you know now that your background when you fired

8    your first group of shots were some homes?

9    A.   Yes.

10   Q.   The vehicle that Mr. Puga was in, was it a white

11   vehicle?

12   A.   Yes.

13   Q.   Do you recall which way it was facing directionally

14   when it was in a stopped position?

15   A.   Facing north.

16   Q.   And then when you were firing, were you kind of

17   firing in a northeast direction for your first volley of

18   shots?

19   A.   Yes.

20   Q.   Do you know if any other officers were near you on

21   the driver's side of the vehicle when you fired your first

22   volley of shots?

23   A.   Yes.

24   Q.   What other officers were on the driver's side?

25   A.   Sergeant Kee.

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 23

1    Q.   And then are you saying that you fired your second

2    volley when Mr. Puga was running away from you?

3    A.   Yes.

4    Q.   And you were aiming at his back?

5    A.   Yes.

6    Q.   And how far do you think he was from you, meaning

7    Mr. Puga, when you started your second volley of shots?

8    A.   About 30 feet.

9    Q.   And how far do you think he was from you at the time

10   of your last shot?

11   A.   About 75 to 100 feet.

12   Q.   So was he essentially running away from you during

13   your second volley of shots?

14   A.   Yes.

15   Q.   Prior to the day of this incident with Mr. Puga, had

16   you ever seen a suspect with a gun in their hand?

17   A.   No.

18   Q.   Had you ever been present before for an

19   officer-involved shooting?

20   A.   No.

21   Q.   Were you involved in the vehicle pursuit of Mr.

22   Puga?

23   A.   Yes.

24   Q.   And do you know which vehicle you were in line

25   generally during the pursuit?

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 24

```
1       A.   The lead vehicle.

2       Q.   At some point did the vehicle pursuit end?

3       A.   Yes.

4       Q.   How long approximately would you estimate the

5   vehicle pursuit was?

6       A.   Approximately an hour.

7       Q.   During the vehicle pursuit, could you tell how many

8   individuals were in the car you were pursuing?

9       A.   Two.

10       Q.   Did it appear to be a male and female, or could you

11   tell at the time?

12       A.   I couldn't tell at the time.

13       Q.   But it appeared like two occupants?

14       A.   Yes.

15       Q.   Were any shots fired, if you know, during the

16   vehicle pursuit?

17       A.   No.

18       Q.   Did you see a weapon or anything during the vehicle

19   pursuit?

20       A.   No.

21       Q.   Do you know what road the vehicle stopped on at the

22   end of the pursuit?

23       A.   Peach.

24       Q.   I want to see if I could just show you a few photos.

25            I'll see if I could identify the Bate numbers.
```

0419

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 27

1    BY MR. GALIPO:

2        Q.    Are you able to see this image on your screen?

3        A.    Yes.

4        Q.    And does this look to be like another angle or

5    picture of Mr. Puga's white vehicle?

6        A.    Yes.

7        Q.    Obviously, it's light outside when these photos were

8    taken, but it was dark outside at the time of the shooting;

9    is that correct?

10        A.    Yes.

11        Q.    And the vehicle we see towards the middle behind and

12    offset to Mr. Puga's vehicle, that would be your vehicle?

13        A.    Yes.

14        Q.    Now, did Mr. Puga remain in your vehicle for some

15    time after the pursuit ended?

16        A.    Yes.

17        Q.    And do you have an approximation as to how long he

18    was remained in the vehicle?

19        A.    Approximately an hour.

20        Q.    And during that time frame, were you communicating

21    with other CHP officers?

22        A.    Yes.

23        Q.    And also with some Deputy Sheriffs?

24        A.    Yes.

25        Q.    Do you know if any less-lethal was used on Mr. Puga

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 39

1    Q.    What could you make out?

2    A.    I don't recall what was said. They were building

3    rapport.

4    Q.    And where were you positioned during this

5    conversation?

6    A.    Behind my driver's side door.

7    Q.    Did you hear during that time frame Mr. Puga say

8    words to the effect he was afraid of being shot?

9    A.    He did.

10   Q.    And did he say that when he was at the driver's side

11   of the vehicle or in that area?

12   A.    Yes.

13   Q.    And did you hear whether the sergeant responded to

14   that concern?

15   A.    He did.

16   Q.    What did the sergeant say, generally?

17   A.    He said, "No one's going to shoot you."

18   Q.    At some point did Mr. Puga go to the front of the

19   car?

20   A.    Yes.

21   Q.    And that would be after a few minutes that he was on

22   the driver's side?

23   A.    Yes.

24   Q.    Did Mr. Puga say why he wanted to go to the front of

25   the car?

0421

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 40

1       A.   He just ran to the front of the car after he said we

2   were going to shoot him.

3       Q.   And when he went to the front of the car, was there

4   a period of time where you saw him with his hands up?

5       A.   Yes.

6       Q.   And when he had his hands up, could you see anything

7   in his hands?

8       A.   No.

9       Q.   And for how long of a period of time did you see him

10  with his hands up?

11      A.   For a few minutes.

12      Q.   And when he had his hands up when he was in the

13  front of the vehicle, was there any discussions with the

14  other officers as to what the tactical approach was going to

15  be?

16      A.   There was a discussion with me and my sergeant, with

17  Sergeant Kee.

18      Q.   Is that kind of when you talked about earlier?

19      A.   Yes.

20      Q.   Just basically to walk up there and take him into

21  custody?

22      A.   Yes.

23      Q.   Was there any coordination or discussion at that

24  time that you were aware with the Sheriffs?

25      A.   No.

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 41

1     Q.   At some point do you know -- strike that.

2          At some point did you approach -- take him into

3     custody?

4     A.   Yes.

5     Q.   And is that when you got up to the area you talked

6     about earlier, at the left-front corner of his vehicle?

7     A.   Yes.

8     Q.   And when you were approaching, did you know if any

9     of the deputies were approaching on the passenger side of his

10    vehicle?

11    A.   I don't recall.

12    Q.   You were kind of focused on what you were doing?

13    A.   Yes.

14    Q.   And as you were approaching, did you have any cover

15    at that point?

16    A.   No.

17    Q.   And as you were approaching the front of Mr. Puga's

18    vehicle, could you see his hands up as you were

19    approaching?

20    A.   Yes.

21    Q.   Were you saying anything to him as you were

22    approaching?

23    A.   No.

24    Q.   Was your sergeant saying anything to him as you were

25    approaching?

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

1    your first group of shots?

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

2       A.   I was trained -- what we're trained.

3       Q.   Were you concerned that you might have used all of

4    your rounds?

5       A.   No.

6       Q.   Or you just wanted to make sure you had enough

7    round?

8       A.   I wanted to make sure I had enough rounds.

9       Q.   Do you know whether you fired more than five shots

10   in the first volley?

11      A.   No.

12      Q.   So five is just like your estimate?

13      A.   Yes.

14      Q.   And when you say you fired five to ten shots in the

15   second volley, do you know whether you fired more than

16   that?

17      A.   No.

18      Q.   Again, that would be your estimate?

19      A.   Correct.

20      Q.   And I think you said when you started your second

21   volley of shots, Mr. Puga was approximately 30 feet from

22   you?

23      A.   Yes.

24      Q.   And where were you positioned?

25           Still towards the front of his vehicle?

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 46

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

```
 1      A.    During the second volley, I was behind my driver's

 2   side door.

 3      Q.    You retreated to behind your door?

 4      A.    Yes.

 5      Q.    And I think you said by the end of your second

 6   volley, he might have been 75 to 100 feet from you?

 7      A.    Yes.

 8      Q.    Was there any illumination over Mr. Puga during your

 9   second volley of shots?

10      A.    No.

11            MR. GALIPO:  Okay.  I think this is a good time we

12   can take a break for about ten minutes if that's good for

13   everybody.

14            MS. ESQUIVEL:  Sounds good.

15            MS. GUSTAFSON:  That's fine.

16            MR. GALIPO:  All right.  Thank you, all.

17            (Recess taken.)

18   BY MR. GALIPO:

19      Q.    Was there any discussion as you were approaching the

20   vehicle that someone was going to tase Mr. Puga?

21      A.    No.

22      Q.    Did you know if anyone was designated as the tasing

23   officer?

24      A.    No.

25      Q.    At some point before you fired your first group of
```

0425

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 53

```
1      A.   The sergeant from the Sheriff's Department.

2      Q.   Okay.  And does that also refresh your recollection

3  that the plan was that they would approach on the passenger

4  side, and you would approach on the driver's side?

5      A.   Yes.

6      Q.   Do you know if that Taser was ever deployed?

7      A.   No.

8      Q.   And I think you've already today me this, but would

9  you agree that generally when Mr. Puga was at the front of

10  the vehicle, he had his hands up?

11      A.   Yes.

12      Q.   When he was in front of the vehicle as you were

13  approaching, did you see any weapon in his waistband at that

14  point?

15      A.   I was unable to see the waistband.

16      Q.   Was it blocked from your view in part by the car?

17      A.   Yes.

18           MR. GALIPO:  Can we show him Page 51, please,

19  Hang.

20  BY MR. GALIPO:

21      Q.   Towards the bottom starting on Line 14, you're

22  talking about he turned to right.

23           Do you see that?

24      A.   Yes.

25      Q.   And you indicate turning to the right would be
```

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 77

```
 1    that you shot the second volley?

 2        A.    One to two seconds.

 3        Q.    And on the video that we just saw of Puga is

 4    exiting the vehicle.

 5              At any time when he -- did you observe him exit the

 6    vehicle?

 7        A.    Yes.

 8        Q.    When he exited the vehicle, at any time did you have

 9    or were you able to see his front waistband?

10        A.    No.

11        Q.    Did you know that he had a gun?

12        A.    No.

13        Q.    When the -- let me back up a little bit.

14              During the pursuit, how did the pursuit start of Mr.

15    Puga's vehicle?

16        A.    We observed him exit the freeway, and we made a

17    U-turn, and he yielded on his own to the right curb.

18        Q.    How did you know that you were looking for his

19    vehicle?

20        A.    His vehicle matched the broadcast for a -- they put

21    a brief -- during our briefing to look for this vehicle which

22    was known to be a suspect of a freeway shooting.

23        Q.    And when you say briefing, are you talking about the

24    beginning of your shift?

25        A.    Yes.
```

0427

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 78

1      Q.    And what time does your shift start on February 17,

2   2021?

3      A.    10:00 p.m.

4      Q.    And tell me all that you remember as to what you

5   were told as to why you were looking for a white SUV.

6      A.    A white SUV was the suspect's vehicle of a freeway

7   shooting, and it was described as a white Ford SUV with black

8   rims, no plates, with the Funeral statement in the back, and

9   black tinted windows.

10     Q.    Were you given information as to the time of that

11   earlier freeway shooting?

12     A.    I did, but I don't recall what time it was.

13     Q.    Were you given any information about the suspect

14   that had -- was involved in the freeway shooting?

15     A.    Hispanic male, adult, heavy set, with a beard.

16     Q.    When -- you testified earlier that there was a

17   less-lethal used that included the shotgun.

18           What kind of rounds did the shotgun discharge?

19     A.    Bean bags.

20     Q.    And you said it was Sergeant Kee?

21     A.    Yes.

22     Q.    That discharged -- fired the shotgun?

23     A.    Yes.

24     Q.    Did you have any less-lethal weapons in your arsenal

25   or in your vehicle?

0428

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 79

```
 1    A.   Just my Taser.

 2    Q.   Did you have that on your person?

 3    A.   On my person.

 4    Q.   Any other less-lethal in the vehicle?

 5    A.   No.

 6    Q.   You indicated earlier that you did not warn Mr. Puga

 7  or didn't give him a verbal warning that you were going to

 8  use lethal weapon or shoot your gun at him.

 9         Did you have an opportunity to do so?

10    A.   No.

11    Q.   Why didn't you have that opportunity to warn him?

12    A.   It's within split second he pulled out his firearm

13  and shot at us.

14    Q.   And when you were approaching Mr. Puga, did you have

15  your gun out?

16    A.   Yes.

17    Q.   Did you have it pointed at him?

18    A.   Yes.

19    Q.   At any point did you holster your gun as you were

20  approaching him?

21    A.   Yes.

22    Q.   At what point did you do that?

23    A.   When he was to the driver's side of his truck, I

24  holstered my weapon because the plan was to approach him and

25  handcuff him.
```

0429

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 80

1    Q.    When you holstered your weapon, did you pull out
2    your handcuffs?

3    A.    Yes.

4    Q.    So at what point did you then unholster your gun as
5    you approached Mr. Puga?

6    A.    When he ran to the front of his vehicle.

7    Q.    So at that point why did you pull out your gun?

8    A.    To -- because of the plans changed.  We were no
9    longer going to approach to handcuff him because he was being
10   uncooperative.

11   Q.    What was it about his running to -- Mr. Puga running
12   to the front of his vehicle that then changed your plan from
13   handcuffing him to now drawing your gun again?

14   A.    He still wouldn't expose his waistband.

15   Q.    And from the view that you had of Mr. Puga as you
16   were approaching him, could you see his waistband at all?

17   A.    No.

18   Q.    What was blocking your view?

19   A.    The hood of a truck.

20   Q.    Do you -- to the best of your recollection, who
21   fired the first round during this shooting incident?

22   A.    The suspect, Puga.

23   Q.    And did you see any flashes or was it just the
24   sound that alerted you to the fact that he had pulled the
25   trigger?

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 85

1    Do you remember if you had already reached your

2    vehicle door and using it as a shield, or if you were still

3    trying to get to the car?

4        A.    Trying to get to the car.

5        Q.    And were you facing Mr. Puga as you were getting to

6    your car, or was your side facing Mr. Puga?

7        A.    I was facing Puga.

8        Q.    Is it fair to say you had -- you kept a visual on

9    Mr. Puga the entire time?

10       A.    Yes.

11       Q.    During the first and second volley?

12       A.    Yes.

13       Q.    During the time that you shot those five to ten

14   rounds during the second volley, did you ever at any point

15   see Mr. Puga drop the gun?

16       A.    No.

17       Q.    Did you ever see him make any gestures that he was

18   surrendering?

19       A.    No.

20       Q.    When you saw in the video that Mr. Puga at some

21   point went down, do you have now having reviewed the videos,

22   have any recollection as to whether you continued to shoot

23   after Mr. Puga went down to the ground?

24       A.    I don't.

25       Q.    Did you see him fall to the ground?

0431

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

1    A.    Yes.

2    Q.    Could you see at any point as to whether he dropped

3    the gun as he fell to the ground?

4    A.    No.

5    Q.    When you approached him after the incident was over

6    and you testified earlier that he was handcuffed; correct?

7    A.    Yes.

8    Q.    Who handcuffed him?

9    A.    Myself and a deputy.

10    Q.    Was the gun still in his hands when you reached the

11    location of where Mr. Puga went down?

12    A.    Yes.

13    Q.    Where exactly was it?

14    A.    It was underneath -- he was facing down, stomach

15    facing down -- he was -- he had it tucked underneath his

16    stomach.

17    Q.    Was it still in his hand, or was his body just on

18    it?

19    A.    Both hands were on his stomach as well.

20    Q.    So you couldn't tell whether or not it was actually

21    in his hand?

22    A.    No.

23    Q.    Did you still consider him an immediate threat

24    during that second volley when you fired the five to ten

25    rounds even though he was running away from you?

0432

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 106

```
 1                    CERTIFICATE

 2                        OF

 3         CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5         I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6  Stenographic Shorthand Reporter of the State of California,

 7  do hereby certify:

 8         That the foregoing proceedings were taken before me

 9  at the time and place herein set forth;

10         That any witnesses in the foregoing proceedings,

11  prior to testifying, were placed under oath;

12         That a verbatim record of the proceedings was made

13  by me, using machine shorthand, which was thereafter

14  transcribed under my direction;

15         Further, that the foregoing is an accurate

16  transcription thereof.

17         I further certify that I am neither financially

18  interested in the action, nor a relative or employee of any

19  attorney of any of the parties.

20

21         IN WITNESS WHEREOF, I have subscribed my name, this

22  date:  November 4, 2024.

23                          _____

24                          _____

25                          Jinna Grace Kim, CSR No. 14151
```

0433