1  **LAW OFFICES OF DALE K. GALIPO**
   Dale K. Galipo, Esq. (Bar No. 144074)
2  dalekgalipo@yahoo.com
   Hang D. Le, Esq. (Bar No. 293450)
3  hlee@galipolaw.com
   21800 Burbank Boulevard, Suite 310
4  Woodland Hills, California, 91367
   Telephone: (818) 347-3333
5  Facsimile: (818) 347-4118

6  Attorneys for Plaintiffs
   JONATHAN WAYNE BOTTEN, SR.,
7  TANJA DUDEK-BOTTEN, ANNABELLE BOTTEN,
   AND J.B.

8

9                  **UNITED STATES DISTRICT COURT FOR THE**

10                      **CENTRAL DISTRICT OF CALIFORNIA**

11

12  JONATHAN WAYNE BOTTEN, SR.;          Case No. 5:23-cv-00257-KK-SHK
13  TANJA DUDEK-BOTTEN;
    ANNABELLE BOTTEN; and J.B., a        *Honorable Kenly Kiya Kato*
14  minor, by and through his guardian
    JONATHAN WAYNE BOTTEN, SR.,          **PLAINTIFFS' CONSOLIDATED**
15                                       **OPPOSITION TO COUNTY**
                                         **DEFENDANTS' MOTION FOR**
16               Plaintiffs,             **SUMMARY JUDGMENT AND**
                                         **STATE DEFENDANTS' MOTION**
17        vs.                            **FOR SUMMARY JUDGMENT**
18
    STATE OF CALIFORNIA; COUNTY
19  OF SAN BERNARDINO; ISAIAH
    KEE; MICHAEL BLACKWOOD;              Date:   March 20, 2025
20  BERNARDO RUBALCAVA; ROBERT           Time:   9:30 a.m.
    VACCARI; JAKE ADAMS; and DOES        Crtrm:  3 (3rd Floor)
21  1-10, inclusive,
22
                 Defendants.
23

24

25

26

27

28

1

# **TABLE OF CONTENTS**

2

3    I.    INTRODUCTION ..................................................................................... 1

4    II.   STATEMENT OF FACTS .......................................................................... 1

5    III.  LEGAL STANDARD ............................................................................... 12

6          A.    Kee and Rubalcava Seized Plaintiffs .................................... 13

7          B.    Kee and Rubalcava Used Excessive Force ............................ 16

8          C.    Kee and Rubalcava Conduct Violated Plaintiffs' Fourteenth
                 Amendment Rights .................................................................. 22
9
           D.    Kee and Rubalcava are Not Entitled to Qualified Immunity ............... 23
10
           E.    Kee and Rubalcava are Not Entitled to Summary Judgment on
11               Plaintiffs' Battery Claim ........................................................ 25

12         F.    The Officers are Not Entitled to Summary Judgment on
                 Plaintiffs' Negligence and NIED Claims ............................... 26
13
           G.    Plaintiffs' Bane Act Claim Survives ...................................... 30
14
           H.    State Law Immunities Do Not Apply ..................................... 31
15
           I.    Plaintiffs Substantially Complied with the Government Tort
16               Claim Act ................................................................................ 32

17   V.    THE COURT SHOULD EXERCISE SUPPLEMENTAL
           JURISDICTION OVER PLAINTIFFS' STATE LAW CLAIMS ................. 33
18
     VI.   CONCLUSION ...................................................................................... 34
19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

<u>Cases</u>

*A.D. v. California Highway Patrol*,
    712 F.3d 446 (9th Cir. 2013) .................................................................... 23, 25

*Adickes v. S.H. Kress & Co.*,
    398 U.S. 144 (1970) ................................................................................... 12

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................................... 12

*Bailey v. Cnty. of San Joaquin*,
    671 F. Supp. 2d 1167 (E.D. Cal. 2009) ....................................... 15, 22, 25, 30

*Ballard v. Uribe*,
    41 Cal.3d 564 (1986) .................................................................................. 27

*Bastian v. Cnty. of San Luis Obispo*,
    199 Cal. App. 3d 520 (Ct. App. 1988) ....................................................... 26

*Boyd v. Benton Cnty.*,
    374 F.3d 773 (9th Cir. 2004) ................................................................ 22, 25

*Brendlin v. California*,
    551 U.S. 249, 254 (2007) ................................................................. 13, 14, 15

*Brower v. Cnty. of Inyo*
    489 U.S. 593 (1989) ................................................................................... 13

*Brown v. Ransweiler*,
    171 Cal. App. 4th 516 (2009) .................................................................... 25

*Bryan v. MacPherson*,
    630 F.3d 805 (9th Cir. 2010) ..................................................................... 18

*Caldwell v. Montoya*,
    10 Cal. 4th 972 (1995) ............................................................................... 31

*Campbell v. Cheathem Cnty. Sheriff's Dep't*,
    47 F.4th 468 (6th Cir. 2022) ...................................................................... 15

*Carnegie-Mellon Univ. v. Cohill*,
    484 U.S. 343 (1988) ................................................................................... 33

*City of Sacramento v. Superior Ct.*,
    131 Cal. App. 3d 395 (1982) ...................................................................... 26

*County of Sacramento v. Lewis*
    523 U.S. 833 (1998) ............................................................................. 14, 25

*Curnow By & Through Curnow v. Ridgecrest Police*,
    952 F.2d 321 (9th Cir. 1991)..................................................................19

*Daniels v. Cnty of Ventura*,
    228 Fed. App'x 669 (9th Cir. 2007)......................................................24

*Diaz v. Cnty. of Ventura*,
    512 F. Supp. 3d 1030 (C.D. Cal. 2021).................................................18

*Foster v. City of Indio*,
    908 F.3d 1204 (9th Cir. 2018)..........................................................23, 24

*George v. Morris*,
    736 F.3d 829 (9th Cir. 2013)............................................................19, 23

*Gillan v. City of San Marino*,
    147 Cal. App. 4th 1033 (2007)..............................................................31

*Gonzalez v. City of Anaheim*,
    747 F.3d 789 (9th Cir. 2014).................................................................13

*Graham v. Connor*,
    490 U.S. 386 (1989) .............................................................................17

*Green v. City of Livermore*,
    117 Cal. App. 3d 82 (1981)....................................................................27

*Harris v. Roderick*,
    126 F.3d 1189 (9th Cir. 1997)...............................................................24

*Hayes v. Cnty. of San Diego*,
    57 Cal. 4th 622 (2013)...........................................................................29

*Hughes v. Rodriguez*,
    31 F.th 1211 (9th Cir. 2022)..................................................................30

*Hulstedt v. City of Scottsdale*,
    884 F. Supp. 2d 972 (D. Ariz. 2012)......................................................22

*Huynh v. Quora, Inc.*,
    508 F. Supp. 3d 633 (N.D. Cal. 2020) ..............................................28, 29

*Lake Nacimiento Ranch Co. v. San Luis Obispo Cnty.*,
    841 F.2d 872 (9th Cir. 1987).................................................................12

*Lam v. City of Los Banos*,
    976 F.3d 986 (9th Cir. 2020).................................................................24

*LaRocca v. City of Los Angeles*,
    No. 2:22-CV-06948-SVW-PD, 2024 WL 1635908 (C.D. Cal. Mar. 14, 2024)
    ...............................................................................................................16

*Latits v. Phillips*,
    878 F.3d 541 (6th Cir. 2017)..................................................................21

PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

*Lennox v. City of Sacramento*,
    No. 2:21-CV-02075-DAD-CSK, 2024 WL 3845378 (E.D. Cal. Aug. 16,
    2024) ................................................................................................... 22, 32

*Liston v. Cnty. of Riverside*,
    120 F.3d 965 (9th Cir. 1997) ........................................................................ 12

*Lopez v. City of Riverside*,
    No. 22-55723, 2023 WL 8433959 (9th Cir. Dec. 5, 2023) .............................. 20

*Marroquin v. Unidentified LAPD Officer*
    No. 221CV07607RGKJEM, 2022 WL 17184717 (C.D. Cal. Aug. 12, 2022) 16

*Marroquin v. Unidentified LAPD Officer*
    No. 221CV07607RGKJEM, 2022 WL 18278405 (C.D. Cal. Dec. 15, 2022) 16

*Mattos v. Agarano*,
    666 F.3d 433 (9th Cir. 2011) ........................................................................ 18

*McCorkle v. City of Los Angeles*,
    70 Cal. 2d 252 (1969) ................................................................................... 31

*Michigan v. Chesternut*,
    486 U.S. 567 (1988) ...................................................................................... 14

*Monroy v. Perez*,
    No. 23-55793, 2025 WL 560233 (9th Cir. Feb. 20, 2025) ............................. 23

*Murillo v. City of Los Angeles*,
    707 F. Supp. 3d 947 (C.D. Cal. 2023) .......................................................... 21

*Ochoa v. City of Mesa*,
    26 F.4th 1050 (9th Cir. 2022) ....................................................................... 22

*People v. Brown*,
    61 Cal. 4th 968 (2015) .................................................................................. 14

*Prison Legal News v. Lehman*,
    397 F.3d 692 (9th Cir. 2005) ........................................................................ 23

*Reese v. Cnty. of Sacramento*,
    888 F.3d 1030 (9th Cir. 2018) ...................................................................... 31

*Robertson v. Cnty. of Los Angeles*,
    No. CV1602761BROSKX, 2017 WL 5643179 (C.D. Cal. Oct. 17, 2017) .... 24

*Rodriguez v. City of Fresno*,
    819 F. Supp. 2d 937 (E.D. Cal. 2011) .......................................................... 25

*Rose v. Cnty. of Plumas*,
    152 Cal. App. 3d 999 (1984) ........................................................................ 27

*S.R. Nehad v. Browder*,
    929 F.3d 1125 (9th Cir. 2019) .............................................................. 17, 18, 22

*S.T. v. City of Ceres*,
    327 F. Supp. 3d 1261 (E.D. Cal. 2018)..........................................................24

*Sanderlin v. City of San Jose*,
    No. 20-CV-04824-BLF, 2023 WL 2562400 (N.D. Cal. Mar. 16, 2023)........16

*Santos v. Gates*,
    287 F.3d 846 (9th Cir. 2002) ..........................................................................12

*Scott v. Henrich*,
    39 F.3d 912 (9th Cir. 1994)..............................................................13, 17, 19

*See Est. of Risher v. City of Los Angeles*,
    No. EDCV17995MWFKKX, 2020 WL 5377306 (C.D. Cal. July 29, 2020).21

*Sharp v. Cnty. of Orange*,
    871 F.3d 901 (9th Cir. 2017) ..........................................................................31

*Singer v. Marx*,
    144 Cal.App.2d 637 (1956) ............................................................................25

*Singh v. City of Phoenix*,
    124 F.4th 746 (9th Cir. 2024) ..................................................................17, 18

*Smith v. City of Hemet*,
    394 F.3d 689 (9th Cir. 2005) ....................................................................12, 18

*Stockett v. Ass'n of Cal. Water Agencies Joint Powers Ins. Auth.*,
    34 Cal. 4th 441 (2004) ..............................................................................32, 33

*Tarasoff v. Regents of University of California*,
    17 Cal.3d 334 (1976)......................................................................................26

*Tennessee v. Garner*,
    471 U.S. 1 (1985) ....................................................................................17, 19

*Torres v. City of Madera*,
    648 F.3d 1119 (9th Cir. 2011) ........................................................................13

*Torres v. Madrid*,
    141 S. Ct. 989 (2021) ..........................................................................13, 14, 15

*Tuggle v. City of Tulare*,
    No. 1:19-CV-01525-JLT-SAB, 2023 WL 4273900 (E.D. Cal. June 29, 2023)
    ..........................................................................................................................22

*United States v. Mendenhall*,
    446 U.S. 544 (1980) ........................................................................................14

*Weirum v. RKO General, Inc.*,
    15 Cal.3d 40 (1975)........................................................................................26

*White v. Superior Court*,
    225 Cal. App. 3d 1505 (1990)........................................................................33

*Xiong v. Chavez,*
    No. 1:13-CV-00083-SKO, 2016 WL 345609 (E.D. Cal. Jan. 28, 2016)........22

*Zion v. Cnty. of Orange,*
    874 F.3d 1072 (9th Cir. 2017)....................................................................21, 24

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

In the early morning hours of February 17, 2021, near the area of Peach Avenue and Catalpa Street in Hesperia, California, CHP Officers and San Bernardino Sheriff's Department Deputies shot at Hector Puga and in the direction of the Botten Residence, killing Puga and seriously injuring Jonathan Wayne Botten, Sr., Tanja Dudek-Botten, and J.B. Summary judgment should be denied because under Plaintiffs' facts, the officers seized Botten, Sr., Dudek-Botten, and J.B. and used excessive and unreasonable force when they shot at Puga as he turned to run, despite Puga never aggressively reaching for anything, not having anything in his hands, never pointing anything at the officers, and never shooting a weapon at the officers. Summary judgment should also be denied because the officers were negligent in their conduct and pre-shooting tactics, including failing to formulate a tactical plan despite interacting with Puga for over an hour in front of the Botten Residence, failing to follow training in dealing with barricaded subjects, including evacuating nearby innocent bystanders, and failing to consider their background in firing numerous shots at Puga.

## II.    STATEMENT OF FACTS

On February 17, 2021, CHP officers Bernardo Rubalcava and Michael Blackwood initiated a pursuit of a white Expedition due to it matching the description of a vehicle that had been involved in a prior freeway shooting, which CHP Sergeant Isaiah Kee then joined. PAMF 132-133. San Bernardino County Sheriff's Department received a call from dispatch requesting assistance with the pursuit. PAMF 134. SBSD Sergeant Robert Vaccari and Deputy Jake Adams joined the pursuit to assist. PAMF 135.

There was little to no traffic on the road and no passing pedestrians during the pursuit. PAMF 137. The Expedition never targeted any of the officers nor forced other vehicles off the road during the pursuit. PAMF 138. The Expedition's speed

during the pursuit was fast but not outrageous. PAMF 139. At some point during the pursuit, Vaccari requested SBSD's police helicopter to join the pursuit and the helicopter did join the pursuit. PAMF 140. As the pursuit continued down the dirt road, the Expedition's driving was not erratic. PAMF 141. The officers did not see any weapon in the Expedition during the pursuit. PAMF 142. Spikes strips were successfully deployed and the Expedition slowed down significantly, traveling approximately 5 to 10 miles per hour before coming to a stop at the intersection of Peach and Catalpa. PAMF 143-144.

The helicopter illuminated the middle of the intersection where the two streets cross and the four homes on the corners. PAMF 145. The house on the northeast corner, ("Botten Residence") had its porch light on and the helicopter's spotlight would occasionally illuminate the entire house while it orbited overhead. PAMF 146. There was also a streetlight on the corner of Peach and Catalpa as well as the patrol vehicles' spotlights and red and blue lights illuminating the area. PAMF 147. The officers were aware they had stopped in a residential neighborhood. PAMF 148. Blackwood, Adams, and Vaccari were aware that there were houses on each of the four corners of the intersection. PAMF 149. Kee never considered evacuating the people in the nearby homes nor did he ever discuss it with the SBSD deputies. PAMF 150. Vaccari never considering alerting the nearby residences of potential harm or evacuating the people in the homes on the four corners of the intersection. PAMF 151.

The officers had never seen Puga before and did not have any specific knowledge regarding Puga's criminal history. PAMF 153. The officers did not have any specific information that Puga had injured anyone. PAMF 154. The officers did not have any specific information as to whether Puga was under the influence of drugs or alcohol. PAMF 155.

The officers attempted to get Puga out of the vehicle but he was not coming out. PAMF 156. Kee considered calling in SWAT because SWAT sometimes comes

out for barricaded suspects, and spoke to Vaccari about it. PAMF 157-158. Kee does not know whether Vaccari actually called to inquire about SWAT. PAMF 160. Kee was told that SWAT would not come out for something of this nature. PAMF 159. Vaccari did not have his cell phone to call SWAT because he had forgotten it at the station and claims he told Kee this. PAMF 161-162. Vaccari has dealt with barricaded suspects in homes before and has called SWAT to come assist with those suspects, and in response SWAT would either give suggestions or advice or they would come out. PAMF 163-164. There were also times when SWAT would give suggestions or advice and when Vaccari recontacted them, SWAT would come out. PAMF 165. Vaccari does not know what SWAT's criteria was in order for them to come out for a barricaded suspect. PAMF 166. If SWAT had responded, Kee would have let them handle the situation. PAMF 167.

The officers never developed a tactical plan. PAMF 168. Approximately 120 to 150 pepper balls were deployed into the Expedition over a period of 30 to 45 minutes to try to get Puga to come out. PAMF 169, 173. After deploying the pepper balls for approximately 30 minutes, Vaccari thought about contacting SWAT by having Dispatch send their phone number to his screen and using someone else's phone. PAMF 176. Instead, Vaccari decided to intentionally hit Puga with pepper balls to try to motivate Puga with pain to come out. PAMF 177. Vaccari deployed pepper balls and struck Puga in the right eye. PAMF 179-180.

Puga eventually exited the vehicle from the driver's side. PAMF 181. The officers never formulated a tactical plan for what to do once Puga exited the vehicle. PAMF 189. The officers were treating Puga as if he had a firearm when Puga was outside of the vehicle. PAMF 182, #. Puga was shirtless and had on a pair of baggy pants when he. PAMF 183, 192. Puga did not appear to have a gun or weapon in his hand, waistband, or pocket when he exited the vehicle and while he was standing at the driver's side. PAMF 184, 188. Puga stood near the driver's side of the car for a period of time and during that time, the officers were able to see Puga's hands and

his hands were raised for the majority of that time. PAMF 185-186. Puga did not have anything in his hands and he never reached for any weapon. PAMF 187. While Puga was standing at the driver's side of the vehicle, there was no discussion about a tactical plan. PAMF 190.

While Puga was next to the driver's side, he would at times raise his hands and then lower them back down. PAMF 193. Puga was continually reaching down to pull up his pants. PAMF 194. Puga expressed concerns to the officers that he thought the officers were going to shoot him. PAMF 195. He sounded scared of being shot by police. PAMF 196. Puga then said something about hearing a click and being afraid that somebody was getting ready to shoot him and walked to the front of the Expedition. PAMF 197-198.

After Puga went to the front of the vehicle, the officers still did not discuss any tactical plan. PAMF 199. Puga had his hands up while he was positioned near the front of the Expedition and did not have anything in his hands. PAMF 200-201. He would occasionally drop his hands to pull up his pants. PAMF 202. A bystander cellphone video shows Puga with his hands up and briefly dropping his right hand to his waistband to adjust his pants before raising his hand up again, twice. PAMF 203.

Kee and Rubalcava decided to approach Puga to take him into custody. PAMF 204. They did not coordinate with the SBSD Sheriffs' deputies regarding any plan to approach and take Puga into custody. PAMF 205. As Kee and Rubalcava were approaching Puga, they did not have any cover. PAMF 206. They were also not aware that Vaccari and Adams were also approaching Puga. PAMF 207.

When Vaccari saw Kee and Rubalcava move towards the shoulder of Peach Street, he thought they were moving to just get a better view of Puga, not to approach Puga. PAMF 209. The only cover Vaccari and Adams had when moving up was the passenger's side of Puga's vehicle. PAMF 211. As Vaccari approached from the dirt shoulder, he did not have any cover. PAMF 213.

Kee claims he could not see Puga's waistband while Puga was standing in front of the vehicle and could only see Puga's waistband once he moved past the front of Puga's vehicle. PAMF 218. However, there was an electrical pole on the southwest corner of the intersection that was parallel to the back passenger doors of the Expedition and in Erin Mangerino's video of the incident, moments before the shooting, two figures can be seen standing without cover in the street, partially obscured by the electrical pole before backing away in a southern direction, away from the pole, and out of frame. PAMF 214-215. Mangerino was unable to see any officers standing on her side of Peach Street. PAMF 216.

As soon as Puga turned to run, officers shot at Puga. PAMF 219. Puga never grabbed or aggressively reached for anything. PAMF 220. Puga never had a gun in his hand and never pointed his hand or a weapon in any specific direction or at any officer. PAMF 221-222. Puga never fired a weapon at any officer. PAMF 223. None of the videos capturing the incident show Puga with a gun in his hand, pointing a gun at anyone, or firing a gun. PAMF 225-227. Neither smoke nor any muzzle flash ever came from Puga. PAMF 224, 228.

As Puga was running, he never turned around to look at the officers. PAMF 229. Witness Betzabeth Gonzalez saw Puga's waistband when he turned to take off running and never saw a gun in his waistband. PAMF 230. While Puga was running, his hands were moving in a running motion. PAMF 231. None of the videos that captured the shooting ever show Puga turn back towards the officers or point his hand back towards the officers. PAMF 232.

When Puga reached the northwest corner, he changed directions and started running north instead of towards the house on the corner. PAMF 233. Puga then fell forward onto his chest and stomach and onto the ground with his hands beside him on the northwest shoulder near the southbound lane, some distance from the northwest corner. PAMF 234. There was no gun in either of Puga's hands immediately after Puga went to the ground. PAMF 236-237. Puga did not pose a

threat to anyone after falling to the ground and appeared incapacitated. PAMF 238. Several shots were fired at Puga after he fell to the ground, including two volleys from two different firearms that were fired after a brief pause. PAMF 239-240. At no time did anyone provide a verbal warning that deadly force was going to be used. PAMF 294. Puga sustained multiple gunshot wounds to the back of his body with back-to-front trajectories, and some with upward trajectories. PAMF 241. The upward trajectory is consistent with Puga leaning forward or falling forward when he sustained those gunshot wounds. PAMF 242.

Kee was the first officer to shoot and did not hear any shots fired before he fired his first shot. PAMF 243. Kee claims he fired two volleys of shots; one volley of 5 to 8 shots while Puga at the front of the vehicle and another volley of 10 to 13 shots at Puga's backside while Puga was running in a northwest direction. PAMF 244. When Kee fired his first shot, he could see both of Puga's hands and Puga did not have a gun in his hand. PAMF 245-246. Kee was trained to consider his background or backdrop when firing because if there are residences or businesses in the background, innocent people could get shot. PAMF 247. Kee was aware that there were residences in Puga's background when Kee was firing both volleys. PAMF 248. After the first volley, Kee retreated to the dirt shoulder parallel to the side of the CHP vehicle and went down prone. PAMF 249. Kee did not keep a visual on Puga while he was repositioning and had his back turned to Puga. PAMF 251-252. Approximately 5 to 8 seconds elapsed between Kee's first volley and when he started firing his second volley. PAMF 253.

Rubalcava heard two shots being fired before he fired his first shot. PAMF 257. Rubalcava was firing in a northeast direction during his first volley. PAMF 265. Rubalcava was side by side and to the right of Kee while they were approaching and when Kee started firing. PAMF 258. Puga was near the front of the vehicle when Rubalcava fired his first volley. PAMF 259. Rubalcava claims he fired approximately 5 shots during his first volley and 5 to 10 shots during his second

volley. PAMF 261. There was an approximately 5 to 10 second pause between Rubalcava's first volley and second volley. PAMF 266. Rubalcava was trained to consider his background when he shoots because if his bullets miss, they may hit innocent people. PAMF #. Rubalcava claims would not have shot as many shots if he had known there was a home in the northeast corner at the time of the shooting. PAMF 262. Puga was running away and Rubalcava was aiming at Puga's back during Rubalcava's second volley. PAMF 268-269. When asked during his interview with detectives after the incident as to what caused Rubalcava to fire his second volley, Rubalcava answered that Puga was still fleeing but that Puga was not doing anything with any alleged weapon. PAMF 270. Rubalcava does not know whether he fired shots at Puga after Puga went to the ground. PAMF 272. Based on Rubalcava's training, if Puga had not pointed a gun at Rubalcava, Rubalcava would not have shot. PAMF 274.

Blackwood heard approximately 2 to 3 shots coming from his left before he fired and Kee and Rubalcava were to Blackwood's left. PAMF 275. Puga had just cleared the front of the vehicle when Blackwood started firing. PAMF 277. Blackwood was firing at Puga's left side while Puga was hunched over as if he had been struck by gunshots. PAMF 278. Blackwood was aiming at Puga's back while Puga was running away. PAMF 280. Blackwood was trying to assess while he was firing by looking for a gun but could not see Puga's hands and therefore never saw Puga with a gun while Puga was running away. PAMF 281. Blackwood fired ten shots during his first volley, paused when he saw Puga stumble, and then fired ten more shots when Puga caught himself and continued to run. PAMF 283-284. During the time Blackwood was shooting at Puga, Blackwood could not see Puga's hands. PAMF 286. Blackwood is not sure whether he fired any shots at Puga while Puga was going to the ground. PAMF 287.

When Adams approached the vehicle, Puga was standing in the front close to the driver's side headlight and Adams could only see Puga from chest up. PAMF

289. As Adams was approaching, he heard shots. PAMF 290. Adams and Vaccari had only reached the part where the painted curb meets the unpainted curb when the shots started, which is near the rear door of the Expedition. PAMF 291. One of Adams' concern with being in a residential neighborhood was innocent people being struck due to the number of shots fired. PAMF 293. Vaccari remained on target with the 40-millimeter as Puga ran away and later dropped the 40-millimeter and unholstered his firearm but did not use it because Puga was going down or already down. PAMF 295.

The Botten family, consisting of father Jonathan Wayne Botten, Sr., mother Tanja Dudek-Botten, daughter Annabelle Botten, and son J.B., were inside their house, on the northeast corner of the intersection, when the shooting happened. PAMF 292-298. There was a lot of police presence surrounding the Botten Residence, including the helicopter flying overhead and police cars with flashing lights in front of and in the back of the house. PAMF 299. Dudek-Botten believed they could not leave the house due to the police presence outside. PAMF 300. Botten, Sr. heard Kee communicating with Puga through the loudspeaker and with verbal commands while Puga was inside the vehicle. PAMF 301. When the shooting started, Botten, Sr. fell back into the house and onto the ground and felt a throbbing to his right arm. PAMF 302. Botten, Sr. then heard his wife screaming, saw blood all over her face and body, and heard his wife say that she had been shot in the face. PAMF 303. Botten, Sr. then exited the front door and into the front yard, yelling at the CHP officers, cursing at them and telling them that his family had been shot and needed help. PAMF 304. Botten, Sr. then yelled at the SBSD Sheriff's Deputies for help and told them to jump the fence and come over and help. PAMF 305. Botten, Sr. then brought his wife out to sit on the bench in the front yard and ran back into the house to grab towels for the officers. PAMF 306. J.B. then walked outside holding his left side and told Botten, Sr. that he could not breathe and believed that he had also been shot. PAMF 307.

1    J.B. sustained three gunshot wounds to his chest that resulted in a collapsed

2  lung on his left side, a ruptured spleen, and damage to his internal organs, requiring

3  surgery and a hospital stay. PAMF 308-310. Dudek-Botten sustained gunshot

4  wounds to her face, chest, and right shoulder. PAMF 311. Botten, Sr. sustained

5  gunshot wounds to his right arm, left arm, left hand, and right leg. PAMF 312. He

6  later told by a doctor that one of his gunshot wounds was caused by a 40 or 45-

7  caliber bullet. PAMF 313. There were bullet strikes to the front of the Botten

8  residence, the screen door of the residence, one of the bedroom windows, and the

9  side of the residence. PAMF 314.

10    Plaintiffs' police practices expert, Roger Clark, opined that the officers'

11  failure to follow standard police practices and training in dealing with barricaded

12  subjects, poor tactics, and rushing to take Puga into custody once he was outside of

13  the vehicle all contributed to the officers' unnecessary use of lethal force and the

14  injuries to Puga, Jonathan Wayne Botten, Sr., Tanja Dudek-Botten, and J.B. PAMF

15  315-317. The officers failed to formulate a safe tactical plan, made poor tactical

16  decisions, and limited their tactical options, ultimately leading to their unnecessary

17  use of lethal force. PAMF 318.

18    POST advises officers that if available, officers should request specialized

19  units and resources as soon as it has been determined that the suspect has taken a

20  barricaded position. PAMF 319. SWAT specifically trains to respond to incidents

21  where subject(s) may be armed, barricaded, and refusing to submit to arrest. PAMF

22  320. Clark opined that given that the officers believed that Puga was involved in a

23  prior freeway shooting, was still armed, was refusing to exit his vehicle, and was

24  situated in a residential neighborhood, Vaccari's failure to request for SWAT to

25  respond when initially requested by Kee and after initial less-lethal force was

26  unsuccessful were poor tactical decisions that contributed to the officers' use of

27  unnecessary lethal force. PAMF 321-322.

28

1    POST advises that some of the "fatal errors" officers commit are poor

2    positioning due to rushing or poor tactics. PAMF 323. The officers' decision to

3    leave cover and enter an open-air environment to take Puga into custody, when the

4    officers stated that they still believed Puga to be armed and dangerous, and Kee

5    stated that he was in fear for his life at the time he made the decision to approach

6    and take Puga into custody, was a tactically poor decision. PAMF 324. The situation

7    did not call for an urgent response at the time the officers approached Puga. PAMF

8    325.

9    Officers are trained that deadly force is only justified when there is an

10    objectively reasonable belief that the suspect poses an immediate threat of death or

11    serious bodily injury that an overreaction is excessive force. PAMF 326-328. Under

12    the facts as alleged by Kee at the time he initially shot Puga, Kee violated standard

13    police practices and training when he shot at Puga when he saw Puga drop his right

14    hand from a raised position. PAMF 329. Kee overreacted when he saw Puga drop

15    his right hand from a raised position. PAMF 330.

16    Rubalcava, Blackwood, Kee, and Adams violated standard police practices

17    and training when they shot at Puga while he was running away. PAMF 332. Puga

18    did not present an immediate threat of death or serious bodily injury as he was

19    running and the officers failed to reassess and overreacted when they fired

20    subsequent volleys when Puga was running. PAMF 333. There was no immediate

21    defense of life situation while Puga was running away. PAMF 334-335. Officers are

22    trained that they may use deadly force against a fleeing suspected felon to prevent

23    escape only if the officer has probable cause to believe that the suspect poses a

24    significant threat of death or serious physical injury to the officers or others. PAMF

25    337. There were no bullet impacts or casings found near the area of the initial

26    shooting that would support the allegation that Puga fired a weapon at anyone.

27    PAMF 336. There is evidence that this was likely a situation of contagious fire.

28    PAMF 338. Officers had time to provide Mr. Puga with a warning that deadly force

1  was going to be used prior to the shooting but failed to follow their training to do so.
2  PAMF 339-340.

3       A reasonable officer facing the facts and circumstances confronting the
4  involved officers knew or should have known that there were innocent bystanders
5  inside the residential homes surrounding the incident location in the middle of the
6  night. PAMF 343. A reasonably trained officer facing the same facts and
7  circumstances would understand that the officers' intentional shooting in the
8  direction of the Bottens' residence would cause a reasonable person in the Bottens'
9  position to believe that they were not free to leave their property while the officers
10 were apprehending Puga in front of the Botten home and that the officers intended
11 to restrain their freedom of movement while attempting to apprehend Puga. PAMF
12 341. A reasonably trained officer facing the same facts and circumstances as the
13 involved officers would understand that the officers' ongoing flashing lights,
14 commands, and deployments of force, would cause a reasonable person residing in
15 the nearby residences to believe that they were not free to leave their residence.
16 PAMF 342-343.

17      Rubalcava and Kee violated standard police practices and training when they
18 failed to consider their background prior to utilizing deadly force. PAMF 345. Kee
19 and Rubalcava failed to follow their training and consider their background prior to
20 and when they fired several volleys of shots at Puga. PAMF 346-347. Kee and
21 Rubalcava's failure to consider their background prior to using deadly force resulted
22 in the serious injuries of Botten, Sr., Dudek-Botten, and J.B., who were inside their
23 home at the time of the shooting. PAMF 348.

24      The officers violated standard practices and training in failing to request
25 backup to set up a perimeter and evacuate uninvolved individuals from the area in
26 order the ensure the safety of these uninvolved individuals. PAMF 349. POST
27 advises officers that the safety of uninvolved individuals must be the principal
28 concern to officers who respond to high-risk situations involving barricaded

1  suspects. PAMF 350. The officers' failure to follow standard practices and training

2  in responding to high-risk, barricaded suspects by requesting backup, setting up a

3  perimeter, and evacuating all uninvolved individuals from the area contributed to the

4  injuries suffered by the Botten family. PAMF 351. A reasonably trained officer

5  facing the same circumstances would have followed their training to ensure the

6  safety of all uninvolved individuals in the area. PAMF 352.

7  **III.    LEGAL STANDARD**

8         In ruling on a motion for summary judgment, the court must view the

9  evidence and draw all reasonable inferences therefrom in the light most favorable to

10  the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970);

11  *Lake Nacimiento Ranch Co. v. San Luis Obispo Cnty.*, 841 F.2d 872, 875 (9th Cir.

12  1987). Even where the basic facts are undisputed, summary judgment should be

13  denied if reasonable minds could differ on the inferences to be drawn from those

14  facts. *Adickes*, 398 U.S. at 158-59; *Lake Nacimiento Ranch Co.*, 841 F.2d at 875.

15  "Credibility determinations, the weighing of the evidence, and the drawing of

16  legitimate inferences from the facts are jury functions, not those of a judge..."

17  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

18         "Because [the excessive force inquiry] nearly always requires a jury to sift

19  through disputed factual contentions, and to draw inferences therefrom, [the Ninth

20  Circuit] held on many occasions that summary judgment or judgment as a matter of

21  law in excessive force cases should be granted sparingly." *Santos v. Gates*, 287 F.3d

22  846, 853 (9th Cir. 2002); *accord Liston v. Cnty. of Riverside*, 120 F.3d 965, 976

23  n.10 (9th Cir. 1997) (as amended) ("We have held repeatedly that the

24  reasonableness of force used is ordinarily a question of fact for the jury."). "This is

25  because such cases almost always turn on a jury's credibility determinations." *Smith*

26  *v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005). Thus, "[t]he [court] must

27  carefully examine all the evidence in the record . . . and the available physical

28  evidence, as well as any expert testimony proffered by the plaintiff, to determine

whether the officer's story is internally consistent and consistent with the known facts." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994); *accord Gonzalez v. City of Anaheim*, 747 F.3d 789, 794-95 (9th Cir. 2014) (en banc). This includes "circumstantial evidence that, if believed, would tend to discredit the police officer's story." *Scott*, 39 F.3d at 915. Courts do "recognize that police officers are often forced to make split-second judgments" but "[n]ot all errors in perception or judgment . . . are reasonable." *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011) (internal quotation marks and citation omitted). While courts "do not judge the reasonableness of an officer's actions 'with the 20/20 vision of hindsight,' nor does the Constitution forgive an officer's every mistake." *Id*.

## IV.   ARGUMENT

### A. Kee and Rubalcava Seized Plaintiffs

Plaintiffs need not show that they were the intended targets of Defendants Kee and Rubalcava's use of force or show of authority that terminated their movement or that the CHP Defendants directed their use of force at Plaintiffs.

> A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority terminates or restrains his freedom of movement, *through means intentionally applied*. Thus, an unintended person may be the object of the detention, so long as the detention is willful and not merely the consequence of an unknowing act.

*Brendlin v. California*, 551 U.S. 249, 254 (2007) (cleaned up) (emphasis in original); *see Brower v. Cnty. of Inyo*, 489 U.S. 593, 596 (1989) ("A seizure occurs even when an unintended person or thing is the object of the detention or taking…[t]his is implicit in the word 'seizure,' which can hardly be applied to an unknowing act"); *Torres v. Madrid*, 141 S. Ct. 989, 998 (2021) ("A seizure requires the use of force with intent to restraint."). Indeed, the Supreme Court in *Brendlin* rejected the proposition that a seizure requires that the person be the target of an officer's show of authority. *See* 551 U.S. at 260-61. In doing so, the Supreme Court

distinguished the facts of *County of Sacramento v. Lewis*, 523 U.S. 833 (1998), in
which the Supreme Court held that no seizure took place, reasoning that when the
officer *accidentally* ran over a passenger who had fallen off a motorcycle during a
high-speed chase, the officer did not seize the passenger "through means
intentionally applied.". *Id.* at 261. Thus, the appropriate inquiry as to whether an
application of force constitutes a seizure is whether the conduct "*objectively*
manifests an intent to restrain" and neither the subjective intent of the police officers
or the subjective perceptions of the seized person are relevant under this inquiry.
*Torres*, 141 S. Ct. at 998-999.

Here, Plaintiffs were once when the officers surrounded their house with
flashing red and blue lights and issued commands, and again when Kee and
Rubalcava shot at the Botten residence and struck Botten, Sr., Dudek-Botten, and
J.B. Neither of these seizures were accidental nor unintentional. Kee and Rubalcava
intentionally activated their flashing red and blue lights while pursuing Puga and
continued flashing their red and blue overhead lights while in front of the Botten
Residence. The Botten Residence was surrounded by police presence and flashing
lights. "The Supreme Court has long recognized that activating sirens or flashing
lights can amount to a show of authority" for the purposes of a seizure. *People v.
Brown*, 61 Cal. 4th 968, 978 (2015) (citing *Michigan v. Chesternut*, 486 U.S. 567,
575 (1988)). As a result of the police presence, flashing lights, display of weapons,
and subsequent commands issued by Kee, the Bottens remained inside their house
and did not feel free to leave. "[W]hen an individual's submission to a show of
governmental authority takes the form of passive acquiescence[,]" "a seizure occurs
if 'in view of all of the circumstances surrounding the incident, a reasonable person
would have believed that he was not free to leave." *Brendlin*, 551 U.S. at 255 (citing
*United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). In *Brendlin*, the Supreme
Court held that the passenger of a car was seized when the car stopped on the side of
the road in response to a police car's flashing lights because the passenger submitted

to the officer's show of authority by remaining inside the vehicle. 551 U.S. at 260, 262, 263. Similarly, when the Bottens saw the officers' patrol vehicles' flashing lights surrounding their house, saw Kee and Rubalcava with their guns drawn in front of their home, and remained inside their house as a result of it, they submitted to Kee and Rubalcava's show of authority. *See Bailey v. Cnty. of San Joaquin*, 671 F. Supp. 2d 1167, 1173 (E.D. Cal. 2009) (reasonable jury could find that plaintiffs were seized because they were aware that police officers were surrounding their home and saw defendant officer at the front door with his gun drawn).

Botten, Sr., Dudek-Botten, and J.B. were again seized when Kee and Rubalcava shot at their house, with them inside it, and struck them with gunshots. In *Campbell v. Cheathem Cnty. Sheriff's Dep't*, 47 F.4th 468 (6th Cir. 2022), the Sixth Circuit held that a husband and wife who were inside their home were seized when the officer repeatedly fired at their front door and the husband and wife submitted to the officer's show of authority by remaining inside their home. 47 F.4th at 477. The Sixth Circuit reasoned that it made no difference that the officer did not know that the wife was inside the home, "[b]y shooting at the house, [the officer] seized everyone inside." 47 F.4th at 478. Additionally, the Sixth Circuit found that the husband's subsequent actions of exiting the house, yelling profanities, and going out into his yard was a "limited range of movement" and were "of little use in determining whether the Campbells were seized at the time Fox fired his weapon, because a seizure is 'a single act, and not a continuous fact,' and an individual may be seized for a brief time despite later demonstrating freedom of movement." 47 F.4th at 477-78 (citing *Torres*, 141 S.Ct. at 1002). Here, Botten, Sr., Dudek-Botten, and J.B. were seized when Kee and Rubalcava shot at their house and front door and the Bottens submitted to Kee and Rubalcava's show of authority by briefly remaining inside their home before Botten, Sr. exited the house to seek help for his wife.

PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Applying *Brendlin*, *Nelson, Brower*, and *Torres*, district courts have held that an unintended innocent bystander is seized for the purposes of the Fourth Amendment so long as the use of force was an intentional act. *See LaRocca v. City of Los Angeles*, No. 2:22-CV-06948-SVW-PD, 2024 WL 1635908, at *1, 4 (C.D. Cal. Mar. 14, 2024) (an innocent bystander who was indisputably not the target of the officer's use of force was seized because "there is a seizure as long as the officer (a) uses force, (b) with intent to restrain *a* person's body (even if that person is not the plaintiff)."); *Sanderlin v. City of San Jose*, No. 20-CV-04824-BLF, 2023 WL 2562400, at *8 (N.D. Cal. Mar. 16, 2023) (plaintiffs "need not prove that they were the intended targets of those shots" so long as there is evidence the shots were intentional); *Marroquin v. Unidentified LAPD Officer*, No. 221CV07607RGKJEM, 2022 WL 17184717, at *3 (C.D. Cal. Aug. 12, 2022) ("*Marroquin I*") ("an unintended person may bring a claim, so long as the police action was not the consequence of an unknowing act"); *Marroquin v. Unidentified LAPD Officer*, No. 221CV07607RGKJEM, 2022 WL 18278405, at *3 (C.D. Cal. Dec. 15, 2022) ("*Marroquin II*") ("An officer need not intentionally aim at a specific person in order to seize that person for Fourth Amendment purposes"). Here, it is undisputed that Kee and Rubalcava intentionally discharged their firearms with the intent to restrain Puga. In shooting at Puga, Kee and Rubalcava also shot Botten, Sr., Dudek-Botten, and J.B. Accordingly, under Supreme Court precedence, Botten, Sr., Dudek-Botten, and J.B. were seized when they were struck be Kee and Rubalcava's gunfire.

B. <u>Kee and Rubalcava Used Excessive Force</u>

"[I]f the underlying force was unlawful, then it does not matter whether that force strikes the suspect or the innocent-bystander-turned plaintiff." *LaRocca*, 2024 WL 1635908, at *6. The fact that the use of force struck an innocent bystander only absolves the officer of his shooting was lawful. *Id.*

A constitutional claim for excessive force is evaluated through the Fourth Amendment's reasonableness standard, considering "whether the officers' actions [we]re 'objectionably reasonable' in light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397 (1989).The inquiry into the reasonableness of an officer's use of force "requires the careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 at 396. "The intrusiveness of a seizure by means of deadly force is unmatched." *Garner*, 471 U.S. at 9. Government interest factors to balance against the type of force used include "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 at 396 In the context of deadly force, the force is reasonable only "if the officer has probable cause to believe the suspect poses a significant threat of death or serious physical injury to the officers or others." *Scott*, 39 F.3d at 914 (quoting *Garner*, 471 U.S. at 3).

Even when a suspect has previously committed a serious crime, "a jury could discount the severity of the suspect's purported crimes when the suspect is indisputably not engaged in felonious conduct when the officer arrives." *Singh v. City of Phoenix*, 124 F.4th 746, 752 (9th Cir. 2024) (cleaned up) (citing *S.R. Nehad v. Browder*, 929 F.3d 1125, 1136 (9th Cir. 2019)). Here, Puga was indisputably not engaged in any shooting or felony when Blackwood and Rubalcava first attempted to pull Puga over and under Plaintiffs' facts, Puga was not engaged in any felonious conduct when Kee and Rubalcava shot Puga with their first volley of shots since Puga had not aggressively reached for anything, did not have a gun in either hand, did not point anything at anyone, did not shoot at anyone, and had turned to run away when the shooting began. Accordingly, the alleged crimes do not support the use of deadly force. *See S.R. Nehad*, 929 F.3d at 1136 (a jury could conclude that

-17-

5:23-cv-00257-KK-SHK

the suspect's already completed felony of "threatening with a weapon" did not render the officer's use of deadly force reasonable because the suspect was not engaged in any such conduct when the officer arrived or when he fired his weapon); *Diaz v. Cnty. of Ventura*, 512 F. Supp. 3d 1030, 1044 (C.D. Cal. 2021) (although the suspect had led the officers on a high-speed chase, the crime was long over at the time he was shot and therefore did not support the use of deadly force).

Because "[r]esistance . . . should not be understood as a binary state, with resistance being either completely passive or active[, r]ather, it runs the gamut from the purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer," the nature of any resistance should be viewed in light of the particular facts of the case. *Bryan v. MacPherson*, 630 F.3d 805, 830 (9th Cir. 2010). In *Smith v. City of Hemet*, the Ninth Circuit held that the plaintiff's refusal to comply with commands to remove his hands from his pockets and place them on his head and his reentry into his home despite officers' ordering otherwise were "not…particularly bellicose." 394 F.3d at 703. In *Singh v. City of Phoenix*, the Ninth Circuit held that the plaintiff's refusal to follow commands, which constituted less than active resistance, did not warrant the use of deadly force. 124 F.4th at 753-54. In *Diaz v. County of Ventura*, the district court found this factor did not weigh in favor of the officers' use of deadly force because at the time of the shooting, the suspect's only resistance was refusing to obey commands to surrender. 512 F. Supp. 3d at 1044. Similarly, Puga's only resistance was his refusal to surrender and subsequent refusal to follow commands to walk backwards towards the officers. Under Plaintiffs' facts, he was not actively resisting nor physically assaulting any of the officers at the time of the use of force.

The most important *Graham* factor is whether the suspect posed an immediate threat to anyone's safety." *S.R. Nehad*, 929 F.3d at 1132 (citing *Mattos v. Agarano*, 666 F.3d 433, 441 (9th Cir. 2011)). Deadly force is reasonable only "if the officer has probable cause to believe the suspect poses a significant threat of death or

serious physical injury to the officers or others." *Scott*, 39 F.3d at 914 (quoting *Garner*, 471 U.S. at 11.). "In cases where the best (and usually only) witness who could offer direct testimony for the plaintiff about what happened before the shooting has died, [the Ninth Circuit's] precedent permits the decedent's version of events to be constructed circumstantially from competent expert and physical evidence, as well as from inconsistencies in the testimony of law enforcement." *George v. Morris*, 736 F.3d 829, 834 (9th Cir. 2013).

Here, while outside of the car, Puga reached down to his waistband several times to adjust his pants. He did so while standing next to the driver's side of the vehicle and while standing in front of the vehicle. Moreover, Betzabeth Gonzalez, who observed Puga reach down several times to adjust his pants, testified that she never saw Puga aggressively reach for anything prior to the shooting and did not see any gun visible in Puga's waistband. Several witnesses testified that they never saw Puga with a gun in his hand when the shooting started nor did they ever see Puga point a weapon at anyone or shoot at anyone; videos of the incident do not show Puga ever with a gun in his hands or pointing an object at anyone; and forensic evidence supports a finding that Puga never shot a gun while at the front of the Expedition. Further, Erin Mangerino's cellphone video of the shooting shows that the shooting did not start until Puga had turned away from the officers to start running. Under these facts, a reasonable jury could find that Puga did not pose an immediate threat of death or serious bodily injury at the time the shooting started because he had just reached down to adjust his pants like he had done several times before, and he was no longer reaching for anything nor was he facing any of the officers, he was not visibly armed, pointing anything at anyone, or shooting a weapon at the time the shooting started. *See Curnow By & Through Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) (although it had been recognized that "an officer could use deadly force to arrest a fleeing felon if, under the circumstances, he reasonably believed such force was necessary to protect

himself or others from death or serious physical harm," the officer could not reasonably believe that it was reasonable to use deadly force against a suspect who did not point the gun at the officers and was not facing the officers when they shot him the first time); *Lopez v. City of Riverside*, No. 22-55723, 2023 WL 8433959, at *1 (9th Cir. Dec. 5, 2023) ("a jury could reasonably find that, *at the moment* he was shot, (1) Mr. Lopez presented no immediate threat to Officer Wright and (2) Officer Wright's use of deadly force was in violation of Mr. Lopez's Fourth Amendment rights" despite the officer having prior knowledge that Lopez was armed with a gun and Lopez had reached into his coat and extracted his empty hands immediately prior to the shooting).

Even assuming *arguendo* that Kee started shooting as soon as he saw Puga's right hand drop from the raised position as he claims, a jury could still find Kee's initial volley to be unreasonable. A jury could find disbelieve Kee's claim that he saw a gun in Puga's waistband immediately prior to the shooting since a video capturing Puga exiting the vehicle does not show a gun visibly sticking out of Puga's waistband, witness Gonzalez testified that she did not see a gun in Puga's waistband, and it is disputed that Kee had reached a position to be able to see Puga's waistband. And since Puga had on many prior occasions dropped his hands from a raised position to adjust his pants and the officers had observed him do so, a jury could find that it was unreasonable for Kee to believe that Puga posed immediate threat of death or serious bodily injury when he dropped his hand down towards his waistband right before the shooting because he had done so on many prior occasions without posing a threat and percipient witnesses testified that Puga did not aggressively reach for anything, did not have a gun visible in his waistband, did not have a gun in his hands, did not point anything, and did not shoot anything prior to the initial shots.

Moreover, a reasonable jury could find that the officers used excessive force when they continued to shoot Puga as he was running away, as he was falling to the

ground, and after he had fallen to the ground (especially since it is undisputed Puga
was no longer a threat after going to the ground). *See Est. of Risher v. City of Los
Angeles*, No. EDCV17995MWFKKX, 2020 WL 5377306, at *10, 12 (C.D. Cal.
July 29, 2020) ("lethal force can be excessive even if the suspect at one time posed a
threat or is still holding a gun while fleeing" and finding that even though it was
undisputed that the suspect shot the officer earlier, a jury could determine the
officer's use of force to be excessive if it found the suspect was not pointing the gun
at officers while fleeing at the time he was shot); *Latits v. Phillips*, 878 F.3d 541,
549–50 (6th Cir. 2017) (fleeing suspect did not place public or officers at imminent
risk because under plaintiff's facts, prior pursuit posed a relatively low risk to public
due to empty highways and conduct prior to being shot only showed intent to flee
not intent to harm); *Zion v. Cnty. of Orange*, 874 F.3d 1072, 1076-77 (9th Cir. 2017)
(second volley of shots at suspect who had fallen to ground after being struck by
first volley could be found unreasonable); *Murillo v. City of Los Angeles*, 707 F.
Supp. 3d 947, 964 (C.D. Cal. 2023) (final shot at decedent who had fallen to the
ground after a brief pause could be found unreasonable). Under Plaintiffs' facts,
Puga did not pose an imminent threat to the public or the officers when he was shot
in the back while he was fleeing because the prior pursuit on empty roadways posed
a relatively low risk to the public and Puga did not show an intent to harm as he did
not grab or aggressively reach for anything, did not had a weapon in his hands, did
not point anything at anyone, did not shoot a weapon at anyone, and was simply
running away. Additionally, the threat had ended after Puga had fallen to the ground
and thus the pause before the final shots to Puga on the ground were also
unreasonable.

    Additional factors also weigh against the reasonableness of the officers' use
of deadly force, including their failure to provide a warning that deadly force was
going to be used despite having the time to give commands prior to the initial shots
and Puga not making any threatening gesture of movements during the volleys while

he was running and after he had fallen to the ground, their failure to call for backup instead of entering an open-air environment to take Puga into custody when there was no urgency to do so, and the presence of innocent bystanders in the nearby houses and the heightened risks to those bystanders due to the officers' tactics, decisions, and excessive number of shots. *See S.R. Nehad*, 929 F.3d at 1137-38 (failure to warn that use of lethal force is contemplated and that noncompliance will result in the use of deadly force cuts against reasonableness of deadly force); *Tuggle v. City of Tulare,* No. 1:19-CV-01525-JLT-SAB, 2023 WL 4273900, at *18 (E.D. Cal. June 29, 2023) ("the presence of innocent bystanders and the risk of harm to those bystanders by the officers' chosen means of force may be relevant to the totality of the circumstances") (citing *Boyd v. Benton Cnty.*, 374 F.3d 773, 779 (9th Cir. 2004); *Xiong v. Chavez*, No. 1:13-CV-00083-SKO, 2016 WL 345609, at *5 (E.D. Cal. Jan. 28, 2016); *Bailey*, 671 F.Supp.2d at 1174; *Hulstedt v. City of Scottsdale*, 884 F. Supp. 2d 972, 990 (D. Ariz. 2012)).

C. Kee and Rubalcava Conduct Violated Plaintiffs' Fourteenth Amendment Rights

Two tests govern whether conduct "shocks the conscience" and the application depends on whether the officers had time to deliberate: if the situation evolved over a time frame that permitted the officer to deliberate before acting, the deliberate-indifference test applies; if the situation escalated so quickly that the officer had to make a snap judgment, the purpose-to-harm test applies. *Ochoa v. City of Mesa*, 26 F.4th 1050, 1056 (9th Cir. 2022).

Plaintiffs contend that the deliberate indifference standard applies because the officers had over an hour to come up with a tactical plan while Puga was inside the vehicle and did not pose a threat to anyone and while Puga was in front of the vehicle as Kee continued to maintain a dialogue in an attempt to deescalate. *See Lennox v. City of Sacramento*, No. 2:21-CV-02075-DAD-CSK, 2024 WL 3845378, at *25 (E.D. Cal. Aug. 16, 2024) (jury could find officers had ample time to

deliberate because the incident spanned roughly twenty minutes, there were several

instances of continued dialogue and de-escalation attempts, and at the time the

officers advanced, the decedent did not appear to pose an immediate threat of death

or serious bodily injury to anyone). Under this standard, a jury could find that Kee

and Rubalcava acted with a reckless indifference to Puga and the Bottens' rights

when they approached Puga despite their being no urgency and shot numerous shots

at Puga and towards the Botten house.

Even under "purpose to harm" standard, a reasonable jury could find that Kee

and Rubalcava's use of deadly force shocks the conscience because Puga did not

pose an immediate threat to anyone at the time of the shooting as he had not

aggressively reached for anything, did not have a gun in his hand, had not pointed

anything at anyone, and had not shot at anyone. *See A.D. v. California Highway

Patrol*, 712 F.3d 446, 458 (9th Cir. 2013).

D. Kee and Rubalcava are Not Entitled to Qualified Immunity

In considering existing precedent, the court "may look at unpublished

decisions and the law of other circuits, in addition to Ninth Circuit precedent."

*Prison Legal News v. Lehman*, 397 F.3d 692, 702 (9th Cir. 2005). "It is clearly

established that shooting a fleeing suspect in the back violates the suspect's Fourth

Amendment rights" where the suspect poses no immediate threat to the officer or

others. *Foster v. City of Indio*, 908 F.3d 1204, 1211 (9th Cir. 2018); *see also

Monroy v. Perez*,

No. 23-55793, 2025 WL 560233 (9th Cir. Feb. 20, 2025) (*Tennessee v. Garner*

established the "specific rule that officers may not reasonably use deadly force

against a fleeing suspect who poses no imminent threat"). Preexisting case law

placed the officers on notice that shooting at Puga in the back as he turned to run

and while he was running, despite Puga never grabbing or aggressively reaching for

anything, not having a gun in his hand, never pointing an object at anyone, and

never shooting a weapon, was unreasonable. *See George*, 736 F.3d at 838, 839

(deputies' use of deadly force against a man, without objective provocation, while he had his gun trained on the ground, violated the Fourth Amendment); *Harris v. Roderick*, 126 F.3d 1189, 1203-04 (9th Cir. 1997) (officers' use of deadly force, without warning, against an suspect armed with a gun who had shot at officers in the immediate past was not reasonable because the suspect had made no aggressive move of any kind); *Daniels v. Cnty of Ventura*, 228 Fed. App'x 669, 670, 671 (9th Cir. 2007) (officer who shot armed plaintiff 7 times in the back where there was no bystanders nearby and suspect was not entering a building with bystanders, despite plaintiff disobeying commands and physically resisting officer, was not entitled to qualified immunity); *S.T. v. City of Ceres*, 327 F. Supp. 3d 1261, 1277 (E.D. Cal. 2018) ("A reasonable jury could infer from the fact that he was shot in the back that the Decedent was facing away from the officers at the time that they fired and therefore did not pose an imminent threat to officer safety.")

It was further clearly established that shooting an incapacitated suspect after the suspect has been shot and has fallen to the ground is unconstitutional. *See Zion*, 874 F.3d at 1075-76 (second volley of shots at suspect who had previously stabbed an officer but was lying on the ground after being struck by first volley was not justified); *Lam v. City of Los Banos*, 976 F.3d 986, 1001-03 (9th Cir. 2020) (clearly established that "an officer violates the Fourth Amendment by shooting a person who had previously injured someone but no longer poses an immediate threat"); *Robertson v. Cnty. of Los Angeles*, No. CV1602761BROSKX, 2017 WL 5643179, at *10 (C.D. Cal. Oct. 17, 2017) (officers not entitled to qualified immunity because even if initial shots at decedent holding gun were reasonable, a jury could determine that not all the shots were justified since shots were fired at decedent after he fell to the ground and stopped moving).

An officer violates the Fourteenth Amendment "purpose to harm" standard when an officer uses force against a clearly harmless or subdued suspect. *Foster*, 908 F.3d at 1211. It was clearly established at the time of the incident that the

1   officers use of deadly force against Puga when he posed no immediate threat or

2   serious bodily injury violated the Fourteenth Amendment. *See A.D.*, 712 F.3d at 458

3   (evidence sufficient to support jury's finding of Fourteenth Amendment violation

4   where officer emptied his gun at decedent who did not pose an immediate threat of

5   death or serious bodily injury).

6        Moreover, it was clearly established that an officer's use of excessive force

7   without considering alternatives or measures to reduce injury to innocent bystanders

8   violates the Fourth and Fourteenth Amendment. *See Bailey*, 671 F. Supp. 2d at 1174

9   (citing *Boyd*, 374 F.3d at 779; *Lewis*, 523 U.S. at 845-55).

10        E.   <u>Kee and Rubalcava are Not Entitled to Summary Judgment on Plaintiffs'</u>

11           <u>Battery Claim</u>

12        "Under the doctrine of transferred intent, a defendant 'who unlawfully aims at

13   one…and hits another…is guilty of assault and battery on the party he hit, the injury

14   being the direct, natural and probable consequence of the wrongful act." *Bailey,* 671

15   F. Supp. 2d at 1175 (quoting *Singer v. Marx,* 144 Cal.App.2d 637, 643 (1956)).

16   "The viability of a claim of battery by a bystander against a police officer turns on

17   the reasonability of the application of force by the police officer against the intended

18   suspect." *Rodriguez v. City of Fresno*, 819 F. Supp. 2d 937, 953 (E.D. Cal. 2011)

19   (citing *Brown v. Ransweiler*, 171 Cal. App. 4th 516, 527 n.10 (2009)). As discussed

20   above, a reasonable jury could find that Puga was not aggressively reaching or

21   grabbing anything, did not have a gun in either hand, was not pointing anything at

22   anyone, did not shoot a weapon and was simply turning to run away when Kee and

23   Rubalcava opened fired and thus, could conclude that Kee and Rubalcava used

24   unreasonable force against Puga. Consequently, Kee and Rubalcava's intent to harm

25   Puga transferred to all those who were hit, specifically Botten, Sr., Dudek-Botten,

26   and J.B. *See Bailey*, 671 F. Supp. 2d at 1175. Thus, Kee and Rubalcava are not

27   entitled to summary judgment on Plaintiffs' battery claim.

28

F.  The Officers are Not Entitled to Summary Judgment on Plaintiffs'
Negligence and NIED Claims

"The question whether one owes a duty to another must be decided on a case-by-case basis, governed by the general rule that 'all persons are required to use ordinary care to prevent others from being injured as the result of their conduct.'" *Bastian v. Cnty. of San Luis Obispo*, 199 Cal. App. 3d 520, 530 (Ct. App. 1988) (quoting *Weirum v. RKO General, Inc.*, 15 Cal.3d 40, 46 (1975)). "A police officer is not insulated from the basic duties owed everyone." *Id.* "A duty may be based on the 'general character' of the activity engaged in by the defendant." *Id.*

"Where the defendant has created the dangerous situation or stands in a relationship to the injured party such that he should warn of danger then the failure to warn may be considered actionable negligence." *City of Sacramento v. Superior Ct.*, 131 Cal. App. 3d 395, 405 (1982). Police officers pursuing a suspect have no exemption from the duty to exercise due care for the safety of others. *Id.* "One who creates a foreseeable danger not readily discoverable by the endangered persons has the duty to warn them of the potential peril." *Bastian*, 199 Cal. App. 3d at 530. In such cases, a special relationship is not required to impose the duty. *Id.*

In determining whether a duty of due care exists in a particular case, the pertinent factors to consider include the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between defendant's acts and the harm suffered by plaintiff, the moral blame attached to the defendant's conduct, and the policy of preventing future harm. *Bastian*, 199 Cal. App. 3d at 530. "The most important of these considerations in establishing duty is foreseeability." *Tarasoff v. Regents of University of California*, 17 Cal.3d 334, 434 (1976). "[A] defendant owes a duty of care to all persons who are foreseeably endangered by his conduct, with respect to all risks which make the conduct unreasonably dangerous." *Id.* at 434-35. In determining foreseeability, the court does not "decide whether a *particular* plaintiff's injury was reasonably

foreseeable in light of a *particular* defendant's conduct, but rather…evaluate[s] more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party." *Ballard v. Uribe*, 41 Cal.3d 564, 527 n.6 (1986).

In *Green v. City of Livermore*, 117 Cal. App. 3d 82 (1981), the court found that once the officers undertook their investigation for drunk driving and subsequently arrested the driver, they were no longer immune for their negligence in leaving the keys in the car for the other occupants to drive drunk, thereby foreseeably increasing the risk of harm to the public generally, and thus had a corresponding duty to act with due care. 117 Cal. App. 3d at 86, 90-91; *see Rose v. Cnty. of Plumas*, 152 Cal. App. 3d 999, 1006 (1984) (recognizing *Green*'s holding that once the officers undertook the investigation and their conduct foreseeably increased the risk of harm to the general public, they had a duty to act with due care).

Here, the officers undertook the investigation of the alleged freeway shooting and detained in front of the Botten Residence as a result. The officers were aware that the suspect of the freeway shooting had allegedly shot at a car, that the driver of the Expedition had just led the officers on a pursuit, and was refusing to come out of the car to surrender. Thus, the officers believed they were dealing with an armed, barricaded suspect in a residential neighborhood, with houses on the four corners of the interactions, in the middle of the night, which foreseeably increased the risk of harm to the nearby residents. While the Bottens were aware that there was police activity outside of the home, they were not aware that the detention involved a high-risk, armed, barricaded suspect. The harm to innocent bystanders in situations dealing with barricaded subjects is foreseeable such that officers are specifically trained on how to avoid this danger. Indeed, POST specifically trains officers responding to high-risks situations involving barricaded suspects to request backup, set up a perimeter, and evacuate all uninvolved individuals from the area because

the safety of uninvolved individuals must be the principal concern to officers who
respond to situations involving high-risk barricaded suspects. The officers' negligent
tactics in attempting to take Puga into custody as discussed above, in addition to
their negligent conduct in failing to follow their training with regards to dealing with
high-risk, barricaded suspects, including evacuating nearby uninvolved individuals
from the scene, created a foreseeable danger that was not readily discoverable by the
Bottens because the Bottens were not aware of the nature of the police contact with
Puga. Thus, the officers had a duty to act with due care in detaining Puga and with
their attempts to take Puga, an armed, barricaded suspect, into custody and a
corresponding duty to warn the Bottens of the potential danger and evacuate the
Bottens as dictated by their training.

The officers breached this duty when they failed to come up with a tactical
plan to take Puga into custody, failed to call for backup and to set up a perimeter,
and failed to evacuate the nearby residents, despite Puga refusing to exit his vehicle
for over an hour. Vaccari further breached this duty by failing to call for SWAT,
despite SWAT being specifically trained to deal with barricaded suspects and
Puga's continual refusal to exit the car after thirty minutes of pepper ball
deployments. The officers further breached their duty to act with due care in leaving
cover and entering an open-air environment despite allegedly believing that Puga
was armed and intentionally concealing his waistband, despite there being no
urgency for approaching Puga and taking him into custody when they did so.

The officers' breach of duty to act with due care in detaining Puga and
dealing with an armed, barricaded suspect caused Plaintiffs' injuries. In order to
demonstrate proximate cause, a plaintiff must show that the defendant's acts or
omissions were a "substantial factor" in bringing about the injury. *Huynh v. Quora,
Inc.*, 508 F. Supp. 3d 633, 651 (N.D. Cal. 2020). Thus, a plaintiff must show a
substantial link or nexus between the act and injury. *Id.* Even though two forces can
operate independently in causing the harm, an actor's negligence can still be found

1  to be a substantial factor so long as each force is sufficient to bring about harm. *Id.*

2  Causation is generally a fact question for the jury unless the evidence is insufficient

3  to give rise to a reasonable inference that the alleged act was the proximate cause of

4  the injury. *Id.* at 650. Here, the officers' negligent conduct in dealing with an armed,

5  barricaded suspect as discussed above was a substantial factor in bringing about

6  Plaintiffs' harm. Plaintiffs' police practices expert opined that their failure to follow

7  standard practices and training with regards to responding to high-risk barricaded

8  suspects contributed to the Bottens' injuries as a reasonably trained officer in facing

9  the same circumstances would have followed their training because the safety of

10  uninvolved individuals is the principal concern in such situations.

11        Kee and Rubalcava were also negligent in their pre-shooting tactics and

12  conduct, and in their use of deadly force against Puga, which was also a substantial

13  cause of Plaintiffs' injuries as Kee and Rubalcava were the only officers who shot in

14  the direction of the Botten Residence. The California Supreme Court "has long

15  recognized that peace officers have a duty to act reasonably when using deadly

16  force." *Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 629 (2013). An officer's

17  tactical conduct and decisions preceding the use of deadly are relevant in

18  determining whether the use of deadly force gives rise to negligence liability. *Id.* at

19  639. "Such liability can arise, for example, if the tactical conduct and decisions

20  show, as part of the totality of the circumstances, that the use of deadly force was

21  unreasonable." *Id.*

22        The officers failed to form a tactical plan and follow their training in dealing

23  with high-risk barricaded suspects despite the over hour-long detention of Puga. Kee

24  and Rubalcava further failed to inform the other officers on scene that they intended

25  to approach to take Puga into custody and left cover, entering an open-air

26  environment despite believing that Puga was armed. These were tactically poor

27  decisions because the situation did not call for an urgent response at the time Kee

28  and Rubalcava approached Puga without cover. Additionally, officers are trained to

be aware of their background when using deadly force to avoid injury to innocent bystanders. Kee and Rubalcava knew or should have known that there were houses in their shooting background and that people were likely inside those houses as it was the middle of the night, yet still fired numerous shots at Puga and in the direction of the Botten Residence. In a case with similar facts, in which an officer fired towards an open doorway of a house with the intention of striking a dog, while aware that at least one person was in the background, the district court held that a jury could find that the plaintiffs' injuries from the shooting were a foreseeable consequence of the officers' negligence because the officer was trained to aware of his surroundings when firing his gun and to be aware that bullets are highly unpredictable. *Bailey*, 671 F. Supp. 2d at 1171, 1175–76. Thus, a jury could find that Kee Rubalcava were negligent in their pre-shooting decisions and unreasonable use of force against Puga—who did not pose an immediate threat of death or serious bodily injury at the time of the shooting as discussed above—and their negligence caused Plaintiffs' injuries and emotional distress.

Defendants do not dispute that Plaintiffs were closely related to each other, were present at the scene when their family members were shot, were aware that their family members were injured by the shooting, and suffered serious emotional distress. Defendants only contend that because Plaintiffs' negligence claim fails, Plaintiffs' NIED claim must also fail. Because Plaintiffs have evidence that could lead a jury to find the defendant officers negligent as discussed above, a reasonable jury could also find the officers liable under Plaintiffs' NIED claim.

G. Plaintiffs' Bane Act Claim Survives

"The elements of a Bane Act claim are essentially identical to the elements of a § 1983 claim, with the added requirement that the government official had a 'specific intent to violate' a constitutional right." *Hughes v. Rodriguez*, 31 F.th 1211, 1224 (9th Cir. 2022). "[A] reckless disregard for a person's constitutional rights is evidence of specific intent to deprive that person of those rights." *Reese v.*

*Cnty. of Sacramento*, 888 F.3d 1030, 1045 (9th Cir. 2018). As discussed above, under Plaintiffs' facts, Kee and Rubalcava used excessive and unreasonable force against Puga and Botten, Sr., Dudek-Botten, and J.B. when they shot numerous shots at Puga and towards the Botten Residence. The officers' acted with reckless disregard for the Bottens' constitutional rights when they failed to follow their training in dealing with high-risk, barricaded suspects and shot numerous times at a non-threatening Puga and towards the Botten Residence.

H. State Law Immunities Do Not Apply

The discretionary immunity provided by Government Code section 820.2 only applies to "basic policy decisions which have been expressly committed to coordinate branches of government." *Gillan v. City of San Marino*, 147 Cal. App. 4th 1033, 1051 (2007) (cleaned up). Operational decisions purporting to apply the law, such as the decision to arrest a suspect, are not basic policy decisions. *Id.*; *Caldwell v. Montoya*, 10 Cal. 4th 972, 981-82 (1995). Accordingly, discretionary immunity does not apply to the officers. *See Sharp v. Cnty. of Orange*, 871 F.3d 901, 920 (9th Cir. 2017) (§ 820.2 immunity "does not apply to an officer's decision to detain or arrest a suspect" and "covers only 'policy decisions made by a 'coordinate branch[] or government,' not 'operational decision[s] by the police purporting to apply the law'") (citations omitted).  Even assuming *arguendo* that the officers' decision on detaining and arresting Puga were discretionary, immunity under section 820.2 does not apply such decisions result in the injury to another, "not from the employee's exercise of 'discretion vested in him' to undertake the act, but from his negligence in performing it after having made the discretionary decision to do so." *McCorkle v. City of Los Angeles*, 70 Cal. 2d 252, 261 (1969) (officer not immune under § 820.2 due to his negligence after exercising his discretion to undertake an investigation of an accident). Accordingly, the officers are not entitled to discretionary immunity under Government Code section 820.2.

Kee and Rubalcava are also not immune under California Penal Code §§ 196 and 835a because, as discussed above, there are disputed issues of fact that could lead a reasonable jury to conclude that the officers used excessive and unreasonable force. *See Lennox*, 2024 WL 3845378, at *29.

I.  Plaintiffs Substantially Complied with the Government Tort Claim Act

In assessing compliance with California Government Code sections 945.4 and 910, the California Supreme Court has held:

> The claim…need not specify each particular act or omissions later proven to have caused injury. A complaint's fuller exposition of the factual basis beyond that given in the claim is not fatal, so long as the complaint is not based on an entirely different set of facts. Only where there has been a complete shift in allegations, usually involving an effort to premise civil liability on acts or omissions committed at different times or by different persons than those described in the claim, have courts generally found the complaint barred. Where the complaint merely elaborates or adds further detail to the claim, but is predicated on the same fundamental actions or failures to act by the defendants, courts have generally found the claim fairly reflects the facts pled in the complaint.

*Stockett v. Ass'n of Cal. Water Agencies Joint Powers Ins. Auth.*, 34 Cal. 4th 441, 447 (2004). Here, all four Plaintiffs alleged in their tort claims that, "On or about February 17, 2021, various police agencies including the California Highway Patrol were in pursuit of and apprehending an alleged suspect at or about the roadway near the home of claimants…The bullets shot and fired in the course of the pursuit and apprehension struck claimant resulting in serious injury and damage." (*See* County UMF 123-126). Plaintiffs' negligence and NIED claims against County Defendants are premised on the same fundamental set of facts—that during the pursuit and apprehension of Puga, the officers' conduct during the pursuit and apprehension, ultimately led to the circumstances of the shooting that caused Plaintiffs' injuries. While Plaintiffs did not specifically allege negligent pre-shooting tactics, this theory does not present an additional cause of action and thus, Plaintiffs' tort claims

1    provided sufficient information for the County to investigate and evaluate their

2    claims. *See Stockett*, 34 Cal.4th at 444, 447 (complaint alleging wrongful

3    termination in violation of public policy on three specific grounds was not barred

4    where claim alleged wrongful termination); *White v. Superior Court*, 225 Cal. App.

5    3d 1505, 1507, 1508, 1511 (1990) (causes of action for negligent hiring, training,

6    and retention and intentional failure to train, supervise and discipline were fairly

7    reflected in claim that stated a police officer had falsely arrested and beaten plaintiff

8    because they were predicated on the same fundamental facts). Accordingly,

9    Plaintiffs' negligence and NIED claims against County Defendants are not barred.

10   **V.     THE COURT SHOULD EXERCISE SUPPLEMENTAL**

11   **JURISDICTION OVER PLAINTIFFS' STATE LAW CLAIMS**

12        "[A] federal court should consider and weigh each case, and at every stage of

13   litigation, the values of judicial economy, convenience, fairness, and comity in order

14   to decide to exercise jurisdiction over a case brought in that court involving pendant

15   state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).

16   While Plaintiff contends there are genuine triable issues of fact that preclude

17   summary judgment to all of Plaintiffs' claims, should the Court grant summary

18   judgment on Plaintiff's federal claims, Plaintiff requests the Court exercise

19   supplemental jurisdiction over Plaintiffs' state law claims. This case has been

20   pending for over two years before this court, and there have been extensive motions

21   and rulings that to some degree, involve state court claims. Further, this case is

22   intertwined with *L.C., et al. v. State of California, et al.*, case no. 5:22-cv-00949-

23   KK-SHK, as the claims arise out of the same nucleus of facts and involve the same

24   or similar issues, especially Plaintiffs' battery claim, which under the transferred

25   intent theory, involves assessing the reasonableness of the use of force against the

26   decedent in *L.C.* Thus, exercising supplemental jurisdiction allows consistent rulings

27   with the issues in *L.C.* Additionally, comity is not an issue as the state law claims

28

are government by well-established case law. Accordingly, the Court should exercise supplemental jurisdiction and retain Plaintiffs' state law claims.

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court deny County Defendants' Motion for Summary Judgment and State Defendants' Motion for Summary Judgment.

DATED: February 27, 2025            LAW OFFICES OF DALE K. GALIPO

By _____ */s/ Hang D. Le*
Dale K. Galipo
Hang D. Le
Attorneys for Plaintiffs

## **Certificate of Compliance**

The undersigned, counsel of record for Plaintiffs JONATHAN WAYNE

BOTTEN, SR., TANJA DUDEK-BOTTEN, ANNABELLE BOTTEN,

AND J.B., certifies that this brief contains 11,921 words, which complies with the

word limit set by the court order dated February 20, 2025 (Doc. No. 91).


DATED: February 27, 2025          LAW OFFICES OF DALE K. GALIPO



                                  By _____*/s/ Hang D. Le*_____
                                         Dale K. Galipo
                                         Hang D. Le
                                         Attorneys for Plaintiffs