**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo, Esq. (Bar No. 144074)
dalekgalipo@yahoo.com
Hang D. Le, Esq. (Bar No. 293450)
hlee@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California, 91367
Telephone: (818) 347-3333
Facsimile: (818) 347-4118

Attorneys for Plaintiffs
JONATHAN WAYNE BOTTEN, SR.,
TANJA DUDEK-BOTTEN, ANNABELLE BOTTEN,
AND J.B.

# UNITED STATES DISTRICT COURT FOR THE
# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| JONATHAN WAYNE BOTTEN, SR.; TANJA DUDEK-BOTTEN; ANNABELLE BOTTEN; and J.B., a minor, by and through his guardian JONATHAN WAYNE BOTTEN, SR., <br><br> Plaintiffs, <br><br> vs. <br><br> STATE OF CALIFORNIA; COUNTY OF SAN BERNARDINO; ISAIAH KEE; MICHAEL BLACKWOOD; BERNARDO RUBALCAVA; ROBERT VACCARI; JAKE ADAMS; and DOES 1-10, inclusive, <br><br> Defendants. | Case No. 5:23-cv-00257-KK-SHK <br><br> *Honorable Kenly Kiya Kato* <br><br> **PLAINTIFFS' CONSOLIDATED STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS** |

Pursuant to Local Rule 56-2, Plaintiffs respectfully submit this Consolidated Statement of Genuine Disputes of Material Facts and Additional Material Facts in support of their Consolidated Opposition to Defendants' Motions for Summary Judgment.

DATED: February 27, 2025          LAW OFFICES OF DALE K. GALIPO


By _____ /s/ Hang D. Le _____
Dale K. Galipo
Hang D. Le
Attorneys for Plaintiffs

## STATE DEFENDANTS' ALLEGED MATERIAL FACTS AND PLAINTIFFS' RESPONSES

| Moving Party's (State Defendants) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| 1. In February 2021, Defendant Michael Blackwood was an officer with the California Highway Patrol (CHP), assigned to patrol. *Evidence:* Blackwood Dep. 5:25-6:10, Ex. P.[1] | Undisputed. |
| 2. In February 2021, Defendant Isaiah Kee was a Sergeant with CHP, assigned to patrol. *Evidence:* Kee Dep. 13:17-14:5, Ex. O. | Undisputed. |
| 3. In February 2021, Defendant Bernardo Rubalcava was a CHP officer, assigned to patrol. *Evidence:* Rubalcava Dep. 9:25-10:20, 66:4-8, Ex. Q. | Undisputed. |
| 4. On February 16, 2021, at approximately 5:45 p.m., CHP officers, including Kee, were investigating a car- to-car shooting, which occurred on highway Interstate 15. The suspect, later identified as decedent Hector Puga, drove along the passenger side of the victim's vehicle, and fired one shot at the victim and struck the victim's front passenger door. Puga fled in his vehicle after shooting at the victim. The victim described Puga as a Hispanic male, heavy set, bald, and Puga's vehicle as a white Ford Expedition, with large black rims, and a funeral procession sticker on the back window. | **Objection**. Compound; hearsay. |

| Moving Party's (State Defendants) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| *Evidence*: Arrest-Investigation Report 1- 12, Ex. N. | |
| 5.  Blackwood and Rubalcava were briefed about the freeway shooting at the beginning of their work shifts. *Evidence*: Blackwood Dep. 51:3-20, Ex. P; Rubalcava Dep. 77:14-78:15, Ex. R. | <u>Undisputed.</u> |
| 6.  At approximately 1:30 a.m. on February 17, 2021, Blackwood and Rubalcava, who were riding in the same CHP patrol vehicle, observed a white Ford Expedition that matched the vehicle involved in the earlier freeway shooting, and initiated a traffic stop. *Evidence*: Blackwood Dep. 51:3-10, Ex. P; Rubalcava Dep. 77:14-17, Ex. Q; Blackwood MVARS, Part 1 at 00:01- 0:30, Ex. D.[2] | <u>Undisputed.</u> |
| 7. Puga pulled over, but did not comply with the officers' commands to turn off the car and roll his window down. Instead, Puga drove away and a pursuit ensued. *Evidence*: Blackwood MVARS, Part 1 at 01:35-02:00, Ex. D. | **<u>Objection</u>**. Compound. <u>Undisputed.</u> |
| 8. Kee and San Bernardino County Sheriff's Deputies Adams and Vaccari joined the pursuit that lasted over an hour, at high speeds through residential and commercial areas. *Evidence*: Kee MVARS, Part 1 at 02:50- 38:50, Ex. B; Blackwood | **<u>Disputed</u>** to the extent that this suggests the pursuit was conducted at high, dangerous speeds and posed a serious threat to the public. There was little to no traffic on the road and no passing pedestrians during the pursuit. |

| Moving Party's (State Defendants) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| MVARS, Part 1 at 01:50-44:52, Ex. D; Blackwood MVARS, Part 2 at 00:01-28:17, Ex. E. | *See* Ex. D to Esquivel Decl., Blackwood MVARS, Part 1; Ex. E to Esquivel Decl., Blackwood MVARS, Part 2.

The white Expedition never targeted any of the officers nor forced other vehicles off the road during the pursuit.

*See* Ex. D to Esquivel Decl., Blackwood MVARS, Part 1; Ex. E to Esquivel Decl., Blackwood MVARS, Part 2.

The white Expedition's speed during the pursuit was fast but not outrageous as even on the freeway, the Expedition was only going 80 miles per hour.

Ex. 6 to Le Decl., Vaccari Int. 13:22-24; Ex. 4 to Le Decl., Adams Dep. 12:3-13.

As the pursuit continued down the dirt road, the Expedition's driving was not erratic.

Ex. 6 to Le Decl., Vaccari Int. 16:6-8. |
| 9. Puga's vehicle became disabled and stopped near the intersection of Peach and Catalpa Streets in Hesperia. It faced north on Peach Street.
*Evidence*: Blackwood MVARS, Part 3 at 08:30-10:00, Ex. F; Scene Photo, Ex. A. | <u>Undisputed</u>. |

| Moving Party's (State Defendants) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| 10. Blackwood and Kee stopped their patrol vehicles behind Puga's Expedition, with Kee's vehicle on the right of the Expedition and Blackwood's on the left.<br>*Evidence*: Scene Photo, Ex. A; Blackwood MVARS, Part 3 at 09:00, Ex. F; Kee MVARS, Part 1 at 38:35- 38:58, Ex. B. | Undisputed. |
| 11. Kee exited his patrol vehicle and took a position on the driver's side of Blackwood's vehicle.<br>*Evidence*: Kee MVARS, Part 1 at 39:00- 39:15, Ex. B | Undisputed. |
| 12. Rubalcava joined Kee on the driver's side of the patrol vehicle, and Blackwood moved to a position on the passenger side of his patrol vehicle, standing behind the open passenger door.<br>*Evidence*: Blackwood Dep. 42:10-19, Ex. P. | Undisputed. |
| 13. Over the course of the next approximately 40 minutes, Kee, Rubalcava, and other officers repeatedly ordered Puga to show his hands out the window and exit the vehicle, but Puga did not comply with these orders. Kee also repeatedly attempted to descale the situation and negotiate, converse, and build a rapport with Puga in attempt to have him come out of the car and surrender, without success.<br>*Evidence*: Kee MVARS, Part 1 at 38:50- 1:04:20, Ex. A; Kee MVARS, Part 2 at | **Objection**. Compound. |

| Moving Party's (State Defendants) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| 00:01-40:20, Ex. C; Blackwood MVARS, Part 3 at 09:30-37:30, Ex F; Blackwood MVARS, Part 4 at 00:01-35:40, Ex G; Mangerino Dep. 42:5-16, Ex. S. | |
| 14. During the course of the standoff, a female passenger exited the vehicle, and informed the officers of Puga's identity. *Evidence*: Kee MVARS, Part 1 at 44:40- 45:15, Ex. B; Adams Dep. 13:7-25, Ex. R. | Undisputed. |
| 15. Kee attempted to break the driver side windows with five rounds of bean bags, but was successful. *Evidence*: Blackwood MVARS, Part 3 at 14:45-15:03, Ex. F; Kee Dep. 21:1-11, Ex. O. | Undisputed that Kee attempted to break the driver's side window with beanbag rounds and was unsuccessful. *See* State Defs.' Notice of Errata. |
| 16. The Sheriff's Sergeant broke the back window of the Expedition, and, for approximately 30 minutes, shot several volleys of pepper balls into the cabin of the Expedition in an attempt to have Puga exit the vehicle. These efforts were unsuccessful, and the pepper balls appeared to have no effect on Puga. *Evidence*: Kee MVARS, Part 2 at 01:27- 28:50, Ex. C; Adams Dep. 14:14-18:18, Ex. R. | **Objection**. Compound.<br><br>**Disputed**.<br><br>Puga reacted to the pepper balls by coughing and complaining that his eyes were burning and that he could not see.<br><br>Ex. 4 to Le Decl., Adams Dep. 18:10-13; Ex. 8 to Le Decl., Gonzalez Dep. 93:10-15.<br><br>Vaccari deployed pepper balls and struck Puga in the right eye, which is extremely painful.<br><br>Ex. 1 to Le Decl., Kee Dep. 23:2-10; Ex. 3 to Le Decl., Blackwood Dep. 14:24-15:6; Ex. 5 to Le Decl., Vaccari Dep. 32:14-18; Ex. 6 to Le Decl., |

| Moving Party's (State Defendants) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | Vaccari Int. 28:25-29:4; Ex. 7 to Le Decl., Mangerino Dep. 25:23-26:1.<br><br>Puga sustained a cut to the area of his forehead right above his right eye, which Blackwood associated with being hit in the right eye by pepper balls.<br><br>Ex. 3 to Le Decl., Blackwood Dep. 13:24-14:10. |
| 17. At approximately 3:40 a.m., Puga finally exited the Expedition with his hands above his head. Although he was shirtless, he faced north away from the officers and not displaying his waistband. *Evidence*: Blackwood MVARS, Part 4 at 33:40-37:49, Ex. G; Edward Mangerino Video at 00:01-00:42, Ex. H. | **Objection**. Compound.<br><br>**Disputed** that the officers could not see Puga's waistband.<br><br>Puga was shirtless and the officers could at least see the back of Puga's waistband, if not the sides of his waistband at times, given that the officers were offset and behind Puga.<br><br>*See* Ex. 11 to Le Decl., Blackwood Dashcam Video at 35:35-37:50; Ex. 13 to Le Decl., Gonzalez Cellphone Video at 00:00-01:54. |
| 18. Puga stood near the driver side door, raising and dropping his hands, for several minutes, then quickly walked to the front of the Expedition and pressed his torso against the hood of the car concealing the front of his waistband from the officers' view. *Evidence*: Blackwood MVARS, Part 4 at 37:50-42:50, Ex. G; Kee Dep. 80:18- | **Objection**. Compound.<br><br>**Disputed** that Puga walked at a quick pace to the front of the Expedition and that he intentionally concealed the front of his waistband from the officers.<br><br>Puga walked at an even pace to the front of the car. |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

| Moving Party's (State Defendants) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| 81:11, Ex. O; Rubalcava Dep. 53:12-17, 80:11-19, Ex. Q; Blackwood Dep. 33:25-34:6, Ex. P. | Ex. 11 to Le Decl., Rubalcava Dashcam Video at 37:48-37:50.<br><br>The front of the vehicle was blocking the officers' view of Puga's waistband.<br><br>Ex. 2 to Le Decl., Rubalcava Dep. 80:15-19; Ex. 4 to Le Decl., Adams Dep. 41:2-9; Ex. 5 to Le Decl., 63:23-64:3. |
| 19. When Puga moved to the front of the Expedition, Kee and Rubalcava moved to the southeast corner of the intersection, near the utility pole, such that they were almost in line with the front of the Expedition. *Evidence*: Erin Mangerino Video at 00:01-00:42, Ex. I; Kee Dep. 81:6-82:3, Ex. O; Rubalcava Dep. 79:14-80:10, 95:15-96:11, Ex. Q. | **Disputed**. Kee and Rubalcava never got to the area near the utility pole. Kee and Rubalcava were further back at the time the shooting started.<br><br>There was an electrical pole on the southwest corner of the intersection that was parallel to the back passenger doors of the Expedition.<br><br>*See* Ex. 15 to Le Decl., Photograph of Scene; Ex. 16 to Le Decl., Photograph of Expedition at Curb.<br><br>In the Erin Mangerino cellphone video of the incident, moments before the shooting, two figures can be seen standing without cover in the street, partially obscured by the utility pole before backing away in a southern direction, away from the utility pole, and out of frame.<br><br>Ex. 10 to Le Decl., Erin Mangerino Cellphone Video at 0:00:29-00:53. |

| Moving Party's (State Defendants) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
|  | Erin Mangerino was unable to see any officers standing on her side of Peach Street.

Ex. 7 to Le Decl., Mangerino Dep. 53:11-22.

Rubalcava was side by side and to the right of Kee while they were approaching and when Kee started firing.

Ex. 1 to Le Decl., Kee Dep. 29:10-19, 30:16-22.

Rubalcava was firing in a northeast direction during his first volley.

Ex. 2 to Le Decl., Rubalcava Dep. 21:16-19. |
| 20. Kee repeatedly asked Puga if he had a gun because Kee was unable to see the front of Puga's pants and waistband; Puga denied having a weapon. *Evidence*: Blackwood MVARS, Part 4 at 40:30-42:20, Ex. G. | **Objection**. Compound. |
| 21. As Kee continued to negotiate with Puga, Puga reached down to his pants waistline, pulled out a gun, and fired it at Kee and Rubalcava. *Evidence*: Gonzalez Video at 05:30-6:47, Ex. J; Erin Marino Video at 00:51-52, Ex. I; Annabelle Botten Interview at 02:00-02:50, Ex. L; Mangerino Dep. 35:2-36:17, 50:14-52:5, Ex. S; Goodson | **Objection**. Vague as to time.

**Disputed**. Puga never reached into his waistband and pulled out a gun. Puga never had a gun in his hand during the shooting. Puga did not point his hand or any object at any officer. Puga never shot a weapon at any officer.

As soon as Puga turned to run, officers shot at Puga. |

| Moving Party's (State Defendants) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Dep. 26:10-27:3, 31:19-32:11, 49:11-22, 53:6-54:6, Ex. T; Adams Dep. 35:12-36:18, Ex. R; Blackwood Dep. 53:14-16, Ex. P. | Ex. 2 to Le Decl., Rubalcava Dep. 60:20-61:1; Ex. 5 to Le Decl., Vaccari Dep. 42:24-43:2, 47:5-14; Ex. 7 to Le Decl., Mangerino Dep. 34:3-9, 36:15-17, 37:11-13; Gonzalez Dep. 42:25-43:1, 55:1-4, 97:5-11, 97:12-15; Ex. 10 to Le Decl., Mangerino Cellphone Video at 0:00:51-00:54; Ex. 13 to Le Decl., Gonzalez Cellphone Video at 0:06:24-06:31.

Puga never grabbed or aggressively reached for anything prior to the shots.

Ex. 8 to Le Decl., Gonzalez Dep. 16:1-3; Ex. 14 to Le Decl., Botten Dep. 129:13-25, 130:6-12.

Puga never had a gun in his hand.

Ex. 8 to Le Decl., Gonzalez Dep. 97:16-25, 83:21-24; Ex. 14 to Le Decl., Botten Dep. 129:13-25, 130:6-12.

Puga never pointed his hand or a weapon in any specific direction or at any officer.

Ex. 5 to Le Decl., Vaccari Dep. 64:8-17; Ex. 8 to Le Decl., Gonzalez Dep. 97:1-6.

Puga never fired a weapon at any officer.

Ex. 7 to Le Decl., Mangerino Dep. 37:14-16; Ex. 8 to Le Decl., Gonzalez |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

| Moving Party's (State Defendants) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | Dep. 132:22-24; Ex. 14 to Le Decl., Botten Dep. 129:13-25, 130:6-12. |
| | Neither smoke nor any muzzle flash ever came from Puga. |
| | Ex. 3 to Le Decl., Blackwood Dep. 20:10-12; Ex. 4 to Le Decl., Adams Dep. 36:12-18; Ex. 5 to Le Decl., Vaccari Dep. 48:14-20; Ex. 8 to Le Decl., Gonzalez Dep. 99:8-25. |
| | None of the videos capturing the incident show Puga with a gun in his hand. |
| | Ex. 1 to Le Decl., Kee Dep. 7:16-18; Ex. 5 to Le Decl., Vaccari Dep. 9:15-18. |
| | None of the videos capturing the incident show Puga ever pointing a gun at anyone. |
| | Ex. 1 to Le Decl., Kee Dep. 7:22-24; Ex. 5 to Le Decl., Vaccari Dep. 9:19-21. |
| | None of the videos capturing the incident show Puga ever firing a gun. |
| | Ex. 1 to Le Decl., Kee Dep. 7:19-21. |
| | None of the videos capturing the incident show any muzzle flash coming from the area Puga was at. |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

| Moving Party's (State Defendants) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | Ex. 1 to Le Decl., Kee Dep. 92:14-16; Ex. 2 to Le Decl., Rubalcava Dep. 93:17-19 <br><br> Gonzalez saw Puga's waistband when he turned to take off running and never saw a gun in his waistband. <br><br> Ex. 8 to Le Decl., Gonzalez Dep. 95:15-25, 115:18-21. |
| 22. Kee fired two volleys of gunfire at Puga. The first volley occurred when Puga reached for the gun in his waistband. *Evidence*: Kee Dep. 9:7-10:16, Ex. O. | **Objection**. Compound. <br><br> **Disputed** that Kee only fired two volleys of shots. Further **disputed** that Puga ever reached for a gun in his waistband or that a gun was visibly sticking out of his waistband. Further **disputed** that Kee fired after Puga reached for a gun in his waistband. Further **disputed** that Kee fired only two volleys of shots. <br><br> Puga did not appear to have a gun or weapon in his hand, waistband, or pocket when he exited the vehicle. <br><br> Ex. 1 to Le Decl., Kee Dep. 24:15-17; Ex. 2 to Le Decl., Rubalcava Dep. 37:25-38:4; Ex. 3 to Le Decl., Blackwood Dep. 34:4-6; Ex. 8 to Le Decl., Gonzalez Dep. 95:15-25; Ex. 9 to Le Decl., Edward Mangerino Video; Clark Decl. ¶ 15. <br><br> Puga stood near the driver's side of the car for a period of time and during that time, the officers were able to see Puga's hands. |

| Moving Party's (State Defendants) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | Ex. 1 to Le Decl., Kee Dep. 23:23-24:3. |
| | Puga did not have anything in his hands and he never reached for any weapon while he was standing near the driver's side of the vehicle. |
| | Ex. 1 to Le Decl., Kee Dep. 24:7-9; Ex. 2 to Le Decl., 38:8-20 Ex. 3 to Le Decl., Blackwood Dep. 15:25-16:2. |
| | Puga did not appear to have a weapon in his hands or on his person while he stood next to the driver's side of the vehicle. |
| | Ex. 3 to Le Decl., Blackwood Dep. 33:25-34:3; Ex. 4 to Le Decl., Adams Dep. 21:22-22:2. |
| | While Puga was outside of the vehicle, Puga was continually reaching down to pull up his pants because they were loose and kept falling. |
| | Ex. 1 to Le Decl., Kee Dep. 11:15-23; Ex. 4 to Le Decl., Adams Dep. 42:12-17, 43:5-13, 43:23-44:5; Ex. 8 to Le Decl., Gonzalez Dep. 105:11-25. |
| | Puga occasionally would drop his hands to pull up his pants while he was standing near the front of the vehicle. |

| Moving Party's (State Defendants) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | Ex. 4 to Le Decl., Adams Dep. 61:3-62:3; Ex. 8 to Le Decl., Gonzalez Dep. 42:18-25. |
| | The bystander cell phone video taken by Erin Mangerino shows Puga with his hands up and briefly dropping his right hand to his waistband to adjust his pants before raising his hand up again, twice. |
| | Ex. 10 to Le Decl., Erin Mangerino Cellphone Video at 0:00:03-00:07; 0:00:20-00:27. |
| | As soon as Puga turned to run, officers shot at Puga. |
| | Ex. 2 to Le Decl., Rubalcava Dep. 60:20-61:1; Ex. 5 to Le Decl., Vaccari Dep. 42:24-43:2, 47:5-14; Ex. 7 to Le Decl., Mangerino Dep. 34:3-9, 36:15-17, 37:11-13; Gonzalez Dep. 42:25-43:1, 55:1-4, 97:5-11, 97:12-15; Ex. 10 to Le Decl., Mangerino Cellphone Video at 0:00:51-00:54; Ex. 13 to Le Decl., Gonzalez Cellphone Video at 0:06:24-06:31. |
| | Gonzalez saw Puga's waistband when he turned to take off running and never saw a gun in his waistband. |
| | Ex. 8 to Le Decl., Gonzalez Dep. 95:15-25, 115:18-21. |
| | Puga never grabbed or aggressively reached for anything prior to the shots. |

| Moving Party's (State Defendants) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
|  | Ex. 8 to Le Decl., Gonzalez Dep. 16:1-3; Ex. 14 to Le Decl., Botten Dep. 129:13-25, 130:6-12. |
|  | Several shots were fired at Puga after he fell to the ground. |
|  | Ex. 1 to Le Decl., Kee Dep. 68:17-24; Ex. 3 to Le Decl., 25:8-12; Ex. 5 to Le Decl., Vaccari Dep. 43:11-24; Ex. 10 to Le Decl., Erin Mangerino Cellphone Video at 0:01:04-01:12; Ex. 11 to Le Decl., Rubalcava Dashcam Video at 0:42:37-42:45. |
|  | After Puga fell to the ground, several shots are fired and there was a pause before the final two, almost simultaneous volleys of shots from two different firearms are heard. |
|  | Ex. 10 to Le Decl., Erin Magerino Cellphone Video at 01:02-01:10. |
| 23. After the first volley, Kee went to the prone position on the ground to avoid any gunfire from Puga.<br>*Evidence*: Kee Dep. 30:23-32:9, Ex. O. | **Disputed** that Kee went to the ground to avoid gunfire from *Puga*.<br><br>Kee went to the prone position on the ground because he was aware that Rubalcava was behind him and he did not want to run the risk of getting hit by friendly fire.<br><br>Ex. 22 to Le Decl., Kee Int. 74:23-75:2. |

| Moving Party's (State Defendants) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| 24. During the first volley, Kee was located at a 90-degree angle from Puga, such that his backdrop was Catalpa Street. During the second volley, Kee was facing north up Peach Street and the open desert. *Evidence*: Kee Dep. 86:17-87:13, Ex. O. | **Disputed**. Kee and Rubalcava never got to the area near the utility pole. Kee and Rubalcava were further back at the time the shooting started.

There was an electrical pole on the southwest corner of the intersection that was parallel to the back passenger doors of the Expedition.

*See* Ex. 15 to Le Decl., Photograph of Scene; Ex. 16 to Le Decl., Photograph of Expedition at Curb.

In the Erin Mangerino cellphone video of the incident, moments before the shooting, two figures can be seen standing without cover in the street, partially obscured by the utility pole before backing away in a southern direction, away from the utility pole, and out of frame.

Ex. 10 to Le Decl., Erin Mangerino Cellphone Video at 0:00:29-00:53.

Erin Mangerino was unable to see any officers standing on her side of Peach Street.

Ex. 7 to Le Decl., Mangerino Dep. 53:11-22.

Rubalcava was side by side and to the right of Kee while they were approaching and when Kee started firing. |

| Moving Party's (State Defendants) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | Ex. 1 to Le Decl., Kee Dep. 29:10-19, 30:16-22.<br><br>Rubalcava was firing in a northeast direction during his first volley.<br><br>Ex. 2 to Le Decl., Rubalcava Dep. 21:16-19.<br><br>Kee was aware that there were residences in Puga's background when Kee was firing both volleys.<br><br>Ex. 1 to Le Decl., Kee Dep. 55:1-19. |
| 25. Puga posed a continuing threat of immediate death or serious harm because Kee saw the muzzle flashes that he believed came from Puga's gun, coupled with Puga's earlier freeway shooting incident indicated to Kee that Puga would not hesitate to use a gun, and he was running towards a house. Kee therefore fired his second volley of gunfire when Puga continued to run in the direction of the house.<br>*Evidence*: Kee Dep. 82:10-85:7, Ex. O. | **Objection**. Compound.<br><br>**Disputed**. Puga did not fire a gun, did not have a gun in his hands while he was running, Puga was nowhere near any houses during the shooting and likely had changed directions away from any house by the time Kee fired his second volley. Puga did not pose an immediate threat of death or serious harm.<br><br>As soon as Puga turned to run, officers shot at Puga.<br><br>Ex. 2 to Le Decl., Rubalcava Dep. 60:20-61:1; Ex. 5 to Le Decl., Vaccari Dep. 42:24-43:2, 47:5-14; Ex. 7 to Le Decl., Mangerino Dep. 34:3-9, 36:15-17, 37:11-13; Gonzalez Dep. 42:25-43:1, 55:1-4, 97:5-11, 97:12-15; Ex. 10 to Le Decl., Mangerino Cellphone Video at 0:00:51-00:54; Ex. 13 to Le |

| Moving Party's (State Defendants) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | Decl., Gonzalez Cellphone Video at 0:06:24-06:31. |
| | Puga never grabbed or aggressively reached for anything prior to the shots. |
| | Ex. 8 to Le Decl., Gonzalez Dep. 16:1-3; Ex. 14 to Le Decl., Botten Dep. 129:13-25, 130:6-12. |
| | Puga never had a gun in his hand. |
| | Ex. 8 to Le Decl., Gonzalez Dep. 97:16-25, 83:21-24; Ex. 14 to Le Decl., Botten Dep. 129:13-25, 130:6-12. |
| | Puga never pointed his hand or a weapon in any specific direction or at any officer. |
| | Ex. 5 to Le Decl., Vaccari Dep. 64:8-17; Ex. 8 to Le Decl., Gonzalez Dep. 97:1-6. |
| | Puga never fired a weapon at any officer. |
| | Ex. 7 to Le Decl., Mangerino Dep. 37:14-16; Ex. 8 to Le Decl., Gonzalez Dep. 132:22-24; Ex. 14 to Le Decl., Botten Dep. 129:13-25, 130:6-12. |
| | Neither smoke nor any muzzle flash ever came from Puga. |
| | Ex. 3 to Le Decl., Blackwood Dep. 20:10-12; Ex. 4 to Le Decl., Adams Dep. 36:12-18; Ex. 5 to Le Decl., |

| Moving Party's (State Defendants) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | Vaccari Dep. 48:14-20; Ex. 8 to Le Decl., Gonzalez Dep. 99:8-25.<br><br>None of the videos capturing the incident show Puga with a gun in his hand.<br><br>Ex. 1 to Le Decl., Kee Dep. 7:16-18; Ex. 5 to Le Decl., Vaccari Dep. 9:15-18.<br><br>None of the videos capturing the incident show Puga ever pointing a gun at anyone.<br><br>Ex. 1 to Le Decl., Kee Dep. 7:22-24; Ex. 5 to Le Decl., Vaccari Dep. 9:19-21.<br><br>None of the videos capturing the incident show Puga ever firing a gun.<br><br>Ex. 1 to Le Decl., Kee Dep. 7:19-21.<br><br>None of the videos capturing the incident show any muzzle flash coming from the area Puga was at.<br><br>Ex. 1 to Le Decl., Kee Dep. 92:14-16; Ex. 2 to Le Decl., Rubalcava Dep. 93:17-19<br><br>Gonzalez saw Puga's waistband when he turned to take off running and never saw a gun in his waistband.<br><br>Ex. 8 to Le Decl., Gonzalez Dep. 95:15-25, 115:18-21. |

| Moving Party's (State Defendants) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | As Puga was running, he never turned around to look at the officers.

Ex. 8 to Le Decl., Gonzalez Dep. 100:13-17.

While Puga was running, his hands were moving in a running motion.

Ex. 8 to Le Decl., Gonzalez Dep. 116:16-21.

None of the videos that captured the shooting ever show Puga turn back towards the officers or point his hand back towards the officers.

Ex. 10 to Le Decl., Erin Mangerino Cellphone Video at 0:00:50-01:44; Ex. 11 to Le Decl., Rubalcava Dashcam Video at 0:42:23-42:47; Kee Dashcam Video at 46:47-47:07.

When asked during his interview with detectives after the incident as to what caused Rubalcava to fire his second volley, Rubalcava answered that Puga was still fleeing but that Puga was not doing anything with any alleged weapon.
Ex. 2 to Le Decl., Rubalcava Dep. 55:8-22.

Blackwood was trying to assess while he was firing by looking for a gun but could not see Puga's hands and |

| Moving Party's (State Defendants) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | therefore never saw Puga with a gun while Puga was running away.

Ex. 3 to Le Decl., 24:10-13, 30:23-31:11, 45:23-46:2.

During the time Blackwood was shooting at Puga, Blackwood could not see Puga's hands.

Ex. 3 to Le Decl., Blackwood Dep. 36:18-20.

Vaccari's impression what that as Puga was running, he had been struck by gunfire because it appeared that Puga was staggering.

Ex. 5 to Le Decl., Vaccari Dep. 52:19-53:1.

Approximately 5 to 8 seconds elapsed between Kee's first volley and when he started firing his second volley.

Ex. 1 to Le Decl., Kee Dep. 54:5-9.

When Puga reached the northwest corner, he changed directions and started running north instead of towards the house on the corner.

Ex. 4 to Le Decl., Adams Dep. 50:15-21; Ex. 7 to Le Decl., Mangerino Dep. 34:3-12.

Puga then fell forward onto his chest and stomach and onto the ground with |

| Moving Party's (State Defendants) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | his hands beside him on the northwest shoulder near the southbound lane, some distance from the northwest corner.<br><br>Ex. 1 to Le Decl., Kee Dep. 37:10-13; Ex. 5 to Le Decl., Vaccari Dep. 53:11-21; Ex. 7 to Le Decl., Mangerino Dep. 60:9-61:13.<br><br>Officer Rubalcava, Officer Blackwood, Sergeant Kee, and Deputy Adams violated standard police practices and training when they shot at Mr. Puga while he was running away. Mr. Puga did not present an immediate threat of death or serious bodily injury as he was running and the officers failed to reassess and overreacted when they fired subsequent volleys when Mr. Puga was running.<br><br>Clark Decl. ¶ 16.<br><br>Under the facts of this case, there was no immediate defense of life situation while Mr. Puga was running away.<br><br>Clark Decl. ¶ 16a.<br><br>Officers are trained that they may use deadly force against a fleeing suspected felon to prevent escape only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officers or others. |

| Moving Party's (State Defendants) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | Clark Decl. ¶ 16c.<br><br>There is evidence that this was likely a situation of contagious fire.<br><br>Clark Decl. ¶ 16d. |
| 26. Kee considered warning the residents in the area to stay inside, but did not do so because he risked creating a cross-fire situation. *Evidence*: Kee Dep. 85:19-86:7, Ex. O. | **Objection**. Vague as to time.<br><br>**Disputed** that Kee could not warn the residents at any time prior to Puga exiting the vehicle or by any other means.<br><br>Puga was inside of his car for over an hour.<br><br>Kee had access to a loudspeaker and could have announced a warning over the loudspeaker like he initially announced commands to Puga.<br><br>*See* Ex. 7 to Le Decl., Mangerino Dep. 21:16-22:2; Ex. 14 to Le Decl., Botten Dep. 43:18-44:6.<br><br>Further **disputed** that Kee could not have followed his training and requested backup, set up a perimeter, and evacuate nearby residences.<br><br>POST Learning Domain 23 advises officers that the safety of uninvolved individuals must be the principal concern to officers who respond to |

| Moving Party's (State Defendants) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | high-risk situations involving barricaded suspects.

Clark Decl. ¶ 20a.

The officers' failure to follow standard practices and training in responding to high-risk situations involving barricaded suspects by requesting backup, setting up a perimeter, and evacuating all uninvolved individuals from the area contributed to the injuries suffered by the Botten family.

Clark Decl. ¶ 20.

A reasonably trained officer facing the same circumstances would have requested backup and additional resources in order to deal with a potentially armed, barricaded subject in order to ensure the safety of all uninvolved individuals in the area.

Clark Decl. ¶ 20c. |
| 27. Rubalcava fired two volleys at Puga—approximately five in the first volley, and five to eight in the second. *Evidence*. Rubalcava Dep. 14:3-11, Ex. Q. | **Disputed**.

Several shots were fired at Puga after he fell to the ground.

Ex. 1 to Le Decl., Kee Dep. 68:17-24; Ex. 3 to Le Decl. Blackwood Dep., 25:8-12; Ex. 5 to Le Decl., Vaccari Dep. 43:11-24; Ex. 10 to Le Decl., Erin Mangerino Cellphone Video at 0:01:04-01:12; Ex. 11 to Le Decl., |

| Moving Party's (State Defendants) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | Rubalcava Dashcam Video at 0:42:37-42:45.<br><br>After Puga fell to the ground, several shots are fired and there is a pause before two almost simultaneous volleys of shots from two different firearms are heard.<br><br>Ex. 10 to Le Decl., Erin Magerino Cellphone Video at 01:02-01:10. |
| 28. In the first volley, Rubalcava returned fire when Puga turned towards Rubalcava and fired the gun<br>*Evidence*: Rubalcava Dep. 17:13-18:20, 80:4-81:11, Ex. Q. | **Disputed**. Puga never had a gun in his hands and never fired anything at anyone.<br><br>As soon as Puga turned to run, officers shot at Puga.<br><br>Ex. 2 to Le Decl., Rubalcava Dep. 60:20-61:1; Ex. 5 to Le Decl., Vaccari Dep. 42:24-43:2, 47:5-14; Ex. 7 to Le Decl., Mangerino Dep. 34:3-9, 36:15-17, 37:11-13; Gonzalez Dep. 42:25-43:1, 55:1-4, 97:5-11, 97:12-15; Ex. 10 to Le Decl., Mangerino Cellphone Video at 0:00:51-00:54; Ex. 13 to Le Decl., Gonzalez Cellphone Video at 0:06:24-06:31.<br><br>Puga never grabbed or aggressively reached for anything prior to the shots.<br><br>Ex. 8 to Le Decl., Gonzalez Dep. 16:1-3; Ex. 14 to Le Decl., Botten Dep. 129:13-25, 130:6-12.<br><br>Puga never had a gun in his hand. |

| Moving Party's (State Defendants) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | Ex. 8 to Le Decl., Gonzalez Dep. 97:16-25, 83:21-24; Ex. 14 to Le Decl., Botten Dep. 129:13-25, 130:6-12. |
| | Puga never pointed his hand or a weapon in any specific direction or at any officer. |
| | Ex. 5 to Le Decl., Vaccari Dep. 64:8-17; Ex. 8 to Le Decl., Gonzalez Dep. 97:1-6. |
| | Puga never fired a weapon at any officer. |
| | Ex. 7 to Le Decl., Mangerino Dep. 37:14-16; Ex. 8 to Le Decl., Gonzalez Dep. 132:22-24; Ex. 14 to Le Decl., Botten Dep. 129:13-25, 130:6-12. |
| | Neither smoke nor any muzzle flash ever came from Puga. |
| | Ex. 3 to Le Decl., Blackwood Dep. 20:10-12; Ex. 4 to Le Decl., Adams Dep. 36:12-18; Ex. 5 to Le Decl., Vaccari Dep. 48:14-20; Ex. 8 to Le Decl., Gonzalez Dep. 99:8-25. |
| | None of the videos capturing the incident show Puga with a gun in his hand. |
| | Ex. 1 to Le Decl., Kee Dep. 7:16-18; Ex. 5 to Le Decl., Vaccari Dep. 9:15-18. |

| Moving Party's (State Defendants) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | None of the videos capturing the incident show Puga ever pointing a gun at anyone. |
| | Ex. 1 to Le Decl., Kee Dep. 7:22-24; Ex. 5 to Le Decl., Vaccari Dep. 9:19-21. |
| | None of the videos capturing the incident show Puga ever firing a gun. |
| | Ex. 1 to Le Decl., Kee Dep. 7:19-21. |
| | None of the videos capturing the incident show any muzzle flash coming from the area Puga was at. |
| | Ex. 1 to Le Decl., Kee Dep. 92:14-16; Ex. 2 to Le Decl., Rubalcava Dep. 93:17-19 |
| | Gonzalez saw Puga's waistband when he turned to take off running and never saw a gun in his waistband. |
| | Ex. 8 to Le Decl., Gonzalez Dep. 95:15-25, 115:18-21. |
| 29. Rubalcava was located on the dirt area near the left-front bumper area of Puga's vehicle when he shot the first volley.<br>*Evidence*: Rubalcava Dep. 26:8-11, Ex. Q. | **Disputed**.<br><br>Kee and Rubalcava never got to the area near the utility pole across from Puga's vehicle's front bumper. Kee and Rubalcava were further back at the time the shooting started.<br><br>There was an electrical pole on the southwest corner of the intersection |

| Moving Party's (State Defendants) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
|  | that was parallel to the back passenger doors of the Expedition. |
|  | *See* Ex. 15 to Le Decl., Photograph of Scene; Ex. 16 to Le Decl., Photograph of Expedition at Curb. |
|  | In the Erin Mangerino cellphone video of the incident, moments before the shooting, two figures can be seen standing without cover in the street, partially obscured by the utility pole before backing away in a southern direction, away from the utility pole, and out of frame. |
|  | Ex. 10 to Le Decl., Erin Mangerino Cellphone Video at 0:00:29-00:53. |
|  | Erin Mangerino was unable to see any officers standing on her side of Peach Street. |
|  | Ex. 7 to Le Decl., Mangerino Dep. 53:11-22. |
|  | Rubalcava was side by side and to the right of Kee while they were approaching and when Kee started firing. |
|  | Ex. 1 to Le Decl., Kee Dep. 29:10-19, 30:16-22. |
|  | Rubalcava was firing in a northeast direction during his first volley. |

| Moving Party's (State Defendants) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | Ex. 2 to Le Decl., Rubalcava Dep. 21:16-19.

Kee was aware that there were residences in Puga's background when Kee was firing both volleys.

Ex. 1 to Le Decl., Kee Dep. 55:1-19. |
| 30. In the second volley, Rubalcava shot Puga as he was running away. Rubalcava still considered Puga a threat because he still had the gun in his hand, and he was running towards a residential area, creating a risk of a hostage situation. *Evidence*: Rubalcava Dep. 23:1-14, 86:23-87:8, Ex. Q. | **Disputed**. Puga did not have a gun in his hands as he was running away, was nowhere near any houses during the shooting and likely had changed directions away from any house by the time Rubalcava fired his second volley and did not pose a risk of a hostage situation.

Puga never had a gun in his hand.

Ex. 8 to Le Decl., Gonzalez Dep. 97:16-25, 83:21-24; Ex. 14 to Le Decl., Botten Dep. 129:13-25, 130:6-12.

Neither smoke nor any muzzle flash ever came from Puga.

Ex. 3 to Le Decl., Blackwood Dep. 20:10-12; Ex. 4 to Le Decl., Adams Dep. 36:12-18; Ex. 5 to Le Decl., Vaccari Dep. 48:14-20; Ex. 8 to Le Decl., Gonzalez Dep. 99:8-25.

None of the videos capturing the incident show Puga with a gun in his hand. |

| Moving Party's (State Defendants) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | Ex. 1 to Le Decl., Kee Dep. 7:16-18; Ex. 5 to Le Decl., Vaccari Dep. 9:15-18.<br><br>None of the videos capturing the incident show any muzzle flash coming from the area Puga was at.<br><br>Ex. 1 to Le Decl., Kee Dep. 92:14-16; Ex. 2 to Le Decl., Rubalcava Dep. 93:17-19.<br><br>Gonzalez saw Puga's waistband when he turned to take off running and never saw a gun in his waistband.<br><br>Ex. 8 to Le Decl., Gonzalez Dep. 95:15-25, 115:18-21.<br><br>There was an approximately 5 to 10 second pause between Rubalcava's first volley and second volley.<br><br>Ex. 2 to Le Decl., Rubalcava Dep. 14:12-18.<br><br>When Puga reached the northwest corner, he changed directions and started running north instead of towards the house on the corner.<br><br>Ex. 4 to Le Decl., Adams Dep. 50:15-21; Ex. 7 to Le Decl., Mangerino Dep. 34:3-12.<br><br>Puga then fell forward onto his chest and stomach and onto the ground with his hands beside him on the northwest |

| Moving Party's (State Defendants) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | shoulder near the southbound lane, some distance from the northwest corner.<br><br>Ex. 1 to Le Decl., Kee Dep. 37:10-13; Ex. 5 to Le Decl., Vaccari Dep. 53:11-21; Ex. 7 to Le Decl., Mangerino Dep. 60:9-61:13. |
| 31. During the second volley, Rubalcava was standing behind the driver's side door of Blackwood's patrol vehicle, and shooting northbound on Peach Street. *Evidence*: Rubalcava Dep. 45:20-46:7, 51:3-8, Ex. Q. | <u>Undisputed</u>. |
| 32. Rubalcava did not give Puga a verbal warning that lethal force would be used because there not opportunity to do so. *Evidence*: Rubalcava Dep. 79:6-80:19, Ex. Q. | **<u>Disputed</u>** that there was no opportunity for Rubalcava to give Puga a verbal warning that lethal force would be used.<br><br>Officers had time to provide Mr. Puga with a warning that deadly force was going to be used prior to the shooting.<br><br>Clark Decl. ¶ 17. |
| 33. Blackwood fired 20 rounds at Puga in two separate volleys. *Evidence*: Blackwood Dep. 10:11-21, 34:18-38:5, Ex. P. | **<u>Disputed</u>** that Blackwood fired only two volleys.<br><br>After Puga fell to the ground, several shots are fired and there is a pause before two almost simultaneous volleys of shots from two different firearms are heard.<br><br>Ex. 10 to Le Decl., Erin Magerino Cellphone Video at 01:02-01:10. |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

| Moving Party's (State Defendants) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | Blackwood is not sure whether he fired any shots at Puga while Puga was going to the ground.<br><br>Ex. 3 to Le Decl., Blackwood Dep. 40:18-20. |
| 34. Blackwood saw the gun in Puga's hand when he fired the first volley, but then paused when he saw Puga stumble. Blackwood fired the second volley because Puga still had the gun which he could have fired at Blackwood or another officer, and Puga was running towards a house, which could have led to a hostage situation.<br>*Evidence.* Blackwood Dep. 53:14-55:7, Ex. P. | **Disputed**. Puga did not have a gun in his hands at any time, was nowhere near any houses during the shooting and Blackwood never saw Puga with a gun while Puga was running.<br><br>Puga never had a gun in his hand.<br><br>Ex. 8 to Le Decl., Gonzalez Dep. 97:16-25, 83:21-24; Ex. 14 to Le Decl., Botten Dep. 129:13-25, 130:6-12.<br><br>Neither smoke nor any muzzle flash ever came from Puga.<br><br>Ex. 3 to Le Decl., Blackwood Dep. 20:10-12; Ex. 4 to Le Decl., Adams Dep. 36:12-18; Ex. 5 to Le Decl., Vaccari Dep. 48:14-20; Ex. 8 to Le Decl., Gonzalez Dep. 99:8-25.<br><br>None of the videos capturing the incident show Puga with a gun in his hand.<br><br>Ex. 1 to Le Decl., Kee Dep. 7:16-18; Ex. 5 to Le Decl., Vaccari Dep. 9:15-18. |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

| Moving Party's (State Defendants) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
|  | None of the videos capturing the incident show any muzzle flash coming from the area Puga was at. |
|  | Ex. 1 to Le Decl., Kee Dep. 92:14-16; Ex. 2 to Le Decl., Rubalcava Dep. 93:17-19. |
|  | Gonzalez saw Puga's waistband when he turned to take off running and never saw a gun in his waistband. |
|  | Ex. 8 to Le Decl., Gonzalez Dep. 95:15-25, 115:18-21. |
|  | Blackwood was trying to assess while he was firing by looking for a gun but could not see Puga's hands and therefore never saw Puga with a gun while Puga was running away. |
|  | Ex. 3 to Le Decl., Blackwood Dep. 24:10-13, 30:23-31:11, 45:23-46:2. |
|  | During the time Blackwood was shooting at Puga, Blackwood could not see Puga's hands. |
|  | Ex. 3 to Le Decl., Blackwood Dep. 36:18-20. |
|  | When Puga reached the northwest corner, he changed directions and started running north instead of towards the house on the corner. |

| Moving Party's (State Defendants) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
|  | Ex. 4 to Le Decl., Adams Dep. 50:15-21; Ex. 7 to Le Decl., Mangerino Dep. 34:3-12.<br><br>Puga then fell forward onto his chest and stomach and onto the ground with his hands beside him on the northwest shoulder near the southbound lane, some distance from the northwest corner.<br><br>Ex. 1 to Le Decl., Kee Dep. 37:10-13; Ex. 5 to Le Decl., Vaccari Dep. 53:11-21; Ex. 7 to Le Decl., Mangerino Dep. 60:9-61:13. |
| 35. Blackwood did not shoot in the direction of the northeast corner of the intersection, towards the Botton residence.<br>*Evidence*: Blackwood Dep. 53:2-5, Ex. P. | <u>Undisputed.</u> |
| 36. Nobody told Plaintiffs that they were required to stay inside their home during the standoff with Puga.<br>*Evidence*: Botten Dep. 112:9-19, Ex. U; Tanja Botten Dep. 129:20-24, 211:22- 213:3, Ex. V; J.B. Dep. 98:12-25, Ex. X. | <u>Undisputed.</u> |
| 37. During the subject incident, Botten Sr. got ready for work and was prepared to leave the home from the opposite direction of where the standoff was taking place with Puga.<br>*Evidence*: Botten Sr. Interview at 1:45- 2:22, Ex. K; Botten Depo. 112:20- 113:11, Ex. U. | **Objection**. Vague as to time.<br><br>**Disputed** to the extent that Botten, Sr. was going to leave his house before the police activity in front of his house ended.<br><br>There was a lot of police presence surrounding the Botten Residence, including the helicopter flying |

| Moving Party's (State Defendants) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | overhead and police cars with flashing lights in front of and in the back of the house.

Ex. 14 to Le Decl., Botten Dep. 25:5-18, 26:5-10; Ex. 17 to Le Decl., Dudek-Botten Dep. 29:9-16, 90:2-13, 91:1-10, 97:22-98:3.

Dudek-Botten believed they could not leave the house due to the police presence outside.

Ex. 17 to Le Decl., Dudek-Botten Dep. 133:8-20. |

## COUNTY DEFENDANTS ALLEGED MATERIAL FACTS AND PLAINTIFFS' RESPONSES

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| 1.      Deputy Adams went to the Academy from March to September 2018.

Clarke Decl. ¶ 14, Ex. X   – Adams Depo. 5:24-25. | **Objection**. Relevance.

Otherwise, <u>undisputed</u>. |
| 2.      After graduation from the Academy Deputy Adams was assigned to the West Valley Detention Center for the San Bernardino County Sheriff's Department.

Clarke Decl. ¶ 14, Ex. X – Adams Depo. 6:1-3. | **Objection**. Relevance.

Otherwise, <u>undisputed</u>. |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| 3. Deputy Adams was assigned to patrol starting May 2020 with the San Bernardino County Sheriff's Department.<br><br>Clarke Decl. ¶ 14, Ex. X – Adams Depo. 6:6-16. | **Objection**. Relevance.<br><br>Otherwise, <u>undisputed</u>. |
| 4. From May through September 2020 Deputy Adams was in field training.<br><br>Clarke Decl. ¶ 14, Ex. X – Adams Depo. 6:6-16. | **Objection**. Relevance.<br><br>Otherwise, <u>undisputed</u>. |
| 5. Sergeant Vaccari graduated from the Academy in 1997.<br><br>Clarke Decl. ¶ 15, Ex. Y – Vaccari Depo. 10:8-14. | **Objection**. Relevance.<br><br>Otherwise, <u>undisputed</u>. |
| 6. After graduation from the Academy Sergeant Vaccari was assigned to West Valley Detention Center for the San Bernardino County Sheriff's Department.<br><br>Vaccari Depo. 10:18-22. Clarke Decl. ¶ 15, Ex. Y – Vaccari Depo. 10:18-22. | **Objection**. Relevance.<br><br>Otherwise, <u>undisputed</u>. |
| 7. Sergeant Vaccari went to patrol in 2000.<br><br>Clarke Decl. ¶ 15, Ex. Y – Vaccari Depo. 10:21-11:3. | **Objection**. Relevance.<br><br>Otherwise, <u>undisputed</u>. |
| 8. Sergeant Vaccari was promoted to Sergeant in January 2012.<br><br>Clarke Decl. ¶ 15, Ex. Y – Vaccari Depo. 11:4-7. | **Objection**. Relevance.<br><br>Otherwise, <u>undisputed</u>. |
| 9. On February 16, 2021, CHP received reports that a white Ford SUV | **Objection**. The cited evidence does not support the allegation that the shooting |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| was involved in a shooting with another vehicle on the freeway during the evening.<br><br>Clarke Decl. ¶ 16, Ex. Z - Sgt. Kee Depo. 14:6-9, 75:3-76:19; Clarke Decl. ¶ 17, Ex. AA - Officer Rubalcava Depo. 77:18-78:9. | with another vehicle on the freeway occurred during the evening of February 16, 2021.<br><br>**Disputed** that it occurred during the evening of February 16, 2021.<br><br>Rubalcava testified that he was given information as to when the freeway shooting occurred but he did not recall the time.<br><br>Ex. 2 to Le Decl., Rubalcava Dep. 78:10-12. |
| 10.    The Ford SUV had a funeral sticker on the back window.<br><br>Clarke Decl. ¶ 16, Ex. Z - Sgt. Kee Depo. 76:14-19; Clarke Decl. ¶ 17, Ex. AA – Officer Rubalcava Depo. 78:4-9. | <u>Undisputed</u>. |
| 11.    CHP Officers Blackwood and Rubalcava located the vehicle and attempted a traffic stop.<br><br>Clarke Decl. ¶ 18, Ex. BB - Officer Blackwood Depo. 51:1-10; Clarke Decl. ¶ 17, Ex. AA - Officer Rubalcava Depo. 23:21-24:6, 77:13-17; see Clarke Decl. ¶ 19, Ex. CC AG0811 Blackwood MVARs. | **Disputed** to the extent that this suggests CHP was in active pursuit of the vehicle after receiving the report.<br><br>After responding to the scene of the alleged freeway shooting, CHP put out a BOLO for a white SUV.<br><br>Ex. 1 to Le Decl., Kee Dep. 75:22-76:2, 76:14-19. |
| 12.    The driver of the White SUV was later identified as Hector Puga.<br><br>Clarke ¶ 2, Ex. L - First Amended Complaint (Dkt. 27) ¶ 28. | <u>Undisputed</u>. |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| 13.    Hector Puga led CHP Officers Rubalcava and Blackwood on a pursuit.<br><br>Clarke Decl. ¶ 17, Ex. AA - Officer Rubalcava Depo. 23:21-24:6; Clarke Decl. ¶ 18, Ex. BB - Officer Blackwood Depo. 51:1-10; see Clarke Decl. ¶ 19, Ex. CC – AG0811 Blackwood MVARs. | Undisputed. |
| 14.    Sergeant Kee later joined the pursuit of the white SUV.<br><br>Clarke Decl. ¶ 16, Ex. Y - Sgt. Kee Depo.17:14-24; 75:3-21. | **Objection**. Vague as to the term "later" and as to time.<br><br>Otherwise, undisputed. |
| 15.    At some point San Bernardino County Sheriff's deputies Sergeant Vaccari and Deputy Adams joined the pursuit of Mr. Puga.<br><br>Clarke Decl. ¶ 14, Ex. X - Deputy Adams Depo. 9:12- 10:13. | Undisputed. |
| 16.    The pursuit terminated at the intersection of Peach Avenue and Catalpa Street in Hesperia, CA.<br><br>Clarke Decl. ¶ 14, Ex. X - Deputy Adams Depo. 10:14-18. | Undisputed. |
| 17.    The pursuit terminated because Puga's vehicle became disabled.<br><br>Clarke ¶ 2, Ex. L - First Amended Complaint (Dkt. 27) ¶ 26. | **Objection**. The cited evidence does not support the alleged fact. Paragraph 26 of Plaintiffs' First Amended Complaint does not allege that the pursuit terminated because Puga's vehicle became disabled. Paragraph 26 reads in full: This incident occurred on February 17, 2021 at approximately 3:00 a.m. near 17994 Catalpa Street in Hesperia, California ("BOTTEN RESIDENCE"). Plaintiffs were asleep |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | inside the BOTTEN RESIDENCE in their respective beds when Plaintiff TANJA heard sirens near their residence and woke Plaintiff JONATHAN up. JONATHAN looked outside one of the windows of the BOTTEN RESIDENCE and observed law enforcement try to intercept a vehicle, ultimately resulting in the vehicle becoming disabled due to a spike strip across the street from the BOTTEN RESIDENCE. JONATHAN and TANJA then went back to sleep.<br><br>First Amended Complaint (Doc. No. 27) ¶ 26. |
| 18.    The pursuit ended just south of Catalpa Street.<br><br>Clarke Decl. ¶ 16, Ex. Z - Sgt. Kee Depo. 16:22-24. | **Objection**. Vague as to location regarding "just south of Catalpa Street."<br><br>Otherwise, <u>undisputed</u>. |
| 19.    The white SUV had a passenger in the vehicle.<br><br>Clarke Decl. ¶ 14, Ex. X - Deputy Adams Depo 13:4-25. | <u>Undisputed</u>. |
| 20.    The passenger complied with commands.<br><br>Clarke Decl. ¶ 14, Ex. X - Deputy Adams Depo 13:4-25. | <u>Undisputed</u>. |
| 21.    The passenger was taken into custody.<br><br>Clarke Decl. ¶ 14, Ex. X - Deputy Adams Depo 13:4-25. | <u>Undisputed</u>. |
| 22.    Hector Puga refused to exit the vehicle for over an hour. | <u>Undisputed</u>. |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Clarke Decl. ¶ 17, Ex. AA - Rubalcava Depo 27:14-19. | |
| 23.     Numerous repeated commands were given for Hector Puga to exit the vehicle.

Clarke Decl. ¶ 16, Ex. Z - Sergeant Kee 19:10-13; Clarke Decl. ¶ 15, Ex. Y - Sergeant Vaccari Depo. 23:15-24:14; Clarke Decl. 13, Ex. W - Botten Jr. Depo. 30:20-31:9. | **Objection**. Vague as to time.

Undisputed that a number of commands were given to Puga to exit the vehicle over the entire course of time Puga was inside the vehicle. |
| 24.     Pepper balls were deployed into Puga's vehicle to get him to exit the vehicle.

Clarke Decl. ¶ 15, Ex. Y - Sergeant Vaccari Depo. 27:1-9, 30:10-24 | **Objection**. Vague as to amount, time, and manner of deployment.

Otherwise, undisputed. |
| 25.     Eventually Puga exited the vehicle from the driver's side.

Clarke Decl. ¶ 17, Ex. AA - Rubalcava Depo. 39:18-40:2 | Undisputed. |
| 26.     Puga ran to the front of his vehicle.

Clarke Decl. ¶ 17, Ex. AA - Rubalcava Depo. 39:18-40:2 | **Disputed**. Puga walked to the front of his vehicle.

Ex. 8 to Le Decl., Gonzalez Dep. 42:21-25; Ex. 11 to Le Decl., Rubalcava Dashcam Video at 37:48-37:50. |
| 27.     Because Puga was near the front of his vehicle, law enforcement officers could no longer see Puga's waistband.

Clarke Decl. ¶ 16, Ex. Z - Sergeant Kee Depo. 80:18- 81:11 | **Objection**. The cited evidence does not support the alleged fact; and vague as to time.

Undisputed that when Puga initially went to the front of the vehicle, and while the officers were still in their positions they were in when Puga was |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | at the driver's side of the vehicle, the officers could no longer see Puga's waistband. |
| 28.    Puga's waistband while he was at the front of his vehicle was concealed by the front of his vehicle.<br><br>Clarke Decl. ¶ 16, Ex. Z - Sergeant Kee Depo. 80:18- 81:11; Clarke Decl. ¶ 17, Ex. AA - Rubalcava Depo. 53:12- 15, 80:11-19; Clarke Decl. ¶ 15, Ex. Y - Vaccari Depo. 63:23-64:3 | **Disputed** to the extent that this alleged fact contends that Puga intentionally concealed his waistband with the front of the vehicle.<br><br>The front of the vehicle was blocking the officers' view of Puga's waistband.<br><br>Ex. 2 to Le Decl., Rubalcava Dep. 80:15-19; Ex. 4 to Le Decl., Adams Dep. 41:2-9; Ex. 5 to Le Decl., 63:23-64:3. |
| 29.    Sergeant Kee and Deputy Rubalcava approached Puga from the driver's side of Puga's vehicle to apprehend Puga.<br><br>Clarke Decl. ¶ 17, Ex. AA - Rubalcava Depo. 41:1-7; Clarke Decl. ¶ 14, Ex. X - Adams Depo. 26:21-27:3 | **Objection**. Vague as to location regarding "from the driver's side of Puga's vehicle."<br><br>**Objection** to the extent that this alleged fact suggests the other officers on scene, Blackwood, Adams, and Vaccari, knew that Kee and Rubalcava were approaching Puga's vehicle with the intent to apprehend Puga.<br><br>Kee and Rubalcava did not coordinate with the SBSD Sheriffs' deputies regarding any plan to approach and take Puga into custody.<br><br>Ex. 1 to Le Decl., Kee Dep. 28:16-19; Ex. 2 to Le Decl., Rubalcava Dep. 40:23-25; Ex. 5 to Le Decl., Vaccari Dep. 36:16-19. |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | When Vaccari and Adams saw Kee and Rubalcava move towards the shoulder of Peach Street, they thought they were moving to just get a better view of Puga, not to approach Puga. |
| | Ex. 4 to Le Decl., Adams Dep. 26:21-27:3; Ex. 5 to Le Decl., Vaccari Dep. 37:1-11, 38:7-12. |
| | Undisputed that Kee and Rubalcava approached to the south of the Expedition. Kee and Rubalcava were to the left of the CHP patrol vehicle to the south, in the dirt area of the street. |
| | Ex. 3 to Le Decl., Blackwood Dep. 18:11-21. |
| 30.    Sergeant Vaccari and Deputy Adams approached from the passenger side of Puga's vehicle to apprehend Puga.<br><br>Clarke Decl. ¶ 14, Ex. X - Adams Depo. 26:17-27:11, 32:5-25; Adams Decl. ¶ 5, Ex. A - Kee MVARs; Clarke Decl. ¶ 5, Ex. O – Screenshot of Mangerino Neighbor Video. | **Objection**. The cited evidence does not support the alleged fact that Vaccari and Adams approached with the intention of apprehending Puga.<br><br>**Objection**. Vague as to location regarding "from the passenger side of Puga's vehicle."<br><br>**Objection** to the extent that this alleged fact suggests the other officers on scene, Blackwood, Kee and Rubalcava, knew that Adams and Vaccari were approaching Puga's vehicle with the intent to apprehend Puga.<br><br>Kee and Rubalcava did not coordinate with the SBSD Sheriffs' deputies |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | regarding any plan to approach and take Puga into custody.<br><br>Ex. 1 to Le Decl., Kee Dep. 28:16-19; Ex. 2 to Le Decl., Rubalcava Dep. 40:23-25; Ex. 5 to Le Decl., Vaccari Dep. 36:16-19.<br><br>Kee and Rubalcava were not aware that Vaccari and Adams were also approaching Puga.<br><br>Ex. 1 to Le Decl., Kee Dep. 28:20-22; Ex. 2 to Le Decl., Rubalcava Dep. 41:8-11. |
| 31.    During the approach towards Puga, Sergeant Kee was armed with a rifle.<br><br>Clarke Decl. ¶ 16, Ex. Z - Sergeant Kee Depo. 8:2-3. | <u>Undisputed</u>. |
| 32.    Officer Rubalcava approached with his duty weapon drawn.<br><br>Clarke Decl. ¶ 17, Ex. AA - Rubalcava Depo. 79:14-18. 80:4-6. | **Objection**. Vague as to "duty weapon."<br><br><u>Undisputed</u>. |
| 33.    During the approach, Sergeant Vaccari was armed with a less lethal 40 mm launcher.<br><br>Clarke Decl. ¶ 15, Ex. Y - Vaccari Depo. 50:25-51:10. | **Objection**. Vague as to the term "the approach." There were two approaches: Kee and Rubalcava on one side of the street and Adams and Vaccari on the opposite side of the street. |
| 34.    The 40 mm launcher that Sergeant Vaccari had only shot less-lethal projectiles. | <u>Undisputed</u>. |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Clarke Decl. ¶ 15, Ex. Y, Vaccari Depo. 51:11-52:13; Hubbs ¶¶ 11-12. | |
| 35.    Deputy Adams approached with his duty weapon drawn.<br><br>Clarke Decl. ¶ 14, Ex. X, Adams Depo. 31:18-32:2, 64:7-65:4. | **Objection**. Vague as to "duty weapon."<br><br><u>Undisputed</u>. |
| 36.    Officer Blackwood remained positioned behind the passenger door of his own patrol vehicle.<br><br>Clarke Decl. ¶ 18, Ex. BB - Blackwood Depo. 12:22-13:10, 18:1-21. | **Objection**. Vague as to time.<br><br>**Objection**. The cited evidence does not support the alleged fact. The cited evidence states that Blackwood was behind the passenger door of his own patrol vehicle when he started firing and was in the general area of the passenger door during all of the rest of his shots. |
| 37.    Officer Blackwood had his rifle drawn.<br><br>Clarke Decl. ¶ 18, Ex. BB - Blackwood Depo. 12:22-13:10, 18:1-21. | **Objection**. Vague as to time.<br><br>**Objection**. The cited evidence does not support the alleged fact that Blackwood's weapon was a rifle. |
| 38.    Officer Blackwood did not approach Puga.<br><br>Clarke Decl. ¶ 18, Ex. BB - Blackwood Depo. 12:22-13:10, 18:1-21. | **Objection**. Vague as to time.<br><br><u>Undisputed</u> that Officer Blackwood did not approach Puga during the time that Kee and Rubalcava approached Puga while Puga was at the front of the vehicle and during the time Adams and Vaccari approached Puga while Puga was at the front of the vehicle. |
| 39.    As law enforcement officers approached, Puga's right hand went | **Disputed** that Puga's right hand went *towards* his waistband. |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| from above his head towards his waistband.<br><br>Clarke Decl. ¶ 14, Ex. X - Adams Depo. 36:5-11, 63:1-9; Clarke Decl. ¶ 16, Ex. Z - Kee Depo. 10:4-7; Adams Decl. ¶ 6, Ex. B – Mangerino Neighbor Video. | Puga's hands were up for the majority of the time he was outside of the car until he turned to run. Puga's hands went down for him to run.<br><br>Ex. 8 to Le Decl., Gonzalez Dep. 116:1-14. |
| 40.      Deputy Adams testified he saw Puga draw his firearm from his waistband as he approached Puga.<br><br>Clarke Decl. ¶ 14, Ex. X - Adams Depo. 63:1-9. | **Disputed**.<br><br>When Adams approached the vehicle, Puga was standing in the front, close to the driver's side headlight and Adams could only see Puga from chest up.<br><br>Ex. 4 to Le Decl., 40:16-22, 41:2-12, 45:11-16.<br><br>As Adams was approaching from the passenger's side of the expedition, he heard shots.<br><br>Ex. 4 to Le Decl., Adams Dep. 76:1-19; Ex. 12 to Le Decl., Kee Dashcam Video at 46:46-46:49; Ex. 16 to Le Decl., Photograph of Expedition at Curb.<br><br>Adams and Vaccari had only reached the part where the painted curb meets the unpainted curb when the shots started, which is near the rear door of the Expedition.<br><br>Ex. 4 to Le Decl., Adams Dep. 76:1-19; Ex. 12 to Le Decl., Kee Dashcam Video at 46:46-46:49; Ex. 16 to Le |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | Decl., Photograph of Expedition at Curb. |
| | Adams heard shots before he fired. |
| | Ex. 4 to Le Decl., Adams Dep. 55:19-22. |
| | As soon as Puga turned to run, officers shot at Puga. |
| | Ex. 2 to Le Decl., Rubalcava Dep. 60:20-61:1; Ex. 5 to Le Decl., Vaccari Dep. 42:24-43:2, 47:5-14; Ex. 7 to Le Decl., Mangerino Dep. 34:3-9, 36:15-17, 37:11-13; Gonzalez Dep. 42:25-43:1, 55:1-4, 97:5-11, 97:12-15; Ex. 10 to Le Decl., Mangerino Cellphone Video at 0:00:51-00:54; Ex. 13 to Le Decl., Gonzalez Cellphone Video at 0:06:24-06:31. |
| | Puga never grabbed or aggressively reached for anything prior to the shots. |
| | Ex. 8 to Le Decl., Gonzalez Dep. 16:1-3; Ex. 14 to Le Decl., Botten Dep. 129:13-25, 130:6-12. |
| | Puga never had a gun in his hand. |
| | Ex. 8 to Le Decl., Gonzalez Dep. 97:16-25, 83:21-24; Ex. 14 to Le Decl., Botten Dep. 129:13-25, 130:6-12. |
| | None of the videos capturing the incident show Puga with a gun in his hand. |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | Ex. 1 to Le Decl., Kee Dep. 7:16-18; Ex. 5 to Le Decl., Vaccari Dep. 9:15-18.<br><br>Gonzalez saw Puga's waistband when he turned to take off running and never saw a gun in his waistband.<br><br>Ex. 8 to Le Decl., Gonzalez Dep. 95:15-25, 115:18-21. |
| 41.    Sergeant Kee testified he saw Puga draw his firearm from his waistband as he approached Puga.<br><br>Clarke Decl. ¶ 16, Ex. Z - Kee Depo. 30:2-6, | **Disputed**.<br><br>Kee claims that as he approached the electrical pole, he could only see a portion of Puga's body in front of the vehicle.<br>Ex. 1 to Le Decl., Kee Dep. 29:20-23.<br><br>Kee claims he could not see Puga's waistband while Puga was standing in front of the vehicle and could only see Puga's waistband once he moved past the front of Puga's vehicle.<br><br>Ex. 1 to Le Decl., Kee Dep. 81:6-19.<br><br>There was an electrical pole on the southwest corner of the intersection that was parallel to the back passenger doors of the Expedition.<br><br>*See* Ex. 15 to Le Decl., Photograph of Scene; Ex. 16 to Le Decl., Photograph of Expedition at Curb. |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | In the Erin Mangerino cellphone video of the incident, moments before the shooting, two figures can be seen standing without cover in the street, partially obscured by the utility pole before backing away in a southern direction, away from the utility pole, and out of frame. |
| | Ex. 10 to Le Decl., Erin Mangerino Cellphone Video at 0:00:29-00:53. |
| | Erin Mangerino was unable to see any officers standing on her side of Peach Street. |
| | Ex. 7 to Le Decl., Mangerino Dep. 53:11-22. |
| | As soon as Puga turned to run, officers shot at Puga. |
| | Ex. 2 to Le Decl., Rubalcava Dep. 60:20-61:1; Ex. 5 to Le Decl., Vaccari Dep. 42:24-43:2, 47:5-14; Ex. 7 to Le Decl., Mangerino Dep. 34:3-9, 36:15-17, 37:11-13; Gonzalez Dep. 42:25-43:1, 55:1-4, 97:5-11, 97:12-15; Ex. 10 to Le Decl., Mangerino Cellphone Video at 0:00:51-00:54; Ex. 13 to Le Decl., Gonzalez Cellphone Video at 0:06:24-06:31. |
| | Puga never grabbed or aggressively reached for anything prior to the shots. |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | Ex. 8 to Le Decl., Gonzalez Dep. 16:1-3; Ex. 14 to Le Decl., Botten Dep. 129:13-25, 130:6-12.<br><br>Puga never had a gun in his hand.<br><br>Ex. 8 to Le Decl., Gonzalez Dep. 97:16-25, 83:21-24; Ex. 14 to Le Decl., Botten Dep. 129:13-25, 130:6-12.<br><br>None of the videos capturing the incident show Puga with a gun in his hand.<br><br>Ex. 1 to Le Decl., Kee Dep. 7:16-18; Ex. 5 to Le Decl., Vaccari Dep. 9:15-18.<br><br>Gonzalez saw Puga's waistband when he turned to take off running and never saw a gun in his waistband.<br><br>Ex. 8 to Le Decl., Gonzalez Dep. 95:15-25, 115:18-21. |
| 42.    Officer Rubalcava testified Puga fired his gun during their approach.<br><br>Clarke Decl. ¶ 17, Ex. AA - Rubalcava Depo. 80:20-22, 85:13-16. | **Objection**. Vague as to "their approach."<br><br>**Disputed**.<br><br>As soon as Puga turned to run, officers shot at Puga.<br><br>Ex. 2 to Le Decl., Rubalcava Dep. 60:20-61:1; Ex. 5 to Le Decl., Vaccari Dep. 42:24-43:2, 47:5-14; Ex. 7 to Le Decl., Mangerino Dep. 34:3-9, 36:15- |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | 17, 37:11-13; Gonzalez Dep. 42:25-43:1, 55:1-4, 97:5-11, 97:12-15; Ex. 10 to Le Decl., Mangerino Cellphone Video at 0:00:51-00:54; Ex. 13 to Le Decl., Gonzalez Cellphone Video at 0:06:24-06:31.

Puga never grabbed or aggressively reached for anything prior to the shots.

Ex. 8 to Le Decl., Gonzalez Dep. 16:1-3; Ex. 14 to Le Decl., Botten Dep. 129:13-25, 130:6-12.

Puga never had a gun in his hand.

Ex. 8 to Le Decl., Gonzalez Dep. 97:16-25, 83:21-24; Ex. 14 to Le Decl., Botten Dep. 129:13-25, 130:6-12.

Puga never pointed his hand or a weapon in any specific direction or at any officer.

Ex. 5 to Le Decl., Vaccari Dep. 64:8-17; Ex. 8 to Le Decl., Gonzalez Dep. 97:1-6.

Puga never fired a weapon at any officer.

Ex. 7 to Le Decl., Mangerino Dep. 37:14-16; Ex. 8 to Le Decl., Gonzalez Dep. 132:22-24; Ex. 14 to Le Decl., Botten Dep. 129:13-25, 130:6-12.

Neither smoke nor any muzzle flash ever came from Puga. |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | Ex. 3 to Le Decl., Blackwood Dep. 20:10-12; Ex. 4 to Le Decl., Adams Dep. 36:12-18; Ex. 5 to Le Decl., Vaccari Dep. 48:14-20; Ex. 8 to Le Decl., Gonzalez Dep. 99:8-25.<br><br>None of the videos capturing the incident show Puga with a gun in his hand.<br><br>Ex. 1 to Le Decl., Kee Dep. 7:16-18; Ex. 5 to Le Decl., Vaccari Dep. 9:15-18.<br><br>None of the videos capturing the incident show Puga ever pointing a gun at anyone.<br><br>Ex. 1 to Le Decl., Kee Dep. 7:22-24; Ex. 5 to Le Decl., Vaccari Dep. 9:19-21.<br><br>None of the videos capturing the incident show Puga ever firing a gun.<br><br>Ex. 1 to Le Decl., Kee Dep. 7:19-21.<br><br>None of the videos capturing the incident show any muzzle flash coming from the area Puga was at.<br><br>Ex. 1 to Le Decl., Kee Dep. 92:14-16; Ex. 2 to Le Decl., Rubalcava Dep. 93:17-19 |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | Gonzalez saw Puga's waistband when he turned to take off running and never saw a gun in his waistband.

Ex. 8 to Le Decl., Gonzalez Dep. 95:15-25, 115:18-21. |
| 43.     Sergeant Vaccari testified he saw Puga draw his firearm from his waistband as he approached Puga.

Clarke Decl. ¶ 15, Ex. Y - Vaccari Depo. 64:4-12. | **Disputed**.

When Adams approached the vehicle, Puga was standing in the front, close to the driver's side headlight and Adams could only see Puga from chest up.

Ex. 4 to Le Decl., Adams Dep. 40:16-22, 41:2-12, 45:11-16.

As Adams was approaching from the passenger's side of the expedition, he heard shots.

Ex. 4 to Le Decl., Adams Dep. 76:1-19; Ex. 12 to Le Decl., Kee Dashcam Video at 46:46-46:49; Ex. 16 to Le Decl., Photograph of Expedition at Curb.

Adams and Vaccari had only reached the part where the painted curb meets the unpainted curb when the shots started, which is near the rear door of the Expedition.

Ex. 4 to Le Decl., Adams Dep. 76:1-19; Ex. 12 to Le Decl., Kee Dashcam Video at 46:46-46:49; Ex. 16 to Le Decl., Photograph of Expedition at Curb. |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | As soon as Puga turned to run, officers shot at Puga. |
| | Ex. 2 to Le Decl., Rubalcava Dep. 60:20-61:1; Ex. 5 to Le Decl., Vaccari Dep. 42:24-43:2, 47:5-14; Ex. 7 to Le Decl., Mangerino Dep. 34:3-9, 36:15-17, 37:11-13; Gonzalez Dep. 42:25-43:1, 55:1-4, 97:5-11, 97:12-15; Ex. 10 to Le Decl., Mangerino Cellphone Video at 0:00:51-00:54; Ex. 13 to Le Decl., Gonzalez Cellphone Video at 0:06:24-06:31. |
| | Puga never grabbed or aggressively reached for anything prior to the shots. |
| | Ex. 8 to Le Decl., Gonzalez Dep. 16:1-3; Ex. 14 to Le Decl., Botten Dep. 129:13-25, 130:6-12. |
| | Puga never had a gun in his hand. |
| | Ex. 8 to Le Decl., Gonzalez Dep. 97:16-25, 83:21-24; Ex. 14 to Le Decl., Botten Dep. 129:13-25, 130:6-12. |
| | None of the videos capturing the incident show Puga with a gun in his hand. |
| | Ex. 1 to Le Decl., Kee Dep. 7:16-18; Ex. 5 to Le Decl., Vaccari Dep. 9:15-18. |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | Gonzalez saw Puga's waistband when he turned to take off running and never saw a gun in his waistband.<br><br>Ex. 8 to Le Decl., Gonzalez Dep. 95:15-25, 115:18-21. |
| 44.    Sgt. Kee testified that he believes he fired first.<br><br>Clarke Decl. ¶ 16, Ex. Z – Kee Depo. 9:4-9. | Undisputed. |
| 45.    Sergeant Kee continued to fire as Puga ran.<br><br>Clarke Decl. ¶ 16, Ex. Z – Kee Depo 34:12-35:4, 60:19-21 | **Objection**. Vague as to time.<br><br>**Disputed** to the extent that this suggests Kee fired one continuous volley.<br><br>Kee claims he fired two volleys of shots; one volley of 5 to 8 shots while Puga at the front of the vehicle and another volley of 10 to 13 shots at Puga's backside while Puga was running in a northwest direction.<br><br>Ex. 1 to Le Decl., Kee Dep. 8:4-9, 9:24-10:3, 30:7-9, 34:12-23, 35:2-20, 35:24-36:5, 46:11-18.<br><br>When Kee fired his first shot, he could see both of Puga's hands.<br><br>Ex. 1 to Le Decl., Kee Dep. 60:10-12.<br><br>Puga did not have a gun in his hand when Kee fired his first volley. |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | Ex. 1 to Le Decl., Kee Dep. 12:2-25. |
| | After the first volley, Kee retreated to the dirt shoulder parallel to the side of the CHP vehicle and went down prone. |
| | Ex. 1 to Le Decl., Kee Dep. 31:11-32:9, 42:23-43:5. |
| | Approximately 3 to 5 seconds elapsed between the last shot in Kee's first volley and when Kee went down into prone position in the dirt. |
| | Ex. 1 to Le Decl., Kee Dep. 32:10-16. |
| | Kee did not keep a visual on Puga while he was repositioning. |
| | Ex. 1 to Le Decl., Kee Dep. 43:14-18. |
| | Kee's back was to Puga while he repositioned to the dirt area. |
| | Ex. 1 to Le Decl., Kee Dep. 45:22-46:1. |
| | Approximately 5 to 8 seconds elapsed between Kee's first volley and when he started firing his second volley. |
| | Ex. 1 to Le Decl., Kee Dep. 54:5-9. |
| 46.    Officer Rubalcava fired at Puga.  Clarke Decl. ¶ 17, Ex. AA - Rubalcava Depo. 17:10-24. | **Objection**. Vague as to time.  Undisputed that Rubalcava fired a Puga. |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| 47.    Officer Blackwood fired at Puga.<br><br>Clarke Decl. ¶ 18, Ex. BB - Blackwood Depo. 28:5-29:13. | **Objection**. Vague as to time.<br><br>Undisputed that Blackwood fired a Puga. |
| 48.    Deputy Adams fired at Puga.<br><br>Clarke Decl. ¶ 14, Ex. X - Adams Depo. 36:5-11. | **Objection**. Vague as to time.<br><br>Undisputed that Adams fired a Puga. |
| 49.    As the officers fired, Puga ran in a northwestern direction away from them.<br><br>Clarke Decl. ¶ 14, Ex. X - Adams Depo. 47:10-14. | **Objection**. Vague as to time.<br><br>Undisputed that during the shooting, Puga ran in a northwestern direction, away from the officers. |
| 50.    Puga then fell to the ground.<br><br>Clarke Decl. ¶ 14, Ex. X - Adams Depo. 51:15-17. | **Objection**. Vague as to time.<br><br>Undisputed that at some point during the shooting, while Puga was running, he stumbled and then fell to the ground. |
| 51.    Puga ultimately died from his injuries.<br><br>Clarke Decl. ¶ 14, Ex. X -Adams Depo. 55:23-56:5. | **Objection**. Vague as to "his injuries."<br><br>Undisputed that Puga died as a result of his gunshot wounds. |
| 52.    A handgun was located underneath Puga's body.<br><br>Clarke Decl. ¶ 17, Ex. AA - Rubalcava Depo. 86:10-16. | **Disputed**. Evidence disputes the officers' claim that Puga's hand were underneath his body near a handgun.<br><br>Puga then fell forward onto his chest and stomach and onto the ground with his hands beside him on the northwest shoulder near the southbound lane, some distance from the northwest corner. |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | Ex. 1 to Le Decl., Kee Dep. 37:10-13; Ex. 5 to Le Decl., Vaccari Dep. 53:11-21; Ex. 7 to Le Decl., Mangerino Dep. 60:9-61:13.<br><br>Puga's hands were next to him when he was on the ground<br><br>Ex. 7 to Le Decl., Mangerino Dep. 61:7-13.<br><br>There was no gun in either of Puga's hands immediately after Puga went to the ground.<br><br>Ex. 4 to Le Decl., Adams Dep. 52:18-22. |
| 53.    Sergeant Vaccari was not aware whether any rounds were ejected from his less lethal launcher.<br><br>Clarke Decl. ¶ 15, Ex. Y - Vaccari Depo. 52:1-6 | Undisputed. |
| 54.    Sergeant Vaccari did not fire any rounds from his service weapon during the incident.<br><br>Clarke Decl. ¶ 15, Ex. Y - Vaccari Depo. 42:17-21, 50:25-51:10; Haag Decl. ¶ 11 | **Objection**. Vague as to "service weapon."<br><br>Undisputed that Vaccari did not fire any rounds from his department-issued firearm. |
| 55.    The Plaintiffs' house is located on the northeast corner of the intersection of Peach and Catalpa<br><br>Clarke Decl. ¶ 11, Ex. U - Tanja Dudek-Botten Depo. 91:23-92:8, Ex. 40 to Depo., 98:4-13, Ex. 41 to Depo.; Haag Decl. ¶ | Undisputed. |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| 56.    The Plaintiffs' house is pushed back slightly from the street.<br><br>Haag Decl. ¶ 23, Ex. H; Haag Decl. ¶ 24, Ex. I. | Undisputed. |
| 57.    A deputy shooting at the Botten house from where Puga stopped his vehicle would have to shoot in a northeastern direction. direction.<br><br>Haag Decl. ¶ 15. | Undisputed. |
| 58.    From the time Puga's vehicle became disabled until the shooting, Sergeant Vaccari nor Deputy Adams contacted the Botten family.<br><br>Clarke Decl. ¶ 6, Ex. P - Botten Sr. Depo. 62:13-19; Clarke Decl. ¶ 8, Ex. R - Annabelle Botten Depo. 83:5- 8; Clarke Decl. ¶ 7, Ex. Q - Tanja Dudek-Botten Depo. 134:17-19; Botten Jr. 98:23-25. | Undisputed. |
| 59.    From the time Puga's vehicle became disabled until the shooting, no law enforcement officer on scene gave any commands to the Plaintiffs.<br><br>Clarke Decl. ¶ 6, Ex. P - Botten Sr. Depo. 62:13-19; Annabelle Botten Depo. 83:5- 8; Clarke Decl. ¶ 7, Ex. Q - Tanja Dudek-Botten Depo. 134:17-19; Botten Jr. 98:23-25. | Undisputed. |
| 60.    Jonathan Botten Sr. saw the white Expedition outside of his house with 2-3 police cars behind it. | Undisputed. |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Clarke Decl. ¶ 6, Ex. P, Botten Sr. Depo. 25:24-26:4 | |
| 61.    Jonathan Botten Sr. saw the driver did not get out of the Puga vehicle when given commands.<br><br>Clarke Decl. ¶ 6, Ex. P - Botten Sr. Depo. 28:21-29:3 | **Objection**. Vague as to "Puga vehicle" and time.<br><br>Undisputed that during the time the passenger of the vehicle exited and walked backwards towards the officers, the officers gave Puga commands to get out of the vehicle and Puga did not get out. |
| 62.    Periodically Botten Sr. would look out the front door to observe what was occurring.<br><br>Clarke Decl. ¶ 6, Ex. P - Botten Sr. Depo. 33:2-6 | Undisputed. |
| 63.    Tanja Dudek-Botten saw there was a white SUV broken down in the street and a lot of police presence.<br><br>Clarke Decl. ¶ 7, Ex. Q - Tanja Dudek-Botten Depo. 95:19-96:6. | **Objection**. Vague as to time.<br><br>Otherwise, undisputed. |
| 64.    Tanja Dudek-Botten saw an officer near the utility pole in the corner.<br><br>Clarke Decl. ¶ 7, Ex. Q - Tanja Dudek-Botten Depo. 106:6-11. | **Objection**. Vague as to time.<br><br>Otherwise, undisputed. |
| 65.    Annabelle Botten saw flashing lights and a white vehicle outside of her house.<br><br>Clarke Decl. ¶ 8, Ex. R - Annabelle Botten Depo. 45:12-18. | **Objection**. Vague as to time.<br><br>Otherwise, undisputed. |
| 66.    Annabelle did not see officers outside of their vehicles. | **Objection**. Vague as to time. |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Clarke Decl. ¶ 8, Ex. R - Annabelle Botten Depo. 49:14-17. | |
| 67.     Jonathan Botten Jr. saw police vehicles outside of his window.<br><br>Clarke Decl. ¶ 9, Ex. S – Botten Jr. Depo. 27:9-24. | **Objection**. Vague as to time.<br><br>Undisputed that at some point, J.B. saw police vehicles outside of his window. |
| 68.     Jonathan Botten Jr. just saw police standing there.<br><br>Clarke Decl. ¶ 9, Ex. S - Botten Jr. Depo. 29:20-30:1. 12:22-13:11. | **Objection**. Vague as to time and "there."<br><br>Undisputed that at some point, J.B. saw police officers standing outside of his house. |
| 69.     The Bottens did not know who Puga was.<br><br>Clarke Decl. ¶ 6, Ex. P - Botten Sr. Depo. 41:17-42:2; Clarke Decl. ¶ 8, Ex. R - Annabelle Depo. 11:18-19; Clarke Decl. ¶ 7, Ex. Q - Tanja Dudek-Botten Depo. 168:17-169:9; Clarke Decl. ¶9, Ex. S - Botten Jr. Depo. 12:22-13:11. | Undisputed. |
| 70.     Jonathan Botten Sr. was 6 inches behind his front door when the shooting occurred.<br><br>Clarke Decl. ¶ 6, Ex. P - Botten Sr. Depo. 63:4-9, 63:18-22. | Undisputed. |
| 71.     When the shooting occurred, the security door was shut and the front door was open.<br><br>Clarke Decl. ¶ 6, Ex. P - Botten Sr. Depo. 63:4-9 | Undisputed. |
| 72.     Tanja Dudek-Botten was roughly in the same area as Botten Sr. near the front entrance when the shooting occurred. | Undisputed. |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Clarke Decl. ¶ 6, Ex. P - Botten Sr. Depo. 63:23-64:2, Clarke Decl. ¶ 7, Ex. Q - Tanja Dudek-Botten Depo. 127:3-20. | |
| 73.    Jonthan Botten Jr. was several feet away from the front door when the shooting occurred.<br><br>Clarke Decl. ¶ 9, Ex. S - Botten Jr. Depo. 32:9-20, 40:22-43:3. | Undisputed. |
| 74.    Jonathan Jr. was somewhere behind his mother in the house.<br><br>Clarke Decl. ¶ 7, Ex. Q - Tanja Dudek-Botten Depo. 129:4-15. | Undisputed. |
| 75.    Annabelle Botten was in between the front door and the kitchen at the time of the shooting.<br><br>Clarke Decl. ¶ 6, Ex. P - Botten Sr. Depo. 64:16-19; Clarke Decl. ¶ 8, Ex. R - Annabelle Botten Depo 60:24-61:11; Clarke Decl. ¶ 7, Ex. Q Tanja Dudek-Botten Depo. 127:22-128:3. | Undisputed. |
| 76.    Plaintiffs' home is in the northeast corner from where Puga's vehicle was located and the shooting began.<br><br>Clarke Decl. ¶ 7, Ex. Q - Tanja Dudek-Botten Depo.: 91:23-92:8, Ex. 40 to Depo., 98:4-13, Ex. 41 to Depo.; Clarke Decl. ¶ 16, Ex. Z - Kee Depo. 93:14-20. | Undisputed. |
| 77.    Sergeant Kee was armed with AR-15 rifles with .223 Remington caliber bullets. | Undisputed. |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Clarke Decl. ¶ 16, Ex. Z - Kee Depo 8:2-3, 53:22-23; Haag Decl. ¶ 11 | |
| 78.    Officer Blackwood as armed with AR-15 rifles with .223 Remington caliber bullets.<br><br>Clarke Decl. ¶ 18, Ex. BB - Blackwood Depo. 10:11-13, Haag Decl. ¶ 11 | <u>Undisputed</u>. |
| 79.    Officer Rubalcava was armed with a Smith & Wesson M&P pistol with 40 Smith & Wesson caliber bullets.<br><br>Clarke Decl. ¶ 17, Ex. AA - Rubalcava Depo. 12:19-22; Haag Decl. ¶ 11. | <u>Undisputed</u>. |
| 80.    CHP Officer Rubalcava approached Puga from the driver's side of Puga's vehicle.<br><br>Clarke Decl. ¶ 17, Ex. AA - Rubalcava Depo. 41:1-11; Clarke Decl. ¶ 14, Ex. X - Adams Depo. 26:17-27:7. | <u>**Objection**</u>. Vague as to location regarding "from the driver's side of Puga's vehicle."<br><br><u>Undisputed</u> that Kee and Rubalcava approached to the south of the Expedition. Kee and Rubalcava were to the left of the CHP patrol vehicle to the south, in the dirt area of the street.<br><br>Ex. 3 to Le Decl., Blackwood Dep. 18:11-21. |
| 81.    Officer Rubalcava fired approximately 10-15 shots.<br><br>Clarke Decl. ¶ 17, Ex. AA - Rubalcava Depo. 12:25-13:2. | <u>Undisputed</u>. |
| 82.    Officer Rubalcava fired in a northeastern direction while Puga was in front of his own vehicle. | <u>Undisputed</u>. |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Clarke Decl. ¶ 17, Ex. AA - Rubalcava Depo. 21:16-19, 26:15-17. | |
| 83.    Officer Rubalcava continued firing while Puga was running away.<br><br>Clarke Decl. ¶ 17, Ex. AA - Rubalcava Depo. 45:14-46:7. | <u>Undisputed</u>. |
| 84.    CHP Sergeant Kee was also on the driver's side of Puga's vehicle.<br><br>Clarke Decl. ¶ 16, Ex. Z - Kee Depo. 25:22-26:3. | **Objection**. Vague as to location regarding "from the driver's side of Puga's vehicle" and as to time.<br><br><u>Undisputed</u> that Kee and Rubalcava approached to the south of the Expedition. Kee and Rubalcava were to the left of the CHP patrol vehicle to the south, in the dirt area of the street.<br><br>Ex. 3 to Le Decl., Blackwood Dep. 18:11-21. |
| 85.    Officer Rubalcava was to Sergeant Kee's right.<br><br>Clarke Decl. ¶ 16, Ex. Z – Kee Depo. 29:6-19. | **Objection**. Vague as to time.<br><br><u>Undisputed</u> to the extent that Rubalcava was side by side and to the right of Kee while they were approaching and when Kee started firing.<br><br>Ex. 1 to Le Decl., Kee Dep. 29:10-19, 30:16-22. |
| 86.    Sergeant Kee discharged 18 rounds at Puga from his AR-15 as Puga ran.<br><br>Clarke Decl. ¶ 16, Ex. Z – Kee Depo. 7:25-8:6. | <u>Undisputed</u>. |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| 87.    CHP Officer Blackwood fired 20 shots with his AR-15 at Puga<br><br>Clarke Decl. ¶ 18, Ex. BB - Blackwood Depo. 10:7-13. | <u>Undisputed</u>. |
| 88.    Officer Blackwood was discharging his firearm at Puga while Puga was in front of him.<br><br>Clarke Decl. ¶ 18, Ex. BB - Blackwood Depo. 13:7-13. | **<u>Objection</u>**. Vague as to "Puga was in front of him" and location.<br><br><u>Undisputed</u> to the extent that Blackwood first volley of shots due north as Puga was in the front of the car, near the driver's side, having just cleared the front of the vehicle.<br><br>Ex. 3 to Le Decl., Blackwood Dep. 28:9-19, 28:20-23. |
| 89.    Officer Blackwood discharged his firearm at Puga while Puga turned to run away.<br><br>Clarke Decl. ¶ 18, Ex. BB - Blackwood Depo. 21:13-23. | **<u>Disputed</u>** to the extent that the only thing Puga was doing was turning to run away when Blackwood discharged his firearm.<br><br>Blackwood was firing at Puga's left side while Puga was hunched over as if he had been struck by gunshots.<br><br>Ex. 3 to Le Decl., Blackwood Dep. 29:9-20. |
| 90.    Deputy Adams and Sergeant Vaccari approached Puga from the eastern side of Puga's vehicle on the passenger side.<br><br>Adams Decl. ¶ 5, Ex. A – Kee Dashcam Video; Adams Decl. ¶ 6, Ex. B – Mangerino Neighbor Video; Clarke | <u>Undisputed</u>. |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Decl. ¶ 14, Ex. X - Adams Depo. 26:17-20. | |
| 91.    Deputy Adams was armed with a Glock (9mm caliber).<br><br>Clarke Decl. ¶ 14, Ex. X - Adams Depo. 31:24-32:2; Haag Decl. ¶ 11. | <u>Undisputed</u>. |
| 92.    Sergeant Vaccari's 40 mm less lethal shot sponge rounds.<br><br>Hubbs Decl. ¶¶ 11-12. | <u>Undisputed</u>. |
| 93.    Deputy Adams' gun was pointed towards Puga during this approach.<br><br>Adams Decl. ¶ 5, Ex. A – Kee Dashcam Video; Adams Decl. ¶ 6, Ex. B – Mangerino Neighbor Video; | <u>Undisputed</u>. |
| 94.    Deputy Adams' gun was pointed away from the Botten house during the approach.<br><br>Adams Decl. ¶ 5, Ex. A – Kee Dashcam Video; Adams Decl. ¶ 6, Ex. B – Mangerino Neighbor Video; | <u>Undisputed</u>. |
| 95.    Deputy Adams testified that upon seeing Puga draw a gun and hearing shots he returned fire at Puga.<br><br>Adams Decl. ¶ 5, Ex. A – Kee Dashcam Video; Adams Decl. ¶ 6, Ex. B – Mangerino Neighbor Video; Clarke Decl. ¶ 14, Ex. X - Adams Depo. 36:5-11. | **<u>Objection</u>**. Vague as to time and Puga's location when Adams started shooting.<br><br>**<u>Disputed</u>**.<br><br>As soon as Puga turned to run, officers shot at Puga.<br><br>Ex. 2 to Le Decl., Rubalcava Dep. 60:20-61:1; Ex. 5 to Le Decl., Vaccari Dep. 42:24-43:2, 47:5-14; Ex. 7 to Le Decl., Mangerino Dep. 34:3-9, 36:15-17, 37:11-13; Gonzalez Dep. 42:25- |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | 43:1, 55:1-4, 97:5-11, 97:12-15; Ex. 10 to Le Decl., Mangerino Cellphone Video at 0:00:51-00:54; Ex. 13 to Le Decl., Gonzalez Cellphone Video at 0:06:24-06:31.

Puga never grabbed or aggressively reached for anything prior to the shots.

Ex. 8 to Le Decl., Gonzalez Dep. 16:1-3; Ex. 14 to Le Decl., Botten Dep. 129:13-25, 130:6-12.

Puga never had a gun in his hand.

Ex. 8 to Le Decl., Gonzalez Dep. 97:16-25, 83:21-24; Ex. 14 to Le Decl., Botten Dep. 129:13-25, 130:6-12.

Puga never pointed his hand or a weapon in any specific direction or at any officer.

Ex. 5 to Le Decl., Vaccari Dep. 64:8-17; Ex. 8 to Le Decl., Gonzalez Dep. 97:1-6.

Puga never fired a weapon at any officer.

Ex. 7 to Le Decl., Mangerino Dep. 37:14-16; Ex. 8 to Le Decl., Gonzalez Dep. 132:22-24; Ex. 14 to Le Decl., Botten Dep. 129:13-25, 130:6-12.

Neither smoke nor any muzzle flash ever came from Puga. |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | Ex. 3 to Le Decl., Blackwood Dep. 20:10-12; Ex. 4 to Le Decl., Adams Dep. 36:12-18; Ex. 5 to Le Decl., Vaccari Dep. 48:14-20; Ex. 8 to Le Decl., Gonzalez Dep. 99:8-25.

None of the videos capturing the incident show Puga with a gun in his hand.

Ex. 1 to Le Decl., Kee Dep. 7:16-18; Ex. 5 to Le Decl., Vaccari Dep. 9:15-18.

None of the videos capturing the incident show Puga ever pointing a gun at anyone.

Ex. 1 to Le Decl., Kee Dep. 7:22-24; Ex. 5 to Le Decl., Vaccari Dep. 9:19-21.

None of the videos capturing the incident show Puga ever firing a gun.

Ex. 1 to Le Decl., Kee Dep. 7:19-21.

None of the videos capturing the incident show any muzzle flash coming from the area Puga was at.

Ex. 1 to Le Decl., Kee Dep. 92:14-16; Ex. 2 to Le Decl., Rubalcava Dep. 93:17-19

Gonzalez saw Puga's waistband when he turned to take off running and never saw a gun in his waistband. |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | Ex. 8 to Le Decl., Gonzalez Dep. 95:15-25, 115:18-21. |
| 96.      Deputy Adams continued firing at Puga as Puga ran in a northwestern direction.<br><br>Adams Decl. ¶ 5, Ex. A – Kee Dashcam Video; Adams Decl. ¶ 6, Ex. B – Mangerino Neighbor Video; Clarke Decl. ¶ 14, Ex. X – Adams Depo. 47:10-23. | **<u>Disputed</u>** to the extent that this alleged fact suggests Adams fired at Puga before he started running in a northwestern direction and that Adams only fired one volley while Puga was running.<br><br>Adams heard shots before he fired.<br><br>Ex. 4 to Le Decl., Adams Dep. 35:15-17.<br><br>After hearing the gunshots, Adams ducked and then stepped over a high curb before firing.<br><br>Ex. 4 to Le Decl., Adams Dep. 38:1-4.<br><br>Adams yelled at Puga to get on the ground and simultaneously heard shots.<br><br>Ex. 4 to Le Decl., Adams Dep. 37:3-6.<br><br>Adams fired his first shot when Puga had already started running.<br><br>Ex. 4 to Le Decl., Adams Dep. 37:10-12.<br><br>Adams fired three volleys of shots with two distinct pauses between the volleys. |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | Ex. 4 to Le Decl., Adams Dep. 37:15-18. |
| 97.    Adams moved closer to the front passenger side of the vehicle to gain cover.<br><br>Adams Decl. ¶ 5, Ex. A – Kee Dashcam Video; Clarke Decl. ¶ 14, Ex. X – Adams Depo. 50:6-10. | **Objection**. Vague as to time.<br><br>Undisputed to the extent that Adams moved closer to the passenger side of the vehicle and was behind the open passenger door for cover when he fired his second volley.<br><br>Ex. 4 to Le Decl., Adams Dep. 50:3-10, 74:3-9; Ex. 12 to Le Decl., Kee Dashcam Video at 46:55-47:02. |
| 98.    Adams returned fire with Puga while he was getting cover.<br><br>Adams Decl. ¶ 5, Ex. A – Kee Dashcam Video; Clarke Decl. ¶ 14, Ex. X – Adams Depo. 50:6-10. | **Disputed**.<br><br>As soon as Puga turned to run, officers shot at Puga.<br><br>Ex. 2 to Le Decl., Rubalcava Dep. 60:20-61:1; Ex. 5 to Le Decl., Vaccari Dep. 42:24-43:2, 47:5-14; Ex. 7 to Le Decl., Mangerino Dep. 34:3-9, 36:15-17, 37:11-13; Gonzalez Dep. 42:25-43:1, 55:1-4, 97:5-11, 97:12-15; Ex. 10 to Le Decl., Mangerino Cellphone Video at 0:00:51-00:54; Ex. 13 to Le Decl., Gonzalez Cellphone Video at 0:06:24-06:31.<br><br>Puga never grabbed or aggressively reached for anything prior to the shots.<br><br>Ex. 8 to Le Decl., Gonzalez Dep. 16:1-3; Ex. 14 to Le Decl., Botten Dep. 129:13-25, 130:6-12. |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | Puga never had a gun in his hand.<br><br>Ex. 8 to Le Decl., Gonzalez Dep. 97:16-25, 83:21-24; Ex. 14 to Le Decl., Botten Dep. 129:13-25, 130:6-12.<br><br>Puga never pointed his hand or a weapon in any specific direction or at any officer.<br><br>Ex. 5 to Le Decl., Vaccari Dep. 64:8-17; Ex. 8 to Le Decl., Gonzalez Dep. 97:1-6.<br><br>Puga never fired a weapon at any officer.<br><br>Ex. 7 to Le Decl., Mangerino Dep. 37:14-16; Ex. 8 to Le Decl., Gonzalez Dep. 132:22-24; Ex. 14 to Le Decl., Botten Dep. 129:13-25, 130:6-12.<br><br>Neither smoke nor any muzzle flash ever came from Puga.<br><br>Ex. 3 to Le Decl., Blackwood Dep. 20:10-12; Ex. 4 to Le Decl., Adams Dep. 36:12-18; Ex. 5 to Le Decl., Vaccari Dep. 48:14-20; Ex. 8 to Le Decl., Gonzalez Dep. 99:8-25.<br><br>None of the videos capturing the incident show Puga with a gun in his hand.<br><br>Ex. 1 to Le Decl., Kee Dep. 7:16-18; Ex. 5 to Le Decl., Vaccari Dep. 9:15-18. |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | None of the videos capturing the incident show Puga ever pointing a gun at anyone.

Ex. 1 to Le Decl., Kee Dep. 7:22-24; Ex. 5 to Le Decl., Vaccari Dep. 9:19-21.

None of the videos capturing the incident show Puga ever firing a gun.

Ex. 1 to Le Decl., Kee Dep. 7:19-21.

None of the videos capturing the incident show any muzzle flash coming from the area Puga was at.

Ex. 1 to Le Decl., Kee Dep. 92:14-16; Ex. 2 to Le Decl., Rubalcava Dep. 93:17-19

Gonzalez saw Puga's waistband when he turned to take off running and never saw a gun in his waistband.

Ex. 8 to Le Decl., Gonzalez Dep. 95:15-25, 115:18-21. |
| 99.     Adams continued returning fire with Puga while Puga was in the northwest corner in a dirt area.

Adams Decl. ¶ 5, Ex. A – Kee Dashcam Video; Adams Decl. ¶ 6, Ex. B – Mangerino Neighbor Video; Clarke Decl. ¶ 14, Ex. X -Adams Depo. 37:23-38:4, 38:8-11, 50:15-21 | **Disputed**.

As soon as Puga turned to run, officers shot at Puga.

Ex. 2 to Le Decl., Rubalcava Dep. 60:20-61:1; Ex. 5 to Le Decl., Vaccari Dep. 42:24-43:2, 47:5-14; Ex. 7 to Le Decl., Mangerino Dep. 34:3-9, 36:15- |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | 17, 37:11-13; Gonzalez Dep. 42:25-43:1, 55:1-4, 97:5-11, 97:12-15; Ex. 10 to Le Decl., Mangerino Cellphone Video at 0:00:51-00:54; Ex. 13 to Le Decl., Gonzalez Cellphone Video at 0:06:24-06:31.

Puga never grabbed or aggressively reached for anything prior to the shots.

Ex. 8 to Le Decl., Gonzalez Dep. 16:1-3; Ex. 14 to Le Decl., Botten Dep. 129:13-25, 130:6-12.

Puga never had a gun in his hand.

Ex. 8 to Le Decl., Gonzalez Dep. 97:16-25, 83:21-24; Ex. 14 to Le Decl., Botten Dep. 129:13-25, 130:6-12.

Puga never pointed his hand or a weapon in any specific direction or at any officer.

Ex. 5 to Le Decl., Vaccari Dep. 64:8-17; Ex. 8 to Le Decl., Gonzalez Dep. 97:1-6.

Puga never fired a weapon at any officer.

Ex. 7 to Le Decl., Mangerino Dep. 37:14-16; Ex. 8 to Le Decl., Gonzalez Dep. 132:22-24; Ex. 14 to Le Decl., Botten Dep. 129:13-25, 130:6-12.

Neither smoke nor any muzzle flash ever came from Puga. |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | Ex. 3 to Le Decl., Blackwood Dep. 20:10-12; Ex. 4 to Le Decl., Adams Dep. 36:12-18; Ex. 5 to Le Decl., Vaccari Dep. 48:14-20; Ex. 8 to Le Decl., Gonzalez Dep. 99:8-25. |
| | None of the videos capturing the incident show Puga with a gun in his hand. |
| | Ex. 1 to Le Decl., Kee Dep. 7:16-18; Ex. 5 to Le Decl., Vaccari Dep. 9:15-18. |
| | None of the videos capturing the incident show Puga ever pointing a gun at anyone. |
| | Ex. 1 to Le Decl., Kee Dep. 7:22-24; Ex. 5 to Le Decl., Vaccari Dep. 9:19-21. |
| | None of the videos capturing the incident show Puga ever firing a gun. |
| | Ex. 1 to Le Decl., Kee Dep. 7:19-21. |
| | None of the videos capturing the incident show any muzzle flash coming from the area Puga was at. |
| | Ex. 1 to Le Decl., Kee Dep. 92:14-16; Ex. 2 to Le Decl., Rubalcava Dep. 93:17-19 |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | Gonzalez saw Puga's waistband when he turned to take off running and never saw a gun in his waistband.

Ex. 8 to Le Decl., Gonzalez Dep. 95:15-25, 115:18-21.

As Puga was running, he never turned around to look at the officers.

Ex. 8 to Le Decl., Gonzalez Dep. 100:13-17.

While Puga was running, his hands were moving in a running motion.

Ex. 8 to Le Decl., Gonzalez Dep. 116:16-21.

None of the videos that captured the shooting ever show Puga turn back towards the officers or point his hand back towards the officers.

Ex. 10 to Le Decl., Erin Mangerino Cellphone Video at 0:00:50-01:44; Ex. 11 to Le Decl., Rubalcava Dashcam Video at 0:42:23-42:47; Kee Dashcam Video at 46:47-47:07.

When asked during his interview with detectives after the incident as to what caused Rubalcava to fire his second volley, Rubalcava answered that Puga was still fleeing but that Puga was not doing anything with any alleged weapon. |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | Ex. 2 to Le Decl., Rubalcava Dep. 55:8-22.<br><br>Blackwood was trying to assess while he was firing by looking for a gun but could not see Puga's hands and therefore never saw Puga with a gun while Puga was running away.<br><br>Ex. 3 to Le Decl., Blackwood Dep. 24:10-13, 30:23-31:11, 45:23-46:2.<br><br>During the time Blackwood was shooting at Puga, Blackwood could not see Puga's hands.<br><br>Ex. 3 to Le Decl., Blackwood Dep. 36:18-20. |
| 100.    Adams fired a total of 10 shots from his 9mm.<br><br>Clarke Decl. ¶ 14, Ex. X - Adams Depo 37:13-14; Haag Decl. ¶ 13. | <u>Undisputed</u>. |
| 101.    All rounds Adams discharged from the passenger side of Puga's vehicle.<br><br>Clarke Decl. ¶ 14, Ex. X - Adams Depo. 38:8-11, 39:13- 16, 47:10-14, 50:15-21, 55:16- 18, Haag Decl. ¶ 13. | <u>Undisputed</u>. |
| 102.    All rounds Adams' discharged were in a northwesterly direction as Puga ran in the same northwesterly direction. | <u>Undisputed</u>. |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Clarke Decl. ¶ 14, Ex. X - Adams Depo. 38:8-11, 39:13-16, 47:10-14, 50:15-21, 55:16-18, Haag Decl. ¶ 13 | |
| 103.    Sergeant Vaccari did not discharge his firearm.<br><br>Clarke Decl. ¶ 15, Ex. Y - Vaccari Depo. 50:25-51:10; Haag Decl. ¶ 11. | Undisputed. |
| 104.    Botten Sr. was shot and only shrapnel and bullet fragments were recovered from his injuries.<br><br>Clarke Decl. ¶ 6, Ex. P - Botten Sr. Depo. 71:20-73:7, 74:7-14. | **Disputed**.<br><br>Botten, Sr. was told by a doctor treating his gunshot wounds that the straight through gunshot wound to his right forearm was caused by either a 40 or 45 caliber bullet.<br><br>Botten Decl. ¶ 3. |
| 105.    Only shrapnel and bullet fragments were recovered from Tanja Dudek- Botten's injuries.<br><br>Clarke Decl. ¶ 6, Ex. P - Botten Sr. Depo 85:25-86:6, 110:7-13; Clarke Decl. ¶ 7, Ex. Q - Tanja Depo. 40:2-6, 79:2-24. | Undisputed. |
| 106.    Jonathan Botten Jr. likewise testified he believes he was injured by bullet fragments.<br><br>Clarke Decl. ¶ 9, Ex. S - Botten Jr. 105:21-106:7. | **Objection**. The cited evidence does not support the alleged fact. |
| 107.    A review of the injuries suffered by the Botten Plaintiffs are all consistent with rifle bullet fragments<br><br>Haag Decl. ¶ 19. | **Disputed**.<br><br>Botten, Sr. was told by a doctor treating his gunshot wounds that the straight through gunshot wound to his right forearm was caused by either a 40 or 45 caliber bullet. |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | Botten Decl. ¶ 3. |
| 108.    The injuries to Plaintiffs were not as a consequence of direct projectile strikes, such as the 9mm bullets fired by Deputy Adams.<br><br>Haag Decl. ¶¶ 17, 19-22. | **Disputed**.<br><br>Botten, Sr. was told by a doctor treating his gunshot wounds that the straight through gunshot wound to his right forearm was caused by either a 40 or 45 caliber bullet.<br><br>Botten Decl. ¶ 3. |
| 109.    The 9mm pistol bullets fired by Deputy Adams can be excluded as the source of the Botten family's injuries.<br><br>Haag Decl. ¶ 20. | Undisputed. |
| 110.    9mm bullets have a relatively velocity.<br><br>Haag Decl. ¶ 17. | **Objection**. Vague and confusing as to "a relatively velocity." Unintelligible. |
| 111.    The 9mm bullets have a propensity to remain intact following shallow incident angle strikes and subsequent ricochet from ground and roadway (asphalt) impacts.<br><br>Haag Decl. ¶ 17. | Undisputed. |
| 112.    The injuries sustained by the Botten family are therefore consistent with the ammunition fired by the AR-15 rifle used by either Sergeant Kee and/or Officer Blackwood, and not the 9mm bullets utilized by Deputy Adams.<br><br>Haag Decl. ¶¶ 11, 17-22. | **Disputed** to the extent that the Botten family only sustained injuries from an AR-15 rifle.<br><br>Botten, Sr. was told by a doctor treating his gunshot wounds that the straight through gunshot wound to his right forearm was caused by either a 40 or 45 caliber bullet. |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | Botten Decl. ¶ 3. |
| 113.   Sergeant Kee was the only officer shooting in a northeastern direction with a rifle.<br><br>Adams Decl. ¶ 6, Ex. B. | Undisputed. |
| 114.   Puga ran in a northwestern direction away from the Botten house.<br><br>Adams Decl. ¶ 5, Ex. A – Kee Dashcam Video; Adams Decl. ¶ 6, Ex. B – Mangerino Neighbor Video; Clarke Decl. ¶ 14, Ex. X – Adams Depo. 47:10-23; Haag Decl. ¶ 23, Ex. H; Haag Decl. ¶ 25, Ex. J. | Undisputed. |
| 115.   Even if his bullets were to have ricocheted, they would remain intact.<br><br>Haag Decl. ¶ 17. | Undisputed. |
| 116.   Intact bullets could not have caused the injuries sustained by the Botten family.<br><br>Haag Decl. ¶¶ 19-21. | **Disputed**.<br><br>Botten, Sr. was told by a doctor treating his gunshot wounds that the straight through gunshot wound to his right forearm was caused by either a 40 or 45 caliber bullet.<br><br>Botten Decl. ¶ 3. |
| 117.   No intact 9mmm bullets were recovered from Plaintiffs or their residence.<br><br>Haag Decl. ¶¶ | Undisputed. |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| 118.    Law enforcement officers are trained to be aware of and clear their background prior to using deadly force.<br><br>Clarke Decl. ¶ 15, Ex. Y - Vaccari Depo. 17:5-13; Clarke Decl. ¶ 16, Ex. Z - Kee Depo. 54:16-25; Clarke Decl. ¶ 17, Ex. AA - Rubalcava Depo. 20:20-21:1 | Undisputed. |
| 119.    On April 6, 2021, Jonathan Botten Sr. submitted a Tort Claim to the County of San Bernardino.<br><br>Clarke Decl. ¶ 10, Ex. T – Botten Sr. Tort Claim. | Undisputed. |
| 120.    On April 6, 2021, Tanja Dudek-Botten submitted a Tort Claim to the County of San Bernardino.<br><br>Clarke Decl. ¶ 11, Ex. U – Botten Sr. Tort Claim. | Undisputed. |
| 121.    On April 6, 2021, Annabelle Botten submitted a Tort Claim to the County of San Bernardino.<br><br>Clarke Decl. ¶ 12, Ex. V – Annabelle Botten Tort Claim. | Undisputed. |
| 122.    On April 6, 2021, Jonathan Botten Jr. submitted a Tort Claim to the County of San Bernardino.<br><br>Clarke Decl. ¶ 13, Ex. W – Botten Jr. Tort Claim. | Undisputed. |
| 123.    Jonathan Botten Sr.'s tort claim recited the following as the basis of the claim: "On or about February 17, 2021, various police agencies including the California Highway Patrol were in | Undisputed. |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| pursuit of and apprehending an alleged suspect at or about the roadway near the home of claimants.  There were shots fired by the police agency employees.  Respondent family members were at their home located at 17944 Catalpa Street, Hesperia, Ca 92395.  The bullets shot and fired in the course of the pursuit and apprehension struck claimant resulting in serious injury and damage."<br><br>Clarke Decl. ¶ 10, Ex. T – Botten Sr. Tort Claim. | |
| 124.    Tanja Dudek-Botten's tort claim recited the following as the basis of the claim: "On or about February 17, 2021, various police agencies including the California Highway Patrol were in pursuit of and apprehending an alleged suspect at or about the roadway near the home of claimants. There were shots fired by the police agency employees. Respondent family members were at their home located at 17944 Catalpa Street, Hesperia, Ca 92395. The bullets shot and fired in the course of the pursuit and apprehension struck claimant resulting in serious injury and damage."<br>and damage."<br><br>Clarke Decl. ¶ 11, Ex. U – Tanja Dudek-Botten Tort Claim. | <u>Undisputed.</u> |
| 125.    Annabelle Botten's tort claim recited the following as the basis of the claim: "On or about February 17, 2021, various police agencies including the | <u>Undisputed.</u> |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| California Highway Patrol were in pursuit of and apprehending an alleged suspect at or about the roadway near the home of claimants. There were shots fired by the police agency employees. Respondent family members were at their home located at 17944 Catalpa Street, Hesperia, Ca 92395. The bullets shot and fired in the course of the pursuit and apprehension struck claimant resulting in serious injury and damage."

Clarke Decl. ¶ 12, Ex. V – Annabelle Botten Tort Claim. | |
| 126.    Jonathan Botten Jr.'s tort claim recited the following as the basis of the claim: "On or about February 17, 2021, various police agencies including the California Highway Patrol were in pursuit of and apprehending an alleged suspect at or about the roadway near the home of claimants. There were shots fired by the police agency employees. Respondent family members were at their home located at 17944 Catalpa Street, Hesperia, Ca 92395. The bullets shot and fired in the course of the pursuit and apprehension struck claimant resulting in serious injury and damage."

Clarke Decl. ¶ 13, Ex. W – Botten Jr. Tort Claim. | <u>Undisputed.</u> |
| 127.    Jonathan Botten Sr. was inside of the residence while Puga was inside of his vehicle. | **Objection**. Vague as to "the residence" and to time. |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| Clarke Decl. ¶ 6, Ex. P 25:5- 15 | <u>Undisputed</u> that Botten, Sr. was inside of his residence for the entirety of the incident, including the shooting and only exited his residence after the shooting had ended. |
| 128.    Tanja Dudek-Botten was inside of the residence while Puga was inside of his vehicle.<br><br>Clarke Decl. ¶ 7, Ex. Q 90:14- 91:10. | **Objection**. Vague as to "the residence" and to time.<br><br><u>Undisputed</u> that Dudek-Botten was inside of his residence for the entirety of the incident, including the shooting and only exited his residence after the shooting had ended. |
| 129.    Annabelle Botten was inside of the residence while Puga was inside of his vehicle.<br><br>Clarke Decl. ¶ 8, Ex. R 42:3-21 | **Objection**. Vague as to "the residence" and to time.<br><br><u>Undisputed</u> that Annabelle Botten was inside of his residence for the entirety of the incident, including the shooting. |
| 130.    Jonathan Botten Jr. was inside of the residence while Puga was inside of his vehicle.<br><br>Clarke Decl. ¶ 9, Ex. S 98:2- 99:5. | **Objection**. Vague as to "the residence" and to time.<br><br><u>Undisputed</u> that J.B. was inside of his residence for the entirety of the incident, including the shooting and only exited his residence after the shooting had ended. |
| 131.    Plaintiffs have no admissible evidence to support any of the claims Plaintiff has alleged against the County Defendants.<br><br>As summarized by the Ninth Circuit, "the Celotex 'showing' can be made by | **Objection**. Legal conclusion; the citation is not "evidence" and does not support the alleged "fact."<br><br>**Disputed**. |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| pointing out through argument – the absence of evidence to support plaintiff's claim." *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc); *see, Celotex Corp.*, *supra*, 477 U.S. at 323. (There is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponents claim"). | The helicopter continued to orbit overhead for approximately 30 minutes, illuminating the middle of the intersection where the two streets cross and the four homes on the corners. |
| | Ex. 1 to Le Decl., 28:7-15; Ex. 3 to Le Decl., Blackwood Dep. 59:23-61:1. |
| | The house on the northeast corner, ("Botten Residence") had its porch light on and the helicopter's spotlight would occasionally illuminate the entire house while it orbited overhead. |
| | Ex. C to Esquivel Decl., 12:56-13:13, 13:41-13:46, 14:15-14:25; Ex. 7 to Le Decl., Mangerino Dep. 56:1-10. |
| | There was also a streetlight on the corner of Peach and Catalpa as well as the patrol vehicles' spotlights and red and blue lights illuminating the area. |
| | Ex. 2 to Le Decl., Rubalcava Dep. 37:8-15; Ex. 7 to Le Decl., Mangerino Dep. 40:17-41:6. |
| | At the time of the incident, the officers were aware they had stopped in a residential neighborhood. |
| | Ex. 1 to Le Decl., Kee Dep. 18:10-12; Ex. 2 to Le Decl., Rubalcava Dep. 20:13-16; Ex. 4 to Le Decl., Adams Dep. 44:12-18; Ex. 5 to Le Decl., Vaccari Dep. 37:17-22. |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | At the time of the incident, Blackwood, Adams, and Vaccari were aware that there were houses on each of the four corners of the intersection. |
| | Ex. 3 to Le Decl., Blackwood Dep. 59:23-61:1; Ex. 4 to Le Decl., Adams Dep. 44:12-18; Ex. 5 to Le Decl., Vaccari Dep. 37:17-22. |
| | For a period of time, the officers attempted to get Puga out of the vehicle but he was not coming out. |
| | Ex. 1 to Le Decl., Kee Dep. 19:10-13. |
| | At some point, Kee considered calling in the SWAT Team and spoke to Vaccari about it. |
| | Ex. 1 to Le Decl., Kee Dep. 19:17-20:2. |
| | Kee made the request because from his experience, SWAT sometimes comes out for barricaded suspects. |
| | Ex. 1 to Le Decl., Keep Dep. 20:12-17. |
| | Kee was told that SWAT would not come out for something of this nature. |
| | Ex. 1 to Le Decl., Kee Dep. 20:3-6. |
| | Kee saw Vaccari go back to his car and get on a cell phone but does not know whether Vaccari actually called to inquire about SWAT. |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | Ex. 1 to Le Decl., Kee Dep. 20:7-11. |
| | Vaccari did not have his cell phone to call SWAT and claims he told Kee this. |
| | Ex. 5 to Le Decl., Vaccari Dep. 26:8-14. |
| | Vaccari had forgotten his cell phone at the station. |
| | Ex. 6 to Le Decl., Vaccari Int. 20:1-6. |
| | Vaccari has dealt with barricaded suspects in homes before and has called SWAT to come assist with those suspects. |
| | Ex. 5 to Le Decl., Vaccari Dep. 12:14-15. |
| | When SWAT is called, they would sometimes give suggestions or advice and other times they would come out. |
| | Ex. 5 to Le Decl., Vaccari Dep. 13:5-13. |
| | There were also times when SWAT would give suggestions or advice and when Vaccari recontacted them, SWAT would come out. |
| | Ex. 5 to Le Decl., Vaccari Dep. 13:14-17. |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | Vaccari does not know what SWAT's criteria was in order for them to come out for a barricaded suspect. |
| | Ex. 5 to Le Decl., Vaccari Dep. 13:18-23. |
| | If SWAT had responded, Kee would have let them handle the situation. |
| | Ex. 1 to Le Decl., Kee Dep. 48:12-21. |
| | The officers never developed a tactical plan. |
| | Ex. 4 to Le Decl., Adams Dep. 19:10-21; Ex. 5 to Le Decl., 36:20-25. |
| | After deploying the pepper balls for approximately 30 minutes, Vaccari thought about contacting SWAT by having Dispatch send their phone number to his screen and using someone else's phone. |
| | Ex. 6 to Le Decl., Vaccari Int. 27:26-28:3. |
| | Instead, Vaccari decided to intentionally hit Puga with pepper balls to try to motivate Puga with pain to come out. |
| | Ex. 6 to Le Decl., Vaccari Int. 28:11-20. |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | The officers were treating Puga as if he had a firearm when Puga exited the vehicle.

Ex. 5 to Le Decl., Vaccari Dep. 34:2-6.

Puga stood near the driver's side of the car for a period of time and during that time, the officers were able to see Puga's hands.

Ex. 1 to Le Decl., Kee Dep. 23:23-24:3.

Puga's hands were raised for the majority of the time he was positioned near the driver's side of the vehicle.

Ex. 1 to Le Decl., Kee Dep. 24:3-6; Ex. 3 to Le Decl., Blackwood Dep. 15:7-12; Ex. 5 to Le Decl., Vaccari Dep. 34:7-9.

Puga did not have anything in his hands and he never reached for any weapon while he was standing near the driver's side of the vehicle.

Ex. 1 to Le Decl., Kee Dep. 24:7-9; Ex. 2 to Le Decl., 38:8-20 Ex. 3 to Le Decl., Blackwood Dep. 15:25-16:2.

While Puga was standing at the driver's side of the vehicle, there was no discussion about a tactical plan.

Ex. 4 to Le Decl., Adams Dep. 22:9-12. |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | After Puga went to the front of the vehicle, the officers still did not have any discussion regarding a tactical plan. |
| | Ex. 4 to Le Decl., Adams Dep. 25:2-11. |
| | Puga had his hands up while he was positioned near the front of the Expedition. |
| | Ex. 2 to Le Decl., Rubalcava Dep. 40:3-5. |
| | When Puga was at front of the Expedition, Puga did not have anything in his hands. |
| | Ex. 2 to Le Decl., Rubalcava Dep. 40:6-8. |
| | Puga occasionally would drop his hands to pull up his pants while he was standing near the front of the vehicle. |
| | Ex. 4 to Le Decl., Adams Dep. 61:3-62:3; Ex. 8 to Le Decl., Gonzalez Dep. 42:18-25. |
| | Kee and Rubalcava did not coordinate with the SBSD Sheriffs' deputies regarding any plan to approach and take Puga into custody. |
| | Ex. 1 to Le Decl., Kee Dep. 28:16-19; Ex. 2 to Le Decl., Rubalcava Dep. |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | 40:23-25; Ex. 5 to Le Decl., Vaccari Dep. 36:16-19.

Kee and Rubalcava were not aware that Vaccari and Adams were also approaching Puga.

Ex. 1 to Le Decl., Kee Dep. 28:20-22; Ex. 2 to Le Decl., Rubalcava Dep. 41:8-11.

Vaccari was still treating Puga as if he was armed with a weapon while Puga was standing near the front of the vehicle.

Ex. 5 to Le Decl., Vaccari Dep. 36:12-15.

When Vaccari and Adams saw Kee and Rubalcava move towards the shoulder of Peach Street, they thought they were moving to just get a better view of Puga, not to approach Puga.

Ex. 4 to Le Decl., Adams Dep. 26:21-27:3; Ex. 5 to Le Decl., Vaccari Dep. 37:1-11, 38:7-12

Vaccari wanted to move up the passenger side of the vehicle to cut off an avenue of escape for Puga.

Ex. 5 to Le Decl., Vaccari Dep. 39:6-20. |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | The only cover Vaccari and Adams had when moving up was the passenger's side of Puga's vehicle.

Ex. 5 to Le Decl., Vaccari Dep. 39:21-25.

As Vaccari approached from the dirt shoulder, he did not have any cover.

Ex. 5 to Le Decl., Vaccari Dep. 41:14-24.

One of Adams' concern with being in a residential neighborhood was innocent people being struck due to the number of shots fired.

Ex. 4 to Le Decl., Adams Dep. 55:19-22.

Kee never considered evacuating the people in the nearby homes nor did he ever discuss it with the SBSD deputies.

Ex. 1 to Le Decl., Kee Dep. 61:14-24.

Vaccari never considering alerting the nearby residences of potential harm or evacuating the people in the homes on the four corners of the intersection.

Ex. 5 to Le Decl., Vaccari Dep. 37:17-38:6.

The Botten family, consisting of father Jonathan Wayne Botten, Sr., mother Tanja Dudek-Botten, daughter |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | Annabelle Botten, and son J.B., were inside their house when the shooting happened.

Ex. 14 to Le Decl., Botten Dep. 63:4-64:2, 64:16-19.

When the shooting started, Botten, Sr. fell back into the house and onto the ground and felt a throbbing to his right arm.

Ex. 14 to Le Decl., Botten Dep. 64:20-24.

Botten, Sr. then heard his wife screaming, saw blood all over her face and body, and heard his wife say that she had been shot in the face.

Ex. 14 to Le Decl., Botten Dep. 64:25-65:4.

J.B. sustained three gunshot wounds to his chest that resulted in a collapsed lung on his left side, a ruptured spleen, and a lot damage to his internal organs due to the spreading of the bullets.

Ex. 14 to Le Decl., Botten Dep. 68:11-15.

Dudek-Botten sustained gunshot wounds to her face, chest, and right shoulder.

Ex. 14 to Le Decl., Botten Dep. 85:20-86:3, 86:7-14, 109:18-110:4. |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
|  | Botten, Sr. sustained gunshot wounds to his right arm, left arm, left hand, and right leg.<br><br>Ex. 14 to Le Decl., Botten Dep. 70:5-9, 71:20-72:5, 74:7-15, 75:14-20, 76:1-7.<br><br>There were bullet strikes to the front of the Botten residence, the screen door of the residence, one of the bedroom windows, and the side of the residence.<br><br>Ex. 18 to Le Decl., Ripley Dep. 31:16-33:19.<br><br>The tactics used by Kee, Rubalcava, Blackwood, Jake Adams, and Vaccari violated standard police practices and training, which contributed to or was a cause of the shooting of Puga, Jonathan Wayne Botten, Sr., Tanja Dudek-Botten, and J.B.<br><br>Clark Decl. ¶ 11.<br><br>The officers' failure to follow standard police practices and training in dealing with barricaded subjects, poor tactics, and rushing to take Puga into custody once he was outside of the vehicle all contributed to the officers' unnecessary use of lethal force.<br><br>Clark Decl. ¶ 12.<br><br>The officers failed to formulate a safe tactical plan, made poor tactical |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | decisions, and limited their tactical options, ultimately leading to their unnecessary use of lethal force.

Clark Decl. ¶ 12a.

POST Learning Domain 23, "Crimes in Progress," advises officers that if available, officers should request specialized units and resources as soon as it has been determined that the suspect has taken a barricaded position.

Clark Decl. ¶ 12b.

SWAT specifically trains to respond to incidents where subject(s) may be armed, barricaded, and refusing to submit to arrest.

Clark Decl. ¶ 12b.

The utilization of San Bernardino Sheriff's Department SWAT would have been a safer alternative as SWAT is equipped with special training, equipment, and tools, which can help resolve the situation of a barricaded subject without escalating the situation.

Clark Decl. ¶ 12b.

Given that the officers believed that Puga was involved in a prior freeway shooting, was still armed, was refusing to exit his vehicle, and was situated in a residential neighborhood, Vaccari's failure to request for SWAT to respond |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | when initially requested by Kee and after initial less-lethal force was unsuccessful were poor tactical decisions that contributed to the officers' use of unnecessary lethal force.

Clark Decl. ¶ 12c.

Among the "Fatal Errors" listed by POST Learning Domain 23, "Crimes in Progress," is poor positioning due to rushing or poor tactics.

Clark Decl. ¶ 12d.

The officers' decision to leave cover and enter an open-air environment to take Puga into custody, when the officers stated that they still believed Puga to be armed and dangerous, and Kee stated that he was in fear for his life at the time he made the decision to approach and take Puga into custody, was a tactically poor decision.

Clark Decl. ¶ 12d.

The situation did not call for an urgent response at the time the officers approached Puga.

Clark Decl. ¶ 12d

Officers are trained that a detention is an assertion of authority by a peace officer that would cause a reasonable person to believe they are not free to |

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | leave and that such a belief may result from physical restraint, unequivocal verbal commands, or other conduct by an officer.

Clark Decl. ¶ 18a

A reasonable officer facing the facts and circumstances confronting the involved officers knew or should have known that there were innocent bystanders inside the residential homes surrounding the incident location in the middle of the night.

Clark Decl. ¶ 18b.

A reasonably trained officer facing the same facts and circumstances as the involved officers would understand that the officers' ongoing flashing lights, commands, and deployments of force, would cause a reasonable person residing in the nearby residences to believe that they were not free to leave their residence.

Clark Decl. ¶ 18c.

The officers violated standard police practices and training in failing to request backup to set up a perimeter and evacuate uninvolved individuals from the area in order the ensure the safety of these uninvolved individuals.

Clark Decl. ¶ 20. |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

| Moving Party's (County) Alleged Uncontroverted Facts and Supporting Evidence | Opposing Party's Response to Cited Fact and Supporting Evidence |
|---|---|
| | POST Learning Domain 23 advises officers that the safety of uninvolved individuals must be the principal concern to officers who respond to high-risk situations involving barricaded suspects.<br><br>Clark Decl. ¶ 20a.<br><br>The officers' failure to follow standard practices and training in responding to high-risk situations involving barricaded suspects by requesting backup, setting up a perimeter, and evacuating all uninvolved individuals from the area contributed to the injuries suffered by the Botten family.<br><br>Clark Decl. ¶ 20.<br><br>A reasonably trained officer facing the same circumstances would have requested backup and additional resources in order to deal with a potentially armed, barricaded subject in order to ensure the safety of all uninvolved individuals in the area.<br><br>Clark Decl. ¶ 20c. |

## PLAINTIFFS' ADDITIONAL MATERIAL FACTS

| Plaintiffs' (Nonmoving Party) Additional Material Facts | Supporting Evidence |
|---|---|
| 132.   On February 17, 2021, CHP officers Bernardo Rubalcava and Michael Blackwood initiated a pursuit of a white Expedition due to it matching the description of a vehicle that had been involved in a prior freeway shooting. | Ex. 1 to Le Decl., Kee Dep. 14:6-9, 75:3-17; Ex. 3 to Le Decl., Blackwood Dep. 51:3-10. |
| 133.   CHP Sergeant Isaiah Kee also joined the pursuit. | Ex. 1 to Le Decl., Kee Dep. 75:13-17. |
| 134.   San Bernardino County Sheriff's Department received a call from dispatch requesting assistance with the pursuit. | Ex. 5 to Le Decl., Vaccari Dep. 18:23-19:3. |
| 135.   SBSD Sergeant Robert Vaccari and Deputy Jake Adams joined the pursuit to assist. | Ex. 4 to Le Decl., Adams Dep. 9:12-13; Ex. 5 to Le Decl., Vaccari Dep. 18:17-19:3. |
| 136.   CHP requested that SBSD take over the pursuit but Vaccari declined because he did not know the details of the alleged crime and did not know what CHP's policies and procedures were for trading or taking over a pursuit and did not want CHP to drop out of the pursuit in the event he agreed to take over. | Ex. 6 to Le Decl., Vaccari Int. 12:22-13:3 |
| 137.   There was little to no traffic on the road and no passing pedestrians during the pursuit. | *See* Ex. D to Esquivel Decl., Blackwood MVARS, Part 1; Ex. E to Esquivel Decl., Blackwood MVARS, Part 2. |
| 138.   The white Expedition never targeted any of the officers nor forced other vehicles off the road during the pursuit. | *See* Ex. D to Esquivel Decl., Blackwood MVARS, Part 1; Ex. E to Esquivel Decl., Blackwood MVARS, Part 2. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | Supporting Evidence |
|---|---|
| 139.    The white Expedition's speed during the pursuit was fast but not outrageous as even on the freeway, the Expedition was only going 80 miles per hour. | Ex. 6 to Le Decl., Vaccari Int. 13:22-24; Ex. 4 to Le Decl., Adams Dep. 12:3-13. |
| 140.    At some point during the pursuit, Vaccari requested SBSD's police helicopter to join the pursuit and the helicopter did join the pursuit. | Ex. 6 to Le Decl., Vaccari Int. 15:6-11. |
| 141.    As the pursuit continued down the dirt road, the Expedition's driving was not erratic. | Ex. 6 to Le Decl., Vaccari Int. 16:6-8. |
| 142.    The officers did not see any weapon in the white Expedition during the pursuit. | Ex. 1 to Le Decl., Kee Dep. 16:16-18; Ex. 4 to Le Decl., Adams Dep. 12:14-17 |
| 143.    Spike strips were successfully deployed on the Expedition around Main Street. | Ex. F to Esquivel Decl. at 8:25; Ex. 6 to Le Decl., Vaccari Int. 17:2-3. |
| 144.    The Expedition then turned north onto Peach and slowed down significantly, traveling approximately 5 to 10 miles per hour before coming to a stop at the intersection of Peach and Catalpa. | Ex. F to Esquivel Decl. at 8:25-9:12; Ex. 6 to Le Decl., Vaccari Int. 17:4-6, 17:15-19; Ex. 1 to Le Decl., Kee Dep. 16:22-24. |
| 145.    The helicopter continued to orbit overhead for approximately 30 minutes, illuminating the middle of the intersection where the two streets cross and the four homes on the corners. | Ex. 1 to Le Decl., 28:7-15; Ex. 3 to Le Decl., Blackwood Dep. 59:23-61:1. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | Supporting Evidence |
|---|---|
| 146.    The house on the northeast corner, ("Botten Residence") had its porch light on and the helicopter's spotlight would occasionally illuminate the entire house while it orbited overhead. | Ex. C to Esquivel Decl., 12:56-13:13, 13:41-13:46, 14:15-14:25; Ex. 7 to Le Decl., Mangerino Dep. 56:1-10. |
| 147.    There was also a streetlight on the corner of Peach and Catalpa as well as the patrol vehicles' spotlights and red and blue lights illuminating the area. | Ex. 2 to Le Decl., Rubalcava Dep. 37:8-15; Ex. 7 to Le Decl., Mangerino Dep. 40:17-41:6. |
| 148.    At the time of the incident, the officers were aware they had stopped in a residential neighborhood. | Ex. 1 to Le Decl., Kee Dep. 18:10-12; Ex. 2 to Le Decl., Rubalcava Dep. 20:13-16; Ex. 4 to Le Decl., Adams Dep. 44:12-18; Ex. 5 to Le Decl., Vaccari Dep. 37:17-22. |
| 149.    At the time of the incident, Blackwood, Adams, and Vaccari were aware that there were houses on each of the four corners of the intersection. | Ex. 3 to Le Decl., Blackwood Dep. 59:23-61:1; Ex. 4 to Le Decl., Adams Dep. 44:12-18; Ex. 5 to Le Decl., Vaccari Dep. 37:17-22. |
| 150.    Kee never considered evacuating the people in the nearby homes nor did he ever discuss it with the SBSD deputies. | Ex. 1 to Le Decl., Kee Dep. 61:14-24. |
| 151.    Vaccari never considering alerting the nearby residences of potential harm or evacuating the people in the homes on the four corners of the intersection. | Ex. 5 to Le Decl., Vaccari Dep. 37:17-38:6. |
| 152.    At some point, a female exited the vehicle and was taken into custody, after which she informed | Ex. 4 to Le Decl., Adams Dep. 13:4-25. |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

| Plaintiffs' (Nonmoving Party) Additional Material Facts | Supporting Evidence |
|---|---|
| Adams that the driver, later identified as Hector Puga, of his first name and that he was a new father and wanted to call his wife. | |
| 153. The officers had never seen Puga before and did not have any specific knowledge regarding Puga's criminal history. | Ex. 1 to Le Decl., Kee Dep. 53:7-9; Ex. 2 to Le Decl., Rubalcava Dep. 32:2-6; Ex. 4 to Le Decl., Adams Dep. 14:6-13. |
| 154. The officers also did not have any specific information that Puga had injured anyone. | Ex. 2 to Le Decl., Rubalcava Dep. 31:18-32:1; Ex. 3 to Le Decl., Blackwood Dep. 16:8-10. |
| 155. The officers did not have any specific information as to whether Puga was under the influence of drugs or alcohol. | Ex. 2 to Le Decl., Rubalcava Dep. 32:7-9. |
| 156. For a period of time, the officers attempted to get Puga out of the vehicle but he was not coming out. | Ex. 1 to Le Decl., Kee Dep. 19:10-13. |
| 157. At some point, Kee considered calling in the SWAT Team and spoke to Vaccari about it. | Ex. 1 to Le Decl., Kee Dep. 19:17-20:2. |
| 158. Kee made the request because from his experience, SWAT sometimes comes out for barricaded suspects. | Ex. 1 to Le Decl., Keep Dep. 20:12-17. |
| 159. Kee was told that SWAT would not come out for something of this nature. | Ex. 1 to Le Decl., Kee Dep. 20:3-6. |
| 160. Kee saw Vaccari go back to his car and get on a cell phone but does | Ex. 1 to Le Decl., Kee Dep. 20:7-11. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | Supporting Evidence |
|---|---|
| not know whether Vaccari actually called to inquire about SWAT. | |
| 161.   Vaccari did not have his cell phone to call SWAT and claims he told Kee this. | Ex. 5 to Le Decl., Vaccari Dep. 26:8-14. |
| 162.   Vaccari had forgotten his cell phone at the station. | Ex. 6 to Le Decl., Vaccari Int. 20:1-6. |
| 163.   Vaccari has dealt with barricaded suspects in homes before and has called SWAT to come assist with those suspects. | Ex. 5 to Le Decl., Vaccari Dep. 12:14-15. |
| 164.   When SWAT is called, they would sometimes give suggestions or advice and other times they would come out. | Ex. 5 to Le Decl., Vaccari Dep. 13:5-13. |
| 165.   There were also times when SWAT would give suggestions or advice and when Vaccari recontacted them, SWAT would come out. | Ex. 5 to Le Decl., Vaccari Dep. 13:14-17. |
| 166.   Vaccari does not know what SWAT's criteria was in order for them to come out for a barricaded suspect. | Ex. 5 to Le Decl., Vaccari Dep. 13:18-23. |
| 167.   If SWAT had responded, Kee would have let them handle the situation. | Ex. 1 to Le Decl., Kee Dep. 48:12-21. |
| 168.   The officers never developed a tactical plan. | Ex. 4 to Le Decl., Adams Dep. 19:10-21; Ex. 5 to Le Decl., 36:20-25. |
| 169.   At some point, a decision was made that pepper balls would be | Ex. 1 to Le Decl., Kee Dep. 20:18-21. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | Supporting Evidence |
|---|---|
| helpful in trying to get Puga to come out. | |
| 170.   Kee attempted to break the car's window with a beanbag shotgun to facilitate getting the pepper balls into the car but was unsuccessful. | Ex. 1 to Le Decl., Kee Dep. 20:22-21:11. |
| 171.   Vaccari then successfully used glass break balls to break open the back window. | Ex. 1 to Le Decl., Kee Dep. 21:12-22; Ex. 5 to Le Decl., Vaccari Dep. 29:17-30:9. |
| 172.   Kee then directed Vaccari to deploy pepper balls. | Ex. 1 to Le Decl., Kee Dep. 21:23-22:6. |
| 173.   Approximately 120 to 150 pepper balls were deployed into the Expedition over a period of 30 to 45 minutes. | Ex. 4 to Le Decl., Adams Dep. 16:3-7; Ex. 5 to Le Decl., Vaccari Dep. 30:22-24, 31:19-21. |
| 174.   Adams observed Puga twisting and turning his body, reaching around, leaning over, and reaching back at different periods of time while Puga was inside the vehicle. | Ex. 4 to Le Decl., Adams Dep. 16:17-22. |
| 175.   Puga reacted to the pepper balls by coughing and complaining that his eyes were burning and that he could not see. | Ex. 4 to Le Decl., Adams Dep. 18:10-13; Ex. 8 to Le Decl., Gonzalez Dep. 93:10-15. |
| 176.   After deploying the pepper balls for approximately 30 minutes, Vaccari thought about contacting SWAT by having Dispatch send their phone number to his screen and using someone else's phone. | Ex. 6 to Le Decl., Vaccari Int. 27:26-28:3. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | Supporting Evidence |
|---|---|
| 177.    Vaccari then made the decision to intentionally hit Puga with pepper balls to try to motivate Puga with pain to come out. | Ex. 6 to Le Decl., Vaccari Int. 28:11-20. |
| 178.    When Vaccari was deploying the pepper balls, he observed that Puga would get his head down low in the window. | Ex. 6 to Le Decl., Vaccari Int. 28:20-23. |
| 179.    Vaccari deployed pepper balls and struck Puga in the right eye, which is extremely painful. | Ex. 1 to Le Decl., Kee Dep. 23:2-10; Ex. 3 to Le Decl., Blackwood Dep. 14:24-15:6; Ex. 5 to Le Decl., Vaccari Dep. 32:14-18; Ex. 6 to Le Decl., Vaccari Int. 28:25-29:4; Ex. 7 to Le Decl., Mangerino Dep. 25:23-26:1. |
| 180.    Puga sustained a cut to the area of his forehead right above his right eye, which Blackwood associated with being hit in the right eye by pepper balls. | Ex. 3 to Le Decl., Blackwood Dep. 13:24-14:10. |
| 181.    Puga eventually exited the vehicle from the driver's side. | Ex. 1 to Le Decl., Kee Dep. 23:14-19. |
| 182.    The officers were treating Puga as if he had a firearm when Puga exited the vehicle. | Ex. 5 to Le Decl., Vaccari Dep. 34:2-6. |
| 183.    Puga did not have a shirt on when he exited the vehicle. | Ex. 1 to Le Decl., Kee Dep. 23:18-22. |
| 184.    Puga did not appear to have a gun or weapon in his hand, waistband, or pocket when he exited the vehicle. | Ex. 1 to Le Decl., Kee Dep. 24:15-17; Ex. 2 to Le Decl., Rubalcava Dep. 37:25-38:4; Ex. 3 to Le Decl., Blackwood Dep. 34:4-6; Ex. 8 to Le Decl., Gonzalez Dep. 95:15-25; Ex. 9 |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | Supporting Evidence |
|---|---|
|  | to Le Decl., Edward Mangerino Video; Clark Decl. ¶ 15. |
| 185.  Puga stood near the driver's side of the car for a period of time and during that time, the officers were able to see Puga's hands. | Ex. 1 to Le Decl., Kee Dep. 23:23-24:3. |
| 186.  Puga's hands were raised for the majority of the time he was positioned near the driver's side of the vehicle. | Ex. 1 to Le Decl., Kee Dep. 24:3-6; Ex. 3 to Le Decl., Blackwood Dep. 15:7-12; Ex. 5 to Le Decl., Vaccari Dep. 34:7-9. |
| 187.  Puga did not have anything in his hands and he never reached for any weapon while he was standing near the driver's side of the vehicle. | Ex. 1 to Le Decl., Kee Dep. 24:7-9; Ex. 2 to Le Decl., Rubalcava Dep. 38:8-20; Ex. 3 to Le Decl., Blackwood Dep. 15:25-16:2. |
| 188.  Puga did not appear to have a weapon in his hands or on his person while he stood next to the driver's side of the vehicle. | Ex. 3 to Le Decl., Blackwood Dep. 33:25-34:3; Ex. 4 to Le Decl., Adams Dep. 21:22-22:2. |
| 189.  The officers never formulated a tactical plan for what to do once Puga exited the vehicle. | Ex. 1 to Le Decl., Kee Dep. 24:21-25; Ex. 3 to Le Decl., Blackwood Dep. 19:16-22, 31:19-23. |
| 190.  While Puga was standing at the driver's side of the vehicle, there was no discussion about a tactical plan. | Ex. 4 to Le Decl., Adams Dep. 22:9-12. |
| 191.  Kee did not assign any CHP officer to be less-lethal nor did he know whether any sheriff's deputy had been assigned less-lethal. | Ex. 1 to Le Decl., Kee Dep. 25:1-6. |
| 192.  Puga had on a baggy pair of jeans when he exited the vehicle. | Ex. 1 to Le Decl., Kee Dep. 11:4-14. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | Supporting Evidence |
|---|---|
| 193.    While Puga was positioned next to the driver's side of the vehicle, Puga would at times raise his hands and then lower them back down. | Ex. 4 to Le Decl., Adams Dep. 21:2-8. |
| 194.    Puga was continually reaching down to pull up his pants because they were loose and kept falling. | Ex. 1 to Le Decl., Kee Dep. 11:15-23; Ex. 4 to Le Decl., Adams Dep. 42:12-17, 43:5-13, 43:23-44:5; Ex. 8 to Le Decl., Gonzalez Dep. 105:11-25. |
| 195.    Puga expressed concerns to the officers that he thought the officers were going to shoot him. | Ex. 1 to Le Decl., Kee Dep. 52:2-5; Ex. 5 to Le Decl., Vaccari Dep. 34:22-35:4; Ex. 2 to Le Decl., Rubalcava Dep. 39:7-9; Ex. 8 to Le Decl., Gonzalez Dep. 40:23-41:11. |
| 196.    Puga sounded scared of being shot by police. | Ex. 8 to Le Decl., Gonzalez Dep. 103:13-23. |
| 197.    Puga said something about hearing a click and being afraid that somebody was getting ready to shoot him. | Ex. 1 to Le Decl., Kee Dep. 52:9-11. |
| 198.    Puga then walked to the front of the white Expedition. | Ex. 8 to Le Decl., Gonzalez Dep. 42:21-25; Ex. 11 to Le Decl., Rubalcava Dashcam Video at 37:48-37:50. |
| 199.    After Puga went to the front of the vehicle, the officers still did not have any discussion regarding a tactical plan. | Ex. 4 to Le Decl., Adams Dep. 25:2-11. |
| 200.    Puga had his hands up while he was positioned near the front of the Expedition. | Ex. 2 to Le Decl., Rubalcava Dep. 40:3-5. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | Supporting Evidence |
|---|---|
| 201.    When Puga was at front of the Expedition, Puga did not have anything in his hands. | Ex. 2 to Le Decl., Rubalcava Dep. 40:6-8. |
| 202.    Puga occasionally would drop his hands to pull up his pants while he was standing near the front of the vehicle. | Ex. 4 to Le Decl., Adams Dep. 61:3-62:3; Ex. 8 to Le Decl., Gonzalez Dep. 42:18-25. |
| 203.    The bystander cell phone video taken by Erin Mangerino shows Puga with his hands up and briefly dropping his right hand to his waistband to adjust his pants before raising his hand up again, twice. | Ex. 10 to Le Decl., Erin Mangerino Cellphone Video at 0:00:03-00:07; 0:00:20-00:27. |
| 204.    At some point, Kee and Rubalcava decided to approach Puga to take him into custody. | Ex. 1 to Le Decl., Kee Dep. 25:17-18; Ex. 2 to Le Decl., Rubalcava Dep. 40:12-22. |
| 205.    Kee and Rubalcava did not coordinate with the SBSD Sheriffs' deputies regarding any plan to approach and take Puga into custody. | Ex. 1 to Le Decl., Kee Dep. 28:16-19; Ex. 2 to Le Decl., Rubalcava Dep. 40:23-25; Ex. 5 to Le Decl., Vaccari Dep. 36:16-19. |
| 206.    As Kee and Rubalcava were approaching Puga, they did not have any cover. | Ex. 2 to Le Decl., Rubalcava Dep. 41:14-16, 83:1-9. |
| 207.    Kee and Rubalcava were not aware that Vaccari and Adams were also approaching Puga. | Ex. 1 to Le Decl., Kee Dep. 28:20-22; Ex. 2 to Le Decl., Rubalcava Dep. 41:8-11. |
| 208.    Vaccari was still treating Puga as if he was armed with a weapon while Puga was standing near the front of the vehicle. | Ex. 5 to Le Decl., Vaccari Dep. 36:12-15. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | Supporting Evidence |
|---|---|
| 209.    When Vaccari and Adams saw Kee and Rubalcava move towards the shoulder of Peach Street, they thought they were moving to just get a better view of Puga, not to approach Puga. | Ex. 4 to Le Decl., Adams Dep. 26:21-27:3; Ex. 5 to Le Decl., Vaccari Dep. 37:1-11, 38:7-12. |
| 210.    Vaccari wanted to move up the passenger side of the vehicle to cut off an avenue of escape for Puga. | Ex. 5 to Le Decl., Vaccari Dep. 39:6-20. |
| 211.    The only cover Vaccari and Adams had when moving up was the passenger's side of Puga's vehicle. | Ex. 5 to Le Decl., Vaccari Dep. 39:21-25. |
| 212.    Prior to approaching, Vaccari and Adams had discussed the possibility of using the Taser on Puga because Puga was a good candidate for the Taser due to him being shirtless, but Vaccari ultimately decided to utilize the 40-mm less-lethal instead. | Ex. 5 to Le Decl., Vaccari Dep. 40:3-16 |
| 213.    As Vaccari approached from the dirt shoulder, he did not have any cover. | Ex. 5 to Le Decl., Vaccari Dep. 41:14-24. |
| 214.    There was an electrical pole on the southwest corner of the intersection that was parallel to the back passenger doors of the Expedition. | *See* Ex. 15 to Le Decl., Photograph of Scene; Ex. 16 to Le Decl., Photograph of Expedition at Curb. |
| 215.    In the Erin Mangerino cellphone video of the incident, moments before the shooting, two figures can be seen standing without cover in | Ex. 10 to Le Decl., Erin Mangerino Cellphone Video at 0:00:29-00:53. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | Supporting Evidence |
| --- | --- |
| the street, partially obscured by the electrial pole before backing away in a southern direction, away from the pole, and out of frame. | |
| 216.    Erin Mangerino was unable to see any officers standing on her side of Peach Street. | Ex. 7 to Le Decl., Mangerino Dep. 53:11-22. |
| 217.    Kee claims that as he approached the electrical pole, he could only see a portion of Puga's body in front of the vehicle. | Ex. 1 to Le Decl., Kee Dep. 29:20-23. |
| 218.    Kee claims he could not see Puga's waistband while Puga was standing in front of the vehicle and could only see Puga's waistband once he moved past the front of Puga's vehicle. | Ex. 1 to Le Decl., Kee Dep. 81:6-19. |
| 219.    As soon as Puga turned to run, officers shot at Puga. | Ex. 2 to Le Decl., Rubalcava Dep. 60:20-61:1; Ex. 5 to Le Decl., Vaccari Dep. 42:24-43:2, 47:5-14; Ex. 7 to Le Decl., Mangerino Dep. 34:3-9, 36:15-17, 37:11-13; Gonzalez Dep. 42:25-43:1, 55:1-4, 97:5-11, 97:12-15; Ex. 10 to Le Decl., Mangerino Cellphone Video at 0:00:51-00:54; Ex. 13 to Le Decl., Gonzalez Cellphone Video at 0:06:24-06:31. |
| 220.    Puga never grabbed or aggressively reached for anything prior to the shots. | Ex. 8 to Le Decl., Gonzalez Dep. 16:1-3; Ex. 14 to Le Decl., Botten Dep. 129:13-25, 130:6-12. |
| 221.    Puga never had a gun in his hand. | Ex. 8 to Le Decl., Gonzalez Dep. 97:16-25, 83:21-24; Ex. 14 to Le Decl., Botten Dep. 129:13-25, 130:6-12. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | Supporting Evidence |
|---|---|
| 222.    Puga never pointed his hand or a weapon in any specific direction or at any officer. | Ex. 5 to Le Decl., Vaccari Dep. 64:8-17; Ex. 8 to Le Decl., Gonzalez Dep. 97:1-6. |
| 223.    Puga never fired a weapon at any officer. | Ex. 7 to Le Decl., Mangerino Dep. 37:14-16; Ex. 8 to Le Decl., Gonzalez Dep. 132:22-24; Ex. 14 to Le Decl., Botten Dep. 129:13-25, 130:6-12. |
| 224.    Neither smoke nor any muzzle flash ever came from Puga. | Ex. 3 to Le Decl., Blackwood Dep. 20:10-12; Ex. 4 to Le Decl., Adams Dep. 36:12-18; Ex. 5 to Le Decl., Vaccari Dep. 48:14-20; Ex. 8 to Le Decl., Gonzalez Dep. 99:8-25. |
| 225.    None of the videos capturing the incident show Puga with a gun in his hand. | Ex. 1 to Le Decl., Kee Dep. 7:16-18; Ex. 5 to Le Decl., Vaccari Dep. 9:15-18. |
| 226.    None of the videos capturing the incident show Puga ever pointing a gun at anyone. | Ex. 1 to Le Decl., Kee Dep. 7:22-24; Ex. 5 to Le Decl., Vaccari Dep. 9:19-21. |
| 227.    None of the videos capturing the incident show Puga ever firing a gun. | Ex. 1 to Le Decl., Kee Dep. 7:19-21. |
| 228.    None of the videos capturing the incident show any muzzle flash coming from the area Puga was at. | Ex. 1 to Le Decl., Kee Dep. 92:14-16; Ex. 2 to Le Decl., Rubalcava Dep. 93:17-19. |
| 229.    As Puga was running, he never turned around to look at the officers. | Ex. 8 to Le Decl., Gonzalez Dep. 100:13-17. |
| 230.    Gonzalez saw Puga's waistband when he turned to take off running and never saw a gun in his waistband. | Ex. 8 to Le Decl., Gonzalez Dep. 95:15-25, 115:18-21. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | Supporting Evidence |
|---|---|
| 231.    While Puga was running, his hands were moving in a running motion. | Ex. 8 to Le Decl., Gonzalez Dep. 116:16-21. |
| 232.    None of the videos that captured the shooting ever show Puga turn back towards the officers or point his hand back towards the officers. | Ex. 10 to Le Decl., Erin Mangerino Cellphone Video at 0:00:50-01:44; Ex. 11 to Le Decl., Rubalcava Dashcam Video at 0:42:23-42:47; Kee Dashcam Video at 46:47-47:07. |
| 233.    When Puga reached the northwest corner, he changed directions and started running north instead of towards the house on the corner. | Ex. 4 to Le Decl., Adams Dep. 50:15-21; Ex. 7 to Le Decl., Mangerino Dep. 34:3-12. |
| 234.    Puga then fell forward onto his chest and stomach and onto the ground with his hands beside him on the northwest shoulder near the southbound lane, some distance from the northwest corner. | Ex. 1 to Le Decl., Kee Dep. 37:10-13; Ex. 5 to Le Decl., Vaccari Dep. 53:11-21; Ex. 7 to Le Decl., Mangerino Dep. 60:9-61:13. |
| 235.    Puga's head was oriented north and his feet were to the south after he fell. | Ex. 5 to Le Decl., Vaccari Dep. 53:22-25. |
| 236.    Puga's hands were next to him when he was on the ground. | Ex. 7 to Le Decl., Mangerino Dep. 61:7-13. |
| 237.    There was no gun in either of Puga's hands immediately after Puga went to the ground. | Ex. 4 to Le Decl., Adams Dep. 52:18-22. |
| 238.    Puga did not pose a threat to anyone after falling to the ground and appeared incapacitated. | Ex. 1 to Le Decl., Kee Dep. 37:17-38:3; Ex. 4 to Le Decl., Adams Dep. 52:1-6. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | Supporting Evidence |
|---|---|
| 239.    Several shots were fired at Puga after he fell to the ground. | Ex. 1 to Le Decl., Kee Dep. 68:17-24; Ex. 3 to Le Decl. Blackwood Dep., 25:8-12; Ex. 5 to Le Decl., Vaccari Dep. 43:11-24; Ex. 10 to Le Decl., Erin Mangerino Cellphone Video at 0:01:04-01:12; Ex. 11 to Le Decl., Rubalcava Dashcam Video at 0:42:37-42:45. |
| 240.    After Puga fell to the ground, several shots are fired and there was a pause before the final two, almost simultaneous volleys of shots from two different firearms are heard. | Ex. 10 to Le Decl., Erin Magerino Cellphone Video at 01:02-01:10. |
| 241.    Puga sustained multiple gunshot wounds to the back of his body with back-to-front trajectories, and some with upward trajectories. | Ex. 19 to Le Decl., Jong Dep. 21:21-22, 45:25-46:4, 46:5-8. |
| 242.    The upward trajectory is consistent with Puga leaning forward or falling forward when he sustained those gunshot wounds. | Ex. 19 to Le Decl., Jong Dep. 13:6-16. |
| 243.    Kee was the first officer to shoot and did not hear any shots fired before he fired his first shot. | Ex. 1 to Le Decl., Kee Dep. 9:4-9. |
| 244.    Kee claims he fired two volleys of shots; one volley of 5 to 8 shots while Puga at the front of the vehicle and another volley of 10 to 13 shots at Puga's backside while Puga was running in a northwest direction. | Ex. 1 to Le Decl., Kee Dep. 8:4-9, 9:24-10:3, 30:7-9, 34:12-23, 35:2-20, 35:24-36:5, 46:11-18. |
| 245.    When Kee fired his first shot, he could see both of Puga's hands. | Ex. 1 to Le Decl., Kee Dep. 60:10-12. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | Supporting Evidence |
|---|---|
| 246.    Puga did not have a gun in his hand when Kee fired his first volley. | Ex. 1 to Le Decl., Kee Dep. 12:2-25. |
| 247.    Kee was trained to consider his background or backdrop when firing because if there are residences or businesses in the background, innocent people could get shot. | Ex. 1 to Le Decl., Kee Dep. 54:16-24 |
| 248.    Kee was aware that there were residences in Puga's background when Kee was firing both volleys. | Ex. 1 to Le Decl., Kee Dep. 55:1-19. |
| 249.    After the first volley, Kee retreated to the dirt shoulder parallel to the side of the CHP vehicle and went down prone. | Ex. 1 to Le Decl., Kee Dep. 31:11-32:9, 42:23-43:5. |
| 250.    Approximately 3 to 5 seconds elapsed between the last shot in Kee's first volley and when Kee went down into prone position in the dirt. | Ex. 1 to Le Decl., Kee Dep. 32:10-16. |
| 251.    Kee did not keep a visual on Puga while he was repositioning. | Ex. 1 to Le Decl., Kee Dep. 43:14-18. |
| 252.    Kee's back was to Puga while he repositioned to the dirt area. | Ex. 1 to Le Decl., Kee Dep. 45:22-46:1. |
| 253.    Approximately 5 to 8 seconds elapsed between Kee's first volley and when he started firing his second volley. | Ex. 1 to Le Decl., Kee Dep. 54:5-9. |
| 254.    Kee was not struck by any gunshots. | Ex. 1 to Le Decl., Kee Dep. 33:3-11. |

PLAINTIFFS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND ADDITIONAL MATERIAL FACTS

| Plaintiffs' (Nonmoving Party) Additional Material Facts | Supporting Evidence |
|---|---|
| 255.   Kee never mentioned in his interview with detectives that he thought he had been struck. | Ex. 1 to Le Decl., Kee Dep. 44:3-7. |
| 256.   When Kee looked down at his left arm, which he claims is where he thought he had been struck, the fabric was not torn. | Ex. 1 to Le Decl., Kee Dep. 65:19-24. |
| 257.   Rubalcava heard two shots being fired before he fired his first shot. | Ex. 2 to Le Decl., Rubalcava Dep. 16:5-10 |
| 258.   Rubalcava was side by side and to the right of Kee while they were approaching and when Kee started firing. | Ex. 1 to Le Decl., Kee Dep. 29:10-19, 30:16-22. |
| 259.   Puga was near the front of the vehicle when Rubalcava fired his first volley. | Ex. 2 to Le Decl., Rubalcava Dep. 15:7-10. |
| 260.   Rubalcava also heard shots coming from the passenger's side of the vehicle. | Ex. 2 to Le Decl., Rubalcava Dep. 47:12-17. |
| 261.   Rubalcava claims he fired approximately 5 shots during his first volley and 5 to 10 shots during his second volley. | Ex. 2 to Le Decl., Rubalcava Dep. 14:2-8. |
| 262.   Rubalcava was trained to consider his background when he shoots because if his bullets miss, they may hit innocent people. | Ex. 2 to Le Decl., Rubalcava Dep. 20:20-21:1. |
| 263.   Rubalcava now knows that there were homes in the background when he fired his first volley. | Ex. 2 to Le Decl., Rubalcava Dep. 21:7-9. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | Supporting Evidence |
|---|---|
| 264.   Rubalcava claims would not have shot as many shots if he had known there was a home in the northeast corner at the time of the shooting. | Ex. 2 to Le Decl., Rubalcava Dep. 92:21-93:1. |
| 265.   Rubalcava was firing in a northeast direction during his first volley. | Ex. 2 to Le Decl., Rubalcava Dep. 21:16-19. |
| 266.   Rubalcava claims that there was an approximately 5 to 10 second pause between Rubalcava's first volley and second volley. | Ex. 2 to Le Decl., Rubalcava Dep. 14:12-18. |
| 267.   Rubalcava took out his magazine and reloaded before firing a second volley of shots. | Ex. 2 to Le Decl., Rubalcava Dep. 22:20-22, 97:13-18. |
| 268.   Puga was running away when Rubalcava fired his second volley. | Ex. 2 to Le Decl., Rubalcava Dep. 18:18-20. |
| 269.   Rubalcava was aiming at Puga's back during the second volley. | Ex. 2 to Le Decl., Rubalcava Dep. 18:21-19:1. |
| 270.   When asked during his interview with detectives after the incident as to what caused Rubalcava to fire his second volley, Rubalcava answered that Puga was still fleeing but that Puga was not doing anything with any alleged weapon. | Ex. 2 to Le Decl., Rubalcava Dep. 55:8-22. |
| 271.   There was enough light for Rubalcava to see Puga while Puga was running away. | Ex. 2 to Le Decl., Rubalcava Dep. 92:10-12. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | Supporting Evidence |
|---|---|
| 272.   Rubalcava does not know whether he fired shots at Puga after Puga went to the ground. | Ex. 2 to Le Decl., Rubalcava Dep. 75:9-13. |
| 273.   Rubalcava concedes it would not have been appropriate to shoot at Puga if he merely saw a gun in Puga's waistband. | Ex. 2 to Le Decl., Rubalcava Dep. 97:19-22. |
| 274.   Based on Rubalcava's training, if Puga had not pointed a gun at Rubalcava, Rubalcava would not have shot. | Ex. 2 to Le Decl., Rubalcava Dep. 103:7-18. |
| 275.   Blackwood heard approximately 2 to 3 shots coming from his left before he fired and Kee and Rubalcava were to Blackwood's left. | Ex. 3 to Le Decl., Blackwood Dep. 11:3-6, 20:13-15, 46:23-47:8. |
| 276.   Blackwood fired his first volley of shots due north while Puga was in the front of the car, near the driver's side. | Ex. 3 to Le Decl., Blackwood Dep. 28:9-19. |
| 277.   Puga had just cleared the front of the vehicle when Blackwood started firing. | Ex. 3 to Le Decl., Blackwood Dep. 28:20-23. |
| 278.   Blackwood was firing at Puga's left side while Puga was hunched over as if he had been struck by gunshots. | Ex. 3 to Le Decl., Blackwood Dep. 29:9-20. |
| 279.   When Blackwood saw Puga bending over, he believed Puga had been shot. | Ex. 3 to Le Decl., Blackwood Dep. 34:18-23. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | Supporting Evidence |
|---|---|
| 280.    Blackwood was aiming at Puga's back while Puga was running away. | Ex. 3 to Le Decl., Blackwood Dep. 29:25-30:2. |
| 281.    Blackwood was trying to assess while he was firing by looking for a gun but could not see Puga's hands and therefore never saw Puga with a gun while Puga was running away. | Ex. 3 to Le Decl., Blackwood Dep. 24:10-13, 30:23-31:11, 45:23-46:2. |
| 282.    Blackwood claims he fired at Puga while Puga was running because he did not see any gun on the ground and believed Puga was still in possession of a gun. | Ex. 3 to Le Decl., Blackwood Dep. 54:7-14. |
| 283.    Blackwood fired ten shots during his first volley, paused when he saw Puga stumble, and then fired ten more shots when Puga caught himself and continued to run. | Ex. 3 to Le Decl., Blackwood Dep. 36:21-37:7. |
| 284.    Blackwood came off his sights and paused when he saw Puga stumbling, and when Puga did not go to the ground, Blackwood got back up on his sights and fired ten more shots. | Ex. 3 to Le Decl., Blackwood Dep. 37:12-38:5. |
| 285.    When Blackwood saw Puga stumble, he believed that some shots he fired may have struck Puga. | Ex. 3 to Le Decl., Blackwood Dep. 39:24-40:3. |
| 286.    During the time Blackwood was shooting at Puga, Blackwood could not see Puga's hands. | Ex. 3 to Le Decl., Blackwood Dep. 36:18-20. |
| 287.    Blackwood is not sure whether he fired any shots at Puga while Puga was going to the ground. | Ex. 3 to Le Decl., Blackwood Dep. 40:18-20. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | Supporting Evidence |
|---|---|
| 288.    Blackwood claims he stopped firing when he saw Puga stop moving. | Ex. 3 to Le Decl., Blackwood Dep. 30:11-13. |
| 289.    When Adams approached the vehicle, Puga was standing in the front close to the driver's side headlight and Adams could only see Puga from chest up. | Ex. 4 to Le Decl., Adams Dep. 40:16-22, 41:2-12, 45:11-16. |
| 290.    As Adams was approaching from the passenger's side of the expedition, he heard shots. | Ex. 4 to Le Decl., Adams Dep. 35:12-14. |
| 291.    Adams and Vaccari had only reached the part where the painted curb meets the unpainted curb when the shots started, which is near the rear door of the Expedition. | Ex. 4 to Le Decl., Adams Dep. 76:1-19; Ex. 12 to Le Decl., Kee Dashcam Video at 46:46-46:49; Ex. 16 to Le Decl., Photograph of Expedition at Curb. |
| 292.    Adams heard shots before he fired. | Ex. 4 to Le Decl., Adams Dep. 35:15-17. |
| 293.    One of Adams' concern with being in a residential neighborhood was innocent people being struck due to the number of shots fired. | Ex. 4 to Le Decl., Adams Dep. 55:19-22. |
| 294.    At no time did anyone provide a verbal warning that deadly force was going to be used. | Ex. 2 to Le Decl., Rubalcava Dep. 94:13-15; Ex. 3 to Le Decl., Blackwood Dep. 24:17-25; Ex. 5 to Le Decl., Vaccari Dep. 63:4-6 |
| 295.    Vaccari remained on target with the 40-millimeter as Puga ran away and later dropped the 40-millimeter and unholstered his firearm but did not use it because Puga was going down or already down. | Ex. 5 to Le Decl., Vaccari Dep. 51:4-10; Ex. 12 to Le Decl., Kee Dashcam Video at 46:47-47:05 |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | Supporting Evidence |
|---|---|
| 296.    After the shooting, the officers heard someone exclaim about being shot coming from the northeast corner house. | Ex. 5 to Le Decl., Vaccari Dep. 57:16-24. |
| 297.    The officers learned that three people from the house on the northeast corner had been shot: an adult male, and adult female, and a juvenile. | Ex. 1 to Le Decl., Kee Dep. 56:22-57:6; Ex. 2 to Le Decl., Rubalcava Dep. 59:1-17, 59:18-22. |
| 298.    The Botten family, consisting of father Jonathan Wayne Botten, Sr., mother Tanja Dudek-Botten, daughter Annabelle Botten, and son J.B., were inside their house when the shooting happened. | Ex. 14 to Le Decl., Botten Dep. 63:4-64:2, 64:16-19. |
| 299.    There was a lot of police presence surrounding the Botten Residence, including the helicopter flying overhead and police cars with flashing lights in front of and in the back of the house. | Ex. 14 to Le Decl., Botten Dep. 25:5-18, 26:5-10; Ex. 17 to Le Decl., Dudek-Botten Dep. 29:9-16, 90:2-13, 91:1-10, 97:22-98:3. |
| 300.    Dudek-Botten believed they could not leave the house due to the police presence outside. | Ex. 17 to Le Decl., Dudek-Botten Dep. 133:8-20. |
| 301.    Botten, Sr. heard Kee communicating with Puga through the loudspeaker and with verbal commands while Puga was inside the vehicle. | Ex. 14 to Le Decl., Botten Dep. 43:18-44:6. |
| 302.    When the shooting started, Botten, Sr. fell back into the house and onto the ground and felt a throbbing to his right arm. | Ex. 14 to Le Decl., Botten Dep. 64:20-24. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | Supporting Evidence |
|---|---|
| 303. Botten, Sr. then heard his wife screaming, saw blood all over her face and body, and heard his wife say that she had been shot in the face. | Ex. 14 to Le Decl., Botten Dep. 64:25-65:4. |
| 304. Botten, Sr. then exited the front door and into the front yard, yelling at the CHP officers, cursing at them and telling them that his family had been shot and needed help. | Ex. 14 to Le Decl., Botten Dep. 65:3-17. |
| 305. Botten, Sr. then yelled at the SBSD Sheriff's Deputies for help and told them to jump the fence and come over and help. | Ex. 14 to Le Decl., Botten Dep. 67:14-21. |
| 306. Botten, Sr. then brought his wife out to sit on the bench in the front yard and ran back into the house to grab towels for the officers. | Ex. 14 to Le Decl., Botten Dep. 68:4-10. |
| 307. Then-minor J.B. then walked outside holding his left side and told Botten, Sr. that he could not breathe and believed that he had also been shot. | Ex. 14 to Le Decl., Botten Dep. 68:11-15. |
| 308. J.B. sustained three gunshot wounds to his chest that resulted in a collapsed lung on his left side, a ruptured spleen, and a lot damage to his internal organs due to the spreading of the bullets. | Ex. 14 to Le Decl., Botten Dep. 96:19-97:13. |
| 309. J.B. required surgery to repair the damage he sustained to his body. | Ex. 14 to Le Decl., Botten Dep. 98:1-8 |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | Supporting Evidence |
|---|---|
| 310.  J.B. had to stay in the hospital for ten days. | Ex. 14 to Le Decl., Botten Dep. 97:20-25 |
| 311.  Dudek-Botten sustained gunshot wounds to her face, chest, and right shoulder. | Ex. 14 to Le Decl., Botten Dep. 85:20-86:3, 86:7-14, 109:18-110:4. |
| 312.  Botten, Sr. sustained gunshot wounds to his right arm, left arm, left hand, and right leg. | Ex. 14 to Le Decl., Botten Dep. 70:5-9, 71:20-72:5, 74:7-15, 75:14-20, 76:1-7. |
| 313.  Botten, Sr. was told by a doctor treating his gunshot wounds that the straight through gunshot wound to his right forearm was caused by either a 40 or 45 caliber bullet. | Botten Decl. ¶ 3. |
| 314.  There were bullet strikes to the front of the Botten residence, the screen door of the residence, one of the bedroom windows, and the side of the residence. | Ex. 18 to Le Decl., Ripley Dep. 31:16-33:19. |
| 315.  The tactics used by Kee, Rubalcava, Blackwood, Jake Adams, and Vaccari violated standard police practices and training, which contributed to or was a cause of the shooting of Puga, Jonathan Wayne Botten, Sr., Tanja Dudek-Botten, and J.B. | Clark Decl. ¶ 11. |
| 316.  Officers are trained that they are responsible for their tactical decisions when they resort to the use of lethal force. | Clark Decl. ¶ 12 |
| 317.  The officers' failure to follow standard police practices and training in dealing with barricaded | Clark Decl. ¶ 12. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | Supporting Evidence |
|---|---|
| subjects, poor tactics, and rushing to take Puga into custody once he was outside of the vehicle all contributed to the officers' unnecessary use of lethal force. | |
| 318.   The officers failed to formulate a safe tactical plan, made poor tactical decisions, and limited their tactical options, ultimately leading to their unnecessary use of lethal force. | Clark Decl. ¶ 12a. |
| 319.   POST Learning Domain 23, "Crimes in Progress," advises officers that if available, officers should request specialized units and resources as soon as it has been determined that the suspect has taken a barricaded position. | Clark Decl. ¶ 12b. |
| 320.   SWAT specifically trains to respond to incidents where subject(s) may be armed, barricaded, and refusing to submit to arrest. | Clark Decl. ¶ 12b. |
| 321.   The utilization of San Bernardino Sheriff's Department SWAT would have been a safer alternative as SWAT is equipped with special training, equipment, and tools, which can help resolve the situation of a barricaded subject without escalating the situation. | Clark Decl. ¶ 12b. |
| 322.   Given that the officers believed that Puga was involved in a prior freeway shooting, was still armed, was refusing to exit his vehicle, and | Clark Decl. ¶ 12c. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | Supporting Evidence |
|---|---|
| was situated in a residential neighborhood, Vaccari's failure to request for SWAT to respond when initially requested by Kee and after initial less-lethal force was unsuccessful were poor tactical decisions that contributed to the officers' use of unnecessary lethal force. | |
| 323.   Among the "Fatal Errors" listed by POST Learning Domain 23, "Crimes in Progress," is poor positioning due to rushing or poor tactics. | Clark Decl. ¶ 12d. |
| 324.   The officers' decision to leave cover and enter an open-air environment to take Puga into custody, when the officers stated that they still believed Puga to be armed and dangerous, and Kee stated that he was in fear for his life at the time he made the decision to approach and take Puga into custody, was a tactically poor decision. | Clark Decl. ¶ 12d. |
| 325.   The situation did not call for an urgent response at the time the officers approached Puga. | Clark Decl. ¶ 12d. |
| 326.   Officers are trained that deadly force is only justified when there is an objectively reasonable belief that the suspect poses an immediate threat of death or serious bodily injury. | Clark Decl. ¶ 13. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | Supporting Evidence |
|---|---|
| 327.    Officers are trained that subjective fear is insufficient to justify the use of deadly force. | Clark Decl. ¶ 13. |
| 328.    Officers are also trained that an overreaction is excessive force. | Clark Decl. ¶ 14. |
| 329.    Under the facts and circumstances as alleged by Kee at the time he initially shot Puga, Kee violated standard police practices and training when he shot at Puga when he saw Puga drop his right hand from a raised position. | Clark Decl. ¶ 15. |
| 330.    Kee overreacted when he saw Puga drop his right hand from a raised position. | Clark Decl. ¶ 15. |
| 331.    The percipient witness' cell phone video, labeled COSB0001459, shows Puga's frontside as he exits the car and there appears to be no weapon on or near Puga's waistband. | Clark Decl. ¶ 15. |
| 332.    Rubalcava, Blackwood, Kee, and Adams violated standard police practices and training when they shot at Puga while he was running away. | Clark Decl. ¶ 16 |
| 333.    Puga did not present an immediate threat of death or serious bodily injury as he was running and the officers failed to reassess and overreacted when they fired subsequent volleys when Puga was running. | Clark Decl. ¶ 16. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | Supporting Evidence |
|---|---|
| 334.   Officers are trained that deadly force may only be used in an immediate defense of life situation. | Clark Decl. ¶ 16a. |
| 335.   There was no immediate defense of life situation while Puga was running away. | Clark Decl. ¶ 16a. |
| 336.   There were no bullet impacts or casings found near the area of the initial shooting that would support the allegation that Puga fired a weapon at anyone. | Clark Decl. ¶ 16a. |
| 337.   Officers are trained that they may use deadly force against a fleeing suspected felon to prevent escape only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officers or others. | Clark Decl. ¶ 16c. |
| 338.   There is evidence that this was likely a situation of contagious fire. | Clark Decl. ¶ 16d. |
| 339.   Officers are trained that a warning that deadly force is going to be used should be given when feasible. | Clark Decl. ¶ 17. |
| 340.   Officers had time to provide Mr. Puga with a warning that deadly force was going to be used prior to the shooting. | Clark Decl. ¶ 17. |
| 341.   A reasonably trained officer facing the same facts and circumstances as the involved shooting officers would understand | Clark Decl. ¶ 18. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | Supporting Evidence |
|---|---|
| that the officers' intentional shooting in the direction of the Bottens' residence would cause a reasonable person in the Botten's position to believe that they were not free to leave their property while the officers were apprehending Mr. Puga in front of the Botten home and that the officers intended to restrain their freedom of movement while attempting to apprehend Puga. | |
| 342.   Officers are trained that a detention is an assertion of authority by a peace officer that would cause a reasonable person to believe they are not free to leave and that such a belief may result from physical restraint, unequivocal verbal commands, or other conduct by an officer. | Clark Decl. ¶ 18a. |
| 343.   A reasonable officer facing the facts and circumstances confronting the involved officers knew or should have known that there were innocent bystanders inside the residential homes surrounding the incident location in the middle of the night. | Clark Decl. ¶ 18b. |
| 344.   A reasonably trained officer facing the same facts and circumstances as the involved officers would understand that the officers' ongoing flashing lights, commands, and deployments of force, would cause a reasonable person residing in the nearby | Clark Decl. ¶ 18c. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | Supporting Evidence |
|---|---|
| residences to believe that they were not free to leave their residence. | |
| 345.    Rubalcava and Kee violated standard police practices and training when they failed to consider their background prior to utilizing deadly force, resulting in the serious injuries of innocent bystanders Botten, Sr., Dudek-Botten, and J.B. | Clark Decl. ¶ 19. |
| 346.    Police officers are trained to consider their background prior to utilizing deadly force. | Clark Decl. ¶ 19. |
| 347.    Kee and Rubalcava failed to consider their background prior to and when they fired several volleys of shots at Puga. | Clark Decl. ¶ 19. |
| 348.    Kee and Rubalcava's failure to consider their background prior to using deadly force resulted in the serious injuries of Botten, Sr., Dudek-Botten, and J.B., who were inside their home at the time of the shooting. | Clark Decl. ¶ 19. |
| 349.    The officers violated standard police practices and training in failing to request backup to set up a perimeter and evacuate uninvolved individuals from the area in order the ensure the safety of these uninvolved individuals. | Clark Decl. ¶ 20. |
| 350.    POST Learning Domain 23 advises officers that the safety of uninvolved individuals must be the | Clark Decl. ¶ 20a. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | Supporting Evidence |
| --- | --- |
| principal concern to officers who respond to high-risk situations involving barricaded suspects. | |
| 351. The officers' failure to follow standard practices and training in responding to high-risk situations involving barricaded suspects by requesting backup, setting up a perimeter, and evacuating all uninvolved individuals from the area contributed to the injuries suffered by the Botten family. | Clark Decl. ¶ 20. |
| 352. A reasonably trained officer facing the same circumstances would have requested backup and additional resources in order to deal with a potentially armed, barricaded subject in order to ensure the safety of all uninvolved individuals in the area. | Clark Decl. ¶ 20c. |