Exhibit 1

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3

 4  JONATHAN WAYNE BOTTEN, SR.; TANJA      )
    DUDEK-BOTTEN; ANNABELLE BOTTEN; and    )
 5  J.B., a minor by and through his       )
    guardian JONATHAN WAYNE BOTTEN, SR.,   )
 6                                         )
                    Plaintiffs,            )
 7                                         )
                    vs.                    ) Case No.
 8                                         ) 5:23-CV-00257-JGB-SHK
    STATE OF CALIFORNIA; COUNTY OF SAN     )
 9  BERNARDINO; ISAIAH KEE; MICHAEL        )
    BLACKWOOD; BERNARDO RUBALCAVA; ROBERT  )
10  VACCARI; JAKE ADAMS; and DOES 1-10,    )
    inclusive,                             )
11                                         )
                    Defendants.            )
12  _____   )

13

14

15

16          REMOTE VIDEOCONFERENCE DEPOSITION OF

17                    ISAIAH KEE

18             TUESDAY, NOVEMBER 5, 2024

19

20

21

22

23  Reported Stenographically By:

24  Jinna Grace Kim, CSR No. 14151

25  Job No.:  113704
```

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 7

1    Q.   And would the MVARS video have been from one of the

2    CHP units?

3    A.   Yes, sir.

4    Q.   Was that the unit that belonged to Rubalcava and

5    Blackwood?

6    A.   Both.  Rubalcava and Blackwood, and they allowed me

7    to review the MVARS to my patrol cars.

8    Q.   As of the time of your initial interview, were you

9    aware of any other videos?

10   A.   Yes.  They did show another video that was taken by

11   a cell phone of a residence.

12   Q.   So before you gave your initial interview, you were

13   able to see the two MVARS videos and also the one cell phone

14   video?

15   A.   Yes.

16   Q.   Did any of those videos show on the video Mr. Puga

17   with a gun in his hand?

18   A.   No.

19   Q.   Did any of those videos actually show Mr. Puga

20   firing a gun?

21   A.   No.

22   Q.   Did any of those videos show Mr. Puga pointing a gun

23   at anyone?

24   A.   No.

25   Q.   Did you fire some rounds during this incident?

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 8

1    A.    Yes.

2    Q.    What type of weapon did you fire the rounds from?

3    A.    I fired a round from my AR-15.

4    Q.    How many rounds did you fire altogether if you
5    know?

6    A.    Based off the records that I read, it was 18.

7    Q.    Do you know how many rounds that particular weapon
8    holds?

9    A.    Each magazine at that time held 20.

10    Q.    Did you change magazines, or did you fire all 18
11    rounds from one magazine?

12    A.    I fired all 18 from one magazine.

13    Q.    And is that weapon a semiautomatic weapon, or was it
14    at the time?

15    A.    Yes, sir.

16    Q.    So you have to press the trigger for each shot?

17    A.    Yes, sir.

18    Q.    Did you hear any shots being fired before you fired
19    your first shot?

20    A.    I didn't hear.  I just saw muzzle flash.

21    Q.    You're saying --

22    A.    Well, let me -- I apologize.  I'm Sorry.

23    For that question, no.

24    Q.    Yeah.  I'm trying to be very specific.

25    A.    Yes, yes.

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 9

```
 1      Q.   Let me ask you again just to make sure we're on the

 2  same page.

 3      A.   Okay.

 4      Q.   What I asked you is, did you hear any rounds or

 5  shots being fired before your first shot?

 6      A.   No.

 7      Q.   Did you have the impression you were the first

 8  police officer to fire?

 9      A.   Yes.

10      Q.   How far were you from Mr. Puga when you fired your

11  first shot, approximately?

12      A.   About 20 to 30 feet.

13      Q.   Prior to firing your first shot did you see a

14  handgun in Mr. Puga's waistband?

15      A.   Yes.

16      Q.   And how much time would you estimate passed between

17  you seeing the handgun in his waistband and you firing your

18  first shot?

19      A.   I'll say about three seconds.

20      Q.   Did you fire your first shot as you saw Mr. Puga's

21  hands going towards the gun?

22      A.   Yes.

23      Q.   Had he touched the gun before your first shot?

24      A.   No.

25      Q.   How many shots approximately did you fire in the
```

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 10

1    first volley?

2         A.    From what I can recall, like five, five to eight

3    shots.

4         Q.    It's my understanding from reading your statement

5    that you initially fired when you saw Mr. Puga's hands moving

6    towards the handgun in his waistband; is that correct?

7         A.    Yes.

8         Q.    And are you saying in that first volley as his hand

9    was moving towards the waistband, you fired approximately

10   five to eight shots?

11        A.    Yes.

12        Q.    Would you have been aiming center mass?

13        A.    Yes.

14        Q.    Was that essentially from your perspective the

15   chest-abdomen area?

16        A.    Yes.

17        Q.    You more or less were aiming at his chest; is that

18   your recollection?

19        A.    Yes.

20        Q.    And from that distance your impression of these was

21   that you were striking him with some of your shots; is that

22   fair?

23        A.    Yes.

24        Q.    Do you recall if Mr. Puga had a shirt on or not at

25   the time?

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 11

```
 1      A.   No, he did not have a shirt on.

 2      Q.   No shirt?

 3      A.   No, sir.

 4      Q.   How about his pants, do you generally recall what

 5   type of pants he had?

 6      A.   Pair of jeans.

 7      Q.   Do you recall whether they were baggy or tight?

 8           How would you describe them?

 9      A.   They were baggy.  He had a belt on, and I remember

10   the jeans were low enough to where you could see his

11   underwear, his under garment.

12      Q.   So they were -- the jeans were kind of hanging low

13   on his waistline or towards his buttocks?

14      A.   Yes, sir.

15      Q.   Did you notice him a few times during the entirety

16   incident -- I know it was a long incident -- reaching down

17   and kind of picking up his pants or moving his hand to pick

18   up his pants?

19      A.   Yes, sir.

20      Q.   How many times did you see him do that,

21   approximately?

22      A.   I recall twice when he was -- when he had exited out

23   of the vehicle, I recall him doing it twice.

24      Q.   Would that be when he was on the driver side of

25   advice?
```

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 12

```
1       A.   Yes, sir.
2       Q.   So would it at least be correct to say during your
3   first volley of shots, you did not see the gun in Mr. Puga's
4   hand?
5       A.   That's correct.
6       Q.   Did you give any verbal warning that you were going
7   to shoot Mr. Puga before you fired?
8       A.   No, sir.
9       Q.   So before we get into all the details of the rest of
10  the incident, I just want to learn a little bit about your
11  background.
12      A.   Yes, sir.
13      Q.   Starting with your education, I'm assuming you
14  graduated high school?
15      A.   Yes.
16      Q.   And what year did you do that in, approximately?
17      A.   1993.
18      Q.   Did you play any sports in high school?
19      A.   Yes.
20      Q.   What sports did you play?
21      A.   Baseball, football, and I was on the wrestling
22  team.
23      Q.   Any military experience?
24      A.   Yes.
25      Q.   Can you tell me about that, please.
```

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 14

1    and I graduated May of 2001.

2         Q.   And at some point you were promoted to sergeant?

3         A.   Yes.

4         Q.   And when were you promoted to sergeant?

5         A.   That was in May of 2017.

6         Q.   Do you recall the date of the incident we're here to

7    talk about?

8         A.   It was February 16 -- technically, the 17th, and

9    that was in 2021.

10        Q.   Prior to that date had you yourself in your work as

11   a law enforcement officer ever seen a suspect with a gun in

12   their hand before?

13        A.   Yes.

14        Q.   On how many occasions, approximately?

15        A.   Maybe I would say three times.

16        Q.   Were you trained that you could shoot someone merely

17   for seeing a gun in their hand, that fact alone?

18        A.   Yes.

19        Q.   How about a gun in the waistband, had you ever seen

20   that before?

21        A.   Yes -- no.  As far as on a suspect?

22        Q.   Yes.

23        A.   Yes.

24        Q.   On how many occasions, approximately?

25        A.   Maybe twice.

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
Isaiah Kee on 11/05/2024

Page 16

1     Q.   Do you recall which officers fired in that

2     particular incident?

3     A.   Yes.

4     Q.   And who were they?

5     A.   Sergeant Fredericks, Officer Lugo, Officer

6     Blackwood, and I can't recall the last officer's name because

7     he was from a different area.

8     Q.   Were you involved in the vehicle pursuit in this

9     case we're here to talk about today?

10    A.   Yes.

11    Q.   And how long was the pursuit for, approximately?

12    A.   From what I recall, it was maybe 30 minutes.

13    Q.   And during the pursuit were any shots fired, to your

14    knowledge?

15    A.   No, sir.

16    Q.   Did you see any weapon in Mr. Puga's vehicle during

17    the pursuit?

18    A.   No, sir.

19    Q.   Were you aware at some point that there were at

20    least two people in the vehicle?

21    A.   No.

22    Q.   And what street did the pursuit end on?

23    A.   It was on Peach, northbound on Peach, south of

24    Catalpa.

25    Q.   And can you spell Catalpa?

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 18

```
 1   they County Sheriff's vehicles?

 2       A.   Yes.

 3       Q.   And it appears there were residences on all four

 4   corners?

 5       A.   Yes.

 6            MS. ESQUIVEL:  Objection.  I'm just going to

 7   belated -- overbroad, and vague as to time.

 8            Excuse me.

 9   BY MR. GALIPO:

10       Q.   Were you aware at the time that the Puga vehicle

11   stopped that you were in the residential neighborhood?

12       A.   Yes.

13       Q.   Okay.

14            MR. GALIPO:  Thank you for that, Hang.

15   BY MR. GALIPO:

16       Q.   And there was a period of time after the vehicle

17   stopped before Mr. Puga got out of the vehicle; is that

18   fair?

19       A.   Yes.

20       Q.   And you would have been the supervising officer at

21   least for the CHP officers?

22       A.   Yes.

23       Q.   To your knowledge, was there anybody higher in

24   command than you at the scene?

25       A.   No.
```

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 19

```
 1      Q.   You were the only sergeant on-scene, to your

 2   knowledge?

 3      A.   No.  There was another sergeant from the Sheriff's

 4   Department on-scene as well.

 5      Q.   Do you know the name of that individual?

 6      A.   No, sir.

 7      Q.   At some point did a female come out of the white

 8   vehicle?

 9      A.   Yes.

10      Q.   And I take it for a period of time you were

11   attempting to get Mr. Puga out of the vehicle, but he was not

12   coming out of the vehicle; is that fair?

13      A.   Yes.

14      Q.   And at that point you were considering what

15   different options you had?

16      A.   Yes.

17      Q.   At some point did you consider calling in the SWAT

18   Team or the equivalent?

19      A.   Yes.

20      Q.   Did you make that request to somebody?

21      A.   Yes.

22      Q.   Who did you make the request to?

23      A.   I spoke to the Sheriff's sergeant.

24      Q.   And did you just generally inquire that you thought

25   that's something that should be considered, maybe calling
```

JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

Page 20

1    SWAT out to see if they're available?

2         A.    Yes.

3         Q.    And do you recall what the response was to your

4    request?

5         A.    They told me that they were not going to come for

6    something of this nature.

7         Q.    Do you know if the call was ever made?

8         A.    That, I don't know.  I just saw him go back to his

9    car, and he had a cell phone, and he got on the cell phone.

10              But I wasn't close enough to hear if he actually

11   called.

12        Q.    Has it been your experience being in law enforcement

13   for some time, that sometimes SWAT does come out for a

14   barricaded suspect?

15        A.    Yes.

16        Q.    And is that why you made the request?

17        A.    Yes.

18        Q.    At some point was it decided that pepper balls might

19   be helpful in making the inside of the car environment

20   uncomfortable and having Mr. Puga come out?

21        A.    Yes.

22        Q.    And obviously, to get pepper balls in the car, you

23   have to have a open or broken window to get them through; is

24   that fair?

25        A.    Yes.

JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

Page 21

1    Q.    And do you recall what attempts were made to try to
2    break the window or windows?
3    A.    Yes.  I first attempted to break the window with our
4    what we refer to as the less-lethal shotgun, but in layman's
5    term most people refer to it as a bean bag shotgun.
6          And so I fired five shots into the left rear
7    passenger side window which is basically behind the driver,
8    and they all failed.
9    Q.    They struck the window, but they were not successful
10   in breaking it?
11   A.    That's correct.
12   Q.    And then did you go to a Plan B to try to break one
13   of the windows?
14   A.    Yes.  That's when I was informed by the Sheriff's
15   sergeant that they had a tool that they can use, and that's
16   when he brought out -- our department doesn't have it.
17          So I don't know the actual name of it.  I could only
18   describe it.  It just looks like a paint ball gun.
19   Q.    In any event, did that work?
20   A.    Yes.
21   Q.    And they broke out the back window of the vehicle?
22   A.    Yes.
23   Q.    And then did you direct someone to use the pepper
24   balls?
25   A.    Yes.

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 22

1    Q.    And who was doing the pepper balls, if you know?

2    A.    That's the sergeant that I spoke about earlier who I

3    don't know his name.

4    Q.    So were the pepper balls being deployed by someone

5    from the Sheriff's Department?

6    A.    Yes.

7    Q.    And do you have any estimate as to how many pepper

8    balls were deployed?

9    A.    Well, I didn't -- if you don't mind, I could you

10   know maybe guess.  He told me that each container as I recall

11   had like a 100 balls in there, and that thing was almost

12   empty.  So you're looking at probably close to a 100 at least

13   in the 90's.

14   Q.    Okay --

15   A.    Maybe 90 to 95, I guess.

16   Q.    That's an estimate in part based on what he told you

17   about the total being a 100?

18   A.    Yes.

19   Q.    And over what period of time were the pepper balls

20   being deployed?

21         In other words, from the first one to the last one,

22   was it 10 minutes, 20 minutes?  Any estimate or range?

23   A.    It was probably close to 20, 20 to 25 minutes.

24   Q.    And do you have any training or experience with the

25   effects of the pepper balls or pepper spray in general?

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 23

```
 1     A.   Pepper spray yes.  Not pepper balls.

 2     Q.   At any point in time did you form the impression

 3   that one of the pepper balls may have struck Mr. Puga in the

 4   eye area or face area?

 5     A.   Yes.

 6     Q.   What did you see in that regard?

 7     A.   He grabbed his -- I remember when he was still in

 8   the vehicle, he grabbed his right eye, and he was making

 9   comments to the effect of, "Oh, you guys shot me in the eye,

10   my eye hurts."

11     Q.   Okay.  And at any point did you see any redness or

12   blood in that area?

13     A.   No, sir.

14     Q.   I know it took quite awhile, and a lot of effort on

15   your part, but did Mr. Puga eventually come out of the

16   vehicle?

17     A.   Yes.

18     Q.   And obviously, he came out on the driver's side?

19     A.   Yes.

20     Q.   And when he came out of the vehicle, is it fair to

21   say that he had no shirt on?

22     A.   That's correct.

23     Q.   And was he on the driver's side of the vehicle for

24   some period of time?

25     A.   Yes.
```

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
Isaiah Kee on 11/05/2024

Page 24

1      Q.    During that period of time, were you able to see his

2   hands at all?

3      A.    Yes.

4      Q.    And was there a period of time when he was on the

5   driver's side of the vehicle that he raised his hands?

6      A.    Yes.

7      Q.    And when he raised his hands, could you see any

8   object in his hands at that point?

9      A.    No.

10      Q.    Did you see any weapon on him at any time before he

11   got out of the vehicle?

12            In other words, did you see any weapon inside the

13   car before he got out?

14      A.    No.

15      Q.    And when he was on the driver's side of the vehicle,

16   did you see any weapon at any time?

17      A.    No, sir.

18      Q.    Did you ever instruct him that if he does have a gun

19   in the car, not to take it out?

20      A.    I don't recall telling him that, no.

21      Q.    And given that the goal was to get him out of the

22   car, was there any discussion with your officers of a

23   tactical plan as to what you were going to do once he got

24   out?

25      A.    No.

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 25

1    Q.   Did you assign any of your officers to be

2    less-lethal, either bean bag or Taser?

3    A.   No.

4    Q.   Do you know if the sergeant for the Sheriff's

5    Department assigned anyone to be less-lethal on his side?

6    A.   That, I do not know.

7    Q.   Did you see anybody with less-lethal out at any

8    point after Mr. Puga got out of the vehicle?

9    A.   No, sir.

10    Q.   And do you have an estimate as to how long he was on

11    the driver's side of the vehicle before he went to the

12    front?

13    A.   I would say maybe about five to seven minutes.

14    Q.   And how long was he at the front of the vehicle

15    approximately before you fired your first shot?

16    A.   Maybe about eight to ten minutes.

17    Q.   You decided to approach at some point?

18    A.   Yes.

19    Q.   Prior to approaching, did you ever see any gun

20    either in his hand or in his waistband?

21    A.   No.

22    Q.   What position did you approach to relative to the

23    vehicles?

24    A.   Well, I'm trying not to confuse anyone using you

25    know tactical terms.  So I guess to keep it simple, there was

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 28

```
 1   yesterday.

 2           Is that good, Amy?

 3           MS. MARGOLIES:  That's good.

 4           MR. GALIPO:  Okay.  Thank you.

 5           Okay.  Thank you for that, Hang.

 6   BY MR. GALIPO:

 7       Q.   At some point was there an airship overhead?

 8       A.   Yes.

 9       Q.   And was the an airship utilizing its spotlight?

10       A.   Yes.

11       Q.   And rotating overhead during some of the incident?

12       A.   Yes.

13       Q.   And was the spotlight providing some light for the

14   area?

15       A.   Yes.

16       Q.   Was there any tactical discussion with your

17   officers, the two CHP officers when you were getting ready to

18   approach?

19       A.   No.

20       Q.   Were you aware that when you were approaching, other

21   officers were also approaching?

22       A.   No.

23       Q.   Did you get close to that pole at some point?

24       A.   Yes.

25       Q.   And how long were you in the area of the pole
```

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 29

1    approximately before you saw the handgun in Mr. Puga's

2    waistband area?

3        A.    I would say maybe three to five seconds.

4        Q.    So a short period of time?

5        A.    Yes.

6        Q.    So just so I'm understanding you, before you got to

7    the pole, so as you're moving forward towards the pole, did

8    you observe any other officers, either CHP or Sheriffs, also

9    advancing forward?

10       A.    No.  The only person that -- that remember advancing

11   was Officer Rubalcava who was actually with me as we was

12   moving towards the pole.

13       Q.    And where was he in relation to you?

14             Were you side-by-side, or in some other

15   configuration?

16       A.    Pretty much side-by-side.

17       Q.    And do you recall if he was to your right or to your

18   left?

19       A.    To the right.

20       Q.    As you were approaching the area of the pole, could

21   you see at least a portion of Mr. Puga's body in front of the

22   vehicle?

23       A.    Yes.

24       Q.    And were there times as you were approaching the

25   pole where you saw Mr. Puga's hands up?

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

```
 1     A.   Yes.

 2     Q.   And am I understanding you correctly that within

 3   approximately three to five seconds of you getting to the

 4   area of the pole, is when you saw the handgun in Mr. Puga's

 5   right hand going down towards it?

 6     A.   Yes.

 7     Q.   And that would be when you fired your first volley

 8   of shots?

 9     A.   Yes.

10     Q.   And I think we covered this, but you did not hear

11   any shots being fired before your first shot; is that fair?

12     A.   That's correct, sir.

13     Q.   After you fired your first five to eight shots, did

14   you hear any other shots being fired?

15     A.   Yes.

16     Q.   Could you tell if any of those shots were coming

17   from law enforcement officers?

18     A.   Not really.  I just was assuming they were coming

19   from the other officers.

20     Q.   For example, Rubalcava, I think was to your -- would

21   it be to your right?

22     A.   Yes.

23     Q.   Did you have the impression he was firing at some

24   point?

25     A.   The issue is when I started firing, it just seemed
```

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 31

1   like it just became tunnel vision where I was just -- it was

2   weird.  Like I couldn't hear.  I couldn't hear.  It's like I

3   could see things happen, but I just couldn't hear anything.

4        So I mean, yeah, I can say I assumed that he was

5   firing because I saw the gun, and I started firing, but I

6   can't say concretely that I know for a fact that he was

7   shooting at the time.

8        Q.   Okay.  Have you heard the term before, "auditory

9   exclusion" or something to that effect?

10       A.   Yes.

11       Q.   Now, at some point did you go down prone?

12       A.   Yes.

13       Q.   I take it one of the issues you're trained on

14  probably both in the military and as a law enforcement

15  officer is crossfire?

16       A.   Yes.

17       Q.   And I take it you didn't want to get caught in the

18  crossfire; is that fair?

19       A.   Exactly, yes.

20       Q.   So at some point did you intentionally put yourself

21  down in a prone position?

22       A.   Yes.

23       Q.   And was one of the reasons you did that so that you

24  would not be in the crossfire?

25       A.   Yes.

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 32

1    Q.    And how many shots do you think you had fired before

2    you went into the prone position?

3    A.    I was thinking I fired maybe like five to eight

4    shots.

5    Q.    The first volley?

6    A.    Yes.

7    Q.    You went to the prone position after your first

8    volley of shots?

9    A.    Yes.

10    Q.    And how much time do you think passed between your

11    last shot and going in to the prone position?

12          Was it pretty quick?

13    A.    Yes.  Probably three to five seconds.

14    Q.    And when you were in the prone position, were you in

15    the dirt or the street, or do you recall?

16    A.    The dirt.

17    Q.    And do you recall if your head was generally north

18    and your feet south, or some other angle?

19    A.    Yes, head north.  Feet south, yes.

20    Q.    Did you have any conversation with Officer Rubalcava

21    when you went in this prone position?

22    A.    No.

23    Q.    For example, you never told him you were struck by

24    gunfire or something, did you?

25    A.    Yes.  You're right.  I do remember saying something

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 33

1    to that effect that I was like, "I think I'm hit" because I

2    felt something hit my forearm, my left forearm.

3        Q.    Did you look at your left forearm at some point?

4        A.    Yes.  Afterwards.

5        Q.    And did it appear that you were struck by a gunshot

6    when you looked at it?

7        A.    I couldn't tell if it was a gunshot or a foreign

8    object, but I did have a scrape along my forearm.

9        Q.    At least do you know now that you were not struck by

10    any gunshots?

11        A.    Yes.

12        Q.    Have you had training on the concept of contagious

13    fire or sympathetic fire?

14            Have you heard those terms?

15            MS. ESQUIVEL:  Objection.  Vague.

16            THE WITNESS:  No.

17    BY MR. GALIPO:

18        Q.    Okay.  The concept, maybe it's something you've

19    heard about, but another phrase was used.

20            The concept that as a law enforcement officer, you

21    don't want to start shooting just because you hear other

22    shots.

23            In other words, you don't want it to be a reaction

24    just to hearing shots, that you start shooting.

25            You want to make sure there is a basis for it.

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 34

1          Have you heard that concept before?

2     A.   Yes.

3          MS. ESQUIVEL:  Objection.  Vague.

4  BY MR. GALIPO:

5     Q.   Is it referred to by something other than contagious

6  fire or sympathetic fire, or you're not sure?

7     A.   Yes, it is.  I just can't think of the term right

8  now, but yes, there is another term they use for it.

9     Q.   But that's been part of your training as a law

10  enforcement officer, to try to avoid that?

11     A.   Yeah.

12     Q.   Now, at some point did you see Mr. Puga start moving

13  or running away from your position or his position?

14     A.   Yes.

15     Q.   And which direction was he running, if you know?

16     A.   Northwest.

17     Q.   And what position were you in when he started

18  running?

19          Were you in that prone position you described?

20     A.   Yes.

21     Q.   And when he was running, at some point were you

22  looking at the backside of his body?

23     A.   Yes.

24     Q.   And did you fire any shots from the prone

25  position?

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 35

```
 1     A.   Yes.

 2     Q.   And how many shots would you estimate you fired from

 3   the prone position?

 4     A.   I recall three.

 5     Q.   I think -- I'm trying to remember.

 6          I think you told me in the beginning how many shots

 7   altogether you fired.

 8          Was that 18?

 9     A.   Yes.  That was the -- the 18 was the number I got

10   from the report that CHP did, but I had estimated that I only

11   fired maybe like 12, but ultimately, they told me that it was

12   18 that I fired.

13     Q.   I see.  You thought it was about 12 shots?

14     A.   Yes.

15     Q.   So do you think now that you probably fired more

16   than three shots in that second volley?

17          MS. ESQUIVEL:  Objection.  Calls for speculation.

18   BY MR. GALIPO:

19     Q.   You may answer.

20     A.   Yes.

21     Q.   What you're saying is that your estimates at the

22   time were a little bit less than what they actually found?

23     A.   That's correct.

24     Q.   And when you fired the second volley of shots, what

25   part of Mr. Puga's body were you aiming at?
```

JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

Page 36

1    A.   I was aiming at his left side.

2    Q.   Would it be like --

3    A.   Rib cage, like the rib cage area.

4    Q.   Would it be like his back left side?

5    A.   Yes.

6    Q.   Because it seems like if you were prone with your

7    head north, and he was running northwest, he would be running

8    at an angle from your right to left.

9         So at some point his left backside would be

10   exposed?

11   A.   Well, the way he was running, he -- from what I

12   recall, I saw the gun in his hand as he's pulling back.

13        So in essence his left arm was raised with the gun

14   pointing back as he was running.  So basically, the only

15   exposure was like the left rib, his left side, like the rib

16   cage area.

17   Q.   And when you fired your shots, was he, meaning

18   Mr. Puga, in the street, or in the intersection, or where was

19   he?

20   A.   He was about right where the street on that

21   northwest corner transitions from the road to the dirt.

22   Q.   At some point did you see him go down to the

23   ground?

24   A.   Yes.

25   Q.   And did he go down to the ground shortly after your

JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

Page 37

1    last shot?

2        A.    Yes.

3        Q.    Did you have the impression that some of your shots

4    were striking him?

5        A.    Yes.

6        Q.    It sounds like your impression was some of your

7    initial shots struck him, and also some of your shots in the

8    second volley as well?

9        A.    Yes.

10       Q.    And when he went down to the ground, how did he go

11   to the ground, if you remember?

12             Was he on his back or chest-down?

13       A.    He just fell forward on his chest and stomach.

14       Q.    Did you hear any shots being fired after he went to

15   the ground?

16       A.    No.  I don't remember hearing shot afterwards.

17       Q.    From your perspective, did you think it was

18   appropriate based on your training, to fire at Mr. Puga after

19   he went to the ground?

20             MS. ESQUIVEL:  Objection.  Lacks foundation; calls

21   for speculation.

22             THE WITNESS:  No.

23   BY MR. GALIPO:

24       Q.    And why not?

25       A.    Because at that point I would consider the threat

JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

Page 38

1    has been neutralized.

2        Q.    He appeared incapacitated at that point?

3        A.    Yes --

4            MS. ESQUIVEL:   Same objections.

5    BY MR. GALIPO:

6        Q.    After the -- strike that.

7            When you were firing in your prone position, did you

8    hear other shots being fired as well?

9        A.    Again, I couldn't hear, but I could see -- I could

10   see like clouds of dust from the like the rounds hitting the

11   ground.  So I could see, but I just, again, I couldn't

12   hear -- I couldn't hear.

13       Q.    Okay.  Did you approach Mr. Puga at some point after

14   all the shots had stopped?

15       A.    Yes.

16       Q.    And did other officers approach him as well?

17       A.    Yes.

18       Q.    At some point was he handcuffed?

19       A.    Yes.

20       Q.    Do you recall who handcuffed him?

21       A.    No, I couldn't recall.

22       Q.    Do you know if it was one of the CHP officers or

23   not?

24       A.    That's why I can't remember because it was CHP and

25   Sheriff's Department who made the approach.  If I did, I

JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

Page 42

```
1      Q.   So he would have been in the front, but close to

2  like the driver side headlights, for example?

3      A.   Yes.

4      Q.   And then were you firing in east direction?

5      A.   Yes.

6      Q.   And then when you started firing your second volley

7  of shots, was he till somewhere in this frame?

8      A.   No, sir.

9      Q.   Okay.

10          MR. GALIPO:  Let's look at Exhibit 2, please.

11  BY MR. GALIPO:

12      Q.   Would you have been close to that pole when you

13  fired the first volley of shots?

14      A.   Yes.

15      Q.   And when you fired the second volley of shots when

16  you were prone in the dirt, would you have also been close to

17  the pole?

18      A.   No.  I was more alongside parallel and the patrol

19  vehicle, the one that's closest to Mr. Puga's vehicle.

20      Q.   Okay.

21          MR. GALIPO:  Go back to Exhibit 1, please.

22  BY MR. GALIPO:

23      Q.   So are you saying you tactically repositioned

24  lateral to the CHP vehicle, you would have been somewhere on

25  the dirt shoulder parallel to or to the side of the CHP
```

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 43

1   vehicle?

2       A.   Yes.

3       Q.   And do you know whether or not Officer Rubalcava

4   tactically repositioned?

5       A.   Yes.

6       Q.   And where did he go to, if you know?

7       A.   The same patrol vehicle.  At that point he was

8   standing in the -- the driver side door was open, and he was

9   standing in the "V" of the driver's side door of the patrol

10  car.

11      Q.   So after your first volley of the five to eight

12  shots, you would have retreated or tactically repositioned?

13      A.   Yes.

14      Q.   And while you were retreating or tactically

15  repositioning, were you keeping a visual on Mr. Puga?

16      A.   No.  When I retreated to the dirt area, my back was

17  turned to his location, and then when I went to the ground

18  and looked to the north, that's when I was able to see him.

19      Q.   And this conversation you had with Officer

20  Rubalcava, would that be while you were in the prone

21  position?

22           MS. ESQUIVEL:  Misstates prior testimony.

23           THE WITNESS:  Yes.

24  BY MR. GALIPO:

25      Q.   Now, I noticed in your review of your statement, you

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 44

```
 1   reviewed that recently?

 2       A.   Yes.

 3       Q.   Would you at least agree with me you didn't mention

 4   anything in your statement about the comment "I think I'm

 5   hit?"

 6       A.   I don't recall telling them that at the interview

 7   with the Sheriff's Department.

 8       Q.   Okay.

 9            MR. GALIPO:  And then can we look at Exhibit 3.

10            MR. GALIPO:  I don't remember what it was, but I'm

11   about to have my recollection refreshed.

12            MS. LE:  It's the MVARS video.

13            MR. GALIPO:  Oh, those are the videos.

14            Then let's go back to Exhibit 5, please.

15            Now I remember.

16   BY MR. GALIPO:

17       Q.   Okay.  So am I understanding you correctly that you

18   would have been close to the pole that we can see, I guess,

19   on the -- is it the southwest corner of the intersection when

20   you fired the first volley?

21       A.   Yes.

22       Q.   And then you tactically repositioned; had your back

23   towards Mr. Puga for some period of time, but went back in a

24   prone position on the dirt area with your head to the north

25   so you can again see Mr. Puga?
```

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 45

```
 1    A.   Yes.

 2    Q.   And there some notations on this diagram that were

 3  made I think at the time of one of the statement.

 4         Do those X's in your opinion show anything related

 5  to where you were?

 6         MS. ESQUIVEL:  Can we make the photo larger so

 7  we can see the markings better?

 8         MR. GALIPO:  We can sure try.

 9         MS. ESQUIVEL:  And there is signature at the

10  bottom-right hand corner.  Maybe we can take a look at that

11  as well.

12         MR. GALIPO:  Okay.  Looks like Blackwood.

13  BY MR. GALIPO:

14    Q.   So I'm not going to ask you about the markings then

15  because probably Blackwood made them, and I'm not sure what

16  he is referring to.

17         But you're saying, Sergeant, you were more in line

18  why the patrol car when you were prone on the dirt?

19    A.   Yes.

20    Q.   And how far were you from the roadway when you were

21  prone on the dirt?

22    A.   I was pretty close to the roadway.  So I may be say

23  maybe 6 inches, 12 inches at the most to the west of the

24  roadway.

25    Q.   And where in the roadway did you again get a visual
```

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 46

1    on Mr. Puga?

2        A.    At that point he was nearing that northwest

3    corner.

4        Q.    Was he still in the intersection?

5        A.    For the most part he was out of the intersection.

6              So you're looking at northwest corner, see how there

7    is a change in color in the concrete?  Looks like there is

8    dirt there, but I don't know if it's dirt or concrete.

9        Q.    Yeah.  I can see that.

10       A.    He was in that area.

11       Q.    So if you fired five or eight shots in your first

12   volley, and a total of 18, just doing the math, that would be

13   I think 10 to 13 shots in your second volley.

14             Does that math seem to be correct?

15             MS. ESQUIVEL:  Objection.  Lacks foundation; calls

16   for speculation.

17             You can answer.

18             THE WITNESS:  Yes.

19   BY MR. GALIPO:

20       Q.    At the time you fired the initial shots at Mr. Puga,

21   what was the lighting like in the area that Mr. Puga was

22   standing?

23       A.    It was very low light conditions.

24       Q.    Was there any illuminations from the spotlights of

25   the vehicles or streetlights or anything like that?

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 48

1    Q.   Where was he when he was making the cell phone call

2    in relation to the vehicles?

3    A.   So in that previous photo you had up, behind the CHP

4    car, the one that's closest to Mr. Puga's vehicle, there is a

5    Sheriff's car directly behind the one that's farthest to the

6    left.  That's the patrol car that he walked to and made --

7    well, what I assumed was the phone call.

8    Q.   The Sheriff's vehicle more to the east?

9    A.   To the west.

10   Q.   Oh, to the west.

11   A.   Yes.

12   Q.   And you had indicated that at some point you

13   considered or wanted to see if SWAT was an option?

14   A.   Yes.

15   Q.   I'm assuming if they had come, you would have

16   communicated with them given them a briefing on what you

17   knew?

18   A.   Yes.

19   Q.   And then let them handle the situation if they

20   agreed to?

21   A.   Yes.

22   Q.   So I want to ask you a few questions about your

23   interview.

24       I kind of underlined and highlighted a few areas,

25   but some of it we've already covered, so I don't want to have

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 52

```
 1      A.   Yes.

 2      Q.   At some point did he express when he got out of the

 3   vehicle on the driver's side a concern that he was going to

 4   be shot or he thought the officers were going to shoot him?

 5      A.   Yes.

 6      Q.   And did you try to assure him or re-assure him that

 7   wasn't going to happen?

 8      A.   Yes.

 9      Q.   Did he say something like about hearing a click, and

10   he got afraid that somebody was getting ready to shoot him?

11      A.   Yes.

12      Q.   And you indicated in your statement, I think,

13   similar to what you told me today, when you saw his hand

14   going towards his waistband, that's when you started

15   shooting?

16      A.   Yes.

17      Q.   And was that more or less like within a second that

18   you saw his hand coming down and the shots started?

19      A.   Yes.

20      Q.   Were you ever using the suspect's vehicle as

21   cover?

22      A.   Yes.  In a -- well, we use the term called pying off

23   the vehicle, kind of a pying which is basically you're using

24   what would be a building or a vehicle, basically, whatever

25   object, and you're slowly -- you're trying to use that
```

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 53

```
 1   vehicle -- well, the object, in this case the vehicle, for

 2   cover.

 3           So tactically speaking, yes, we were using his

 4   vehicle as we approached as some sort of cover.

 5       Q.   When you say we, you and Officer Rubalcava?

 6       A.   Yes.

 7       Q.   You didn't have any prior contact with Mr. Puga, did

 8   you?

 9       A.   No.

10       Q.   Have you ever been shown a picture of Mr. Puga

11   before the time you shot him?

12       A.   No.

13       Q.   Is part of the goal in taking someone into custody

14   to do it safely as possible?

15       A.   Yes.

16       Q.   With the least amount of force if feasible?

17       A.   Yes.

18       Q.   And safety is a concern in these situations I take

19   it for everyone, the law enforcement officers, the public,

20   and even the suspect?

21       A.   Yes.

22       Q.   And the AR-15, does that have 223 ammunition?

23       A.   Yes.

24       Q.   And you picked that particular weapon because you

25   thought it could give you a tactical advantage?
```

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 54

```
 1     A.   Yes.

 2     Q.   And you described in your interview two separate

 3   volley of shots; is that fair?

 4     A.   Yes.

 5     Q.   And how much time do you think passed between your

 6   first volley where you were near the light pole and your

 7   second volley after you retreated, went down into the prone

 8   position and started firing?

 9     A.   Maybe about five to eight seconds, I guess.

10     Q.   How far would you estimate Mr. Puga was from you

11   when you fired your second volley of shots?

12     A.   Close to maybe 50 to 60 feet in that second.

13          MR. GALIPO:  Could we put up Page 50 of the

14   interview, please, Hang, Bates stamp I think ends in 700.

15   BY MR. GALIPO:

16     Q.   Do you have training with respect to considering the

17   background or backdrop when you're firing?

18     A.   Yes.

19     Q.   And is part of that training to be careful because

20   obviously, if there is residences or businesses in the

21   background, then innocent people could get shot?

22     A.   Yes.

23     Q.   And that's a factor you're trained that should be

24   taken into consideration?

25     A.   Yes.
```

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 55

1      Q.   And there is a question on Line 20 of Page 50 by

2   Abernathy, that says, "Okay.  Do you remember what was behind

3   the suspect when you fired during both volleys."

4          Do you see that?

5      A.   Yes.

6      Q.   And did you understand that he was asking you about

7   the backdrop or the background?

8      A.   Yes.

9      Q.   So your response if you could read it just to

10   yourself for a moment and let me know when you've had a

11   chance to do that.

12      A.   Yes, I'm done.

13      Q.   Okay.  As part of your response, you said, "And of

14   course I could see you know residences on both sides."

15          Do you see that?

16      A.   Yes.

17      Q.   And that's something obviously you saw prior to the

18   shooting when you were out there for 30-plus minutes?

19      A.   Yes.

20      Q.   And then going to Page 51, I think this is when they

21   were asking you about the rounds.  You could see on Lines 9

22   and 10, they're saying you remembered firing about 12

23   rounds."

24          And you respond, "A total, yes."

25          Do you see that?

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 56

1    A.    Yes.

2    Q.    And then they were following up in the next

3  questions asking you about how many in the first and second

4  volley, and on Line 17 and 18 you indicated about five or six

5  in the first, and probably another five or six on the second.

6         Do you see that?

7    A.    Yeah.

8    Q.    Did you feel at least at the time you gave the

9  statement that there was about an equal number of rounds in

10  the first volley and the second volley?

11    A.    Yes.

12    Q.    As you were tactically repositioning as you

13  described, moving back and getting into the prone position --

14         MR. GALIPO:  We can take that down.

15         Thank you, Hang.

16  BY MR. GALIPO:

17    Q.    Were you hearing gunshots going off as you were

18  tactically repositioning, or it sounds like your hearing was

19  just kind of not there at the time.

20    A.    Yes, sir.  That's correct.

21         I just don't recall the hearing the gunshots.

22    Q.    After the shooting, at some point did you learn that

23  three innocent bystanders have been struck by gunfire?

24    A.    Yes.

25    Q.    How did you learn that?

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 57

1    A.    I could hear commotion at the house initially, and

2    then as I was walking towards the house, a deputy notified me

3    that some people had been injured.

4    Q.    And what -- is this the house on the northeast

5    corner?

6    A.    Yes.

7    Q.    And did you learn more information about how many

8    people or what type of injuries?

9    A.    Yes.

10    Q.    What did you learn?

11    A.    I was told that there were three people, a male,

12    adult male, adult female, husband and wife, and then a

13    teenaged kid which was the son of the male and female.

14         And then I heard that the male was hit by shrapnel

15    from one of the rounds, and then I heard that the kid got

16    injured, sustained the most injury.  He got hit three times

17    in the chest, and then I want to say the adult female which

18    was the mom was I think she was hit once.

19         That's all I recall.

20    Q.    Did you have any contact with these people?

21         Did you ever observe them or talk to them at any

22    time?

23    A.    Only one.

24    Q.    Which one was that?

25    A.    The adult male, the dad.

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 60

1      Q.    What did you say?

2      A.    I told him to keep his hands up where I could see

3   them.

4      Q.    Anything else?

5      A.    Command-wise, no.  I did -- I know a couple times I

6   told him to step out under the streetlight which is the same

7   electrical pole that I pointed to before in the photo.

8          I told him to step out from in front of the vehicle

9   under the streetlight where I could see him.

10     Q.    When you -- at the time you fired your first shot,

11   could you see both of his hands?

12     A.    Yes.

13     Q.    One was up and one was moving towards the

14   waistband?

15     A.    Yes.

16     Q.    At the exact moment you fired the first shot, was

17   anything in either one of his hands?

18     A.    No.

19     Q.    Did you fire your first volley of shots in rapid

20   succession?

21     A.    Yes.

22     Q.    Do you have experience with that weapon that you

23   fired at the shooting range, the AR-15?

24     A.    Yes.

25     Q.    Is that weapon capable of firing four or five shots

JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

Page 61

1  per second, if you know?

2      A.   Yes.  But the mode that it was in at that particular

3  time, it would have been very difficult to do that.

4      Q.   Was it in a semiautomatic mode?

5      A.   Yes.

6      Q.   It also have an automatic mode?

7      A.   It can be -- it can be, but the department doesn't

8  allow you to switch it to automatic.

9      Q.   So the policy of the department is keep it in

10  semiautomatic?

11      A.   Exactly.

12      Q.   And that's what it was at the time?

13      A.   Yes.

14      Q.   You do you remember being asked during your

15  interview by the department whether you had considered during

16  the standoff of taking steps to evacuate some of the nearby

17  homes?

18      A.   Yes.

19      Q.   Was that something that you at least thought

20  about?

21      A.   Yes.

22      Q.   Did you discuss that at all with the people from the

23  Sheriff's Department, if you recall?

24      A.   No.

25      Q.   And then looking at -- if we can go to the bottom of

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 65

1    A.    Yes.  From what I remember, that's about where I was

2    at because I remember to the right of me when I made

3    reference to me being hit, Rubalcava was right to my right in

4    the door jam.

5    **Q.    Okay.  And then the other area moving up towards the**

6    **pole, is that where you generally think you were for the**

7    **first volley of shots?**

8    A.    Yes.

9    **Q.    Okay.**

10    MR. GALIPO:  Thank you, Hang.

11    I'm going to take another break, kind of look at my

12    notes, and I think we can take another ten minutes if that

13    works for everyone.

14    I hope that I'll be done in 15 minutes or so, but

15    sometimes the other attorneys have some questions, so we'll

16    see how it goes.

17    (Recess taken.)

18    BY MR. GALIPO:

19    **Q.    When you looked down at your left arm when you felt**

20    **a little something, did you look to see whether any of the**

21    **fabric was torn?**

22    A.    Yes.

23    **Q.    And I'm sure you were happy to see that it wasn't?**

24    A.    Yes.

25    **Q.    And when he was running away, are you saying that**

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 68

1    Q.   Is that part of the video you had seen before?

2    A.   Yes.  But it is definitely much, much like

3    clearer.

4    Q.   Wow.  We usually get the other response, that ours

5    are not clear.  So that was good.

6         The one you saw before was more clear, or this one

7    was more clear?

8    A.   This one.

9    Q.   Great.  Obviously, you heard a lot of shots; is that

10   fair?

11   A.   Yes.

12   Q.   And you could see him running away at some point?

13   A.   Yes.

14   Q.   In watching the video do you ever see a gun in his

15   left hand?

16   A.   No.

17   Q.   And in watching that portion of the video, did it

18   refresh your recollection as to whether any shots were fired

19   after he went to the ground?

20   A.   Yes.

21   Q.   And how did it refresh your recollection in that

22   regard?

23   A.   I just can't remember that many shots being fired

24   when he went to the ground.

25   Q.   All right.  And then Exhibit 4, I think is one of

JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

Page 75

```
1                         EXAMINATION

2    BY MS. ESQUIVEL:

3         Q.   Going back to the information -- were you aware

4    of -- well, how did you become aware of the pursuit of

5    Mr. Puga, for the standoff that we've been talking about?

6         A.   Well, I was notified by our dispatcher that the

7    officers -- my officers had stopped, the dispatcher's words

8    were -- and again, I'm paraphrasing, that the guy from

9    earlier or the vehicle earlier, not the guy, but the vehicle

10   from earlier who was involved in this road rage, the freeway

11   shooting, that my officers had the vehicle stopped on Bear

12   Valley, west of Cottonwood.

13        Q.   And did you join the -- why did you go out there, or

14   what did you do when you heard that?

15        A.   Well, I began responding to the scene, and before I

16   can get out there doing the traffic stop, the officers put

17   out that they were now in pursuit of the vehicle.

18        Q.   And did you have any information about the earlier

19   freeway shooting that the white vehicle, SUV, was suspected

20   of being involved in?

21        A.   Yes.

22        Q.   And what information did you have about that earlier

23   shooting?

24        A.   Well, because of the time my shift started, I was

25   the on-duty supervisor when the freeway shooting took place.
```

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 76

1    So I actually responded to the scene along with two officers

2    from that particular shift.

3            I spoke to the victim, and he showed me pictures of

4    the vehicle of the suspect's vehicle which ended up being

5    Mr. Puga's vehicle.

6        Q.    And did you see -- did the victim ever show you any

7    evidence of him or his vehicle being shot during that freeway

8    road rage incident?

9        A.    Yes.  I noticed he pointed -- he directed my

10   attention to the right passenger side door, and when I

11   inspected it, it had a bullet hole in the door, and when you

12   looked on the inside of the door, the bullet penetrated

13   through the door and the passenger seat.

14       Q.    And what kind of BOLO, if any, was put out

15   following this freeway shooting?

16       A.    We pull out BOLO for a white SUV with 22 inch rims

17   that were all black, and the thing that was very distinctive

18   is the left-rear corner of the rear window, it had Funeral in

19   the left rear window.  It was a little sticker.

20       Q.    Was there any information put out about the

21   driver?

22       A.    Yes.  The victim did describe the driver as a male

23   with bald head, and so we put out the description that the

24   victim gave.

25       Q.    Was there any little of -- I don't know what you

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 81

```
 1   vehicle which you testified was for about five to seven

 2   minutes before he moved to the front of the vehicle, during

 3   that five to seven minutes, at any time did you -- were you

 4   able to have a view or see his waist or waistband?

 5        A.   No.

 6        Q.   Once he moved to the front of the vehicle where you

 7   said he was there for about eight to ten minutes before you

 8   first shot, during that eight to ten minutes, did he ever

 9   turn to you towards you such that you could see his waist or

10   his waistband?

11        A.   No.

12        Q.   At what point then did you first see the gun in his

13   waistband?

14        A.   Once I had moved forward of his vehicle.

15             So once I was past his vehicle, because his vehicle

16   was blocked from the waist down, so when he was standing up

17   in front of his vehicle, I could only see his chest up.

18             So once I had passed his vehicle, that's when I was

19   able to see his waistband.

20        Q.   And is this when you were still on the southwest

21   corner of the intersection?

22        A.   Yes.

23        Q.   And were you still on the dirt portion?

24        A.   Yes.

25        Q.   Once you could see his waistband, was there anything
```

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 92

```
 1   advised them to respond that they arrived on-scene?

 2       A.   Maybe a minute, less.

 3       Q.   I have no further questions.

 4            Thank you.

 5            MR. GALIPO:  Okay.  I just have a few follow-up

 6   based on those questions, Sergeant.

 7                          EXAMINATION

 8   BY MR. GALIPO:

 9       Q.   With respect to your initial shots, in your

10   statement you indicate that you fired your initial shots as

11   his hand was coming towards his waistband; is that

12   accurate?

13       A.   Yes.

14       Q.   And do you see anywhere in any of the videos any

15   muzzle flash coming from the area that Mr. Puga was?

16       A.   No.

17       Q.   As he was running away, if you hypothetically didn't

18   see any gun in his hand, based on your training, would you

19   think it would have been appropriate to shoot him?

20            MS. ESQUIVEL:  Objection.  Incomplete and improper

21   hypothetical; lacks foundation; calls for speculation.

22            You can answer.

23            THE WITNESS:  No.

24   BY MR. GALIPO:

25       Q.   And why not?
```

**JONATHAN WAYNE BOTTEN, SR., ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 96

```
 1                         CERTIFICATE

 2                            OF

 3         CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5         I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6  Stenographic Shorthand Reporter of the State of California,

 7  do hereby certify:

 8         That the foregoing proceedings were taken before me

 9  at the time and place herein set forth;

10         That any witnesses in the foregoing proceedings,

11  prior to testifying, were placed under oath;

12         That a verbatim record of the proceedings was made

13  by me, using machine shorthand, which was thereafter

14  transcribed under my direction;

15         Further, that the foregoing is an accurate

16  transcription thereof.

17         I further certify that I am neither financially

18  interested in the action, nor a relative or employee of any

19  attorney of any of the parties.

20

21         IN WITNESS WHEREOF, I have subscribed my name, this

22  date:  November 5, 2024.

23

24  _____
        Jinna Grace Kim, CSR No. 14151
25
```