Exhibit 3

```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3

 4   JONATHAN WAYNE BOTTEN, SR.; TANJA    )
     DUDEK-BOTTEN; ANNABELLE BOTTEN; and  )
 5   J.B., a minor by and through his     )
     guardian JONATHAN WAYNE BOTTEN, SR., )
 6                                        )
                    Plaintiffs,           )
 7                                        )
                    vs.                   ) Case No.
 8                                        ) 5:23-CV-00257-JGB-SHK
     STATE OF CALIFORNIA; COUNTY OF SAN   )
 9   BERNARDINO; ISAIAH KEE; MICHAEL      )
     BLACKWOOD; BERNARDO RUBALCAVA; ROBERT)
10   VACCARI; JAKE ADAMS; and DOES 1-10,  )
     inclusive,                           )
11                                        )
                    Defendants.           )
12   _____)

13

14

15

16          REMOTE VIDEOCONFERENCE DEPOSITION OF

17                   MICHAEL BLACKWOOD

18              MONDAY, NOVEMBER 4, 2024

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  112646
```

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 11

1   your first shot?

2       A.   Yes.

3       Q.   **How many shots did you hear before you fired your**

4   **first shot?**

5       A.   **I couldn't be specific on the exact number, but**

6   **approximately two to three.**

7       Q.   Could you tell where those two or three shots were

8   coming from?

9       A.   No.

10      Q.   When you fired your first group, you had two volleys

11  of shots; is that correct?

12      A.   I don't -- I don't recall.

13           I don't recall pausing.

14      Q.   Do you recall in your statement describing your

15  first ten shots and then describing your second ten shots?

16      A.   I don't off the top of my head.

17           I would have to review it.

18      Q.   Okay.  I'll show you some portions of it in a little

19  bit just so we can look at it together.

20           Where were you located when you fired -- when you

21  started firing?

22      A.   I was to the right of my patrol vehicle.

23      Q.   And where was your patrol vehicle in relationship to

24  Mr. Puga's vehicle?

25      A.   It was behind his vehicle to the left.

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 13

1      Q.   And where on the passenger side were you,

2   approximately?

3      A.   Maybe approximately like one to two feet from the

4   patrol vehicle from the passenger side at the door.

5      Q.   Were you in the "V" of the open door?

6      A.   I believe so, yes.

7      Q.   And where was Mr. Puga when you fired your first

8   shot?

9      A.   He was in front of his vehicle a little bit to the

10  left.

11     Q.   Was he stationary or moving when you fired your

12  first shot?

13     A.   He was -- he wasn't -- he was stationary.

14     Q.   And for how many of your shots was he stationary?

15     A.   I would -- I don't know.  I wouldn't be able to

16  estimate.  I'm not sure.

17     Q.   Do you know if it was more than one or two shots

18  that he was stationary?

19     A.   Again, it would -- it would be a guess on my part.

20          I'm not sure.

21     Q.   Do you recall pepper balls being deployed in the

22  vehicle at some point?

23     A.   Yes.

24     Q.   And do you recall seeing some injury to Mr. Puga

25  while he was still in the vehicle?

JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.
Michael Blackwood on 11/04/2024

Page 14

```
 1      A.    Yes.
 2      Q.    And what injury did you see to him?
 3      A.    He had a like a cut, I believe, to his right, like,
 4  forehead eye area right above his eye.
 5      Q.    And did you associate that with him being hit in the
 6  right eye by pepper balls?
 7            MS. ESQUIVEL:  Objection.  Lacks foundation; calls
 8  for speculation.
 9            You can answer.
10            THE WITNESS:  Yes.
11  BY MR. GALIPO:
12      Q.    And do you have an estimate as to how many pepper
13  balls were deployed in the vehicle?
14      A.    I don't.
15      Q.    Do you recall giving an estimate in your statement
16  of between 100 and 150?
17      A.    That sounds familiar.
18      Q.    Have you -- when was the last time you reviewed your
19  statement?
20      A.    It was a few days ago.
21      Q.    And do you recall Mr. Puga using something to try to
22  help with the bleeding from his right eye?
23      A.    I don't recall.
24      Q.    Do you recall him complaining about his right eye
25  both when he was in the vehicle and after when he got out of
```

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 15

1   the vehicle?

2        A.   I do, yes.

3        Q.   What do you recall him saying regarding his eye?

4        A.   I just remember him saying, "My eye, my eye," but

5   other than that, I don't remember the other comments that he

6   was making regarding his eye.

7        Q.   At some point after you goat out of the vehicle, did

8   you see him put his hands up?

9        A.   Yes.

10        Q.   Where was he when you saw him put his hands up?

11        A.   He was in the "V" of his vehicle on the driver's

12   side.

13        Q.   Did you ever see him go to the front of the vehicle

14   at some point?

15        A.   I did.

16        Q.   Did you ever see him with his hands up when he was

17   to the front of the vehicle?

18        A.   Yes.

19        Q.   And were both of his arms appeared to be extended

20   upward above his head?

21            MS. ESQUIVEL:  Objection.  Vague; overbroad.

22            THE WITNESS:  I don't recall if his hands were fully

23   extended or partially.

24   BY MR. GALIPO:

25        Q.   When his hands were extended upward, did you see

JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.
Michael Blackwood on 11/04/2024

Page 16

1    anything in his hands?

2        A.    No.

3        Q.    Did he have a shirt on?

4        A.    No.

5        Q.    Did you ever hear him verbally threaten to harm any

6    of the officers?

7        A.    No.

8        Q.    Did you have any specific information that he had

9    specifically injured anyone before he got out of the car?

10       A.    No.

11       Q.    I want to show you an exhibit that I think was part

12   of your statement, and I'll mark it as Exhibit 6, and it's --

13   I think the Bates stamp ends in 544.

14           (Exhibit 6 was marked for identification.)

15   BY MR. GALIPO:

16       Q.    Do you recall this type of photograph or depiction

17   being discussed at the time of your statement?

18       A.    Yes.

19       Q.    And we could see Mr. Puga's vehicle in this?

20       A.    Yes.

21       Q.    And I think you already told me that his vehicle

22   would be facing northbound?

23       A.    Correct.

24       Q.    Do you see your patrol vehicle?

25       A.    Yes.

JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.
Michael Blackwood on 11/04/2024

Page 18

1      Q.   Were you generally in the same position for all of

2   your shots?

3      A.   Yes.

4      Q.   So you believe you fired all your shots from within

5   the open "V" on the passenger side of your patrol unit?

6      A.   So I did move out of the "V" sometime during that

7   interaction, but it was a foot to -- no more than two feet

8   away from the "V."

9           So I was generally in the same area, but not always

10  in the "V" of my vehicle.

11     Q.   So at some point when Mr. Puga was in the front of

12  the vehicle, did you notice other officers approaching his

13  position?

14     A.   There was -- yes.

15     Q.   And tell me about that.

16          What CHP officers did you notice approaching?

17     A.   So to the -- Sergeant Kee and Officer Rubalcava were

18  to the left of the patrol vehicle in the south, like west

19  dirt area, and there was two Sheriff's deputies, I believe, a

20  sergeant and the deputy who were approaching towards the

21  lights.

22     Q.   And before the approach did you hear any

23  conversation about the Sheriff's deputies having a Taser

24  available?

25     A.   I don't recall that conversation.

JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.
Michael Blackwood on 11/04/2024

Page 19

1      Q.   Were you -- did you have any awareness that there

2  was less-lethal designated before the shooting?

3      A.   Can you kind of rephrase that?

4      Q.   Sure.

5           MR. GALIPO:  We can take this photo down.

6  BY MR. GALIPO:

7      Q.   I take it one of the goals was to get him out of the

8  car?

9      A.   Yes, correct.

10     Q.   That's why the pepper balls whether it was a 100 or

11 150 or whatever it was were used to make it so uncomfortable

12 he would come out of the car; is that your understanding?

13     A.   Yes.

14     Q.   And he eventually came out?

15     A.   Yes.

16     Q.   Was there a tactical plan that you're aware of in

17 place as to once he got out of the car, who would he

18 designated lethal, and would who he designated less-lethal?

19     A.   I understand.  Not -- there wasn't a conversation

20 with me about it, no.

21     Q.   Did you overhear any conversations about it?

22     A.   Not that I recall, no.

23     Q.   Did you hear anyone say, for example, so and so will

24 be designated the bean bag, so and so would be designated

25 Taser, and so and so would be designated lethal?

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 20

```
1       A.    No.

2       Q.    As the officers were approaching Mr. Puga, did you

3    hear anyone yell out "Gun?"

4       A.    Not that I recall.

5       Q.    Anyone yell out "Drop it?"

6       A.    Nobody yelled out "Drop it."

7       Q.    Any verbal warning that you heard that shots were

8    going to be fired?

9       A.    Not that I recall, no.

10      Q.    When you heard these initial shots, did you see any

11   muzzle flash coming from the front of the car?

12      A.    No, I didn't see a flash.

13      Q.    And when you heard these initial two or three shots

14   before you fired, were there the two CHP officers on the

15   driver's side of the vehicle and the two deputy Sheriffs on

16   the passenger side?

17      A.    Yes.

18      Q.    And do you know if any of them had fired those

19   initial shots?

20      A.    I remember hearing shots from the left of me.

21            I don't know how many of those came from the left of

22   me, though.

23      Q.    Do you recall hearing shots to the left of you

24   before you fired?

25      A.    Yes.
```

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 24

1   after he stumbled?

2       A.   I don't -- I don't recall before and after saying

3   that, but again, it's been a few days since I reviewed my

4   statement.  I would have to review it again.

5       Q.   We'll take a break in a little bit so that I can put

6   it up there in fairness to you so at least you can see it.

7            But you're saying that you recall as he was running

8   away, you could not see his hands; is that fair?

9       A.   Yes.

10      Q.   Obviously, as he was running away, you did not see a

11  gun in his hand because you couldn't see his hands; is that

12  also fair?

13      A.   Correct.

14      Q.   Did you give him any commands at any time in the ten

15  seconds before you fired your first shot?

16      A.   No.

17      Q.   Did you give him any commands during your shooting

18  sequence?

19      A.   No.

20      Q.   Did you give him any commands after you fired your

21  shots?

22      A.   No.

23      Q.   Did you ever give him any verbal warning you were

24  going to shoot?

25      A.   No.

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 25

```
 1      Q.   Did you hear any shots being fired after your last

 2   shot?

 3      A.   Yes.

 4      Q.   How many shots did you think you heard approximately

 5   after your last shot?

 6      A.   Again, it would be an estimate, but approximately

 7   five.

 8      Q.   Did you hear any shots being fired after Mr. Puga

 9   went to the ground?

10      A.   Yes.

11      Q.   Was that about the five shots?

12      A.   Yes.

13      Q.   Could you tell where those shots were coming from?

14      A.   No.

15      Q.   Did you approach Mr. Puga after the shooting?

16      A.   Yes.

17      Q.   Could you tell if he had been struck by any of the

18   shots?

19      A.   Yes.

20      Q.   He appeared to have been struck?

21      A.   Yes.

22      Q.   Multiple times?

23      A.   I would assume so, yes.

24      Q.   Was he still alive when you approached him or

25   breathing?
```

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 28

```
 1      A.   Yes.

 2      Q.   Probably close to the middle of the roadway; is that

 3   fair?

 4      A.   Yes.

 5      Q.   So did you fire any shots while from that position

 6   while Mr. Puga was in front of his car?

 7      A.   I fired shots while he was partially in front of his

 8   car.

 9      Q.   Where was he in relation to his car when you started

10   firing?

11      A.   So he was in the front of his car, but I could still

12   see him.  He was in the front towards the driver's side, so I

13   could still see him partially from that side.

14           So he was to the left of his vehicle in the front of

15   his vehicle.

16      Q.   Because you're saying when you started firing, you

17   were firing north or northwest?

18      A.   So when I started firing, it would have been north,

19   like due north.

20      Q.   So for you to be firing due north, Mr. Puga would

21   have just had to clear the front of his vehicle; is that

22   fair?

23      A.   Correct.

24      Q.   And what part of his body were you firing at,

25   initially?
```

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 29

```
 1      A.    It was his torso area, like his top half of his

 2   body.

 3      Q.    So chest-abdomen?

 4      A.    Yes.

 5      Q.    Side or back?  Because the torso, obviously, as you

 6   know from your law enforcement and nursing experience, is

 7   from the waist to the neck; right?

 8      A.    Correct.

 9      Q.    What part of his torso were you firing at,

10   initially?

11      A.    Side.

12      Q.    Left side or right side?

13      A.    His left side.

14      Q.    And was he turning away and starting to run as you

15   were firing?

16      A.    At this point he was not starting to run away.

17            He was like hunched over.

18      Q.    Was that the hunched over where you thought that he

19   was struck?

20      A.    Correct.

21      Q.    And then you saw him start to run away?

22      A.    Correct.

23      Q.    Started to run away after he was hunched over?

24      A.    Correct.

25      Q.    And then what part of his body were you aiming at as
```

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 30

1   he was running away and you were shooting north?

2        A.    His back area.

3        Q.    Okay.  And how far do you think he ran from where he

4   started at the car to where he fell down?

5        A.    Approximately like 100 feet.

6        Q.    Okay.  And are you saying, I think you said you kept

7   shooting until he fell down; is that right?

8        A.    I continued to fire until I didn't see him move

9   anymore.  So when he fell down, I didn't see anymore

10   movement, so yes.

11        Q.    So you stopped firing when you saw him stop

12   moving?

13        A.    Correct.

14        Q.    So are you saying that you were firing during the

15   course of him running this 100 feet, approximately?

16        A.    Yes.

17        Q.    And how long do you think it took him to run this

18   100 feet, approximately?

19        A.    Again, an estimate, maybe six to ten seconds.

20        Q.    And were you firing during this six to ten

21   seconds?

22        A.    Yes.

23        Q.    Were you trying to assist during the time you were

24   firing?

25        A.    Yes.

JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.
Michael Blackwood on 11/04/2024

Page 31

1      Q.    And what were you doing to try to assess?

2      A.    I was looking for a gun, if he had dropped it from

3   the front of his car to where he fell.

4      Q.    But I think you've already told us that you could

5   not see his hands when he was running because they were like

6   in front of him?

7      A.    Correct.  When he was running, correct.

8      Q.    Did his hands seem like they were more towards his

9   chest when he was running away?

10          Was that your impression?

11     A.    Yes.

12     Q.    And when he was running away, were you the only

13  person firing, or were there other officers firing, if you

14  know?

15     A.    I don't know.

16     Q.    So from your first shot to your last shot, you think

17  it was approximately six to ten seconds?

18     A.    Yes.  That would be my estimate, yes.

19     Q.    Did you ever discuss any tactical plan with the

20  other CHP officers you were with as to what you three were

21  going to do once he got out of the car?

22     A.    It was -- there was no plan discussed that I recall,

23  no.

24     Q.    Was there any discussion about possibly just having

25  the four residences at the corner see if you can get the

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 33

1    before the paramedics arrived?

2        A.   Not that I'm aware of.

3        Q.   I'm just going to show you a few portions of your

4    statement, and then we'll take our first break.

5             We're going to try to share the screen and show you

6    the bottom of Page 53 and the top of Page 54 of your

7    statement.

8             Are you able to see that on your screen?

9        A.   Yes.

10       Q.   You see the bottom question by Detective Bustamante

11   or Investigator Bustamante asking you about how many pepper

12   ball rounds you recall?

13            Do you see that general questions on Lines 24

14   through 26?

15            Do you want us to enlarge it a little bit for you?

16       A.   I could see it.  I apologize.

17       Q.   It's okay.  Take your time.

18            You might have to look above to give it context.

19       A.   Yes, I remember that.

20       Q.   Going to the top of Page 54, do you see your

21   estimate between 100 and 150?

22       A.   Yes.

23       Q.   Does that seem about right?

24       A.   Yes.

25       Q.   At any time prior to Mr. Puga going to the front of

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 34

1  his vehicle, did you ever see any gun in his hand or on his

2  person?

3      A.   No.

4      Q.   Did you at any time ever see the gun in his

5  waistband, actually in his waistband?

6      A.   No.

7          MR. GALIPO:  Can we go to Page 64, please.

8  BY MR. GALIPO:

9      Q.   Looking towards the top and particularly Lines 3, 4,

10 and 5, do you see the reference to hearing them talking about

11 the Taser?

12     A.   Yes.

13     Q.   Does that refresh your memory, you did something

14 about a Taser at some point?

15     A.   Yes.

16         MR. GALIPO:  Can we go to Page 66, please.

17 BY MR. GALIPO:

18     Q.   Looking at the top, you're referencing him bending

19 over, and that's when you thought he probably got hit?

20     A.   Yes.

21     Q.   And you were thinking maybe by your shots or maybe

22 by someone else's shots; is that fair?

23     A.   Yes.

24     Q.   And then you say, "And he starts to run kind of

25 north, and then you stop firing because it looks like he's

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 36

1    You say, "So I'm tracking him and firing as he's

2  running, and then stopped when it looks like he's going to

3  fall to the ground."

4        Do you see that part on Line 13 and 14?

5    A.   Yes.

6    Q.   "And then he doesn't fall to the ground, and he

7  keeps running, so I get him back into my sights, and then

8  continued firing until he falls to the ground."

9        Do you see that?

10   A.   Yes.

11   Q.   So I think we covered this, but you would agree that

12  you saw him appear to stumble at some point, and you

13  continued firing after you saw that?

14        MS. ESQUIVEL:  Objection.  Misstates the transcript.

15        Go ahead.

16        THE WITNESS:  Yes.

17  BY MR. GALIPO:

18   Q.   And during that time you could not see his hands or

19  the gun; is that fair?

20   A.   Correct.

21   Q.   And if you can turn, we can look at Page 71, please,

22  towards the top or at the top, Bustamante's asking, he says,

23  "And now you track him and you're firing approximately 20

24  times, what -- was that -- those -- was that cadence pretty

25  close together, you would say?"

JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.
Michael Blackwood on 11/04/2024

Page 37

1          And then you say, "I fired about 10 pretty close

2     together, and that's when I thought it looked like he was

3     going to fall to the ground, and then he like caught himself

4     and then kept running, kept running, and that's when I fired

5     ten more."

6          Do you see that?

7     A.   I do.

8     Q.   And I take it this incident was probably fresher in

9     your mind when you gave your statement a few days later than

10    it is now in some respects; is that fair?

11    A.   Sure, yes.

12    Q.   And so it sounds like looking at Page 71 of what we

13    went through on Page 68, you came off your sights for some

14    period of time during this time it looked like he was

15    stumbling?

16    A.   Yes.

17    Q.   And then when he didn't go to the ground at that

18    point, you got back up on your sights, and at least according

19    to this, fired ten more rounds?

20    A.   Yes.

21    Q.   So getting back to what I stated at the beginning

22    that there were two volleys of shots, would you at least

23    agree there was somewhat of a pause between your first group

24    of shots and your last group of shots at about the time it

25    looked like he was stumbling?

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 38

1          MS. ESQUIVEL:  Objection.  Lacks foundation;

2    misstates prior testimony.

3          Go ahead.  You can answer.

4          THE WITNESS:  After reviewing the statement I gave,

5    yes.

6    BY MR. GALIPO:

7        Q.   Okay.  And when you saw him stumbling, was he kind

8    of like in the middle of the street at that point?

9        A.   I don't remember at what position he was in the road

10   at that point.

11       Q.   Let's look at Page 72 real quick, and then we'll

12   take a break.

13            On Lines 9 through 14, I think you're talking about

14   he was running, he was still kind of like in the middle of

15   the intersection, he doesn't really fall, but it looks like

16   he's going to fall, but and then he kind of like pops back

17   up, and then he keeps running, and then that's when he falls,

18   falls in the dirt shoulder face-down.

19            I'm paraphrasing a little bit, but do you see

20   that?

21       A.   I see that, yes.

22       Q.   Is that consistent with your recollection now that

23   we've refreshed it a little bit?

24       A.   Yes.

25       Q.   So when he initially stumbled, he was more in the

JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.
Michael Blackwood on 11/04/2024

Page 39

1    street, and then when he finally fell, it was more on the

2    dirt shoulder?

3        A.   Yes.

4        Q.   Okay.

5             MR. GALIPO:  Thank you, Hang.

6             All right.  If it's okay with everyone, I think

7    we're making a lot of the progress.  I don't expect to be as

8    long as I was with the first depo, but we can take a

9    ten-minute break.

10            MS. ESQUIVEL:  Okay.  Thank you.

11            (Recess taken.)

12   BY MR. GALIPO:

13       Q.   When you fired your initial shots, what would you

14   estimate the distance to be between yourself and Mr. Puga?

15       A.   Approximately 20 to 30 feet.

16       Q.   And you were using your sights when you fired?

17       A.   Yes.

18       Q.   Aiming at his -- essentially, would it be the chest,

19   maybe the left side, did you say?

20       A.   Yes.

21       Q.   And was it your impression that some of your initial

22   shots may have struck him?

23       A.   Yes.

24       Q.   And when he continued to run and you continued to

25   fire and he started stumbling, at that point did you think

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 40

1    some additional shots you fired may have struck him when you

2    saw him look like he was stumbling?

3        A.    Yes.

4        Q.    And is that why you stopped for a moment thinking

5    maybe he's going to fall to the ground?

6        A.    Correct.

7        Q.    But then he kept going?

8        A.    Yes.

9        Q.    And that's when you got back on your sights and

10   fired your additional shots?

11       A.    Yes.

12       Q.    And then he eventually went to the ground again; is

13   that correct?

14       A.    Yes.

15       Q.    And I think you said you stopped firing when he

16   stopped moving?

17       A.    Correct.

18       Q.    Do you know if you fired any shots as he was going

19   to the ground?

20       A.    I can't be sure.

21       Q.    Did you know if you fired any shots after he went to

22   the ground?

23       A.    No.

24       Q.    Did you hear any shots being fired after he went to

25   the ground?

JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.
Michael Blackwood on 11/04/2024

Page 45

1   feet?

2       A.   I don't recall the distance that we're trained on to

3   use it.  I don't recall.  I'm not sure.

4       Q.   You had to wipe that out to make room for all the

5   nursing information.

6       A.   Exactly.

7       Q.   And then on Page 20 starting on Line 18 or 17, you

8   say, "I'm assuming he got hit at that point because he kind

9   of like crunches down a little bit and then he starts to

10  running north from where we were at, so away from us, and I

11  don't see a gun on the floor, and he's -- his hands are like

12  to his chest almost, his chest area, and I still can't see

13  his hands, so I keep firing."

14          Do you see that?

15      A.   Yes.

16      Q.   And then you continue on to say, "I keep firing

17  until I don't see him moving anymore," and then you say he

18  fell to the ground on his left side.

19          Do you see that?  Do you more or less see that?

20      A.   Yes.

21      Q.   Okay.  I know I paraphrased a little bit.

22          I could read it directly if you're more comfortable.

23          But do you remember being that part of your

24  statement that as he was running away, you couldn't see his

25  hands, and his hands were like to his chest area, and you

JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.
Michael Blackwood on 11/04/2024

Page 46

1    kept firing?

2         A.    Yes.

3         Q.    And on Page 21 the next page, it seems like you're

4    referencing the tasing after he went to the ground, and

5    on Line 16, you're saying, "Tases him again."

6              Does that portion refresh your recollection that he

7    may have been tased twice after he went to the ground?

8         A.    Yes.

9         Q.    And then going to the top of Page 22, you're

10   referencing people screaming after the shooting, "You shot

11   him, you shot him, you don't know what you guys are doing."

12             Do you see that?

13        A.    Yes.

14        Q.    Who was screaming that?

15        A.    I don't know.

16        Q.    I take it it wasn't law enforcement; it was some

17   civilians?

18        A.    Yes.

19        Q.    People came out of their homes afterwards, and you

20   heard them screaming that?

21        A.    I'm assuming that's what happened.

22             I don't know where they were before, but yes.

23        Q.    Were you aware that either Officer Rubalcava or your

24   sergeant or both of them had fired immediately before you

25   fired or about the same time?

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 47

1      A.    I remember hearing shots from my left, and I know

2    Sergeant Kee and Rubalcava were to my left.

3            I don't know if anybody else was to my left,

4    however, so.

5      Q.    And you heard those shots before you fired your

6    first shot?

7      A.    I heard at least one shot come in from my left,

8    yes.

9      Q.    So when you got to him, was he more or less

10   chest-down or face-down with his arms and hands underneath

11   him?

12     A.    He was face-down, but with his arms underneath of

13   him, yes.

14     Q.    And going to Page 78 of your statement, if we can

15   look at that for just a moment and read to yourself if you

16   want to Lines 11 through 22, and let me know when you've had

17   a chance to do that.

18     A.    I'm done.

19     Q.    Have you had a chance -- does a refresh your

20   recollection about the two tasing and the body locking up?

21     A.    Yes.

22     Q.    And I take it you had the impression he was still

23   alive at that time?

24           MS. ESQUIVEL:  Objection.  Calls for speculation.

25   BY MR. GALIPO:

JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.
Michael Blackwood on 11/04/2024

Page 51

1        Q.    Officer, I'm going to call you officer because at

2    that time you were an officer.

3            How was it that you came to be involved in the

4    pursuit of Mr. Puga?

5        A.    I -- so we, me and Officer Rubalcava recognized that

6    vehicle from a description that was given to us at the

7    beginning of our shift where that vehicle was involved in a

8    car-to-car freeway shooting.

9            So that's -- we made a traffic stop on that

10    vehicle.

11        Q.    And what were you told about that earlier

12    incident?

13        A.    We were told that there was a car-to-car shooting

14    involving a white Ford Expedition with black rims that had a

15    yellow sticker in the back windshield that said Funeral, and

16    that that shooting resulted from a road rage incident; that

17    the victim of that shooting followed the Expedition for a

18    little bit, and then lost sight of it, and the officers

19    during the day attempted to locate that vehicle, and they

20    didn't locate the vehicle.

21        Q.    Were you told anything about the suspected driver?

22        A.    Not that I remember, no.

23        Q.    You testified earlier when Mr. Galipo showed you

24    exhibit, and I believe it's either 6 or 5, a photograph and

25    the Bates stamp 544, that was shown to you during your

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 54

1  BY MS. ESQUIVEL:

2      Q.    And when you said you saw Mr. Puga starting running

3  away and you saw him stumble, that you paused and reassessed,

4  then he didn't fall, so you continued to fire; is that

5  correct?

6      A.    Yes.

7      Q.    Why did you continue to fire if he was running away

8  from you?

9      A.    Because I knew he initially had a firearm, and I

10  didn't see him drop the firearm.  At that time part of my

11  reassessment was tracking from where he was at to where --

12  where he initially started to where he was at that point, and

13  I didn't see a firearm on the ground up until that point.

14          So that's why I continued to fire.

15      Q.    And why did you consider the fact that he still had

16  the gun as an immediate threat to yourself or someone else?

17          MR. GALIPO:  Objection.  Leading.

18          THE WITNESS:  Because of -- he still had the gun in

19  his hand.  He was still able to fire at me or my partners,

20  and then the fact that he was heading towards where he was

21  running, headed towards residential area, him being able to

22  enter residence with the handgun could have made a worse

23  situation.

24  BY MS. ESQUIVEL:

25      Q.    And what was the concern on your part that he would

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 59

1    Q.   How do you know that it was 100 to 150 pepper

2    balls?

3    A.   I just remember that conversation between -- I don't

4    know who it was between, but I just know Sheriff's deputies

5    said that his canister was full, and then it has anywhere

6    between a 100 to 150 pepper balls.

7         So that's where that number came from.

8    Q.   Okay.  I have no further questions.

9         MR. GALIPO:  Okay.  Shannon, any follow-up?

10        MS. GUSTAFSON:  No.  I have nothing else.

11        MR. GALIPO:  Okay.  I have nothing further.

12        I'm assuming you both want the same request from the

13   court reporter?

14        MS. ESQUIVEL:  Yes.  Madam Court Reporter, the

15   witness will review the transcript.  I'll order an electronic

16   only, and I will provide my copy to him for review.

17        MS. GUSTAFSON:  And I would like a copy if you need

18   it on the record.

19        MR. GALIPO:  I just thought of one other question.

20        I'm sorry.

21                         EXAMINATION

22   BY MR. GALIPO:

23   Q.   Was the helicopter orbiting above for some period of

24   time?

25   A.   It was.

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 60

1    Q.   And do you have an estimate as for how long the
2    helicopter was orbiting above?
3    A.   From the time that we were stopped at that
4    intersection?
5    Q.   Yes.
6    A.   I can't be 100 percent sure on how long he was
7    there, but I would estimate approximately 30 minutes into the
8    interaction.
9    Q.   And has it been your experience with the helicopters
10   that orbit, they use spotlights to illuminate the area?
11   A.   Yes.
12   Q.   And did they sometimes orbit in a some type of
13   circular area above?
14   A.   Yes.
15   Q.   And would you at least agree that when they were
16   orbiting with their spotlight, they were illuminating not
17   only the car of Mr. Puga, but some of the surrounding area?
18         MS. ESQUIVEL:  Objection.  Calls for speculation.
19         THE WITNESS:  From my recollection, the spotlight
20   was in the middle of that intersection.  I don't remember how
21   far out from that intersection the spotlight actually was.
22   BY MR. GALIPO:
23   Q.   The middle of the intersection where we've been
24   talking about where the two streets cross and there is the
25   four homes?

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 61

1   A.    Yes, that intersection.

2   Q.    Okay.  Thank you.

3         That's all that I have.

4         (Deposition proceeding concluded at 4:00 p.m.)

5                          *   *   *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.
Michael Blackwood on 11/04/2024

Page 63

```
 1                         CERTIFICATE

 2                             OF

 3            CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5            I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6    Stenographic Shorthand Reporter of the State of California,

 7    do hereby certify:

 8            That the foregoing proceedings were taken before me

 9    at the time and place herein set forth;

10            That any witnesses in the foregoing proceedings,

11    prior to testifying, were placed under oath;

12            That a verbatim record of the proceedings was made

13    by me, using machine shorthand, which was thereafter

14    transcribed under my direction;

15            Further, that the foregoing is an accurate

16    transcription thereof.

17            I further certify that I am neither financially

18    interested in the action, nor a relative or employee of any

19    attorney of any of the parties.

20

21            IN WITNESS WHEREOF, I have subscribed my name, this

22    date:  November 4, 2024.

23            _____

24            Jinna Grace Kim, CSR No. 14151

25
```