Exhibit  4

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3

 4   JONATHAN WAYNE BOTTEN, SR.; TANJA      )
     DUDEK-BOTTEN; ANNABELLE BOTTEN; and    )
 5   J.B., a minor by and through his       )
     guardian JONATHAN WAYNE BOTTEN, SR.,   )
 6                                          )
                     Plaintiffs,            )
 7                                          )
                  vs.                       ) Case No.
 8                                          ) 5:22-CV-00949-JGB-KK
     STATE OF CALIFORNIA; COUNTY OF SAN     )
 9   BERNARDINO; ISAIAH KEE; MICHAEL        )
     BLACKWOOD; BERNARDO RUBALCAVA; ROBERT  )
10   VACCARI; JAKE ADAMS; and DOES 1-10,    )
     inclusive,                             )
11                                          )
                     Defendants.            )
12   _____)

13

14

15

16         REMOTE VIDEOCONFERENCE DEPOSITION OF

17                     JAKE ADAMS

18            TUESDAY, NOVEMBER 12, 2024

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  116769
```

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 9

1    A.    Being no other separate facts or circumstances

2    around it, I -- what would have to happen is more on the

3    situation, sir.

4    **Q.    The previous individuals that you saw with guns in**

5    **their hand, did you shoot any of those individuals?**

6    A.    I've only been in one -- involved in one lethal

7    force encounter which is the one that occurred on February

8    17, 2021.

9    **Q.    On the date of the incident, were you partnered up**

10   **in a vehicle or solo in a vehicle?**

11   A.    I was solo in a vehicle, sir.

12   **Q.    And were you part of the vehicle pursuit?**

13   **A.    Yes, sir.**

14   **Q.    And do you know where your vehicle was in line**

15   **during the vehicle pursuit?**

16   A.    During the pursuit there were multiple turns and

17   avenues taken throughout the city, and I was not part of the

18   initial pursuit.

19          But when one of the deputy's vehicle became

20   disabled, I was able to join the pursuit as it already had

21   been going on.  At that point in time I was directly behind

22   my supervisor at that time which was also behind two CHP

23   vehicles.

24   **Q.    Who was your supervisor at the time?**

25   A.    Sergeant Vaccari.

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

Page 12

```
 1              Is that your recollection as well?

 2      A.   Yes, sir.

 3      Q.   Was there a helicopter overhead at some point?

 4      A.   Yes, sir.  The helicopter was overhead for a period

 5   of time throughout the end of the pursuit or through the

 6   pursuit as well as through the end.

 7              But they were not there through the duration or

 8   through the ending of the incident that occurred that day.

 9      Q.   So if I'm understanding what you're saying, the

10   helicopter was present during the pursuit, and after the

11   pursuit came to an end, but it left at some point before the

12   shooting; is that correct?

13      A.   Yes, sir, that's correct.

14      Q.   Did you see any guns in the vehicle, the white

15   suspect vehicle during the pursuit?

16      A.   I was not able to see inside of the vehicle during

17   the pursuit, sir.

18      Q.   Were any shots fired during the pursuit that you're

19   aware of?

20      A.   Not that I'm aware of.

21      Q.   Did you have an understanding as to how many people

22   were in the vehicle?

23              MS. GUSTAFSON:  Objection.  Vague as to time.

24              You can answer.

25   BY MR. GALIPO:
```

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 13

1      Q.    During the pursuit.

2      A.    During the pursuit I was not aware of how many

3   people may have been inside of the vehicle.

4      Q.    At some point did it come to your attention that

5   there was more than one person in the vehicle?

6      A.    Yes, sir.

7      Q.    And at some point was a female either taken out, or

8   did she exit the vehicle?

9      A.    Yes, sir.

10     Q.    Did you have any conversation with the female after

11   she exited the vehicle?

12     A.    Yes, sir.

13     Q.    Can you tell me about that, please.

14     A.    Yes.  She exited the vehicle and was given commands

15   to walk back towards deputies, and I made contact with her,

16   placed her in handcuffs, patted her down for weapons, and I

17   asked her if anybody else was inside the vehicle, and she

18   told me Mr. Puga was inside.

19          She referred to him as Hector.  She wasn't sure on

20   his last name.  I also asked her if there were other weapons

21   inside the vehicle and if there was anything for me to know

22   about, and she said she didn't know.

23          And she informed me that she -- he wanted to call

24   his wife, and he was a new father.  That was about the extent

25   of the conversation I had with her.

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 14

1    Q.   Did you communicate any of that conversation to any

2   of the other officers on-scene?

3    A.   I told my supervisor the suspect's name, and we were

4   unsure of the last name and unsure of any weapons inside the

5   vehicle.

6    Q.   I take it since you didn't have the last name, you

7   were unable to run a criminal history; is that a correct

8   statement?

9    A.   I think due to the dynamic nature of the situation

10   and being involved in a high-risk traffic stop, it

11   was probably the primary reason I was unable to or chose not

12   to step aside and run a criminal history on Mr. Puga at that

13   time.

14    Q.   So at some point was it decided that pepper balls

15   would be used to try to see if that would assist getting him

16   out of the car?

17    A.   Yes, sir.  It's true.

18    Q.   And who did you have that discussion with?

19    A.   I was not privy to that discussion or part of that

20   decision making process.  I would say it was made by my

21   supervisor.

22    Q.   And do you know who ended up deploying the pepper

23   balls?

24    A.   I do know.

25    Q.   And who was that?

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

Page 16

1  know.  So I probably would say it's still an estimate that I

2  have till this day.

3      Q.   And do you have an estimates to over what period of

4  time the pepper balls were deployed from the first one to the

5  last one?

6      A.   I would estimate over a period of 30 to 45 minutes,

7  probably.

8      Q.   Where were you positioned, and there may be multiple

9  positions, during the deployment of the pepper balls?

10     A.   During the deployment of pepper balls, I was next to

11  the -- behind the suspect vehicle, but next to the CHP

12  vehicles that were still facing northbound behind the suspect

13  vehicle.

14     Q.   When you say next to, were you like on the passenger

15  side, for example?

16     A.   Yes.  The passenger side behind the open door.

17     Q.   And were you able to make any observations of

18  Mr. Puga inside the vehicle before he got out?

19     A.   Yes, sir.  During while watching the vehicle and

20  maintaining observation of it, I could see that Mr. Puga was

21  twisting and turning his body, reaching around, leaning over,

22  reaching back at different periods of time.

23          And at one point I could remember seeing him reach

24  from the driver side where he was seated, reach across, and

25  pull the passenger -- the front passenger door which had been

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 18

1    trying to be given, and at one point in time he was shouting

2    that he had been hit with the pepper ball in the head or the

3    face.

4            Different things of that nature.  I don't remember

5    exactly what his statements were verbatim, though.

6    **Q.   Okay.  Did you ever see anything on his face or head**

7    **that was consistent with him being struck by pepper balls in**

8    **the face?**

9    A.   Not that I recall.

10   **Q.   Did you ever hear any coughing or anything like that**

11   **coming from the car after the deployment of the pepper**

12   **balls?**

13   A.   Yes.  I remember hearing coughing.

14   **Q.   Based on your training is that consistent at least**

15   **with one of the potential effects from the pepper balls?**

16   A.   That's one of the effects.  It doesn't necessarily

17   make it effective, but that can be one of the effects of

18   pepper balls.

19   **Q.   Do you have training with respect to the pepper**

20   **balls?**

21   A.   Yes, sir.

22   **Q.   And based on the training what are some of the**

23   **intended effects or effects of pepper balls?**

24   A.   The intended effect is to create a distraction for

25   and gain compliance through the pain given to the --

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 19

1 someone's ability to see and breathe comfortably so that

2 they -- so they can comply, get them out of the environment,

3 detain them as they needed, and then remove them from that

4 environment so they can see and breathe more clearly.

5      Q.    And so I have some familiarity with pepper spray.

6           Is it some of the similar effects, the burning of

7 the skin, the tearing up of the eye, the effect on the mucous

8 membranes, et cetera?

9      A.    Yes, sir.

10      Q.    Was there some tactical plan that you were aware of

11 of what steps were going to be taken once, if and when

12 Mr. Puga exited the vehicle?

13      A.    No.  I don't think there was a tactical plan fully

14 formed and put together.  I think when the pursuit came to an

15 end, the officers, myself, and my supervisor gained positions

16 of best the cover we could while trying to control the

17 situation.  These situations tend to be very dynamic, and we

18 needed to be able to, one, maintain observations of the

19 suspect as well as there was communication going on with the

20 suspect as well as being able to attempt to try to

21 communicate amongst ourselves as well.

22      Q.    Were you taking a position of cover during some of

23 this time frame?

24      A.    Yes, sir.

25      Q.    And where were you taking a position of cover?

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 21

1    outside the vehicle.

2        Q.    Do you recall anything that he said when he was on

3    the driver's side of the vehicle even if it's not exact to

4    the effect?

5        A.    I remember him saying something to the effect of he

6    was -- he was getting out or he's listening, or my hands are

7    up.  But that was during the time where he would raise his

8    hands up and then he would lower them back down.

9            But, no, I don't recall exactly what he said.

10        Q.    Was he being given some commands to put his hands up

11    when he was on the driver's side?

12        A.    Yes, sir.

13        Q.    And at times were his hands up?

14        A.    At various times he would put his hands up, but then

15    he would put them down.  They were never up for an extended

16    period of time.  He was not compliant at any point in time.

17        Q.    What is the longest period of time you recall him

18    having his hands up?

19        A.    I don't know because the situation was so dynamic.

20            I don't know that I could even give a reasonable

21    guess of how long the hands were up.  I don't, sir.

22        Q.    During the time he was on the driver's side of the

23    vehicle, did you ever see a weapon in his hands?

24        A.    Not during that time, sir, no.

25        Q.    Did you ever see a weapon on his person during the

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

Page 22

1   time he was on the driver's side of the vehicle?

2        A.    Not during that time, sir.

3        Q.    Did you ever hear him verbally threaten to harm any

4   of the officers?

5        A.    I don't recall hearing anything like that, sir.

6        Q.    Did you ever hear him verbally threaten to harm

7   himself?

8        A.    I don't recall hearing anything like that, sir.

9        Q.    When he was on the driver's side of the vehicle, was

10   there any tactical communications between the officers as to

11   what the next steps would be?

12        A.    Not that I'm aware of, no.

13        Q.    At some point did he go to the front of the

14   vehicle?

15        A.    Yes, sir.

16        Q.    And where were you, if you recall, when Mr. Puga

17   went to the front of the vehicle?

18        A.    I believe when he went to the front of the vehicle,

19   I was on the driver's side of the CHP vehicle that was on the

20   most east side of the street, the second vehicle where I

21   could see through the broken back window and through the

22   windshield.  And I could see a portion of the torso of

23   Mr. Puga, his head, and his hands when he would raise it

24   up.

25        Q.    When he was in the front of the vehicle?

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 25

1    BY MR. GALIPO:

2       Q.   After Mr. Puga went to the front of the vehicle, was

3    there any discussion about a tactical plan at that point?

4       A.   Not that I'm aware of.  I know there were two

5    sergeants on-scene, and I know they had a consistent level of

6    communication amongst themselves.  I was close enough to see

7    them next to each other and hear them talking, but I couldn't

8    make out what they were saying.

9            There never was never a formal plan put together or

10   we all got together and communicated what everybody's going

11   to with x, y, and z.

12      Q.   Was any specific tactical plan ever communicated to

13   you?

14      A.   Just prior to the end of the incident before the

15   shooting occurred, my supervisor, Sergeant Vaccari and I,

16   formulated a plan to move to the east side of the vehicle

17   because we could no longer see the suspect's hands, and he

18   was out of the vehicle.

19           And so our plan was to move ourselves out of our

20   current positions and to a position where we can have better

21   observations on the suspect.

22           That was our level of plan there, sir.

23      Q.   Okay.  And between you and your sergeant, was one of

24   you designated less-lethal?

25      A.   Yes, sir.

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

Page 26

1     Q.   And who was that?

2     A.   Sergeant Vaccari, sir.

3     Q.   And do you know what type of less-lethal he had?

4     A.   He had a 40-millimeter munitions less-lethal.

5     Q.   Did you yourself have a Taser on you?

6     A.   I did, sir.

7     Q.   What type of Taser was it?

8     A.   I don't know the exact model.  It's a standard

9 issued San Bernardino Sheriff's Department Taser that we are

10 all issued and carry on our Sam Brownes.

11    Q.   Do you recall if the Taser that you had was such

12 that you could fire a cartridge, and if you needed to fire a

13 second cartridge, you can do that without loading a new one

14 in, or whether you had to load a second cartridge in?

15    A.   The Taser I had is capable of firing two cartridges

16 without having to go through a reload process.

17    Q.   Were you aware at the time frame that you and your

18 sergeant were approaching on -- I take it the passenger side

19 of the white car would have been your approach?

20    A.   That's correct, sir.

21    Q.   Were you aware that the CHP officers during that

22 time frame were also approaching?

23    A.   Yes, sir.  I could see them also moving slightly

24 north, and they were moving on to the -- I want to say the

25 west side of the vehicle, and we were on the east side.

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 27

1          So that they can also gain a better line of sight or

2    observation of the suspect's hands and movement while he was

3    in front of the vehicle.

4          Q.    Between you and your sergeant in your approach on

5    the east side, I think the passenger side would be the east

6    side of the vehicle?

7          A.    That's correct, sir.

8          Q.    Do you recall who was first and who was behind

9    between you and your sergeant as you started your approach?

10         A.    I would have been just in front of my supervisor,

11    sir.

12         Q.    Okay.  So Sergeant Vaccari would have been slightly

13    behind you?

14         A.    That's correct.

15         Q.    And did you have a sense between yourself and the

16    CHP officers who was further north as the approach was going

17    on?

18         A.    I think we were in similar positions, give or take a

19    few feet, but we were approaching in a walking pace similar.

20         I don't know if I was more north or if they were

21    more north of position.

22         Q.    And could you tell how many CHP officers were

23    approaching, whether it was one or more than one?

24         A.    I do not know, sir.

25         Q.    Was there any discussion you heard about someone

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

Page 35

```
 1    back with one foot and drop down to a knee and then a second

 2    knee and keeping your hands up.  That is general practice.

 3            A lot of times during high-risk traffic stops where

 4    we've asked somebody to walk backwards towards us, we attempt

 5    to have them keep their hands where we can see them until the

 6    last possible minute where they might need to place them on

 7    the ground.

 8        Q.   Right.  But in a high-risk traffic stop you're

 9    normally are very specific with the commands; right?

10            Go to a knee, but keep your hands up, for example?

11        A.   That's correct, sir.

12        Q.   Now, as you were approaching at some point, do you

13    hear shots?

14        A.   Yes, sir.

15        Q.   And do you hear shots before you fired your first

16    shots?

17        A.   Yes, sir.

18        Q.   And how many shots did you hear before you fired

19    your first shot?

20        A.   I do not know, sir.

21        Q.   Do you have any estimate?

22        A.   I do not, sir.

23        Q.   Do you know if it was more or less than ten, for

24    example?

25        A.   I would estimate it was less than ten shots were
```

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 36

```
1   fired before I fired.

2        Q.   Were you looking at Mr. Puga when you heard the

3   shots starting?

4        A.   Yes, sir.

5        Q.   And did you ever see any muzzle flash coming from

6   Mr. Puga?

7        A.   When I approached on the east side of the vehicle,

8   Mr. Puga looked at me, and I saw his hands dive down into his

9   waistband area.  I don't know if it was waistband or pockets.

10  And I saw a gun, and then I heard shots, and then I returned

11  fire.

12       Q.   I think my question was, did you ever see any muzzle

13  flash coming from Mr. Puga?

14       A.   At what point in time, sir?

15       Q.   When he was in front of the vehicle before you

16  fired?

17       A.   When I saw the gun and heard the shots, I did not

18  specifically see a muzzle flash at that point in time.

19       Q.   Is one of the documents that you reviewed in

20  preparation for the deposition your statement or interview

21  you gave?

22       A.   Yes, sir.

23       Q.   And when was the last time you reviewed that?

24       A.   This past weekend, sir.

25       Q.   Do you recall in your statement indicating you heard
```

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

Page 37

1   the shots before you saw anything in Mr. Puga's hand?

2       A.   I do not recall that, sir.

3       Q.   Do you recall in your statement saying that you

4   yelled at Mr. Puga to get on the ground and simultaneously

5   you heard gunshots?

6       A.   I believe that's accurate, sir.

7       Q.   And do you recall saying after you heard the

8   gunshots is when you saw his arm or hand come up?

9       A.   I don't specifically recall that, sir.

10      Q.   Had you fired your first shot when Mr. Puga already

11  starting to run?

12      A.   I believe so.

13      Q.   And how many shots did you fire altogether?

14      A.   I believe it was ten rounds that I fired, sir.

15      Q.   Was there any pause in your sequence?

16      A.   Yes, sir.  There were two extended or distinct

17  pauses over the course of what I would describe as three

18  volleys of fire.

19      Q.   What would you estimate the number of shots in your

20  first volley?

21      A.   I believe it was three.  I believe that's what it

22  was in my first volley, sir.

23      Q.   And Mr. Puga was already starting to run away at the

24  time of your first volley of shots?

25      A.   Yes, sir.  It was very fluid and dynamic.

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 38

1          It happened within a couple of seconds.  After I saw

2    the gun and heard the shots, I remember ducking and having to

3    step over a high curb that was right there and having to

4    return fire.

5          Q.    And then your second volley of shots, how many did

6    you fire in your second volley?

7          A.    I fired four rounds at that time, sir.

8          Q.    And was Mr. Puga still running away at that point?

9          A.    Yes, sir.  Also, during that time as he was running,

10   I remember seeing the gun again as he turned towards me and

11   the other officers.

12         Q.    Which hand did you see the gun in?

13         A.    I believe it was his right hand, sir.

14         Q.    And how far was he from you when you fired your

15   first volley of shots?

16         A.    I'm going to have to estimate.  I didn't do any of

17   the measurements.

18         I would estimate he was probably between 15 to 25

19   feet away during my first volley.

20         Q.    How about your second volley, what would you

21   estimate the distance?

22         A.    I would estimate he was probably from 10 to 20 or 25

23   feet further.  So maybe somewhere between 25 to 40 feet away

24   from me at the time.

25         Q.    And how about your third volley, what would you

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 40

1      Q.   Okay.

2           MR. GALIPO:  I think we're making a lot of progress.

3           Is this a good time for a ten-minute break for

4    everyone?

5           MS. GUSTAFSON:  Sure.

6           MR. GALIPO:  Okay.  I'll come back in about ten

7    minutes if that's good for everybody.

8           THE WITNESS:  Thank you, sir.

9           (Recess taken.)

10          MR. GALIPO:  Back on the record.

11          Could we put Exhibit 8 back up please, Hang.

12          MS. LE:  Sure.

13   BY MR. GALIPO:

14      Q.   Are you able to see that on your screen?

15      A.   Yes, sir.

16      Q.   So when you approached the vehicle prior to the

17   shooting, where was Mr. Puga situated in terms of the front

18   of the vehicle?

19      A.   He was in front of the vehicle facing south closest

20   to the driver's side headlight.  I don't know if he was

21   standing directly in front of the lights, but he was more

22   towards the driver's side of the vehicle.

23      Q.   And you don't recall if the door was open or not?

24      A.   I think the door was closed because I know he had

25   closed it.  I think -- I think the door was closed, but I

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 41

 1    could be wrong.

 2        Q.    As you approached, was any part of this vehicle

 3    blocking your view of portions of Mr. Puga's body?

 4        A.    Yes, sir.  One, that's partly why I think the door

 5    was closed because I don't recall seeing the door obstructing

 6    my line of sight, but the part of Mr. Puga's mid section

 7    around his stomach area and all the way down to his feet were

 8    obstructed by the front of the vehicle from where I was

 9    positioned.

10        Q.    So could you essentially see him from the chest

11    up?

12        A.    Yes, sir.

13        Q.    And do you know where -- I'm assuming you were

14    approaching on the asphalt?

15        A.    Yes, sir.

16        Q.    And do you know where you were in relation to the

17    vehicle when you heard the initial shots?

18        A.    I believe I was near the center, center line of the

19    vehicle between the front passenger door and the rear

20    passenger door somewhere in those couple feet close to the

21    curb line.

22            And I don't know if you could see, but that curb is

23    elevated, and that's when after when after when I approached

24    and Mr. Puga reached down and came up and I saw the gun and

25    heard shots, I had to step over the curb line before

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 42

```
 1   returning fire.

 2        Q.   So is the center line of the vehicle between the

 3   front door and the rear door, is that sometimes referred to

 4   as the B-pillar?

 5        A.   Yes, sir.

 6        Q.   So you were in the area of the B-pillar, but closer

 7   to the curb?

 8        A.   Yes, sir.

 9        Q.   And Sergeant Vaccari would have been somewhere

10   behind you?

11        A.   That's correct.

12        Q.   Now, at any time when Mr. Puga was out of the

13   vehicle, did you ever see him reaching down to adjust his

14   pants or pick his pants up?

15        A.   I saw him reaching down several times.  I don't know

16   if he was -- what he was trying to do, but yes, I did see him

17   reach down several times.

18        Q.   Okay.

19             MR. GALIPO:  I don't know if it's possible, Hang, to

20   put up Page 41 of the deputy's interview transcript?

21   BY MR. GALIPO:

22        Q.   And are you able to see that on your screen?

23        A.   Yes.

24        Q.   Do you want us to try to enlarge it a little bit, or

25   are you able to read it?
```

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 43

1      A.   I could see it, sir.

2      Q.   So I'm looking towards the bottom, do you see some

3   line numbers on the left?

4      A.   Yes, sir.

5      Q.   And you see like on Lines 26 and 27, you're talking

6   about commands for him to show his hands; he put his hands

7   like halfway up, and then bring them down, and then look

8   almost like he would adjust his pants.

9           Do you see that?

10     A.   Yes, sir.

11     Q.   So do you recall seeing that on occasion, him

12  putting his hands down to adjust his pants?

13     A.   Yes, sir.

14     Q.   And looking at Page 71 of your transcript --

15          MS. GUSTAFSON:  I'm sorry.  71 or 41?

16          MR. GALIPO:  I think this is 71 if my notes are

17  right.

18          MS. GUSTAFSON:  Okay.  I just wasn't sure if you

19  were changing pages.

20          Thank you.

21          MR. GALIPO:  Yeah, I did.  Thank you.

22  BY MR. GALIPO:

23     Q.   And you talk about this again on Lines 12 through

24  16, you say, "I could also see the suspect would show his

25  hands briefly and then hide his hands.  Whether it was, you

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 44

1  know, he put them behind him to pull up his pants or adjust

2  his waist or reach in his pockets, again, I couldn't see.  I

3  was blinded from just my line of sight."

4       Do you see that?

5       A.   Yes, sir.

6       Q.   And when you say you were blinded from your line of

7  sight, is that in part when he was in front of the car?

8       A.   Yes, sir.

9       Q.   Okay.

10      MR. GALIPO:  Thank you, Hang.

11  BY MR. GALIPO:

12      Q.   Obviously, you were aware this was a residential

13  neighborhood; correct?

14      A.   Yes, I was aware, sir.

15      Q.   I think you talk in your statement about being aware

16  there were houses on the different corners of the

17  intersection?

18      A.   Yes, sir.

19      MR. GALIPO:  Could we look at Exhibit 9, please.

20  BY MR. GALIPO:

21      Q.   Okay.  So this shows another angle, but if I'm

22  understanding your testimony, you were approaching northbound

23  near the curb, but got to about the B-pillar area of the

24  vehicle; is that correct?

25      A.   I believe that is.  Yes, sir.

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

Page 45

1      Q.   Okay.

2           MR. GALIPO:  Exhibit 10, can we see that again,

3   please.

4   BY MR. GALIPO:

5      Q.   This shows another angle, but we can see obviously

6   the B-pillar here and this curb you're referring to?

7      A.   Correct.  Like I said, my position -- I can't be

8   exactly sure where my feet were, but it was somewhere in that

9   general vicinity of that midline of the car what would be the

10  B-pillar of that passenger door.

11     Q.   Okay.  But if I'm understanding you, as you were

12  approaching, you could essentially only see Mr. Puga from the

13  chest upwards?

14     A.   Yes.  The top part area of his stomach, but a lot of

15  his stomach and legs were completely concealed by the

16  vehicle.

17     Q.   Okay.

18          MR. GALIPO:  Hang, can we show Page 17 of his

19  interview, please.

20  BY MR. GALIPO:

21     Q.   So I wanted to show you what I was reading from

22  before which you may have reviewed previously when you looked

23  at this, but starting at about Lines 15 through 17, starting

24  on Line 14, you're talking about paralleling the vehicle and

25  got to kind of where the doors intersect, and I think you

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 50

1   direction or not, but I believe that's true.

2   BY MR. GALIPO:

3        Q.   Okay.  So you kind of were in a different position

4   for your second volley of shots; is that true?

5        A.   Yes, sir.

6        Q.   Where were you positioned during your second volley

7   of shots?

8        A.   I had moved closer to the passenger side of the

9   vehicle in attempt to gain some level of cover while still

10   engaged in returning fire with Mr. Puga.

11       Q.   And was Mr. Puga running towards the northwest

12   corner of that intersection when you fired your second volley

13   of shots?

14       A.   Yes, sir.

15       Q.   And then after he got to the northwest corner, you

16   think you fired another three rounds?

17       A.   When I fired my last volley, Mr. Puga was still --

18   well, I think he had reached the northwest corner and was

19   headed in more of a direct northern north direction I should

20   say instead of directly towards the house that's on that

21   corner the way he had started to run straight north.

22       Q.   So when you fired your first volley of rounds,

23   Mr. Puga would have been on the asphalt?

24       A.   Yes, sir.

25       Q.   And when you fired your second volley of rounds, he

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 52

1    After he went to the ground, from your perspective

2  did you think it was necessary to fire anymore shots?

3    A.   I stopped firing my weapon when I no longer saw

4  Mr. Puga posing a threat.

5    Q.   Was that after he went to the ground?

6    A.   Yes, sir.

7    Q.   I'm wondering, did you fire any shots, if you know,

8  after he went to the ground?

9    A.   I don't know.  And I don't believe so.

10    I believe my last round fired were when he was still

11  standing.

12    Q.   It sounds like you're not a 100 percent sure; is

13  that fair?

14    A.   Correct.  I mean that situation was very dynamic,

15  and it was a lot going on.  To know exactly when my last

16  trigger pull was versus when Mr. Puga went to the ground, it

17  would have been very close in time from when what happens.

18    Q.   After he went to the ground, could you see any gun

19  in his hands?

20    A.   Immediately or after approaching the suspect?

21    Q.   Immediately.

22    A.   No, sir.  Not at that time.

23    Q.   And did you think it was appropriate from your

24  perspective to keep shooting him once he was on the ground

25  and you couldn't see a gun?

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

Page 55

1    Q.   Did you approach Mr. Puga at some point after all

2    the shots had ended?

3    A.   Yes, sir, I did.

4    Q.   Did you hear some screaming coming from the

5    residence at the northeast corner?

6    A.   Yes, sir, I did.

7    Q.   And at some point did you become aware that some

8    innocent bystanders were struck by gunfire?

9    A.   I do recall hearing somebody saying somebody had

10   been shot.  I did not know who.  I did not know exactly

11   where, but it did sound like it was coming from the residence

12   on the northeast corner.

13         But I overheard that as I was approaching the

14   suspect, and I never made contact again for clarification by

15   anybody at that residence.

16   Q.   When Mr. Puga was running northwest, were you firing

17   generally in a northwest direction?

18   A.   Yes, sir.

19   Q.   One of your concerns, obviously, being in a

20   residential neighborhood with a lot of shots being fired is

21   innocent people potentially being struck; is that fair?

22   A.   Yes, sir.

23   Q.   And when you approached Mr. Puga, did you notice his

24   chest cavity rising still, and it appeared initially he was

25   still alive?

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 61

1   again, please, Hang, from the interview.

2   BY MR. GALIPO:

3       Q.    And we kind of talked about this earlier, but

4   towards the bottom you're talking about the CHP giving him

5   commands to show his hands.  "He put his hands like halfway

6   up and then bring them down, and then look almost like he

7   would adjust his pants."

8           MR. GALIPO:  Can we go to the top of the next page,

9   please.

10  BY MR. GALIPO:

11      Q.    "And put his hands back up and hide his hands again

12  behind the front of or in front of him between him and the

13  vehicle."

14          Do you see that?

15      A.    Yes, sir, I do.

16      Q.    Are you talking about a time frame when Mr. Puga was

17  in front of the vehicle where his hands were going up and

18  down?

19      A.    I don't know.  It was asked prior to this.

20          So I don't want to guess.  I don't recall seeing the

21  question ahead of time.  I don't know if we're talking about

22  when he was on the driver side or in front of the vehicle.

23          Can you clarify that?

24      Q.    Yeah.  If you look -- if you look further down in

25  the paragraph, it seems like this is right before you started

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

Page 62

1    your approach with Sergeant Vaccari.

2         A.    Okay.  Yes.  That would have been when he was in

3    front of the vehicle, sir.

4         Q.    Okay.  And then Page 43, I take it you could not see

5    where this gun came from, on what part of his body because

6    that portion would have been blocked from you?

7         A.    I could, sir.

8         Q.    And was your gun aimed at Mr. Puga when you're

9    saying you saw this come up, this gun come up in your

10   direction?

11        A.    Yes, sir.

12        Q.    And he would have been facing you at the time?

13        A.    Yes, sir.

14        Q.    But you didn't fire any shots at that time; is that

15   correct?

16        MS. GUSTAFSON:  Objection.  Overbroad; vague;

17   misstates testimony.

18        You can answer.

19        THE WITNESS:  When I saw the gun almost

20   simultaneously or what felt like simultaneously at the time,

21   Mr. Puga turned towards me, reached down, came up with a gun

22   pointed at me, I heard shots.

23        And then my reaction time was that of whatever it

24   was before I returned fire.

25   BY MR. GALIPO:

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 74

```
 1          (Video paused.)

 2   BY MR. GALIPO:

 3       Q.   First of all, does that refresh your recollection,

 4   Deputy, that the door on the passenger side was actually

 5   open?

 6       A.   Yes, sir.  I think that's fair to say.

 7       Q.   And did you actually take cover behind that door for

 8   a portion of the incident?

 9       A.   Yes, sir.

10       Q.   And I want you to look as to where -- do you see

11   this white -- the painting on the white raised curb where it

12   starts?

13       A.   Yes, sir.

14       Q.   I want to play it one more time, and I want you to

15   see if you could tell whether you got past that white

16   painting of the curb or not when the shooting started.

17          (Video playing.)

18          MS. GUSTAFSON:  It's not playing for us.

19          MR. GALIPO:  Yes.  I think she's aware of that.

20          Let's make sure.  Hang, are you going to try to play

21   it again because we don't see it at all.

22          MS. LE:  Yeah.  I'll try to play it again.

23          MR. GALIPO:  Okay.  Thank you.

24          Shannon pointed out the obvious, but yes.

25          MS. GUSTAFSON:  You never know if everybody's seeing
```

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 76

1      Q.   Okay.  Did you hear the shots starting?

2      A.   Yes, sir.

3      Q.   Could you tell if you made it to that white painted

4   curb yet or not?

5           MS. GUSTAFSON:  Objection.  Speculation.

6           You can answer.

7           THE WITNESS:  It is difficult to see, but it looks

8   like I'm right there where the unpainted and painted portions

9   meet.

10      Q.   Okay.

11           MR. GALIPO:  And, Hang, could be go back to Exhibit

12   10, please, if possible?

13   BY MR. GALIPO:

14      Q.   Do you see where the white curb lines up with the

15   vehicle from this angle?

16      A.   Yes, sir, I do.

17      Q.   Would you agree it's a little bit to the rear of the

18   rear door?

19      A.   Yes, sir.  And that's why I had said earlier I don't

20   know if I had made it all the way to that B-pillar or

21   somewhere in that general area, give or take a couple feet.

22      Q.   Okay.  That's fine.

23           MR. GALIPO:  Thank you, Hang.

24           That's all that I have.

25           THE WITNESS:  Thank you, sir.

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

```
 1                        CERTIFICATE

 2                            OF

 3            CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5            I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6   Stenographic Shorthand Reporter of the State of California,

 7   do hereby certify:

 8            That the foregoing proceedings were taken before me

 9   at the time and place herein set forth;

10            That any witnesses in the foregoing proceedings,

11   prior to testifying, were placed under oath;

12            That a verbatim record of the proceedings was made

13   by me, using machine shorthand, which was thereafter

14   transcribed under my direction;

15            Further, that the foregoing is an accurate

16   transcription thereof.

17            I further certify that I am neither financially

18   interested in the action, nor a relative or employee of any

19   attorney of any of the parties.

20

21            IN WITNESS WHEREOF, I have subscribed my name, this

22   date:  November 12, 2024.

23            _____

24            Jinna Grace Kim, CSR No. 14151

25
```