1  ROB BONTA
   Attorney General of California
2  NORMAN D. MORRISON
   Supervising Deputy Attorney General
3  DIANA ESQUIVEL
   Deputy Attorney General
4  State Bar No. 202954
     1300 I Street, Suite 125
5    P.O. Box 944255
     Sacramento, CA 94244-2550
6    Telephone: (916) 210-7320
     Facsimile: (916) 322-8288
7    E-mail: Diana.Esquivel@doj.ca.gov
   *Attorneys for Defendants Blackwood, Kee, and*
8  *Rubalcava*

9           IN THE UNITED STATES DISTRICT COURT

10          FOR THE CENTRAL DISTRICT OF CALIFORNIA

11                   RIVERSIDE DIVISION

12

13

14  **JONATHAN WAYNE BOTTEN,**          No. 5:23-cv-257 KK (SHKx)
    **SR., et al.,**

15                                      **STATE DEFENDANTS'**
                          Plaintiffs,   **RESPONSE TO PLAINTIFFS'**
                                        **STATEMENT OF GENUINE**
16                                      **DISPUTES**
               v.
17                                      Date:        March 20, 2025
                                        Time:        9:30 a.m.
18  **STATE OF CALIFORNIA, et al.,**    Courtroom:   3 (3rd Floor)
                                        Judge:       The Honorable Kenly
19                          Defendants.               Kiya Kato
                                        Trial Date:  July 28, 2025
20                                      Action Filed: February 17, 2023

21

22          Defendants California Highway Patrol Officers Michael Blackwood, Isaiah

23  Kee, and Bernardo Rubalcava (State Defendants) respond to Plaintiffs' Statement

24  of Genuine Disputes as follows:

25  / / /

26  / / /

27  / / /

28  / / /

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 132.    On February 17, 2021, CHP officers Bernardo Rubalcava and Michael Blackwood initiated a pursuit of a white Expedition due to it matching the description of a vehicle that had been involved in a prior freeway shooting. *Ex. 1 to Le Decl., Kee Dep. 14:6-9, 75:3-17; Ex. 3 to Le Decl., Blackwood Dep. 51:3-10.* | Undisputed. |
| 133.    CHP Sergeant Isaiah Kee also joined the pursuit. *Ex. 1 to Le Decl., Kee Dep. 75:13-17.* | Undisputed. |
| 134.    San Bernardino County Sheriff's Department received a call from dispatch requesting assistance with the pursuit. Ex. 5 to Le Decl., Vaccari Dep. 18:23-19:3. | Undisputed. |
| 135.    SBSD Sergeant Robert Vaccari and Deputy Jake Adams joined the pursuit to assist. *Ex. 4 to Le Decl., Adams Dep. 9:12-13; Ex. 5 to Le Decl., Vaccari Dep. 18:17-19:3.* | Undisputed. |
| 136.    CHP requested that SBSD take over the pursuit but Vaccari declined because he did not know the details of the alleged crime and did not know what CHP's policies and procedures were for trading or taking over a pursuit and did not want CHP to drop out of the pursuit in the event he agreed to take over. *Ex. 6 to Le Decl., Vaccari Int. 12:22-13:3* | Undisputed. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 137. There was little to no traffic on the road and no passing pedestrians during the pursuit. *See Ex. D to Esquivel Decl., Blackwood MVARS, Part 1; Ex. E to Esquivel Decl., Blackwood MVARS, Part 2.* | Disputed that there was little to no traffic.<br><br>"Any high-speed pursuit is inherently dangerous to the lives of the pursuing police officers." *People v. Howard*, 34 Cal. 4th 1129, 1140 (2005). Further, Plaintiffs ignore that Puga, on a number of occasions during the pursuit, was driving on the wrong side of the street and failing to stop a numerous stop signs in residential areas, including with oncoming traffic. *See, e.g., Blackwood MVARS, Part 2 at 00:22-0:33, 02:06-02:09, 04:34-04:38, 18:24-18:31, 19:44-19:52, 23:16-23:32, Ex. E to Esquivel Decl.* Puga's highspeed, reckless driving created an obvious dangerous condition for the public and the officers involved in the pursuit. |
| 138. The white Expedition never targeted any of the officers nor forced other vehicles off the road during the pursuit. *See Ex. D to Esquivel Decl., Blackwood MVARS, Part 1; Ex. E to Esquivel Decl., Blackwood MVARS, Part 2.* | Undisputed that Puga did not attempt to hit any of the CHP patrol vehicles with his vehicle, but disputed that his not doing so made him any less dangerous. "Any high-speed pursuit is inherently dangerous to the lives of the pursuing police officers." *People v. Howard*, 34 Cal. 4th 1129, 1140 (2005). |
| 139. The white Expedition's speed during the pursuit was fast but not outrageous as even on the freeway, the Expedition was only going 80 miles per hour. *Ex. 6 to Le Decl., Vaccari Int. 13:22-24; Ex. 4 to Le Decl., Adams Dep. 12:3-13.* | Disputed. Going 80 mph in commercial and residential areas is obviously "outrageous." Further, as Officer Blackwood's MVARS show, Puga's car was constantly swaying and veering into the opposite lane because of the speed Puga was going. "Any high-speed pursuit is inherently dangerous to |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| | the lives of the pursuing police officers." *People v. Howard*, 34 Cal. 4th 1129, 1140 (2005);*see, generally*, *Blackwood MVARS, Parts 1-3, Ex. D-F to Esquivel Decl.* |
| 140.   At some point during the pursuit, Vaccari requested SBSD's police helicopter to join the pursuit and the helicopter did join the pursuit. *Ex. 6 to Le Decl., Vaccari Int. 15:6-11.* | Undisputed. |
| 141.   As the pursuit continued down the dirt road, the Expedition's driving was not erratic. *Ex. 6 to Le Decl., Vaccari Int. 16:6-8.* | Disputed and vague as to time. As Officer Blackwood's MVARS show, Puga's car was constantly swaying and veering into the opposite lane because of the speed Puga was going. "Any high-speed pursuit is inherently dangerous to the lives of the pursuing police officers." *People v. Howard*, 34 Cal. 4th 1129, 1140 (2005);*see, generally*, *Blackwood MVARS, Parts 1-3, Ex. D-F to Esquivel Decl.* |
| 142.   The officers did not see any weapon in the white Expedition during the pursuit. *Ex. 1 to Le Decl., Kee Dep. 16:16-18; Ex. 4 to Le Decl., Adams Dep. 12:14-17* | Undisputed as to Officer Kee. |
| 143.   Spike strips were successfully deployed on the Expedition around Main Street. Ex. F to Esquivel Decl. at 8:25; Ex. 6 to Le Decl., Vaccari Int. 17:2-3. | Undisputed. |
| 144.   The Expedition then turned north onto Peach and slowed down significantly, traveling | Undisputed that the Puga turned north onto Peach. Dispute any implication that Puga voluntarily reduced his speed |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| approximately 5 to 10 miles per hour before coming to a stop at the intersection of Peach and Catalpa. *Ex. F to Esquivel Decl. at 8:25-9:12; Ex. 6 to Le Decl., Vaccari Int. 17:4-6, 17:15-19; Ex. 1 to Le Decl., Kee Dep. 16:22-24.* | and stopped. The spike strip disabled Puga's vehicle. *Blackwood MVARS, Part 3 at 07:50-09:13, Ex. F to Esquivel Decl.* |
| 145.   The helicopter continued to orbit overhead for approximately 30 minutes, illuminating the middle of the intersection where the two streets cross and the four homes on the corners. *Ex. 1 to Le Decl., 28:7-15; Ex. 3 to Le Decl., Blackwood Dep. 59:23-61:1.* | Undisputed that helicopter continued to orbit for about 30 minutes and illuminated the intersection. Disputed that it illuminated the homes on the corners of the intersection. Blackwood Dep. 6015-21, Ex. 3 to Le Decl.; *Blackwood MVARS Part 3 at 09:00-37:30, Ex. F to Esquivel Decl.; Blackwood MVARS Part 4 at 00:00-13:04, Ex. G to Esquivel Decl.* |
| 146.   The house on the northeast corner, ("Botten Residence") had its porch light on and the helicopter's spotlight would occasionally illuminate the entire house while it orbited overhead. *Ex. C to Esquivel Decl., 12:56-13:13, 13:41-13:46, 14:15-14:25; Ex. 7 to Le Decl., Mangerino Dep. 56:1-10.* | Undisputed that the Botten residence had the porch light on and that the helicopter's spotlight illuminated certain portions of the house. Disputed that the spotlight illuminated the entire house on occasion. *Kee MVARS Part 1 at 38:50-1:04:20, Ex. B to Esquivel Decl.; Kee MVARS Part 2 at 00:00-16:45, Ex. C to Esquivel Decl.* |
| 147.   There was also a streetlight on the corner of Peach and Catalpa as well as the patrol vehicles' spotlights and red and blue lights illuminating the area. *Ex. 2 to Le Decl., Rubalcava Dep. 37:8-15; Ex. 7 to Le Decl., Mangerino Dep. 40:17-41:6.* | Disputed only to the extent that the phrase "illuminating the area" is vague. The northeast corner of the intersection was still dark despite the lighting. *Rubalcava Dep. 101:13-103:3, Ex. Q to Esquivel Suppl. Decl.* |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 148.    At the time of the incident, the officers were aware they had stopped in a residential neighborhood. *Ex. 1 to Le Decl., Kee Dep. 18:10-12; Ex. 2 to Le Decl., Rubalcava Dep. 20:13-16; Ex. 4 to Le Decl., Adams Dep. 44:12-18; Ex. 5 to Le Decl., Vaccari Dep. 37:17-22.* | Undisputed as to the State Defendants. |
| 149.    At the time of the incident, Blackwood, Adams, and Vaccari were aware that there were houses on each of the four corners of the intersection. *Ex. 3 to Le Decl., Blackwood Dep. 59:23-61:1; Ex. 4 to Le Decl., Adams Dep. 44:12-18; Ex. 5 to Le Decl., Vaccari Dep. 37:17-22.* | Disputed. The cited deposition testimony of Blackwood does not support this fact. He explained that the spotlight was in the middle of intersection and did not remember how far it went out from the intersection. Blackwood was not asked if he was aware at the time of the incident that there was a house on each corner. *Blackwood Dep. 59:23-61:1, Ex. 3 to Le Decl.* |
| 150.    Kee never considered evacuating the people in the nearby homes nor did he ever discuss it with the SBSD deputies. *Ex. 1 to Le Decl., Kee Dep. 61:14-24.* | Disputed. Kee was asked whether evacuating the nearby homes was "something that [he] at least thought about?" He answered "yes." *Kee Dep. 61:14-21, Ex. 1 to Le Decl.*<br><br>Evacuating during a standoff situation as the one Kee encountered with Puga is a judgment call, based on various factors, including the available resources. Meyer Dep. 72:24-74:5, Ex. Y to Esquivel Suppl. Decl. |
| 151.    Vaccari never considering alerting the nearby residences of potential harm or evacuating the people in the homes on the four | Not applicable to State Defendants. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| corners of the intersection. *Ex. 5 to Le Decl., Vaccari Dep. 37:17-38:6.* | |
| 152.   At some point, a female exited the vehicle and was taken into custody, after which she informed Adams that the driver, later identified as Hector Puga, of his first name and that he was a new father and wanted to call his wife. *Ex. 4 to Le Decl., Adams Dep. 13:4-25.* | Not applicable to State Defendants. |
| 153.   The officers had never seen Puga before and did not have any specific knowledge regarding Puga's criminal history. *Ex. 1 to Le Decl., Kee Dep. 53:7-9; Ex. 2 to Le Decl., Rubalcava Dep. 32:2-6; Ex. 4 to Le Decl., Adams Dep. 14:6-13.* | Undisputed that State Defendants had not seen Puga before and Rubalcava had no specific knowledge of Puga's criminal history.<br><br>Disputed to the extent that the State Defendants were aware or informed that Puga was a suspect in the earlier freeway shooting incident. *Blackwood Dep. 51:3-20, Ex. P to Esquivel Decl.; Rubalcava Dep. 77:14-78:15, Ex. R to Esquivel Decl.; Arrest-Investigation Report 1-12, Ex. N to Esquivel Decl.* |
| 154.   The officers also did not have any specific information that Puga had injured anyone. *Ex. 2 to Le Decl., Rubalcava Dep. 31:18-32:1; Ex. 3 to Le Decl., Blackwood Dep. 16:8-10.* | Undisputed that Rubalcava and Blackwood had no specific information that Puga had injured anyone, but disputed to the extent the officers were aware that Puga was suspected of shooting at someone on the freeway. *Blackwood Dep. 51:3-20, Ex. P to Esquivel Decl.; Rubalcava Dep. 77:14-78:15, Ex. R to Esquivel Decl.* |
| 155.   The officers did not have any specific information as to whether | Undisputed as to Rubalcava. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| Puga was under the influence of drugs or alcohol. *Ex. 2 to Le Decl., Rubalcava Dep. 32:7-9.* | |
| 156.   For a period of time, the officers attempted to get Puga out of the vehicle but he was not coming out. *Ex. 1 to Le Decl., Kee Dep. 19:10-13.* | Undisputed. |
| 157.   At some point, Kee considered calling in the SWAT Team and spoke to Vaccari about it. *Ex. 1 to Le Decl., Kee Dep. 19:17-20:2.* | Undisputed. |
| 158.   Kee made the request because from his experience, SWAT sometimes comes out for barricaded suspects. *Ex. 1 to Le Decl., Keep Dep. 20:12-17.* | Undisputed. |
| 159.   Kee was told that SWAT would not come out for something of this nature. *Ex. 1 to Le Decl., Kee Dep. 20:3-6.* | Undisputed. |
| 160.   Kee saw Vaccari go back to his car and get on a cell phone but does not know whether Vaccari actually called to inquire about SWAT. Ex. 1 to Le Decl., Kee Dep. 20:7-11. | Undisputed. |
| 161.   Vaccari did not have his cell phone to call SWAT and claims he told Kee this. *Ex. 5 to Le Decl., Vaccari Dep. 26:8-14.* | Undisputed that this is Vaccari's testimony. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 162.   Vaccari had forgotten his cell phone at the station. *Ex. 6 to Le Decl., Vaccari Int. 20:1-6.* | Not applicable to State Defendants. |
| 163.   Vaccari has dealt with barricaded suspects in homes before and has called SWAT to come assist with those suspects. *Ex. 5 to Le Decl., Vaccari Dep. 12:14-15.* | Not applicable to State Defendants. |
| 164.   When SWAT is called, they would sometimes give suggestions or advice and other times they would come out. *Ex. 5 to Le Decl., Vaccari Dep. 13:5-13.* | Not applicable to State Defendants |
| 165.   There were also times when SWAT would give suggestions or advice and when Vaccari recontacted them, SWAT would come out. Ex. 5 to Le Decl., *Vaccari Dep. 13:14-17.* | Not applicable to State Defendants |
| 166.   Vaccari does not know what SWAT's criteria was in order for them to come out for a barricaded suspect. *Ex. 5 to Le Decl., Vaccari Dep. 13:18-23.* | Not applicable to State Defendants |
| 167.   If SWAT had responded, Kee would have let them handle the situation. *Ex. 1 to Le Decl., Kee Dep. 48:12-21.* | Undisputed. |
| 168.   The officers never developed a tactical plan. *Ex. 4 to Le Decl., Adams Dep. 19:10-21; Ex. 5 to Le Decl., 36:20-25.* | Disputed as to State Defendants. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 169.    At some point, a decision was made that pepper balls would be helpful in trying to get Puga to come out. *Ex. 1 to Le Decl., Kee Dep. 20:18-21.* | Undisputed. |
| 170.    Kee attempted to break the car's window with a beanbag shotgun to facilitate getting the pepper balls into the car but was unsuccessful. *Ex. 1 to Le Decl., Kee Dep. 20:22-21:11.* | Undisputed. |
| 171.    Vaccari then successfully used glass break balls to break open the back window. *Ex. 1 to Le Decl., Kee Dep. 21:12-22; Ex. 5 to Le Decl., Vaccari Dep. 29:17-30:9.* | Undisputed. |
| 172.    Kee then directed Vaccari to deploy pepper balls. *Ex. 1 to Le Decl., Kee Dep. 21:23-22:6.* | Undisputed. |
| 173.    Approximately 120 to 150 pepper balls were deployed into the Expedition over a period of 30 to 45 minutes. *Ex. 4 to Le Decl., Adams Dep. 16:3-7; Ex. 5 to Le Decl., Vaccari Dep. 30:22-24, 31:19-21.* | Not applicable to State Defendants.<br><br>Kee testified that he estimated Viccari deploying about 90 to 95 pepper balls over a 20 to 25 minute period. *Kee Dep. 22:1-23, Ex. 1 to Le Decl.* |
| 174.    Adams observed Puga twisting and turning his body, reaching around, leaning over, and reaching back at different periods of time while Puga was inside the vehicle. *Ex. 4 to Le Decl., Adams Dep. 16:17-22.* | Undisputed that this is what Deputy Adams testified to. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 175.    Puga reacted to the pepper balls by coughing and complaining that his eyes were burning and that he could not see. *Ex. 4 to Le Decl., Adams Dep. 18:10-13; Ex. 8 to Le Decl., Gonzalez Dep. 93:10-15.* | Undisputed that this is what the witnesses testified to. |
| 176.    After deploying the pepper balls for approximately 30 minutes, Vaccari thought about contacting SWAT by having Dispatch send their phone number to his screen and using someone else's phone. *Ex. 6 to Le Decl., Vaccari Int. 27:26-28:3.* | Disputed to the extent that the cited deposition testimony does not support this fact. |
| 177.    Vaccari then made the decision to intentionally hit Puga with pepper balls to try to motivate Puga with pain to come out. *Ex. 6 to Le Decl., Vaccari Int. 28:11-20.* | Disputed to the extent that the cited deposition testimony does not support this fact. |
| 178.    When Vaccari was deploying the pepper balls, he observed that Puga would get his head down low in the window. *Ex. 6 to Le Decl., Vaccari Int. 28:20-23.* | Disputed to the extent that the cited deposition testimony does not support this fact. |
| 179.    Vaccari deployed pepper balls and struck Puga in the right eye, which is extremely painful. *Ex. 1 to Le Decl., Kee Dep. 23:2-10; Ex. 3 to Le Decl., Blackwood Dep. 14:24-15:6; Ex. 5 to Le Decl., Vaccari Dep. 32:14-18; Ex. 6 to Le Decl., Vaccari Int. 28:25-29:4; Ex. 7 to Le Decl., Mangerino Dep. 25:23-26:1.* | Undisputed that cited deposition testimony states that Puga said he was shot or struck in the eye with a pepper ball. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 180.    Puga sustained a cut to the area of his forehead right above his right eye, which Blackwood associated with being hit in the right eye by pepper balls. *Ex. 3 to Le Decl., Blackwood Dep. 13:24-14:10.* | Undisputed that Blackwood testified to this. Disputed to the extent that Blackwood has no personal knowledge how Puga sustained the cut on his forehead, such that Blackwood's testimony is speculation. Fed. R. Eiv. 602. |
| 181.    Puga eventually exited the vehicle from the driver's side. *Ex. 1 to Le Decl., Kee Dep. 23:14-19.* | Undisputed. |
| 182.    The officers were treating Puga as if he had a firearm when Puga exited the vehicle. *Ex. 5 to Le Decl., Vaccari Dep. 34:2-6.* | Undisputed that Viccari testified to this. |
| 183.    Puga did not have a shirt on when he exited the vehicle. *Ex. 1 to Le Decl., Kee Dep. 23:18-22.* | Undisputed. |
| 184.    Puga did not appear to have a gun or weapon in his hand, waistband, or pocket when he exited the vehicle. *Ex. 1 to Le Decl., Kee Dep. 24:15-17; Ex. 2 to Le Decl., Rubalcava Dep. 37:25-38:4; Ex. 3 to Le Decl., Blackwood Dep. 34:4-6; Ex. 8 to Le Decl., Gonzalez Dep. 95:15-25; Ex. 9 to Le Decl., Edward Mangerino Video; Clark Decl. ¶ 15.* | Undisputed to the extent the State Defendants did not see a gun on those parts of Puga's body that was visible to them. When Puga stepped out of the vehicle, he did not show the State Defendants the front of his torso or waistline. The video from Officer Blackwood's MVARS (dashcam) undisputably shows that, from the time Puga exits the vehicle to the point where Kee tells him not to reach after Puga tells Kee that he does not have a gun, Puga never displayed the front of his waistband to the officers despite being shirtless. The Gonzalez cellphone video similarly never shows the front of Puga's waistband. *Blackwood MVARS, Part 4 at 33:00-* |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| | *42:28, Ex. G to Esquivel Decl.; Gonzalez Video at 00:00-06:28, Ex. J to Esquivel Decl.*) |
| 185.    Puga stood near the driver's side of the car for a period of time and during that time, the officers were able to see Puga's hands. *Ex. 1 to Le Decl., Kee Dep. 23:23-24:3.* | Undisputed, but Puga stood with his back to the officers such that they could only see his hands when they were up or to his sides. *Blackwood MVARS, Part 4 at 33:00-42:28, Ex. G to Esquivel Decl* |
| 186.    Puga's hands were raised for the majority of the time he was positioned near the driver's side of the vehicle. *Ex. 1 to Le Decl., Kee Dep. 24:3-6; Ex. 3 to Le Decl., Blackwood Dep. 15:7-12; Ex. 5 to Le Decl., Vaccari Dep. 34:7-9.* | Disputed to the extent that none of the cited deposition testimony states that Puga had his hands up for a "majority" of the time. |
| 187.    Puga did not have anything in his hands and he never reached for any weapon while he was standing near the driver's side of the vehicle. *Ex. 1 to Le Decl., Kee Dep. 24:7-9; Ex. 2 to Le Decl., Rubalcava Dep. 38:8-20; Ex. 3 to Le Decl., Blackwood Dep. 15:25-16:2.* | Undisputed. |
| 188.    Puga did not appear to have a weapon in his hands or on his person while he stood next to the driver's side of the vehicle. *Ex. 3 to Le Decl., Blackwood Dep. 33:25-34:3; Ex. 4 to Le Decl., Adams Dep. 21:22-22:2.* | Undisputed to the extent the State Defendants did not see a weapon in Puga's hands or on those parts of Puga's body that was visible to them. When Puga stepped out of the vehicle, he did not show the State Defendants the front of his torso or waistline. The video from Officer Blackwood's MVARS (dashcam) undisputably shows that, from the time Puga exits the vehicle to the point where Kee tells |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| | him not to reach after Puga tells Kee that he does not have a gun, Puga never displayed the front of his waistband to the officers despite being shirtless. The Gonzalez cellphone video similarly never shows the front of Puga's waistband. *Blackwood MVARS, Part 4 at 33:00-42:28, Ex. G to Esquivel Decl.; Gonzalez Video at 00:00-06:28, Ex. J to Esquivel Decl.* |
| 189.   The officers never formulated a tactical plan for what to do once Puga exited the vehicle. *Ex. 1 to Le Decl., Kee Dep. 24:21-25; Ex. 3 to Le Decl., Blackwood Dep. 19:16-22, 31:19-23.* | Disputed. Rubalcava testified that he had a brief discussion with Kee, and the plan was to approach Puga nd handcuff him. Blackwood testified that no one spoke with him about a plan once Puga got out of the care regarding designation of lethal and less-lethal. *Rubalcava Dep. 30:18, Ex. Q to Esquivel Decl.; Blackwood Dep. 19:16-22, 31:19-23, Ex. 3 to Le Decl.* |
| 190.   While Puga was standing at the driver's side of the vehicle, there was no discussion about a tactical plan. *Ex. 4 to Le Decl., Adams Dep. 22:9-12.* | Undisputed that this is what Deputy Adams testified to |
| 191.   Kee did not assign any CHP officer to be less-lethal nor did he know whether any sheriff's deputy had been assigned less-lethal. *Ex. 1 to Le Decl., Kee Dep. 25:1-6.* | Undisputed. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 192.    Puga had on a baggy pair of jeans when he exited the vehicle. *Ex. 1 to Le Decl., Kee Dep. 11:4-14.* | Undisputed. |
| 193.    While Puga was positioned next to the driver's side of the vehicle, Puga would at times raise his hands and then lower them back down. *Ex. 4 to Le Decl., Adams Dep. 21:2-8.* | Undisputed. |
| 194.    Puga was continually reaching down to pull up his pants because they were loose and kept falling. *Ex. 1 to Le Decl., Kee Dep. 11:15-23; Ex. 4 to Le Decl., Adams Dep. 42:12-17, 43:5-13, 43:23-44:5; Ex. 8 to Le Decl., Gonzalez Dep. 105:11-25.* | Disputed that Puga "continually" pulled up his pants. Blackwood's MVARS and the Gonzalez cellphone video similarly show Puga pull up his underwear from behind (above his buttocks) then his pants by also grabbing them from the back. Puga never displayed his front torso or waistband to the officers. *Blackwood MVARS, Part 4 at 33:00-42:28, Ex. G to Esquivel Decl.; Gonzalez Video at 00:00-06:28, Ex. J to Esquivel Decl.* |
| 195.    Puga expressed concerns to the officers that he thought the officers were going to shoot him. *Ex. 1 to Le Decl., Kee Dep. 52:2-5; Ex. 5 to Le Decl., Vaccari Dep. 34:22-35:4; Ex. 2 to Le Decl., Rubalcava Dep. 39:7-9; Ex. 8 to Le Decl., Gonzalez Dep. 40:23-41:11.* | Undisputed. |
| 196.    Puga sounded scared of being shot by police. *Ex. 8 to Le Decl., Gonzalez Dep. 103:13-23.* | Undisputed that Ms. Gonzalez testified to this, but disputed that she has personal knowledge to testify about how Puga was feeling. Fed. R. Evid. 602. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 197.    Puga said something about hearing a click and being afraid that somebody was getting ready to shoot him. *Ex. 1 to Le Decl., Kee Dep. 52:9-11.* | Undisputed that Puga made this comment. |
| 198.    Puga then walked to the front of the white Expedition. *Ex. 8 to Le Decl., Gonzalez Dep. 42:21-25; Ex. 11 to Le Decl., Rubalcava Dashcam Video at 37:48-37:50* | Undisputed that Puga went to the front of the vehicle despite Kee's repeated orders that Puga walk backwards to him. *Blackwood MVARS, Part 4 at 36:20-37:51, Ex. G to Esquivel Decl.* |
| 199.    After Puga went to the front of the vehicle, the officers still did not have any discussion regarding a tactical plan. *Ex. 4 to Le Decl., Adams Dep. 25:2-11.* | Disputed as vague as to time. Adams testified that he and Vaccari formulated a plan to move to the east side of the vehicle because they could no longer see Puga's hands when he was out of the vehicle. *Adams Dep. 25:12-22, Ex. 4 to Le Decl.* |
| 200.    Puga had his hands up while he was positioned near the front of the Expedition. *Ex. 2 to Le Decl., Rubalcava Dep. 40:3-5.* | Disputed. Puga lowered one or both of his hands several times while standing in front of the Expedition. *Erin Mangerino Video at 00:00-00:50, Ex. I to Esquivel Decl; Blackwood MVARS, Part 4 at 37:48 to 42.27, Ex. G to Esquivel Decl.; Gonzalez Video at 01:50-6:25, Ex. J to Esquivel Decl.* |
| 201.    When Puga was at front of the Expedition, Puga did not have anything in his hands. *Ex. 2 to Le Decl., Rubalcava Dep. 40:6-8.* | Undisputed. |
| 202.    Puga occasionally would drop his hands to pull up his pants while he was standing near the front of the vehicle. *Ex. 4 to Le Decl., Adams* | Disputed to the extent neither witness has personal knowledge of what Puga was doing with his hands when he lowered them while standing in front of the vehicle because his hand were |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| *Dep. 61:3-62:3; Ex. 8 to Le Decl., Gonzalez Dep. 42:18-25.* | hidden behind the vehicle and out of the witnesses' view. Fed. R. Evid. 602; *Erin Mangerino Video at 00:00-00:50, Ex. I to Esquivel Decl.; Blackwood MVARS, Part 4 at 37:48 to 42.27, Ex. G to Esquivel Decl.; Gonzalez Video at 01:50-6:25, Ex. J to Esquivel Decl.* |
| 203.   The bystander cell phone video taken by Erin Mangerino shows Puga with his hands up and briefly dropping his right hand to his waistband to adjust his pants before raising his hand up again, twice. *Ex. 10 to Le Decl., Erin Mangerino Cellphone Video at 0:00:03-00:07; 0:00:20-00:27.* | Disputed. The video taken by Erin Mangerino does not support a finding that Puga was adjusting his pants when he lowered his hands while standing in front of the Expedition. The amount of his dark underwear visible from behind Puga did not change,  nor do his lighter pants appear to move, when he lowered his hands. If he was adjusting his pants, it is logical that the amount of underwear visible would either increase or decrease as the lighter pants move up or down. This does not happen on the video. *Erin Mangerino Video at 00:00-00:50, Ex. I to Esquivel Decl.* |
| 204.   At some point, Kee and Rubalcava decided to approach Puga to take him into custody. *Ex. 1 to Le Decl., Kee Dep. 25:17-18; Ex. 2 to Le Decl., Rubalcava Dep. 40:12-22.* | Undisputed that Kee and Rubalcava decided to approach Puga when Puga stated that he did not have any weapons on him. *Blackwood MVARS, Part 4 at 40:20 to 42.27, Ex. G to Esquivel Decl.;* |
| 205.   Kee and Rubalcava did not coordinate with the SBSD Sheriffs' deputies regarding any plan to approach and take Puga into custody. *Ex. 1 to Le Decl., Kee Dep. 28:16-19; Ex. 2 to Le Decl.,* | Undisputed. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| *Rubalcava Dep. 40:23-25; Ex. 5 to Le Decl., Vaccari Dep. 36:16-19.* | |
| 206.   As Kee and Rubalcava were approaching Puga, they did not have any cover. *Ex. 2 to Le Decl., Rubalcava Dep. 41:14-16, 83:1-9.* | Undisputed. |
| 207.   Kee and Rubalcava were not aware that Vaccari and Adams were also approaching Puga. *Ex. 1 to Le Decl., Kee Dep. 28:20-22; Ex. 2 to Le Decl., Rubalcava Dep. 41:8-11.* | Undisputed. |
| 208.   Vaccari was still treating Puga as if he was armed with a weapon while Puga was standing near the front of the vehicle. *Ex. 5 to Le Decl., Vaccari Dep. 36:12-15.* | Not applicable as to State Defendants. |
| 209.   When Vaccari and Adams saw Kee and Rubalcava move towards the shoulder of Peach Street, they thought they were moving to just get a better view of Puga, not to approach Puga. *Ex. 4 to Le Decl., Adams Dep. 26:21-27:3; Ex. 5 to Le Decl., Vaccari Dep. 37:1-11, 38:7-12.* | Not applicable as to State Defendants. |
| 210.   Vaccari wanted to move up the passenger side of the vehicle to cut off an avenue of escape for Puga. *Ex. 5 to Le Decl., Vaccari Dep. 39:6-20.* | Not applicable as to State Defendants. |
| 211.   The only cover Vaccari and Adams had when moving up was the passenger's side of Puga's | Not applicable as to State Defendants. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| vehicle. *Ex. 5 to Le Decl., Vaccari Dep. 39:21-25.* | |
| 212.   Prior to approaching, Vaccari and Adams had discussed the possibility of using the Taser on Puga because Puga was a good candidate for the Taser due to him being shirtless, but Vaccari ultimately decided to utilize the 40-mm less-lethal instead. *Ex. 5 to Le Decl., Vaccari Dep. 40:3-16* | Not applicable as to State Defendants. |
| 213.   As Vaccari approached from the dirt shoulder, he did not have any cover. *Ex. 5 to Le Decl., Vaccari Dep. 41:14-24.* | Not applicable as to State Defendants. |
| 214.   There was an electrical pole on the southwest corner of the intersection that was parallel to the back passenger doors of the Expedition. *See Ex. 15 to Le Decl., Photograph of Scene; Ex. 16 to Le Decl., Photograph of Expedition at Curb.* | Undisputed. |
| 215.   In the Erin Mangerino cellphone video of the incident, moments before the shooting, two figures can be seen standing without cover in the street, partially obscured by the electrial pole before backing away in a southern direction, away from the pole, and out of frame. *Ex. 10 to Le Decl., Erin Mangerino Cellphone Video at 0:00:29-00:53.* | Disputed. The two individuals seen in the Erin Mangerino video are standing near the electrical pole, then start stepping back in a western direction, not a southern direction, until they are both out of the frame. *Erin Mangerino Video at 00:39-00:46, Ex. I to Esquivel Decl.*<br><br>Kee testified at his deposition that he was in the area of the electrical pole approximately 3-5 seconds before he |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| | saw the gun in Puga's waistband. *Kee Dep. 28:23-29:5, Ex. O to Esquivel Decl.* |
| 216.   Erin Mangerino was unable to see any officers standing on her side of Peach Street. Ex. 7 to Le Decl., Mangerino Dep. 53:11-22. | Undisputed that the witness testified to this based on where she was located within her house. |
| 217.   Kee claims that as he approached the electrical pole, he could only see a portion of Puga's body in front of the vehicle. *Ex. 1 to Le Decl., Kee Dep. 29:20-23.* | Undisputed. |
| 218.   Kee claims he could not see Puga's waistband while Puga was standing in front of the vehicle and could only see Puga's waistband once he moved past the front of Puga's vehicle. *Ex. 1 to Le Decl., Kee Dep. 81:6-19.* | Undisputed. |
| 219.   As soon as Puga turned to run, officers shot at Puga. *Ex. 2 to Le Decl., Rubalcava Dep. 60:20-61:1; Ex. 5 to Le Decl., Vaccari Dep. 42:24-43:2, 47:5-14; Ex. 7 to Le Decl., Mangerino Dep. 34:3-9, 36:15-17, 37:11-13; Gonzalez Dep. 42:25-43:1, 55:1-4, 97:5-11, 97:12-15; Ex. 10 to Le Decl., Mangerino Cellphone Video at 0:00:51-00:54; Ex. 13 to Le Decl., Gonzalez Cellphone Video at 0:06:24-06:31.* | Disputed. Kee shot his first round when he saw Puga's hand going towards the gun in his waistband and before Puga started to run. Kee was approximately 20-30 feet from Puga and had seen the gun in Puga's waistband about three second before Kee fired the first shot. *Kee Dep. 9:10-10:3, Ex. O to Esquivel Decl.* |
| 220.   Puga never grabbed or aggressively reached for anything prior to the shots. *Ex. 8 to Le Decl.,* | Disputed, and vague as to the meaning of "aggressively reached." Kee saw Puga's hand reach for the gun in his |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| *Gonzalez Dep. 16:1-3; Ex. 14 to Le Decl., Botten Dep. 129:13-25, 130:6-12.* | waistband. *Kee Dep. 9:10-24, Ex. O to Esquivel Decl.* |
| 221.   Puga never had a gun in his hand. *Ex. 8 to Le Decl., Gonzalez Dep. 97:16-25, 83:21-24; Ex. 14 to Le Decl., Botten Dep. 129:13-25, 130:6-12.* | Disputed. Several officers and witnesses saw a gun or evidence of a gun in Puga's hand. Annabelle Botten Interview at 02:00-02:50, Ex. L to Esquivel Decl. (stating Puga "grabbed the gun" and "tried to shoot at the cops and that's when the cops started shooting back"); Mangerino Dep. 35:2-36:17, 50:14-52:5, Ex. S to Esquivel Decl. (stating Puga's arm was raised up and although he could not see a gun, Puga "had his hand around something, and smoke came from the front of his hand, which gave me the impression that he had a gun"); Goodson Dep. 26:10-27:3, 31:19-32:11, 49:11-22, 53:6-54:6, Ex. T to Esquivel Decl. (testifying that Puga took something out of his waistband and shot at the cops, and that Puga was "shooting and running away"); Adams Dep. 35:12-36:18, Ex. R to Esquivel Decl. (explaining that he saw Puga's hands "dive down into his waistband area," saw a gun, then heard shots, and then returned fire); Blackwood Dep. 53:14-16, Ex. P to Esquivel Decl. (confirming that he saw a gun in Puga's hand). |
| 222.   Puga never pointed his hand or a weapon in any specific direction or at any officer. *Ex. 5 to Le Decl., Vaccari Dep. 64:8-17; Ex. 8 to Le Decl., Gonzalez Dep. 97:1-6.* | Disputed. Annabelle Botten Interview at 02:00-02:50, Ex. L to Esquivel Decl. (stating Puga "grabbed the gun" and "tried to shoot at the cops and that's when the cops started shooting back"). |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 223.    Puga never fired a weapon at any officer. *Ex. 7 to Le Decl., Mangerino Dep. 37:14-16; Ex. 8 to Le Decl., Gonzalez Dep. 132:22-24; Ex. 14 to Le Decl., Botten Dep. 129:13-25, 130:6-12.* | Disputed. Several witnesses heard or saw evidence that Puga had fired a gun. Annabelle Botten Interview at 02:00-02:50, Ex. L to Esquivel Decl. (stating Puga "grabbed the gun" and "tried to shoot at the cops and that's when the cops started shooting back"); Mangerino Dep. 35:2-36:17, 50:14-52:5, Ex. S to Esquivel Decl. (stating Puga's arm was raised up and although he could not see a gun, Puga "had his hand around something, and smoke came from the front of his hand, which gave me the impression that he had a gun"); Goodson Dep. 26:10-27:3, 31:19-32:11, 49:11-22, 53:6-54:6, Ex. T to Esquivel Decl. (testifying that Puga took something out of his waistband and shot at the cops, and that Puga was "shooting and running away"); Adams Dep. 35:12-36:18, Ex. R to Esquivel Decl. (explaining that he saw Puga's hands "dive down into his waistband area," saw a gun, then heard shots, and then returned fire). |
| 224.    Neither smoke nor any muzzle flash ever came from Puga. *Ex. 3 to Le Decl., Blackwood Dep. 20:10-12; Ex. 4 to Le Decl., Adams Dep. 36:12-18; Ex. 5 to Le Decl., Vaccari Dep. 48:14-20; Ex. 8 to Le Decl., Gonzalez Dep. 99:8-25.* | Disputed. Neighbor Edward Mangerino, who lives in the house on the northwest corner of the intersection of Peach and Catalpa Streets, testified that he saw Puga raise his arm up, and although he could not see a gun, Puga had his hand around something, and smoke came from the front of his hand, which gave Mangerino the impression that Puga had a gun. Kee also testified to seeing muzzle flash from Puga's location. Mangerino Dep. 35:2-36:17, |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| | 50:14-52:5, Ex. S to Esquivel Decl.; Kee Dep. 82:10-85:7, Ex. O to Esquivel Decl. |
| 225.   None of the videos capturing the incident show Puga with a gun in his hand. Ex. 1 to Le Decl., Kee Dep. 7:16-18; Ex. 5 to Le Decl., Vaccari Dep. 9:15-18. | Disputed. Blackwood's MVARS video, part 4, show a shiny object flashing in Puga's right hand as he is running in a northern-westerly direction to the curb. There is no evidence that Puga had a cell phone or other object on his person that could reflect light and create the shine or reflection seen in the video other than the gun found under his body at the end of the incident. *Blackwood MVARS, Part 4 at 42:29-42:31, Ex. G at Esquivel Decl.* |
| 226.   None of the videos capturing the incident show Puga ever pointing a gun at anyone. *Ex. 1 to Le Decl., Kee Dep. 7:22-24; Ex. 5 to Le Decl., Vaccari Dep. 9:19-21.* | Disputed to the extent that the quality and angles of the videos do not lend themselves to ascertain whether Puga is pointing a gun, especially when there is eye-witness testimony that Puga pointed or shot a gun at the officers. Annabelle Botten Interview at 02:00-02:50, Ex. L to Esquivel Decl.; Mangerino Dep. 35:2-36:17, 50:14-52:5, Ex. S to Esquivel Decl.; Goodson Dep. 26:10-27:3, 31:19-32:11, 49:11-22, 53:6-54:6, Ex. T to Esquivel Decl.; Adams Dep. 35:12-36:18, Ex. R to Esquivel Decl.; Blackwood Dep. 53:14-16, Ex. P to Esquivel Decl.; Kee Dep. 82:10-85:7, Ex. O to Esquivel Decl. |
| 227.   None of the videos capturing the incident show Puga ever firing a | Disputed to the extent that the quality and angles of the videos do not lend themselves to ascertain whether Puga |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| gun. *Ex. 1 to Le Decl., Kee Dep. 7:19-21.* | fired the gun, especially when there is eye-witness testimony that Puga pointed or shot a gun at the officers. Annabelle Botten Interview at 02:00-02:50, Ex. L to Esquivel Decl.; Mangerino Dep. 35:2-36:17, 50:14-52:5, Ex. S to Esquivel Decl.; Goodson Dep. 26:10-27:3, 31:19-32:11, 49:11-22, 53:6-54:6, Ex. T to Esquivel Decl.; Adams Dep. 35:12-36:18, Ex. R to Esquivel Decl.; Blackwood Dep. 53:14-16, Ex. P to Esquivel Decl.; Kee Dep. 82:10-85:7, Ex. O to Esquivel Decl. |
| 228.   None of the videos capturing the incident show any muzzle flash coming from the area Puga was at. *Ex. 1 to Le Decl., Kee Dep. 92:14-16; Ex. 2 to Le Decl., Rubalcava Dep. 93:17-19.* | Disputed to the extent that the quality and angles of the videos do not lend themselves to ascertain whether Puga fired the gun, especially when there is eye-witness testimony that Puga pointed or shot a gun at the officers. Annabelle Botten Interview at 02:00-02:50, Ex. L to Esquivel Decl.; Mangerino Dep. 35:2-36:17, 50:14-52:5, Ex. S to Esquivel Decl.; Goodson Dep. 26:10-27:3, 31:19-32:11, 49:11-22, 53:6-54:6, Ex. T to Esquivel Decl.; Adams Dep. 35:12-36:18, Ex. R to Esquivel Decl.; Blackwood Dep. 53:14-16, Ex. P to Esquivel Decl.; Kee Dep. 82:10-85:7, Ex. O to Esquivel Decl. |
| 229.   As Puga was running, he never turned around to look at the officers. *Ex. 8 to Le Decl., Gonzalez Dep. 100:13-17.* | Disputed to the extent that the quality and angles of the videos do not lend themselves to ascertain whether Puga turned his head towards the officers as he ran. See, e.g., Blackwood MVARS, |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| | Part 4 at 42:29-42:31, Ex. G to Esquivel Decl. (showing Puga running towards northwest corner of intersection and color of head changes, suggesting his head turned towards the officers). |
| 230.   Gonzalez saw Puga's waistband when he turned to take off running and never saw a gun in his waistband. *Ex. 8 to Le Decl., Gonzalez Dep. 95:15-25, 115:18-21.* | Undisputed that Gonzalez testified at deposition that, from her position behind the officers, she did not see a gun in Puga's waistband. However, all the videos show that Puga never turned his torso in such a way that his front waistband was visible to the officers or anyone south of the intersection. Because Gonzalez's testimony so blatantly contradicts the video evidence, including her own video, no reasonable juror could find that Gonzalez could see the front of Puga's waistband, and this Court need not adopt that version of the facts for purposes of summary judgment. S*cott v. Harris*, 550 U.S. 372, 380 (2007). |
| 231.   While Puga was running, his hands were moving in a running motion. *Ex. 8 to Le Decl., Gonzalez Dep. 116:16-21.* | Undisputed. |
| 232.   None of the videos that captured the shooting ever show Puga turn back towards the officers or point his hand back towards the officers. *Ex. 10 to Le Decl., Erin Mangerino Cellphone Video at 0:00:50-01:44; Ex. 11 to Le Decl., Rubalcava* | Disputed to the extent that the quality and angles of the videos do not lend themselves to ascertain whether Puga is pointing a gun, especially when there is eye-witness testimony that Puga pointed his hand back towards the officers as he ran. *Kee Dep. 83:13-84:3, Ex. O to Esquivel Decl.; Erin* |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| *Dashcam Video at 0:42:23-42:47; Kee Dashcam Video at 46:47-47:07.* | *Mangerino Video at 00:50-01:02, Ex. I to Esquivel Decl.* |
| 233.   When Puga reached the northwest corner, he changed directions and started running north instead of towards the house on the corner. *Ex. 4 to Le Decl., Adams Dep. 50:15-21; Ex. 7 to Le Decl., Mangerino Dep. 34:3-12.* | Disputed to the extent that there is no evidence that Puga could not have accessed or entered the houses on the northwest side of Peach Street as he ran north on Peach. |
| 234.   Puga then fell forward onto his chest and stomach and onto the ground with his hands beside him on the northwest shoulder near the southbound lane, some distance from the northwest corner. *Ex. 1 to Le Decl., Kee Dep. 37:10-13; Ex. 5 to Le Decl., Vaccari Dep. 53:11-21; Ex. 7 to Le Decl., Mangerino Dep. 60:9-61:13.* | Disputed to the extent that, as worded, this purported fact suggests that Puga did not move after falling down. The Erin Mangerino video shows Puga crawled up the street on his elbows after he falls and his limbs continued to move after the fall. *Erin Mangerino Video at 01:03-01:10, Ex. I to Esquivel Decl.* |
| 235.   Puga's head was oriented north and his feet were to the south after he fell. *Ex. 5 to Le Decl., Vaccari Dep. 53:22-25.* | Undisputed. |
| 236.   Puga's hands were next to him when he was on the ground. *Ex. 7 to Le Decl., Mangerino Dep. 61:7-13.* | Undisputed that the witness testified to this, but the Erin Mangerino video shows Puga crawled up the street on his elbows after he falls and his limbs continued to move after the fall. *Erin Mangerino Video at 01:03-01:10, Ex. I to Esquivel Decl.* |
| 237.   There was no gun in either of Puga's hands immediately after | Undisputed that Deputy Adams testified to this. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| Puga went to the ground. *Ex. 4 to Le Decl., Adams Dep. 52:18-22.* | |
| 238.   Puga did not pose a threat to anyone after falling to the ground and appeared incapacitated. *Ex. 1 to Le Decl., Kee Dep. 37:17-38:3; Ex. 4 to Le Decl., Adams Dep. 52:1-6.* | Undisputed. |
| 239.   Several shots were fired at Puga after he fell to the ground. *Ex. 1 to Le Decl., Kee Dep. 68:17-24; Ex. 3 to Le Decl. Blackwood Dep., 25:8-12; Ex. 5 to Le Decl., Vaccari Dep. 43:11-24; Ex. 10 to Le Decl., Erin Mangerino Cellphone Video at 0:01:04-01:12; Ex. 11 to Le Decl., Rubalcava Dashcam Video at 0:42:37-42:45.* | Undisputed that several shots were fired in Puga's direction after he fell to the ground. There is no evidence that he was struck by any of those shots. |
| 240.   After Puga fell to the ground, several shots are fired and there was a pause before the final two, almost simultaneous volleys of shots from two different firearms are heard. *Ex. 10 to Le Decl., Erin Magerino Cellphone Video at 01:02-01:10.* | Disputed to the extent this fact is vague as to time. As the Erin Mangerino Video show, Puga continued to move his limbs after he fell to the ground and shots can be heard during this points in time. However, the firing stops when Puga no longer moves. *Erin Mangerino Video at 01:00-01:12, Ex. I to Esquivel Decl.* |
| 241.   Puga sustained multiple gunshot wounds to the back of his body with back-to-front trajectories, and some with upward trajectories. *Ex. 19 to Le Decl., Jong Dep. 21:21-22, 45:25-46:4, 46:5-8.* | Undisputed. |
| 242.   The upward trajectory is consistent with Puga leaning | Undisputed, but the upward trajectory of the gunshot wounds could also have |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| forward or falling forward when he sustained those gunshot wounds. *Ex. 19 to Le Decl., Jong Dep. 13:6-16.* | been caused by Puga's body movement. *Jong Dep. 35:10-14, Ex. U to Esquivel Suppl. Decl.* |
| 243.   Kee was the first officer to shoot and did not hear any shots fired before he fired his first shot. *Ex. 1 to Le Decl., Kee Dep. 9:4-9.* | Undisputed. |
| 244.   Kee claims he fired two volleys of shots; one volley of 5 to 8 shots while Puga at the front of the vehicle and another volley of 10 to 13 shots at Puga's backside while Puga was running in a northwest direction. *Ex. 1 to Le Decl., Kee Dep. 8:4-9, 9:24-10:3, 30:7-9, 34:12-23, 35:2-20, 35:24-36:5, 46:11-18.* | Disputed to the extent that Kee testified that, during the second volley, he was aiming at Puga's left side, rib cage area, while Puga ran in a northwest direction. *Kee Dep. 35:24-36:21, Ex. 1 to Le Decl.* |
| 245.   When Kee fired his first shot, he could see both of Puga's hands. *Ex. 1 to Le Decl., Kee Dep. 60:10-12.* | Undisputed. |
| 246.   Puga did not have a gun in his hand when Kee fired his first volley. *Ex. 1 to Le Decl., Kee Dep. 12:2-25* | Disputed. Kee testified that as he was shooting his first volley at Puga, Puga was able to remove the gun from his waistband, point the gun in Kee and Rubalcava's direction, and fire because Kee saw two muzzle flashes. *Kee Dep. 78:15-79:6, Ex. O to Esquivel Decl.* |
| 247.   Kee was trained to consider his background or backdrop when firing because if there are residences or businesses in the background, innocent people could get shot. *Ex. 1 to Le Decl., Kee Dep. 54:16-24* | Undisputed. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 248.   Kee was aware that there were residences in Puga's background when Kee was firing both volleys. *Ex. 1 to Le Decl., Kee Dep. 55:1-19.* | Disputed. Misstates Kee's deposition testimony and the contents of Kee's interview. At his interview, Kee stated that the backdrop during the first volley was Catalpa Street and the street running north was the backdrop during the second volley. *Kee Interview 50:20-51:7, Ex. AA to Esquivel Suppl. Decl.* |
| 249.   After the first volley, Kee retreated to the dirt shoulder parallel to the side of the CHP vehicle and went down prone. *Ex. 1 to Le Decl., Kee Dep. 31:11-32:9, 42:23-43:5.* | Undisputed. |
| 250.   Approximately 3 to 5 seconds elapsed between the last shot in Kee's first volley and when Kee went down into prone position in the dirt. *Ex. 1 to Le Decl., Kee Dep. 32:10-16* | Undisputed. |
| 251.   Kee did not keep a visual on Puga while he was repositioning. *Ex. 1 to Le Decl., Kee Dep. 43:14-18.* | Undisputed. |
| 252.   Kee's back was to Puga while he repositioned to the dirt area. *Ex. 1 to Le Decl., Kee Dep. 45:22-46:1.* | Undisputed. |
| 253.   Approximately 5 to 8 seconds elapsed between Kee's first volley and when he started firing his second volley. *Ex. 1 to Le Decl., Kee Dep. 54:5-9.* | Undisputed but Kee testified that the time lapse was a "guess." *Kee Dep. 54:5-9, Ex. 1 to Le Decl.* |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 254.    Kee was not struck by any gunshots. *Ex. 1 to Le Decl., Kee Dep. 33:3-11.* | Undisputed. |
| 255.    Kee never mentioned in his interview with detectives that he thought he had been struck. *Ex. 1 to Le Decl., Kee Dep. 44:3-7.* | Disputed but immaterial, and it misstate Kee's testimony. Kee testified that he did not recall whether he informed the Sheriff's Department that he may have been struck by gun fire. *Kee Dep. 44:3-7, Ex. 1 to Le Decl.* |
| 256.    When Kee looked down at his left arm, which he claims is where he thought he had been struck, the fabric was not torn. *Ex. 1 to Le Decl., Kee Dep. 65:19-24.* | Undisputed but immaterial. |
| 257.    Rubalcava heard two shots being fired before he fired his first shot. *Ex. 2 to Le Decl., Rubalcava Dep. 16:5-10* | Undisputed. |
| 258.    Rubalcava was side by side and to the right of Kee while they were approaching and when Kee started firing. *Ex. 2 to Le Decl., Rubalcava Dep. 29:10-19, 30:16-22.* | Disputed to the extent the cited testimony does not support this fact. |
| 259.    Puga was near the front of the vehicle when Rubalcava fired his first volley. *Ex. 2 to Le Decl., Rubalcava Dep. 15:7-10.* | Undisputed. |
| 260.    Rubalcava also heard shots coming from the passenger's side of the vehicle. *Ex. 2 to Le Decl., Rubalcava Dep. 47:12-17.* | Undisputed but vague as to time. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 261. Rubalcava claims he fired approximately 5 shots during his first volley and 5 to 10 shots during his second volley. *Ex. 2 to Le Decl., Rubalcava Dep. 14:2-8.* | Undisputed. |
| 262. Rubalcava was trained to consider his background when he shoots because if his bullets miss, they may hit innocent people. *Ex. 2 to Le Decl., Rubalcava Dep. 20:20-21:1.* | Undisputed. |
| 263. Rubalcava now knows that there were homes in the background when he fired his first volley. *Ex. 2 to Le Decl., Rubalcava Dep. 21:7-9.* | Undisputed but immaterial and irrelevant what his knows "now." |
| 264. Rubalcava claims would not have shot as many shots if he had known there was a home in the northeast corner at the time of the shooting. *Ex. 2 to Le Decl., Rubalcava Dep. 92:21-93:1.* | Disputed. Misstates Rubalcava's testimony. Rubalcava testify that he "probably" would not have shot the same number of rounds. *Rubalcava Dep. 92:21-93:1, Ex. 2 to Le Decl.* |
| 265. Rubalcava was firing in a northeast direction during his first volley. *Ex. 2 to Le Decl., Rubalcava Dep. 21:16-19.* | Undisputed but Rubalcava confirmed that he was "kind of firing" in  he was northeast direction. ., *Rubalcava Dep. 21:16-19, Ex. 2 to Le Decl.* |
| 266. Rubalcava claims that there was an approximately 5 to 10 second pause between Rubalcava's first volley and second volley. *Ex. 2 to Le Decl., Rubalcava Dep. 14:12-18.* | Disputed. Misstates Rubalcava's testimony. Rubalcava initially testified that he believed 5-10 seconds lapse between each volley. But after refreshing his recollection by reviewing the MVARS video, he testified that one to two second lapsed between the first and second volleys. *Rubalcava Dep. 14:12-18, 76:16-77:2,* |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| | *Ex. Q to Esquivel Decl.,* |
| 267.   Rubalcava took out his magazine and reloaded before firing a second volley of shots. *Ex. 2 to Le Decl., Rubalcava Dep. 22:20-22, 97:13-18.* | Disputed. Misstates Rubalcava's testimony. After reviewing the MVARS video, Rubalcava recalled that he reloaded after the second volley. *Rubalcava 84:10-23, Ex. Q to Esquivel Decl.* |
| 268.   Puga was running away when Rubalcava fired his second volley. *Ex. 2 to Le Decl., Rubalcava Dep. 18:18-20.* | Undisputed. |
| 269.   Rubalcava was aiming at Puga's back during the second volley. *Ex. 2 to Le Decl., Rubalcava Dep. 18:21-19:1.* | Undisputed. |
| 270.   When asked during his interview with detectives after the incident as to what caused Rubalcava to fire his second volley, Rubalcava answered that Puga was still fleeing but that Puga was not doing anything with any alleged weapon. *Ex. 2 to Le Decl., Rubalcava Dep. 55:8-22.* | Undisputed, but Rubalcava was provided an incomplete portion of his response during the interview. At the Sheriff's interview, Rubalcava explained that he continued to hear gunshots after his first volley, and believed that some of those shots were coming from Puga, so Rubalcava feared for his life and shot the second volley. *Rubalcava Interview 54:5-55:21, Ex. BB to Esquivel Suppl. Decl.* |
| 271.   There was enough light for Rubalcava to see Puga while Puga was running away. *Ex. 2 to Le Decl., Rubalcava Dep. 92:10-12.* | Disputed to the extent it takes Rubalcava's testimony out of context. Rubalcava testified there was sufficient light in the northwest corner to see Puga and the houses on that side of the street, but he was unaware of the homes in the northeast corner of the intersection. He further explained that |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| | the northeast corner was dark, and he could not see that there was a home there. *Rubalcava Dep. 92:1-20, 102:4-12, Ex. Q to Esquivel Suppl. Decl.* |
| 272.    Rubalcava does not know whether he fired shots at Puga after Puga went to the ground. *Ex. 2 to Le Decl., Rubalcava Dep. 75:9-13.* | Undisputed. |
| 273.    Rubalcava concedes it would not have been appropriate to shoot at Puga if he merely saw a gun in Puga's waistband. *Ex. 2 to Le Decl., Rubalcava Dep. 97:19-22.* | Undisputed. |
| 274.    Based on Rubalcava's training, if Puga had not pointed a gun at Rubalcava, Rubalcava would not have shot. *Ex. 2 to Le Decl., Rubalcava Dep. 103:7-18.* | Undisputed. |
| 275.    Blackwood heard approximately 2 to 3 shots coming from his left before he fired and Kee and Rubalcava were to Blackwood's left. *Ex. 3 to Le Decl., Blackwood Dep. 11:3-6, 20:13-15, 46:23-47:8.* | Undisputed, but incomplete testimony. Blackwood testified that he saw a gun in Puga's hand and saw it pointed. Blackwood Dep. 8:13-17, Ex. P to Esquivel Decl. |
| 276.    Blackwood fired his first volley of shots due north while Puga was in the front of the car, near the driver's side. *Ex. 3 to Le Decl., Blackwood Dep. 28:9-19.* | Undisputed. |
| 277.    Puga had just cleared the front of the vehicle when Blackwood started | Undisputed. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| firing. *Ex. 3 to Le Decl., Blackwood Dep. 28:20-23.* | |
| 278.   Blackwood was firing at Puga's left side while Puga was hunched over as if he had been struck by gunshots. *Ex. 3 to Le Decl., Blackwood Dep. 29:9-20.* | Undisputed. |
| 279.   When Blackwood saw Puga bending over, he believed Puga had been shot. *Ex. 3 to Le Decl., Blackwood Dep. 34:18-23.* | Undisputed. |
| 280.   Blackwood was aiming at Puga's back while Puga was running away. *Ex. 3 to Le Decl., Blackwood Dep. 29:25-30:2.* | Undisputed. |
| 281.   Blackwood was trying to assess while he was firing by looking for a gun but could not see Puga's hands and therefore never saw Puga with a gun while Puga was running away. *Ex. 3 to Le Decl., Blackwood Dep. 24:10-13, 30:23-31:11, 45:23-46:2.* | Undisputed. |
| 282.   Blackwood claims he fired at Puga while Puga was running because he did not see any gun on the ground and believed Puga was still in possession of a gun. *Ex. 3 to Le Decl., Blackwood Dep. 54:7-14.* | Undisputed but incomplete testimony. Blackwood explained that he believed Puga still had the gun and considered him as an immediate threat to Blackwood and others, and Puga was now running towards a house, creating a potential for a hostage situation. *Blackwood 54:7-55:7, Ex. P to Esquivel Decl.* |
| 283.   Blackwood fired ten shots during his first volley, paused when he saw | Undisputed. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| Puga stumble, and then fired ten more shots when Puga caught himself and continued to run. *Ex. 3 to Le Decl., Blackwood Dep. 36:21-37:7.* | |
| 284.    Blackwood came off his sights and paused when he saw Puga stumbling, and when Puga did not go to the ground, Blackwood got back up on his sights and fired ten more shots. *Ex. 3 to Le Decl., Blackwood Dep. 37:12-38:5.* | Undisputed but incomplete testimony. Blackwood explained that Puga continued to pose an immediate threat of death or serious harm to the officers and others because he was still in possession of the gun, had been drinking, asked to speak with his mother, and was now heading towards a house that could have resulted in a hostage situation. *Blackwood 54:7-55:7, Ex. P to Esquivel Decl.* |
| 285.    When Blackwood saw Puga stumble, he believed that some shots he fired may have struck Puga. *Ex. 3 to Le Decl., Blackwood Dep. 39:24-40:3.* | Undisputed. |
| 286.    During the time Blackwood was shooting at Puga, Blackwood could not see Puga's hands. *Ex. 3 to Le Decl., Blackwood Dep. 36:18-20.* | Undisputed. |
| 287.    Blackwood is not sure whether he fired any shots at Puga while Puga was going to the ground. *Ex. 3 to Le Decl., Blackwood Dep. 40:18-20.* | Undisputed. |
| 288.    Blackwood claims he stopped firing when he saw Puga stop | Undisputed. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| moving. *Ex. 3 to Le Decl., Blackwood Dep. 30:11-13.* | |
| 289.   When Adams approached the vehicle, Puga was standing in the front close to the driver's side headlight and Adams could only see Puga from chest up. *Ex. 4 to Le Decl., Adams Dep. 40:16-22, 41:2-12, 45:11-16.* | Not applicable to State Defendants. |
| 290.   As Adams was approaching from the passenger's side of the expedition, he heard shots. *Ex. 4 to Le Decl., Adams Dep. 35:12-14.* | Not applicable to State Defendants. |
| 291.   Adams and Vaccari had only reached the part where the painted curb meets the unpainted curb when the shots started, which is near the rear door of the Expedition. *Ex. 4 to Le Decl., Adams Dep. 76:1-19; Ex. 12 to Le Decl., Kee Dashcam Video at 46:46-46:49; Ex. 16 to Le Decl., Photograph of Expedition at Curb.* | Not applicable to State Defendants. |
| 292.   Adams heard shots before he fired. *Ex. 4 to Le Decl., Adams Dep. 35:15-17.* | Not applicable to State Defendants. |
| 293.   One of Adams' concern with being in a residential neighborhood was innocent people being struck due to the number of shots fired. *Ex. 4 to Le Decl., Adams Dep. 55:19-22.* | Not applicable to State Defendants. |
| 294.   At no time did anyone provide a verbal warning that deadly force was going to be used. *Ex. 2 to Le* | Not applicable to State Defendants. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| *Decl., Rubalcava Dep. 94:13-15; Ex. 3 to Le Decl., Blackwood Dep. 24:17-25; Ex. 5 to Le Decl., Vaccari Dep. 63:4-6* | |
| 295.    Vaccari remained on target with the 40-millimeter as Puga ran away and later dropped the 40-millimeter and unholstered his firearm but did not use it because Puga was going down or already down. *Ex. 5 to Le Decl., Vaccari Dep. 51:4-10; Ex. 12 to Le Decl., Kee Dashcam Video at 46:47-47:05* | Not applicable to State Defendants. |
| 296.    After the shooting, the officers heard someone exclaim about being shot coming from the northeast corner house. *Ex. 5 to Le Decl., Vaccari Dep. 57:16-24.* | Undisputed. |
| 297.    The officers learned that three people from the house on the northeast corner had been shot: an adult male, and adult female, and a juvenile. *Ex. 1 to Le Decl., Kee Dep. 56:22-57:6; Ex. 2 to Le Decl., Rubalcava Dep. 59:1-17, 59:18-22.* | Undisputed. |
| 298.    The Botten family, consisting of father Jonathan Wayne Botten, Sr., mother Tanja Dudek-Botten, daughter Annabelle Botten, and son J.B., were inside their house when the shooting happened. *Ex. 14 to Le Decl., Botten Dep. 63:4-64:2, 64:16-19* | Undisputed that this was the Plaintiffs' testimony. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 299.   There was a lot of police presence surrounding the Botten Residence, including the helicopter flying overhead and police cars with flashing lights in front of and in the back of the house. *Ex. 14 to Le Decl., Botten Dep. 25:5-18, 26:5-10; Ex. 17 to Le Decl., Dudek-Botten Dep. 29:9-16, 90:2-13, 91:1-10, 97:22-98:3.* | Disputed as vague as to time. Undisputed that as the standoff continued, more officers and first responders arrived in the general vicinity. Dispute any suggestion that the Botten residence was surrounded by patrol vehicles on Catalpa and Peach Streets. |
| 300.   Dudek-Botten believed they could not leave the house due to the police presence outside. *Ex. 17 to Le Decl., Dudek-Botten Dep. 133:8-20.* | Undisputed that this was Plaintiff's subjective belief. Disputed that Plaintiff's belief was reasonable because no officer told her or anyone else that they could no leave their residence, there was no activity, between he officers and Puga that affected Plaintiffs movement, and Botten Sr. was getting dressed for and was prepared to go to work. *Botten Sr. Interview at 1:45-2:22, Ex. K;Botten Dep. 112:9-113:11, Ex. U; Tanja Botten Dep. 129:20-24, 211:22-213:3, Ex. V; J.B. Dep. 98:12-25, Ex. X to Esquivel Decl.; see generally, Blackwood MVARS Parts 3-4, Ex. G-F to Esquivel Decl.* |
| 301.   Botten, Sr. heard Kee communicating with Puga through the loudspeaker and with verbal commands while Puga was inside the vehicle. *Ex. 14 to Le Decl., Botten Dep. 43:18-44:6.* | Undisputed that Plaintiff testified to this. |
| 302.   When the shooting started, Botten, Sr. fell back into the house | Undisputed that Plaintiff testified to this. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| and onto the ground and felt a throbbing to his right arm. *Ex. 14 to Le Decl., Botten Dep. 64:20-24.* | |
| 303.   Botten, Sr. then heard his wife screaming, saw blood all over her face and body, and heard his wife say that she had been shot in the face. *Ex. 14 to Le Decl., Botten Dep. 64:25-65:4.* | Undisputed that Plaintiff testified to this. |
| 304.   Botten, Sr. then exited the front door and into the front yard, yelling at the CHP officers, cursing at them and telling them that his family had been shot and needed help. *Ex. 14 to Le Decl., Botten Dep. 65:3-17.* | Undisputed. |
| 305.   Botten, Sr. then yelled at the SBSD Sheriff's Deputies for help and told them to jump the fence and come over and help. *Ex. 14 to Le Decl., Botten Dep. 67:14-21.* | Undisputed. |
| 306.   Botten, Sr. then brought his wife out to sit on the bench in the front yard and ran back into the house to grab towels for the officers. *Ex. 14 to Le Decl., Botten Dep. 68:4-10.* | Undisputed. |
| 307.   Then-minor J.B. then walked outside holding his left side and told Botten, Sr. that he could not breathe and believed that he had also been shot. *Ex. 14 to Le Decl., Botten Dep. 68:11-15.* | Undisputed. |
| 308.   J.B. sustained three gunshot wounds to his chest that resulted in | Undisputed. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| a collapsed lung on his left side, a ruptured spleen, and a lot damage to his internal organs due to the spreading of the bullets. *Ex. 14 to Le Decl., Botten Dep. 96:19-97:13.* | |
| 309.   J.B. required surgery to repair the damage he sustained to his body. *Ex. 14 to Le Decl., Botten Dep. 98:1-8* | Undisputed. |
| 310.   J.B. had to stay in the hospital for ten days. Ex. 14 to Le Decl., Botten Dep. 97:20-25 | Undisputed. |
| 311.   Dudek-Botten sustained gunshot wounds to her face, chest, and right shoulder. *Ex. 14 to Le Decl., Botten Dep. 85:20-86:3, 86:7-14, 109:18-110:4.* | Undisputed that Plaintiff testified to this. |
| 312.   Botten, Sr. sustained gunshot wounds to his right arm, left arm, left hand, and right leg. Ex. 14 to Le Decl., Botten Dep. 70:5-9, 71:20-72:5, 74:7-15, 75:14-20, 76:1-7. | Undisputed that Plaintiff testified to this. |
| 313.   Botten, Sr. was told by a doctor treating his gunshot wounds that the straight through gunshot wound to his right forearm was caused by either a 40 or 45 caliber bullet. *Botten Decl. ¶ 3* | Disputed and objection to Botten Declaration. Botten Sr. medical records do not show that any medical provider determined the caliber of any bullet that caused Plaintiff's injury, and Plaintiff did not disclose this information, including the name of the medical provider who purportedly made this comment, during fact discovery. Thus, the statement is inadmissible hearsay. *Fed. R. Evid. 801-802; Fed. R. Civ. P. 37; Desert* |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| | *Valley Hospital Records, Ex. CC; Botten Sr. Resp. to Interrog. 13, Ex. DD; Botten Sr. Resp. to Special Interrog. 6-7, Ex. EE; Pls' Second Supp. Initial Disclosures, Ex. FF; Pls' Expert Disclosures, Ex. GG.* |
| 314.  There were bullet strikes to the front of the Botten residence, the screen door of the residence, one of the bedroom windows, and the side of the residence. *Ex. 18 to Le Decl., Ripley Dep. 31:16-33:19.* | Undisputed. |
| 315.  The tactics used by Kee, Rubalcava, Blackwood, Jake Adams, and Vaccari violated standard police practices and training, which contributed to or was a cause of the shooting of Puga, Jonathan Wayne Botten, Sr., Tanja Dudek-Botten, and J.B. *Clark Decl. ¶ 11.* | Disputed as to the State Defendants. State Defendants' tactics met the standard of care and did not contribute to Plaintiffs' injuries. *Meyer Report 22-28, Ex. Y to Esquivel Decl.* |
| 316.  Officers are trained that they are responsible for their tactical decisions when they resort to the use of lethal force. Clark Decl. ¶ 12 | Undisputed. |
| 317.  The officers' failure to follow standard police practices and training in dealing with barricaded subjects, poor tactics, and rushing to take Puga into custody once he was outside of the vehicle all contributed to the officers' unnecessary use of lethal force. Clark Decl. ¶ 12. | Disputed. State Defendants' tactics met the standard of care and did not contribute to Plaintiffs' injuries. *Meyer Report 22-28, Ex. Y to Esquivel Decl.* |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 318.  The officers failed to formulate a safe tactical plan, made poor tactical decisions, and limited their tactical options, ultimately leading to their unnecessary use of lethal force. Clark Decl. ¶ 12a. | Disputed. State Defendants' tactics met the standard of care and did not contribute to Plaintiffs' injuries. *Meyer Report 22-28, Ex. Y to Esquivel Decl.* |
| 319.  POST Learning Domain 23, "Crimes in Progress," advises officers that if available, officers should request specialized units and resources as soon as it has been determined that the suspect has taken a barricaded position. Clark Decl. ¶ 12b. | Undisputed but vague as to the term barricaded. Use of SWAT team is a judgment call on the part of the officer in charge. *Meyer Dep. 72:24-74:5, Ex. Z to Esquivel Suppl. Decl.* |
| 320.  SWAT specifically trains to respond to incidents where subject(s) may be armed, barricaded, and refusing to submit to arrest. Clark Decl. ¶ 12b. | Undisputed but vague as to the term barricaded. Use of SWAT team is a judgment call on the part of the officer in charge. *Meyer Dep. 72:24-74:5, Ex. Z to Esquivel Suppl. Decl.* |
| 321.  The utilization of San Bernardino Sheriff's Department SWAT would have been a safer alternative as SWAT is equipped with special training, equipment, and tools, which can help resolve the situation of a barricaded subject without escalating the situation. Clark Decl. ¶ 12b. | Disputed. Use of SWAT team is a judgment call on the part of the officer in charge. *Meyer Dep. 72:24-74:5, Ex. Z to Esquivel Suppl. Decl.* |
| 322.  Given that the officers believed that Puga was involved in a prior freeway shooting, was still armed, was refusing to exit his vehicle, and was situated in a residential neighborhood, Vaccari's failure to request for SWAT to respond when | Not applicable to State Defendants. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| initially requested by Kee and after initial less-lethal force was unsuccessful were poor tactical decisions that contributed to the officers' use of unnecessary lethal force. Clark Decl. ¶ 12c. | |
| 323.   Among the "Fatal Errors" listed by POST Learning Domain 23, "Crimes in Progress," is poor positioning due to rushing or poor tactics. Clark Decl. ¶ 12d. | Disputed to the extent it implies that State Defendants were poorly positioned, and there is no evidence that Kee rushed in his tactics. *Meyer Report 22-28, Ex. Y to Esquivel Decl.* |
| 324.   The officers' decision to leave cover and enter an open-air environment to take Puga into custody, when the officers stated that they still believed Puga to be armed and dangerous, and Kee stated that he was in fear for his life at the time he made the decision to approach and take Puga into custody, was a tactically poor decision. Clark Decl. ¶ 12d. | Disputed. State Defendants' tactics met the standard of care and did not contribute to Plaintiffs' injuries. *Meyer Report 22-28, Ex. Y to Esquivel Decl.* |
| 325.   The situation did not call for an urgent response at the time the officers approached Puga. Clark Decl. ¶ 12d. | Disputed. No evidence shows that Kee "urgently" responded to Puga's pursuit and standoff. Both incidents lasted over an hour. Kee engaged in lengthy de-escalation efforts to get Puga to exit the vehicle and submit to an arrest. *See generally Blackwood MVARS Parts 3-4, Ex. F-G to Esquivel Decl.*

Further, the State Defendants' tactics met the standard of care for proper police practices. *Meyer Report 22-28, Ex. Y to Esquivel Decl.* |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 326.   Officers are trained that deadly force is only justified when there is an objectively reasonable belief that the suspect poses an immediate threat of death or serious bodily injury. Clark Decl. ¶ 13. | Disputed to the extent that it misstates the requirements of POST pertaining to the use of deadly force. *Meyer Report 13-14, Ex. Y to Esquivel Decl.* |
| 327.   Officers are trained that subjective fear is insufficient to justify the use of deadly force. Clark Decl. ¶ 13. | Undisputed. |
| 328.   Officers are also trained that an overreaction is excessive force. Clark Decl. ¶ 14. | Undisputed but vague. |
| 329.   Under the facts and circumstances as alleged by Kee at the time he initially shot Puga, Kee violated standard police practices and training when he shot at Puga when he saw Puga drop his right hand from a raised position. Clark Decl. ¶ 15. | Disputed. *Meyer Report 22-28, Ex. Y to Esquivel Decl.* |
| 330.   Kee overreacted when he saw Puga drop his right hand from a raised position. Clark Decl. ¶ 15. | Disputed. *Meyer Report 22-28, Ex. Y to Esquivel Decl.* |
| 331.   The percipient witness' cell phone video, labeled COSB0001459, shows Puga's front side as he exits the car and there appears to be no weapon on or near Puga's waistband. Clark Decl. ¶ 15. | Disputed. State Defendants' police practices expert sees a gun in Puga's waistband as depicted in the Edward Mangerino Video, bates stamped COSB0001459. Meyer Dep. 75:11-14, Ex. Z to Esquivel Suppl. Decl. |
| 332.   Rubalcava, Blackwood, Kee, and Adams violated standard police practices and training when they | Disputed. *Meyer Report 22-28, Ex. Y to Esquivel Decl.* |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| shot at Puga while he was running away. Clark Decl. ¶ 16 | |
| 333.   Puga did not present an immediate threat of death or serious bodily injury as he was running and the officers failed to reassess and overreacted when they fired subsequent volleys when Puga was running. Clark Decl. ¶ 16. | Disputed. *Meyer Report 22-28, Ex. Y to Esquivel Decl.* |
| 334.   Officers are trained that deadly force may only be used in an immediate defense of life situation. Clark Decl. ¶ 16a. | Disputed to the extent that it misstates the requirements of POST pertaining to the use of deadly force. *Meyer Report 13-14, Ex. Y to Esquivel Decl.* |
| 335.   There was no immediate defense of life situation while Puga was running away. Clark Decl. ¶ 16a. | Disputed. *Meyer Report 22-28, Ex. Y to Esquivel Decl.*<br><br>Also disputed because this is not a fact but a legal conclusion. |
| 336.   There were no bullet impacts or casings found near the area of the initial shooting that would support the allegation that Puga fired a weapon at anyone. Clark Decl. ¶ 16a. | Undisputed that bullet impacts or casing from Puga's gun were not located. Disputed that Puga did not fire his gun at anyone. *Annabelle Botten Interview at 02:00-02:50, Ex. L; Mangerino Dep. 35:2-36:17, 50:14-52:5, Ex. S; Goodson Dep. 26:10-27:3, 31:19-32:11, 49:11-22, 53:6-54:6, Ex. T; Adams Dep. 35:12-36:18, Ex. R; Blackwood Dep. 53:14-16, Ex. P.* |
| 337.   Officers are trained that they may use deadly force against a fleeing suspected felon to prevent escape only if the officer has probable cause to believe that the suspect poses a significant threat of | Undisputed. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| death or serious physical injury to the officers or others. Clark Decl. ¶ 16c. | |
| 338.   There is evidence that this was likely a situation of contagious fire. Clark Decl. ¶ 16d. | Disputed. *Meyer Report 22-28, Ex. Y to Esquivel Decl.* |
| 339.   Officers are trained that a warning that deadly force is going to be used should be given when feasible. Clark Decl. ¶ 17. | Undisputed. |
| 340.   Officers had time to provide Mr. Puga with a warning that deadly force was going to be used prior to the shooting. Clark Decl. ¶ 17. | Disputed. *Meyer Report 22-28, Ex. Y to Esquivel Decl.* Rubalcava Dep. 79:6-80:19, Ex. Q to Esquivel Decl.<br><br>Also disputed because this is not a fact but a legal conclusion. |
| 341.   A reasonably trained officer facing the same facts and circumstances as the involved shooting officers would understand that the officers' intentional shooting in the direction of the Bottens' residence would cause a reasonable person in the Botten's position to believe that they were not free to leave their property while the officers were apprehending Mr. Puga in front of the Botten home and that the officers intended to restrain their freedom of movement while attempting to apprehend Puga. Clark Decl. ¶ 18. | Disputed. *Meyer Report 22-28, Ex. Y to Esquivel Decl.*<br><br>Also disputed because this is not a fact but a legal conclusion. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 342.    Officers are trained that a detention is an assertion of authority by a peace officer that would cause a reasonable person to believe they are not free to leave and that such a belief may result from physical restraint, unequivocal verbal commands, or other conduct by an officer. Clark Decl. ¶ 18a. | Undisputed. |
| 343.    A reasonable officer facing the facts and circumstances confronting the involved officers knew or should have known that there were innocent bystanders inside the residential homes surrounding the incident location in the middle of the night. Clark Decl. ¶ 18b. | Disputed. *Meyer Report 22-28, Ex. Y to Esquivel Decl.*<br><br>Also disputed because this is not a fact but a legal conclusion. |
| 344.    A reasonably trained officer facing the same facts and circumstances as the involved officers would understand that the officers' ongoing flashing lights, commands, and deployments of force, would cause a reasonable person residing in the nearby residences to believe that they were not free to leave their residence. Clark Decl. ¶ 18c. | Disputed. *Meyer Report 22-28, Ex. Y to Esquivel Decl.*<br><br>Also disputed because this is not a fact but a legal conclusion. |
| 345.    Rubalcava and Kee violated standard police practices and training when they failed to consider their background prior to utilizing deadly force, resulting in the serious injuries of innocent bystanders | Disputed. *Meyer Report 22-28, Ex. Y to Esquivel Decl.;* Kee Dep. 86:17-87:13, Ex. O; Rubalcava Dep. 45:20-46:7, 51:3-8, Ex. Q. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| Botten, Sr., Dudek-Botten, and J.B. Clark Decl. ¶ 19. | |
| 346.   Police officers are trained to consider their background prior to utilizing deadly force. Clark Decl. ¶ 19. | Undisputed. |
| 347.   Kee and Rubalcava failed to consider their background prior to and when they fired several volleys of shots at Puga. Clark Decl. ¶ 19. | Disputed. *Meyer Report 22-28, Ex. Y to Esquivel Decl.;* Kee Dep. 86:17-87:13, Ex. O; Rubalcava Dep. 45:20-46:7, 51:3-8, Ex. Q. |
| 348.   Kee and Rubalcava's failure to consider their background prior to using deadly force resulted in the serious injuries of Botten, Sr., Dudek-Botten, and J.B., who were inside their home at the time of the shooting. Clark Decl. ¶ 19. | Disputed. *Meyer Report 22-28, Ex. Y to Esquivel Decl.;* Kee Dep. 86:17-87:13, Ex. O; Rubalcava Dep. 45:20-46:7, 51:3-8, Ex. Q. |
| 349.   The officers violated standard police practices and training in failing to request backup to set up a perimeter and evacuate uninvolved individuals from the area in order the ensure the safety of these uninvolved individuals. Clark Decl. ¶ 20. | Disputed. *Meyer Report 22-28, Ex. Y to Esquivel Decl.; Meyer Dep. 72:24-74:5, Ex. Z to Esquivel Suppl. Decl.* |
| 350.   POST Learning Domain 23 advises officers that the safety of uninvolved individuals must be the principal concern to officers who respond to high-risk situations involving barricaded suspects. Clark Decl. ¶ 20a. | Undisputed but object to a version of the POST that was not in effect during the relevant time. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 351.   The officers' failure to follow standard practices and training in responding to high-risk situations involving barricaded suspects by requesting backup, setting up a perimeter, and evacuating all uninvolved individuals from the area contributed to the injuries suffered by the Botten family. Clark Decl. ¶ 20. | Disputed. *Meyer Report 22-28, Ex. Y to Esquivel Decl.; Meyer Dep. 72:24-74:5, Ex. Z to Esquivel Suppl. Decl.* |
| 352.   A reasonably trained officer facing the same circumstances would have requested backup and additional resources in order to deal with a potentially armed, barricaded subject in order to ensure the safety of all uninvolved individuals in the area. Clark Decl. ¶ 20c. | Disputed. *Meyer Report 22-28, Ex. Y to Esquivel Decl.; Meyer Dep. 72:24-74:5, Ex. Z to Esquivel Suppl. Decl.* |

Dated:  March 6, 2025

Respectfully submitted,

ROB BONTA
Attorney General of California
NORMAN D. MORRISON
Supervising Deputy Attorney General


*/s/ Diana Esquivel*

DIANA ESQUIVEL
Deputy Attorney General
*Attorneys for Defendants Blackwood, Kee, and Rubalcava*

SA2023302180
38843994.docx