1  ROB BONTA
   Attorney General of California
2  NORMAN D. MORRISON
   Supervising Deputy Attorney General
3  DIANA ESQUIVEL
   Deputy Attorney General
4  State Bar No. 202954
     1300 I Street, Suite 125
5     P.O. Box 944255
     Sacramento, CA 94244-2550
6    Telephone: (916) 210-7320
     Facsimile: (916) 322-8288
7    E-mail: Diana.Esquivel@doj.ca.gov
   *Attorneys for Defendants Blackwood, Kee, and*
8  *Rubalcava*

9           IN THE UNITED STATES DISTRICT COURT

10          FOR THE CENTRAL DISTRICT OF CALIFORNIA

11                      EASTERN DIVISION

12

13
   **JONATHAN WAYNE BOTTEN,**          No. 5:23-cv-257 KK (SHKx)
14 **SR., et al.,**
                                       **SUPPLEMENTAL**
15                      Plaintiffs,    **DECLARATION OF DIANA**
                                       **ESQUIVEL IN SUPPORT OF**
16         v.                          **REPLY TO STATE**
                                       **DEFENDANTS' MOTION FOR**
17                                     **SUMMARY JUDGMENT**
   **STATE OF CALIFORNIA, et al.,**
18                                     Date:       March 20, 2025
                        Defendants.    Time:       9:30 a.m.
19                                     Courtroom:  3 (3rd Floor)
                                       Judge:      The Honorable Kenly
20                                                 Kiya Kato
                                       Trial Date: July 28, 2025
21                                     Action Filed: February 17, 2023

22

23      I, Diana Esquivel, declare:

24      1. I am admitted to practice law in California and before this Court, and am a

25 Deputy Attorney General with the Office of the Attorney General for the State of

26 California, attorneys of record for Defendants California Highway Patrol (CHP)

27 Officers Michael Blackwood, Isaiah Kee, and Bernardo Rubalcava. (State

28 Defendants).

2.  Exhibit Q are additional excerpts of the relevant portions of the transcript
of Defendant Rubalcava's deposition testimony, taken on November 4, 2024, in this
matter.

3.  Exhibit U are additional excerpts of the relevant portions of the transcript
of Dr. Timonthy Jong's deposition testimony, taken on February 12, 2024, in this
matter.

4.  Exhibit Z are excerpts of the relevant portions of the transcript of State
Defendants' police practices expert, Greg Meyer, whose deposition testimony was
taken on February 12, 2025, in this matter.

5.  Exhibit AA are the relevant portions of Defendant Isaiah Kee's interview
with the San Bernardo County Sheriff's Department, conducted on March 4, 2021.

6.  Exhibit BB are the relevant portions of Defendant Bernardo Rubalcava's
interview with the San Bernardino County Sherriff's Department, conducted on
March 5, 2021.

7.  Exhibit CC is a true copy of Plaintiff Jonathan W. Botten, Sr.'s medical
records from Desert Valley Hospital, Victorville, California. Under Federal Rule of
Civil Procedure 5.2, I redacted the Plaintiff's birthdate and medical number.

8.  Exhibit DD are the relevant pages of Plaintiff Jonathan W. Botten, Sr.'s
Responses to Interrogatories, Set One, dated April 3, 2023.

9.  Exhibit EE are the relevant pages of Plaintiff Jonathan W. Botten, Sr.'s
Responses to Special Interrogatories, Set One, date April 3, 2023.

10.  Exhibit FF is a true copy of Plaintiffs' Second Supplemental Initial
Disclosures, dated December 23, 2024.

11.  Exhibit GG is a true copy of Plaintiffs' Expert Disclosures, dated January
30, 2025.

/ / /

/ / /

/ / /

1    12.  Exhibit HH are excerpts of the relevant portions of the transcript of

2  Betzabeth Gonzalez's deposition testimony, taken on December 30, 2024, in this

3  matter.

4    I declare under penalty of perjury under the laws of the United States and the

5  State of California that the foregoing statements are true and correct.

6

7  Dated:  March 6, 2025                              */s/ Diana Esquivel*
                                                      Diana Esquivel

8

9  SA2023302180
   38847511.docx
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit Q

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

```
 1                  UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3

 4   JONATHAN WAYNE BOTTEN, SR.; TANJA      )
     DUDEK-BOTTEN; ANNABELLE BOTTEN; and    )
 5   J.B., a minor by and through his       )
     guardian JONATHAN WAYNE BOTTEN, SR.,   )
 6                                          )
                    Plaintiffs,             )
 7                                          )
                    vs.                     ) Case No.
 8                                          ) 5:23-CV-00257-JGB-SHK
     STATE OF CALIFORNIA; COUNTY OF SAN     )
 9   BERNARDINO; ISAIAH KEE; MICHAEL        )
     BLACKWOOD; BERNARDO RUBALCAVA; ROBERT  )
10   VACCARI; JAKE ADAMS; and DOES 1-10,    )
     inclusive,                             )
11                                          )
                    Defendants.             )
12   _____)

13

14

15

16         REMOTE VIDEOCONFERENCE DEPOSITION OF

17                 BERNARDO RUBALCAVA

18               MONDAY, NOVEMBER 4, 2024

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  112646
```

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 90

1  located as you knew it at the time you were being
2  interviewed, or at the time of the shooting.
3      A.   At the time I was being interviewed.
4      Q.   At the time of the shooting, were you aware where
5  all the houses were located on the intersection of Peach
6  and -- I don't remember the name of the cross street?
7      A.   No.
8      Q.   At the time that you were approaching Mr. Puga, did
9  you have any intention to shoot him?
10     A.   No.
11     Q.   Did you think that that might be a possibility given
12 the fact that during the briefing you were informed that the
13 suspect was armed?
14     A.   Yes.
15     Q.   Did you see any lights coming from behind Mr. Puga's
16 person as you were approaching him?
17     A.   No.
18     Q.   Anything indicate to you that there were residents
19 or people somewhere in his background?
20     A.   No.
21     Q.   I think that might be all the questions I have.
22          Just give me a minute.
23          You testified earlier that you spoke to one of the
24 bystanders that was shot; is that correct?
25     A.   Yes.

Page 91

1      Q.   Where did that conversation take place?
2      A.   At the intersection -- well, he sat at the rear of
3  the ambulance.
4      Q.   Other than obtaining his names and the injuries
5  sustained by the other individuals, any other conversations
6  that you had with that gentleman?
7      A.   No.
8      Q.   Did he say anything to you other than providing you
9  with the information that you were asking?
10     A.   No.
11     Q.   I think that's all the question I have.
12          Thank you, Officer.
13          MR. GALIPO:  I just have a few follow-up based on
14 those questions.
15               EXAMINATION
16 BY MR. GALIPO:
17     Q.   So am I understanding that the helicopter with the
18 light was there earlier, but not there at the time of the
19 shooting?
20     A.   Yes.
21     Q.   And how long do you think the helicopter was
22 illuminating the area with its spotlight?
23          Half hour?  45 minutes?
24          What would be your estimate?
25     A.   Half hour.

Page 92

1      Q.   And is it your testimony that you didn't know during
2  that time that there were homes around the area?
3      A.   Yes.
4      Q.   You didn't see the helicopter's light illuminating
5  any homes?
6      A.   No.
7      Q.   You're saying you didn't know there were any homes
8  on the corners near where you were?
9      A.   I didn't know.
10     Q.   You indicated there were street lights and lighting
11 such that you could see Mr. Puga running away in the dark?
12     A.   Yes.
13     Q.   But you're saying you were not aware of any homes
14 there?
15     A.   I wasn't aware of any homes in the northeast
16 corner.
17     Q.   How about the other corners?
18     A.   I was aware of the northwest corner.
19     Q.   You could see the home there?
20     A.   Yes.
21     Q.   Are you saying if you knew there was a home in the
22 northeast corner, you wouldn't have shot so many shots?
23     A.   No.
24     Q.   So you would have shot the same number of shots
25 anyway?

Page 93

1      A.   Probably not.
2      Q.   With respect to justifying all your shots, based on
3  your training, there has to be an immediate threat of death
4  or serious bodily injury for each shot; correct?
5      A.   Correct.
6      Q.   And you simply can't shoot someone for running away,
7  true?
8      A.   True.
9      Q.   With respect to your recollection that Mr. Puga
10 fired two shots at you, do you know where these bullets went?
11     A.   Do you know if they struck anything?
12     Q.   Do you know if they struck anything?
13     A.   I believe -- no.
14     Q.   Do you know if they were located anywhere down
15 range?
16     A.   No.
17     Q.   Do you know if you can see these muzzle flash you're
18 referring to in any of the videos from Mr. Puga?
19     A.   No.
20     Q.   Do you know if other deputies saw him actually
21 firing a shot, or it was only you?
22     A.   I don't know.  I didn't speak to the deputies.
23     Q.   Are you saying that if he wouldn't have fired shots
24 at you, you wouldn't have fired at him?
25     A.   No.

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 98

EXAMINATION

BY MS. ESQUIVEL:

Q.   I just want to make sure because I don't think I understood your testimony on some of the questions that Mr. Galipo was asking you.

If you would have still shot Mr. Puga -- so let me just ask.

Would you still have shot Mr. Puga had he not fired his gun at you?

A.   Yes.

Q.   Why would you have still shot at him if he had not fired his gun?

A.   Because he reached for his handgun and pointed it at us, and he's still a threat towards us.

Q.   Is there anything that you're aware of either your trainings or CHP policies or POST training that requires you to wait until a suspect actually pulls a trigger after you see him reach for a gun?

A.   No.

Q.   So you viewed Mr. Puga as a threat when he reached for his weapon or the gun in his waistband; is that correct?

A.   Yes.

MR. GALIPO:  Objection.  Leading.

BY MS. ESQUIVEL:

Page 99

Q.   Let me show you, and this video's just produced on Friday, and it's Plaintiff 0241.

I'm not going to turn on the sound because I can't, but I will -- it's pretty grainy.

(Video playing.)

BY MS. ESQUIVEL:

Q.   I'm going to fast-forward -- well, from this angle, I'm just going to stop it real briefly.

This was -- it looks like a bystander video, and this appears to be from the southwest corner somewhere behind you on the southwest corner; is that your understanding of the view?

A.   Yes.

Q.   And based on what we see here, can you tell who this person is that's -- do you see Mr. Puga with his hands up, and there is a figure right to the right if you're looking at your screen on the right of that?

Do you know who that is?

A.   I believe that's Sergeant Kee.

Q.   Can you see where you're standing?

A.   No.

Q.   I'm going to play it for a little bit, and then you tell me if you can see where -- if at any point it captures you.

(Video playing.)

Page 100

(Video paused.)

BY MS. ESQUIVEL:

Q.   Let me fast-forward it a little bit to see if that will --

(Video playing.)

MS. ESQUIVEL:  I'm going to stop it at 2:53.

(Video paused.)

(Video playing.)

BY MS. ESQUIVEL:

Q.   From here, I'm just going to play it a little bit.

Do you see yourself anywhere?

A.   No.

Q.   So I'll continue to fast-forward.

A.   Yeah, I think so.

Q.   I'm going to stop it at three minutes in.

A.   Behind the driver's side door of the patrol car.

Q.   So we're now at 4 minutes in, and I'm going to stop it right here.  It's going to get grainy again.

There is a figure over here.

Do you know who that is?  I don't know if you can see my mouse, but I'll just describe it.

Mr. Puga's in the middle here on the left-hand side of this frame, and then there is a figure to the left if you're looking at the screen, and then there is a figure to the right of Mr. Puga.

Page 101

Who is on the left?

A.   Sergeant Kee.

Q.   And who is on the right?

A.   I am.

Q.   I'm going to fast-forward again.

(Video playing.)

(Video paused.)

BY MS. ESQUIVEL:

Q.   We're now at 5 minutes and 37 seconds in.

And there is someone walking up.

Do you know who this person is right here?

A.   That's me.

Q.   And is this where you were -- you testified earlier that you were walking to bring yourself, I guess, parallel perpendicular in line with the front bumper of the white SUV?

A.   Yes.

Q.   From this angle other than this light post, the light from the post there, could you see any lights in the background?

A.   No.

Q.   I'll continue playing the video.

(Video playing.)

(Video paused.)

BY MS. ESQUIVEL:

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 102

1    Q.   Do you recall if at this point you still have your
2  weapon drawn?
3    A.   Yes.
4    Q.   It gets a little fuzzy there.
5        Having seen that, does that in way refresh your
6  recollection in terms of whether you saw any lights or
7  anything that would have indicated to you that there were
8  homes on the northeast corner of the intersection?
9    A.   Yes.
10   Q.   And what did it refresh your recollection?
11   A.   It was dark, and I couldn't see that there's a
12  home.
13   Q.   Okay.  I have no further questions.
14              EXAMINATION
15  BY MR. GALIPO:
16   Q.   Okay.  Is it generally your experience that in
17  residential neighborhoods, there is homes at the
18  intersections or corners?
19       MS. ESQUIVEL:  Objection.  Vague; overbroad; lacks
20  foundation; calls for speculation.
21  BY MR. GALIPO:
22   Q.   You may answer.
23   A.   Not in that area.
24   Q.   You saw a home on one corner; correct?
25       So you're saying you thought there was just a home

Page 103

1  on one corner, but not the other?
2        Or you didn't know either way?
3    A.   Didn't know either way.
4    Q.   And just so I'm clear, if he had not pointed a gun
5  at you, are you saying you still would have shot him?
6    A.   Can you repeat the question?
7    Q.   Sure.  If he had not pointed a gun at you -- forget
8  about the shots, shooting the gun -- if he had not pointed a
9  gun at you, are you saying you wouldn't have shot him?
10   A.   No.
11       MS. ESQUIVEL:  Calls for speculation.
12  BY MR. GALIPO:
13   Q.   So you would have shot him even if he didn't point a
14  gun at you; is that what you're saying?
15   A.   If he wouldn't have pointed a gun, I would not have
16  shot him.
17   Q.   And that's based on your training?
18   A.   Yes.
19   Q.   That's all I have.
20       MS. ESQUIVEL:  Any other questions from anyone?
21       MR. GALIPO:  I don't have any other, and I think
22  Shannon has no questions, I think.
23       MS. GUSTAFSON:  Yeah, I don't have any questions.
24       Sorry.  I was having trouble turning my mic on.
25       MS. ESQUIVEL:  Madam Court Reporter, the witness

Page 104

1  will review, but you don't need to send him a transcript.
2  I'll order electronic only, and I'll provide him a copy of my
3  transcript.
4        MS. GUSTAFSON:  I will like a copy of the
5  transcript.
6        MR. GALIPO:  Great.  Off the record.
7        (Deposition proceeding concluded at 1:19 p.m.)
8                      *  *  *

Page 105

1              DECLARATION UNDER PENALTY OF PERJURY

3  Case Name:  Jonathan Wayne Botten, et al. vs. State of
4  California, et al.
5  Date of Deposition:  November 4, 2024
6  Job No.:  112646

8        I, _____, hereby certify
9  under penalty of perjury under the laws of the State of
10  California that the foregoing is true and correct.
11       Executed this _____ day of _____,
12  20____, at _____, California.

18                    _____
                       BERNARDO RUBALCAVA

# Exhibit U

```
 1                UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3

 4   JONATHAN WAYNE BOTTEN, SR.; TANJA      )
     DUDEK-BOTTEN; ANNABELLE BOTTEN; and    )
 5   J.B., a minor by and through his       )
     guardian JONATHAN WAYNE BOTTEN, SR.,   )
 6                                          )
                      Plaintiffs,           )
 7                                          )
                  vs.                       ) Case No.
 8                                          ) 5:22-CV-00949-KK-SHK
     STATE OF CALIFORNIA; COUNTY OF SAN     )
 9   BERNARDINO; ISAIAH KEE; MICHAEL        )
     BLACKWOOD; BERNARDO RUBALCAVA; ROBERT  )
10   VACCARI; JAKE ADAMS; and DOES 1-10,    )
     inclusive,                             )
11                                          )
                      Defendants.           )
12   _____)

13

14

15

16           REMOTE VIDEOCONFERENCE DEPOSITION OF

17                    TIMOTHY JONG, M.D.

18               THURSDAY, JANUARY 2, 2025

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  127502
```

JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Timothy Jong, M.D. on 01/02/2025

Page 22

1    Q.   And one of the reasons that was fatal was because it
2  went through major organs and the internal bleeding?
3    A.   Yes.
4    Q.   I take it with the wound like that, death is not
5  instantaneous; it happens over minutes in part because of the
6  loss of blood?
7    A.   Yes.  There is also the possibility that air could
8  have gotten into the left chest cavity which I previously
9  mentioned which could also compress the lung.
10   Q.   Which could also add to the cause of death?
11   A.   Yes.
12   Q.   And then you have something called Other Injuries on
13  Page 7 of your report towards the bottom.
14       Do you see that section?
15   A.   Yes.
16   Q.   Item one, were you describing something in your
17  opinion that was consistent with the decedent being struck by
18  a Taser dart?
19   A.   Yes.
20   Q.   And where on the body generally was that?
21   A.   That was on the right upper back.
22   Q.   And item two, what were you describing there?
23   A.   I was describing a puncture on the mid right back.
24   Q.   Do you know if that was consistent with a Taser or
25  some other less-lethal ammunition?

Page 23

1    A.   It could be consistent with a Taser or a conductive
2  energy device as we call it.
3    Q.   How about item three, what were you describing
4  there?
5    A.   I was describing another puncture wound.
6    Q.   Item four as well?
7    A.   That's correct.
8    Q.   And three and four were also to the back?
9    A.   That's correct.
10   Q.   Also consistent with Taser wounds?
11   A.   Yes.  It could be consistent with it.
12   Q.   And then you documented numerous abrasions to the
13  body?
14   A.   Yes.
15   Q.   And then going to Page 10, is this where you're kind
16  of doing a synopsis or summary diagnosis of all the injuries?
17   A.   Yes.
18   Q.   And again, without going through all this, this is
19  much of the information we've already been discussing; is
20  that fair?
21   A.   Yes.
22   Q.   Do you recall if you were ever provided with any of
23  the video of the shooting itself?
24   A.   I don't know if I saw video, but my recollection is
25  I did not.

Page 24

1    Q.   Okay.  And then in terms of the clothing, I noticed
2  you have some documentation or diagrams with respect to
3  clothing.
4        Did you have an opportunity to look at some of the
5  decedent's clothing?
6    A.   Yes.
7    Q.   And did you examine the clothing yourself, or did
8  someone else do that, if you recall?
9    A.   I examined the clothing myself.
10   Q.   And were there bullet defects in the clothing that
11  were consistent with at least some of the wounds you saw to
12  the body?
13   A.   Yes.
14   Q.   Okay.  Thank you, Doctor.
15       That's all the question I have.
16       But I think other counsel may have some questions.
17       So let's find out.
18   A.   Sounds good.
19       MS. ESQUIVEL:  Yes.  I do have a couple of
20  questions, Doctor.
21                    EXAMINATION
22  BY MS. ESQUIVEL:
23   Q.   I apologize because I am not as learned as Mr.
24  Galipo is.  So I'm going to be asking some more basic
25  questions looking from more layman terms on some of these.

Page 25

1        As far as -- just going through the -- some wounds
2  that you have identified here starting on Page 3 of your
3  report, the one of the entry wound K to the mid left, other
4  than the lung -- well, first of all, did the bullet -- did
5  the -- did the gunshot -- did the bullet puncture more than
6  one lung?
7    A.   No.
8    Q.   Other than the lung, were there any other major
9  organs that were injured based on the trajectory or the
10  travel track of the bullet?
11   A.   No.
12   Q.   And here you describe the entry point as 17 and
13  one-eighth inches from the top of the head and nine inches
14  left of the posterior midline.
15       Can you tell me generally -- I know size makes a
16  difference, but just on your body can you tell me where that
17  would be, generally, what would be that general area?
18   A.   Clarification: Are you referring to the measurement
19  17 and one-eighth inches from the top of the head?
20   Q.   Right.  Where that would be, or if looking on your
21  diagram, if you can tell me which one it is.
22       Because I'm looking at it, and I don't see a K.
23       I see a number.  So I don't know if that's
24  different.  So whichever one would be easier for you to tell
25  me, just point to me where on the back that entry point is

JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Timothy Jong, M.D. on 01/02/2025

Page 26

1  for the bullet -- the gunshot that you identified as K.
2      A.  So based on my diagram, it's near -- it's on the
3  left back near the arm pit area.
4      Q.  So if looking at the bottom, I don't think yours is,
5  but just for identification purposes for the rest of us, it's
6  Bates stamp ending in 846.
7          And this is your diagram at the top.  It just has
8  San Bernardino Sheriff/Coroner, and at the bottom it says
9  male, anterior/posterior.
10         It -- maybe using that, can you tell me where that
11 entry point is for the gunshot identified as K?
12     A.  Sure.
13         MR. GALIPO:  Diana, it might help you.
14         Do you have Bates stamp 848?
15         Because he actually has it written in.
16         MS. ESQUIVEL:  Okay.  So let me just enlarge.
17         Give me a minute.
18 BY MS. ESQUIVEL:
19     Q.  So I see now, we're looking at 848 which I don't
20 know what page that would be on your report, Doctor, but are
21 you looking at the same diagram we are now instead of
22 numbers --
23         MR. GALIPO:  I'm holding it up just so the doctor
24 can see which diagram I'm referring to.
25         THE WITNESS:  Yes.

Page 27

1          MR. GALIPO:  Yes.
2  BY MS. ESQUIVEL:
3      Q.  Okay.  So I see one that says "GSWK."
4          Is that what you're referring to on Page 3 as the K
5  entry, gunshot wound K?
6      A.  That's correct.
7      Q.  And that's up by the arm -- behind the arm pit
8  area?
9      A.  Yes.
10     Q.  Okay.  Based on your observation on the size or
11 trajectory, all the information that was available to you,
12 could you make any kind of determination as to the distance
13 that the gun was from the time from where the gun was shot to
14 that -- this bullet to where it struck Mr. Puga?
15     A.  So the distance is indeterminate.
16     Q.  And Mr. Galipo was asking you earlier whether the
17 trajectory that you noted of the bullet, the direction that
18 it traveled, would it be consistent with Mr. Puga bending
19 over, and you said it's possible.
20         Is that correct?
21     A.  Yes, it's possible.
22     Q.  Would -- could you, again, based on all the
23 information available to you that you saw, could you make any
24 kind of determination as to the angle that Mr. Puga was bent
25 over, meaning, whether he was bent at 90 degree at the waist,

Page 28

1  45 degree bend at the waist?
2      A.  No.  I can only answer in hypotheticals.
3      Q.  Okay.  Can you rule -- given that it was going
4  left-to-right in an upward trajectory, could you tell whether
5  Mr. Puga at the time that he was shot at entry K, whether his
6  back was directly to the shooter, or if it was at an angle,
7  meaning, the left side was to the shooter?
8      A.  So just for clarification, you're asking if he was
9  completely faced straight on, or at an angle?
10     Q.  Correct.  Based on all the information you have, can
11 you rule out that Mr. Puga's back was directionally towards
12 the shooter?
13     A.  The possibility does exist, that he could have been
14 straight back or at an angle.
15     Q.  So it could have been both either his left -- the
16 left side facing the shooter, or his entire back facing the
17 shooter?
18     A.  Yes.
19     Q.  Is there any information that you would need to rule
20 out that Mr. Puga's back was directly facing the shooter?
21     A.  If there was a clear video, then it might clarify
22 things.
23     Q.  And I don't know if, again, not being familiar with
24 the entire forensic autopsy procedure, is there any way to
25 tell either by the level of coagulation or I don't know if

Page 29

1  there is something else in the tissue that would indicate
2  whether this was -- a K was a first gunshot or a last
3  gunshot?
4      A.  So that depends, and to explain that, I would say
5  that if it all occurred and the person's bleeding, generally
6  speaking, if the person's heart is still beating, there will
7  be hemorrhage throughout the wound track.
8          In some cases, and it's not covering 100 percent,
9  in some cases if a person is shot after death, there will be
10 no hemorrhage in the wound track.
11     Q.  And here it says you noted that there was hemorrhage
12 throughout the track.
13         You're able to conclude that he was alive when he
14 sustained gunshot K?
15     A.  That's the most likely explanation, yes.
16     Q.  And you indicated earlier that death would not have
17 been instantaneous because of the amount of blood loss
18 required and the hemorrhaging throughout the track; is that
19 correct?
20     A.  Yes.
21     Q.  Do you know if this type of gunshot wound would have
22 immediately immobilized Mr. Puga?
23     A.  I would say that based on his prior physical
24 examination of him, it would most likely not have immediately
25 incapacitated him or caused death if that's what you're

JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Timothy Jong, M.D. on 01/02/2025

**Page 34**

1  facing the officer -- the shooter directly, could the path
2  become upward just based on the material and tissue that the
3  bullet struck upon entry?
4         MR. GALIPO:  Objection.  Incomplete hypothetical.
5         THE WITNESS:  So would you be able to reword that,
6  please.
7  BY MS. ESQUIVEL:
8     Q.   I'm sorry.  Your sound muffled a little bit.
9     A.   Oh, would you be able to reword that question,
10  please.
11    Q.   Sure.  Can you make any kind of determination as to
12  whether the officer or who the shooter or shooters that
13  struck -- who shot the bullets that struck from A to E on
14  your report  -- strike that.  That's a bad question.
15         Let me see if I could phrase it a little better
16  without going through each one.
17         Can you -- that Mr. Puga was not facing the shooter
18  or shooters that -- for gunshots A through E did not shoot
19  directly at him as he was facing the shooter or shooters, and
20  that the upward trajectory was caused by the tissue or other
21  material that the bullet might have struck as it entered the
22  body or the leg in this case?
23         MR. GALIPO:  Objection.  Vague and ambiguous as
24  phrased.
25         THE WITNESS:  So to clarify, you're asking if it

**Page 35**

1  could have ricocheted within the body and it changed the
2  trajectory?
3  BY MS. ESQUIVEL:
4     Q.   Correct.  Causing the upward trajectory that you
5  observed during your autopsy.
6         MR. GALIPO:  Objection.  Incomplete hypothetical.
7         THE WITNESS:  Based on my description of the wounds,
8  it seems that does not seem like a possibility.
9  BY MS. ESQUIVEL:
10    Q.   Okay.  Is it possible that Mr. Puga had raised his
11  leg when he sustained gunshots A through E that resulted in
12  the upward trajectory that you observed during your
13  autopsy?
14    A.   Yes, that's a possibility.
15    Q.   I'm sorry.  I think that might be all the questions
16  I have.  I'm just taking a quick look at my notes.
17         Okay.  I have no further questions.
18         Thank you, Doctor.
19    A.   Thank you.
20         MR. GALIPO:  Amy, do you have any questions today?
21         MS. MARGOLIES:  I do.  I have a few just to make sure
22  that I'm also understanding what we've heard.  I probably
23  understand forensic science the least of our group.
24                    EXAMINATION
25  BY MS. MARGOLIES:

**Page 36**

1     Q.   Let's start with -- it's going to be the fifth
2  gunshot wound listed on your report.
3         So the anterior left thigh, COSB E3E.
4         I think you already confirmed that this was a
5  non-fatal wound; is that right?
6     A.   Yes.
7     Q.   And anterior essentially means the front; would that
8  be accurate?
9     A.   Yes.
10    Q.   And so that this wound is to the front of Mr. Puga's
11  left thigh?
12    A.   Yes.
13    Q.   And it traveled front-to-back?
14    A.   Yes.
15    Q.   And projectile was recovered?
16    A.   Yes.
17    Q.   And Doctor, I'm going to ask you to assume for a
18  moment here since I know you weren't on the scene.
19         Assume that Hector Puga was found lying faced-down
20  on the ground.
21         Okay?
22    A.   Sure.
23    Q.   Would you agree that to a reasonable degree of
24  medical probability Puga was not in this face-down position
25  when he sustained the fifth gunshot wound that we discussed,

**Page 37**

1  and I believed you've identified as H, the front anterior
2  left thigh?
3         MR. GALIPO:  I'll object.
4         It's an incomplete hypothetical.
5         THE WITNESS:  Yes, that's likely.
6  BY MS. MARGOLIES:
7     Q.   Was there something you wanted to add?
8     A.   No.
9     Q.   Okay.  Would you further agree that it had to be in
10  some other position than lying faced-down on the ground to
11  sustain the anterior left thigh gunshot wound?
12    A.   Sorry.  Can you repeat the question.
13    Q.   Sure.  Would you further agree then that Hector Puga
14  had to be in some other position other than lying faced-down
15  on the ground when he sustained the gunshot wound to the
16  anterior left thigh?
17         MR. GALIPO:  I'll object as an incomplete
18  hypothetical.  Again, depends on the position and angle of
19  the shooter.
20         THE WITNESS:  Yes, that's a possibility.
21  BY MS. MARGOLIES:
22    Q.   To confirm, Hector Puga would have to be in some
23  position other than lying faced-down to sustain the anterior
24  left thigh gunshot wound?
25    A.   Yes.

JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Timothy Jong, M.D. on 01/02/2025

Page 46

1  indicated in the questioning, many of the shots to the back,
2  the buttocks, et cetera, have a back-to-front trajectory;
3  correct?
4      A.   Yes.
5      Q.   And there were a few with an upward trajectory with
   the body in an anatomical position that counsel pointed out.
6      Do you recall that?
7
8      A.   Yes.
9      Q.   And I think a couple that you pointed out was wound
10 H was with the anterior left thigh, and then C which was the
11 right lower leg number one, D was the right lower leg number
12 two, and F was the right foot.
13     Do you generally recall that?
14     A.   Yes.
15     Q.   Would those upward trajectories to the thigh, lower
16 right leg, and toe at least be consistent in your mind with
17 Mr. Puga going down to the ground having the front of his
18 legs exposed to the shooters and hitting his lower legs and
19 traveling upward?
20     MS. ESQUIVEL:  Objection.  Incomplete and improper
21 hypothetical.
22     Go ahead.
23     THE WITNESS:  So to clarify, you're saying that Mr.
24 Puga is face-down on the ground with one of his legs up?
25 BY MR. GALIPO:

Page 47

1      Q.   No.  Not faced-down, just down on the ground, even
2  on his back or side with his legs out in front of him.
3      A.   That possibility does exist, yes.
4      Q.   And I think you answered the question before, but
5  you wouldn't expect the bullet to hit someone in the ankle
6  and travel straight up the leg if someone was standing
7  upright, would you?
8      MS. ESQUIVEL:  Same objection.
9  BY MR. GALIPO:
10     Q.   So if the shooter and the decedent were on the same
11 ground plane both standing up, and the shooters were shooting
12 from chest level, you wouldn't expect the bullet to hit him
13 in the ankle and travel up his leg, would you?
14     A.   Highly unlikely.  That's very highly unlikely.
15     Q.   And in terms of a ricochet, sometimes you describe
16 in your reports bullets hitting intermediary objects
17 potentially?
18     A.   That's correct.
19     Q.   And when a bullet hits a intermediary object, you
20 sometimes see an irregular entry wound; is that fair?
21     A.   Yes, you can.
22     Q.   And then you note that in your report when you see
23 that?
24     A.   Yes.
25     Q.   Did you indicate anywhere in your report that you

Page 48

1  thought these bullets hit intermediary objects or ricochet?
2      A.   I did not.
3      Q.   Okay.  Thank you.
4      That's all that I have.
5      MS. ESQUIVEL:  I'm sorry, Doctor.
6      I just have a few follow-ups.
7                        EXAMINATION
8  BY MS. ESQUIVEL:
9      Q.   Did you order the toxicology report on Mr. Puga?
10     A.   Yes.
11     Q.   Is that something that you normally do in the course
12 of your work as a forensic pathologist?
13     A.   Do you rely on the results of the toxicology report
14     Q.   Do you rely on the results of the toxicology report
15 to make your final determination as to cause of death?
16     MR. GALIPO:  Vague and ambiguous; incomplete
17 hypothetical.
18     You mean in this case?
19     MS. ESQUIVEL:  I'm just asking him in general.
20 BY MS. ESQUIVEL:
21     Q.   Do you rely on toxicology reports to make a
22 determination as to cause of death?
23     MR. GALIPO:  Vague and ambiguous; incomplete
24 hypothetical.
25     THE WITNESS:  Yes.

Page 49

1  BY MS. ESQUIVEL:
2      Q.   Do you rely on toxicology reports to rule out a
3  cause of death?
4      A.   I would have to -- it depends, but yes.
5      Q.   Now, what was the purpose of ordering the toxicology
6  report in this case of Mr. Puga's blood?
7      A.   So toxicology is something I generally order on
8  pretty much all my cases.
9      So it's part of my protocol and procedure.
10     Q.   Would it be fair to say that it was also to rule out
11 the possibility that he died related to any kind of intake,
12 whether it would be alcohol or drugs?
13     A.   In this case no because there is obvious cause of
14 death.
15     Q.   And Mr. Galipo asked you about whether there is
16 intermediary -- well, something changes a trajectory of a
17 bullet causing an irregular wound.
18     Based on your observations during Mr. Puga's
19 autopsy, is there any way that you were able to tell whether
20 there was -- I'm sorry, strike that.
21     Based on your observations that you saw, can you
22 rule out that -- that the bullets that struck Mr. Puga did
23 not ricochet off the ground or other object?
24     A.   I would probably have to look at each gunshot wound
25 picture, but to answer your question, based on what I

JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Timothy Jong, M.D. on 01/02/2025

**Page 50**

1  remember of the wounds, I can't say whether something
2  ricocheted or not.
3      Q.  Thank you, Doctor.  No further questions.
4          MS. MARGOLIES:  I just have a couple follow-ups.
5                  EXAMINATION
6  BY MS. MARGOLIES:
7      Q.  Doctor, earlier Plaintiff's counsel asked you if
8  certain bullet entries were consistent with Mr. Puga either
9  leaning forward or falling down.
10         Do you remember some of those questions?
11     A.  Vaguely.  Yes.
12     Q.  And I believe your answers were generally something
13 to the effect of that's a possibility or this is a
14 possibility; is that right?
15     A.  Yes.
16     Q.  Earlier you also testified that there were very many
17 scenarios that could have occurred; is that right?
18     A.  Yes.
19     Q.  And do you say that because you don't know for
20 certain what scenario actually occurred as to each bullet
21 entry wound?
22         MR. GALIPO:  Objection.  Vague as phrased.
23         THE WITNESS:  Yes.
24 BY MS. MARGOLIES:
25     Q.  You are able to testify because you have written

**Page 51**

1  your report on the way or the direction, rather, that a
2  bullet traveled once in Mr. Puga's body.
3          Would that be accurate?
4      A.  Yes.
5      Q.  But you're not a ballistics expert; right?
6      A.  That's correct.
7      Q.  And you are not able to say as you sit here today
8  what position an officer or even Mr. Puga was in at the time
9  of each bullet entry; is that right?
10         MR. GALIPO:  Objection.  Vague and ambiguous as
11 phrased; depending on the hypothetical question posed.
12         THE WITNESS:  Yes, that's correct.
13 BY MS. MARGOLIES:
14     Q.  For example, you don't know whether or not Mr. Puga
15 was a lethal threat to officers at the time he sustained
16 these bullet entry wounds; right?
17     A.  That's correct.
18     Q.  You can't rule out if Mr. Puga was pointing a gun at
19 officers when he sustained these bullet entry wounds;
20 right?
21     A.  That's correct.
22     Q.  I don't have any another questions.
23         Thank you.
24         MR. GALIPO:  It sounds like what you're saying,
25 Doctor, is based on the trajectory of the bullets within the

**Page 52**

1  body, if you're given hypothetical questions, specific
2  hypotheticals, you may be able to say whether or not the
3  trajectory is consistent or inconsistent with that
4  hypothetical; is that what you're generally saying?
5          THE WITNESS:  Yes.
6          MR. GALIPO:  Any other questions from Diana or Amy?
7          MS. ESQUIVEL:  No further questions.
8          Thank you, Doctor, for your time.
9          MS. MARGOLIES:  No further questions.
10         MR. GALIPO:  Yes.  Thank you, Doctor, for your time.
11         Let's go off the record.
12         (Deposition proceeding concluded at 3:34 p.m.)
13                     * * *
14
15
16
17
18
19
20
21
22
23
24
25

**Page 53**

1              DECLARATION UNDER PENALTY OF PERJURY
2
3  Case Name:  Jonathan Wayne Botten, et al. vs. State of
4  California, et al.
5  Date of Deposition:  January 2, 2025
6  Job No.:  127502
7
8          I, _____, hereby certify
9  under penalty of perjury under the laws of the State of
10 California that the foregoing is true and correct.
11         Executed this _____ day of _____,
12 20____, at _____, California.
13
14
15
16
17
18                     _____
                            TIMOTHY JONG
19
20
21
22
23
24
25

# Exhibit Z

**JONATHAN WAYNE BOTTEN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Greg Meyer on 02/12/2025**

```
 1                   UNITED STATES DISTRICT COURT

 2                   CENTRAL DISTRICT OF CALIFORNIA

 3                          --oOo--

 4   JONATHAN WAYNE BOTTEN, SR.;
     TANJA DUDEK-BOTTEN;
 5   ANNABELLE BOTTEN; and J.B., a
     minor by and through his guardian
 6   JONATHAN WAYNE BOTTEN,

 7           Plaintiffs,

 8   vs.                      Case No.  5:23-cv-00257-JGB-SHK

 9   STATE OF CALIFORNIA;
     COUNTY OF SAN BERNARDINO;
10   ISAIAH KEE; MICHAEL BLACWOOD;
     BERNARDO RUBALCAVA;
11   ROBERT VACCARI; JAKE ADAMS;
     and DOES 1-10 inclusive,

12
             Defendants.
13   _____/

14

15          STENOGRAPHIC REPORTER'S TRANSCRIPT OF

16               DEPOSITION OF GREG MEYER

17              WEDNESDAY, FEBRUARY 12, 2025

18

19

20

21   Reported Stenographically by:

22   KIMBERLY D'URSO, CSR 11372, RPR

23   Job No.  00135667

24

25
```

JONATHAN WAYNE BOTTEN, ET AL. vs STATE OF CALIFORNIA, ET AL.
Greg Meyer on 02/12/2025

Page 4

```
 1                         --oOo--

 2             BE IT REMEMBERED, that set on Wednesday, the

 3  12th day of February, 2025, commencing at the hour of

 4  10:04 a.m., thereof, GREG MEYER appeared remotely in

 5  Glendale, California, before me, Kimberly E. D'Urso, an

 6  RPR and Certified Shorthand Reporter of the State of

 7  California, the following deposition was stenographically

 8  reported by me:

 9             (Whereby the Certified Shorthand Reporter

10              introduced herself on the record and

11              administered the oath to the deponent.)

12

13                       EXAMINATION

14  BY MR. GALIPO:

15      Q.   Can you please state your name?

16      A.   My name is Greg Meyer.

17      Q.   How long have you been serving as an expert

18  witness in the field of police practices?

19      A.   A little over 35 years.

20           THE WITNESS:  Give me a moment, please, to

21  adjust my volume.  I think in the heat of battle I made

22  it much too loud on my end.

23           MR. GALIPO:  Okay.

24           THE WITNESS:  Okay.  There we go.

25           MR. GALIPO:  Are you able to hear me okay so
```

**JONATHAN WAYNE BOTTEN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Greg Meyer on 02/12/2025**

Page 72

1  it was very, very hard to see him while he's falling to

2  the ground, and you'd have to ask the officers what they

3  perceived after he was on the ground, when and why did

4  they stop shooting at that point -- or why did they

5  continue to shoot him and why did they decided to stop

6  shooting.

7           So these things become very complex, especially

8  when there's this type of scenario where they have --

9  they start out with an immediate defense of life

10  shooting, and within split seconds, it transfers to a

11  fleeing felon shooting.

12          But the answer, with respect to the

13  re-assessment is, you're kind of reassessing all the

14  time.  We're, generally, looking at rapid fire here.

15  It's -- it's humanly impossible to re-assess bullet by

16  bullet, in -- in a rapid-fire situation, which I believe

17  Mr. Galipo's expert is flat wrong about.

18          But at some point during the shooting, the

19  officers, when they perceived that the threat is

20  diminished, that's when they're supposed to stop

21  shooting.

22          Sorry about that long sentence, again.

23  BY MS. ESQUIVEL:

24      Q.   And another question that you were asked by

25   Mr. Galipo was whether the officers had evacuated the

JONATHAN WAYNE BOTTEN, ET AL. vs STATE OF CALIFORNIA, ET AL.
Greg Meyer on 02/12/2025

Page 73

1  homes during the -- I want to call it the standoff,

2  while Mr. Puga was inside the vehicle.  And then,

3  obviously, once he stepped out and then moved to the

4  front of the car, where several more minutes went by.

5  Is there anything in the CHP policy or POST that

6  requires officers in a standoff situation to evacuate

7  residents if the incident occurs in a residential area?

8      A.   No.  And that becomes a judgment call.  If it

9  becomes a SWAT situation, then it's part and parcel of a

10 SWAT situation to secure the surrounding area, perhaps

11 perform some evacuations, if there's time, and if

12 there's resources to do so.

13        In this case, it's evident to me that during

14 this standoff situation, that minute by minute, the

15 officers are attempting to de-escalate this thing

16 through all of the verbal and even nonlethal weapons

17 usage -- which is part of de-escalation in a case like

18 this -- to end it, like, this minute.  But it keeps

19 going on, and it keeps going on, and it keeps going on

20 in this case.  That's point one.

21        Point two is, let's assume somebody decided at

22 that scene:  Okay, we're going to have ti get a whole

23 lot more officers and deputies here and -- and secure

24 the neighborhood and evacuate some of the houses, the

25 practical question becomes:  Where do you get those

JONATHAN WAYNE BOTTEN, ET AL. vs STATE OF CALIFORNIA, ET AL.
Greg Meyer on 02/12/2025

Page 74

1   people?

2          This is a graveyard shift.  There's not that

3   many officers and deputies out there.  Even if you

4   wanted to, as a practical matter, it's not going to

5   happen.  You don't have the resources.

6      **Q.   And I know you were not asked to opine as to**

7   **the reasonableness of the deputies' use of force,**

8   **specifically, Sergeant Vaccari's use of the pepper**

9   **balls.  But I have a question, just in terms of the**

10  **failure to intervene.**

11         **Was -- did you see any evidence that would have**

12  **indicated to either -- to any of the CHP officers that**

13  **Sergeant Vaccari's use of the pepper balls was excessive**

14  **or unreasonable, such that they should have intervened**

15  **in his use of the pepper ball?**

16     A.   No, not at all.  In fact, Sergeant Kee,

17  himself, attempted -- I think it was -- he shot four

18  beanbag projectiles at the rear windshield, trying to

19  break it.  That didn't work.  And it was some time after

20  that -- I don't remember the timing -- that Sergeant

21  Vaccari used pepper balls, and some of the pepper balls

22  were glass breakers, apparently to do -- to accomplish

23  the -- the same thing.

24         In both cases, what they're doing is they're

25  encouraging Mr. Puga to, you know, submit -- I mean, get

JONATHAN WAYNE BOTTEN, ET AL. vs STATE OF CALIFORNIA, ET AL.
Greg Meyer on 02/12/2025

Page 75

1  out of the car and submit to arrest.  I don't find that

2  there's excessive force in play at all in that situation.

3       **Q.   And is it possible for you to give us a brief**

4  **summary of any disputes or disagreements you have with**

5  **Mr. Clark's opinions that he offered in his report?  And**

6  **this is Roger Clark, the plaintiff's expert.**

7       A.   Yes, I can do that, if you give me a minute.

8  If I may look at my notes?

9       **Q.   Yes, please.**

10           (Pause.)

11           THE WITNESS:  In Mr. Clark's -- page 11, at the

12  bottom of his first paragraph, he -- he -- he says

13  there's -- in the video, it's video COSB 1459, he says he

14  doesn't see the handgun in the waistband.  I do.

15           In page 13, paragraph 1 of his report, where

16  he's listing a number of witnesses talking about not

17  seeing Puga being armed and all that, he -- he more or

18  less, conveniently, I guess, leaves out the fact that

19  witness Annabelle Botten, said that she saw Puga with a

20  gun and that he shot at the officers, which is detailed

21  in my report, both my reports.

22           On page 14, in the first paragraph, apparently,

23  Mr. Clark says he does not see Puga running away with the

24  gun in his hand.  But my viewing of the videos, he --

25  clearly shows him running with the gun in his hand, on

**JONATHAN WAYNE BOTTEN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Greg Meyer on 02/12/2025**

Page 76

1  multiple occasions.  Also documented in my report.

2          His opinion 2, which is on page 15 of his

3  report, again, dealing with video COSB 1459 -- and I have

4  to interrupt and actually look at his report in order to

5  understand my own note, if I may have a moment.

6          (Pause.)

7          THE WITNESS:  Let's see.  Page -- I'm almost

8  there.  This is almost a repeat of a note I had earlier.

9          But in his opinion number 2, which appears on

10  the 15th PDF page of the expert disclosure, and probably

11  eight lines down he refers to the cell phone video COSB

12  1459.  And Mr. Clark writes that:  "It shows Mr. Puga's

13  front side as he exits the car, and there appears to be

14  no weapon on or near Mr. Puga's waistband."

15          I disagree.  I see the butt of a handgun on his

16  waistband, on the right side of his waistband there.

17          Also, on page 15, opinion number 3, the third

18  line -- well, the whole opinion, he says he violated

19  police practices and training when they shot at Puga

20  while he was running away.  He said:  "It's my opinion

21  that even if Mr. Puga had initially presented a threat

22  when the officers first opened fire" -- thank you for

23  that -- "Mr. Puga did not present an immediate threat of

24  death or serious bodily injury while he was running

25  away."

**JONATHAN WAYNE BOTTEN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Greg Meyer on 02/12/2025**

```
 1  STATE OF CALIFORNIA)
                       ) ss:
 2  COUNTY OF ALAMEDA  )

 3
            I, KIMBERLY E. D'URSO, do hereby certify:
 4

 5          That the witness named in the foregoing

 6  deposition was present remotely and duly sworn to testify

 7  to the truth in the within-entitled action on the day and

 8  date and at the time and place therein specified;

 9          That the testimony of said witness was reported

10  by me in shorthand and was thereafter transcribed through

11  computer-aided transcription;

12          That the foregoing constitutes a full, true and

13  correct transcript of said deposition and of the

14  proceedings which took place;

15          Further, that if the foregoing pertains to the

16  original transcript of a deposition in a federal case,

17  before completion of the proceedings, review of the

18  transcript [x] was [ ] was not requested.

19          That I am a certified stenographic reporter and

20  a disinterested person to the said action;

21          IN WITNESS WHEREOF, I have hereunder subscribed

22  my hand this 25th day of February, 2025.

23  _____

24  KIMBERLY D'URSO, CSR NO. 11372, RPR

25
```

# Exhibit AA

DR 192101044  H# 024-2021
Typed By: Dawn
Reviewed By / Date:  Detective S. Abernathy / 03-04-21

| | | |
|---|---|---|
| 1 | | |
| 2 | KEE: | Oh, I'd say about, I'm about, about 20 about 25 feet, yeah about 25. |
| 3 | | |
| 4 | ABERNATHY: | So, you are directly between the patrol car and that light pole or |
| 5 | | somewhere around that area? |
| 6 | | |
| 7 | KEE: | Ex, exactly.  Um, exactly between um it's probably like a 45-degree |
| 8 | | angle um from the patrol car, but yes, it is, it is between that, that light |
| 9 | | pole. |
| 10 | | |
| 11 | ABERNATHY: | Okay. |
| 12 | | |
| 13 | KEE: | Well, I was between the light pole and the car. |
| 14 | | |
| 15 | ABERNATHY: | Did you ever see anybody else around the area besides the law |
| 16 | | enforcement officers and the suspect and the passenger? |
| 17 | | |
| 18 | KEE: | No, Sir. |
| 19 | | |
| 20 | ABERNATHY: | Okay.  Do you remember what was behind the suspect when you fired |
| 21 | | during both volleys? |
| 22 | | |
| 23 | KEE: | Um, when, when I was approaching him only thing I saw was just a |
| 24 | | street, which is Catalpa, I just remember seeing the, the backdrop being |
| 25 | | the street, and of course I could see you know residences on both sides |
| 26 | | but pretty much it's like I had an alley way to shoot now when I um fired |
| 27 | | the first time. |
| 28 | | |

50

COSB000700

DR 192101044  H# 024-2021
Typed By: Dawn
Reviewed By / Date:  Detective S. Abernathy / 03-04-21

| | | |
|---|---|---|
| 1 | | |
| 2 | ABERNATHY: | Okay. |
| 3 | | |
| 4 | KEE: | And um and then you said the second one, um so the second one, it |
| 5 | | was the same thing. Um it was like just shooting up, shooting up in the |
| 6 | | alley way cause there was nothing behind, where in front of him |
| 7 | | because he is running north. |
| 8 | | |
| 9 | ABERNATHY: | Okay.  I know you said you, you remembered firing about 12 rounds is |
| 10 | | that right? |
| 11 | | |
| 12 | KEE: | A total, yes. |
| 13 | | |
| 14 | ABERNATHY: | Okay.  And how many of those were during the first volley and then how |
| 15 | | many during the second? |
| 16 | | |
| 17 | KEE: | So, it was probably like about five or six, 5 about five or six on the first |
| 18 | | one and then probably about another five or six on the second. |
| 19 | | |
| 20 | ABERNATHY: | Okay.  Um and can you describe the cadence of both of the volleys, the |
| 21 | | fire? |
| 22 | | |
| 23 | KEE: | Yeah, the first one it, it was, it was rapid, I mean you know boom, |
| 24 | | boom, boom, boom, boom.  And then I, I ran back then I got in a prone |
| 25 | | position but that one was more calm, because there was dust and then |
| 26 | | as soon as it settled I could see the gun, I saw him, he is still running |
| 27 | | and then I just took, then it was like boom, boom, boom.  You know it |
| 28 | | |

51

COSB000701

# Exhibit BB

R 192101044
H# 2021-024
Typed By: Terry
Reviewed By / Date:  Detective Edward Hernandez G4629 / March 5, 2021

1    RUBALCAVA:        Correct.

2

3    WEAVER:           …shoot backwards while running forwards?

4

5    RUBALCAVA:        Correct.

6

7    WEAVER:           So, did you think the suspect was still firing at you?

8

9    RUBALCAVA:        It's a possibility, yes.

10

11   WEAVER:           Did that make you feel unsafe?

12

13   RUBALCAVA:        Yes.

14

15   WEAVER:           And were you in fear for your life then?

16

17   RUBALCAVA:        Yes.

18

19   WEAVER:           So, is that why you might have discharged your gun?

20

21   RUBALCAVA:        Yes.

22

23   HERNANDEZ:        Okay. Did you see any muzzle flashes at that point…

24

25   RUBALCAVA:        No.

26

27                                          55

28

COSB000454

R 192101044
H# 2021-024
Typed By: Terry
Reviewed By / Date:  Detective Edward Hernandez G4629 / March 5, 2021

| | | |
|---|---|---|
| 1 | HERNANDEZ: | …coming from the….? Okay.  Did you have a clear view when you shot |
| 2 | | your second volley? |
| 3 | | |
| 4 | RUBALCAVA: | Yes. |
| 5 | | |
| 6 | HERNANDEZ: | Okay. Could you describe your backdrop at the time of your uh, well |
| 7 | | let's go back to the first volley, can you describe your backdrop, what |
| 8 | | was behind the suspect? |
| 9 | | |
| 10 | RUBALCAVA: | I didn't see anything because it was dark. |
| 11 | | |
| 12 | HERNANDEZ: | Okay. Uh, no lighting in the distance, anything like that? |
| 13 | | |
| 14 | RUBALCAVA: | No. |
| 15 | | |
| 16 | HERNANDEZ: | Okay. Could you describe your backdrop during your second volley? |
| 17 | | |
| 18 | RUBALCAVA: | Um, just the Peach, Peach um Peach and the dirt shoulder. |
| 19 | | |
| 20 | HERNANDEZ: | Okay. And how many rounds did you fire in your second volley? |
| 21 | | |
| 22 | RUBALCAVA: | Um, at least three, three to five. |
| 23 | | |
| 24 | HERNANDEZ: | Three to five. Uh can you recall what shooting platform you had at that |
| 25 | | point? |
| 26 | | |
| 27 | | |
| 28 | | |

56

COSB000455

# Exhibit CC

EMERGENCY DEPT REPORT Name: BOTTEN SR,JONATHAN   Acct: V00001808857

Desert Valley Hospital
16850 Bear Valley Road, Victorville, Ca 92395
Ph:760-241-8000

Emergency Room
PDOC:0217-0010
Signed

Patient: BOTTEN SR,JONATHAN          Acct:▮            Unit:M000108329
DOB: ▮              Loc:ER
Age/Sex: 40/M                        Service Date:02/17/21

## SCRIBE
### Scribe Authentication:
I Russell Carrillo , certified that the note below was transcribed by me on 2/17/21 at 05:01 HR for Provider: Dr.
Leonard

## Mult. trauma (HPI)
### HPI Comments
40-year-old male came to ER via EMS due to gunshot wound.  Per EMS, patient along with his wife and daughter
was caught in a crossfire between police and suspected criminals. Family sustained gunshot wounds, with the wife
and daughter being airlifted to Arrowhead Medical Center, and the husband sustained gunshot wounds on the right
elbow and left wrist.  No other injuries noted at this time care.  Blood pressure on scene was 154/90 mmHg
**Chief Complaint:** Gun Shot Wound
**Time Seen by MD:** 05:04
**Primary Care Provider:** UNKNOWN
**Reviewed notes:** Nurses Notes, Medications, Allergies
**Allergies:**
**Coded Allergies:**
    Charcoal (Unverified  Allergy, Unknown, 5/26/15)
    Penicillins (Unverified  Allergy, Unknown, 5/26/15)
**Information Source:** Patient, Emergency Med Personnel
**Mode of Arrival:** EMS
**Severity:** Moderate
**Timing:** Minutes
**Duration:** Since onset
**Prehospital treatment:** Other (Bandages)
**Location:** (R) Elbow, (L) Wrist
**Location of laceration:** Extremities
**Mechanism:** Gunshot

### Past Medical History
**PAST MEDICAL HISTORY:** Denies
**Surgical History:** Denies all surgeries

### Family History
**Family History:** Reviewed,noncontributory to illness

### Social History
**Smoker:** Non-Smoker
**Alcohol:** Denies ETOH Use
**Drugs:** Denies Drug Use
**Lives In:** Home

**Constitutional:** denies: chills, diaphoresis, fatigue, fever, malaise, sweats, weakness, others
**EENTM:** denies: blurred vision, double vision, ear bleeding, ear discharge, ear drainage, ear pain, ear ringing, eye

EMERGENCY DEPT REPORT Name: BOTTEN SR,JONATHAN Acct: ▮▮▮▮▮▮

pain, eye redness, hearing loss, mouth pain, mouth swelling, nasal discharge, nose bleeding, nose congestion, nose pain, photophobia, tearing, throat pain, throat swelling, voice changes, others

**Respiratory:** denies: cough, hemoptysis, orthopnea, SOB at rest, shortness of breath, SOB with excertion, stridor, wheezing, others

**Cardiovascular:** denies: chest pain, dizzy spells, diaphoresis, Dyspnea on exertion, edema, irregular heart beat, left arm pain, lightheadedness, palpitations, PND, syncope, others

**Gastrointestinal:** denies: abdomen distended, abdominal pain, blood streaked bowels, constipated, diarrhea, dysphagia, difficulty swallowing, hematemesis, melena, nausea, poor appetite, poor fluid intake, rectal bleeding, rectal pain, vomiting, others

**Genitourinary:** denies: burning, dysuria, flank pain, frequency, hematuria, incontinence, penile discharge, penile sore, pain, testicle pain, testicle swelling, urgency, others

**Neurological:** denies: dizziness, fainting, headache, left sided numbness, left sided weakness, numbness, paresthesia, pre-existing deficit, right sided numbness, right sided weakness, seizure, speech problems, tingling, tremors, weakness, others

**Integumetry:** reports: **wounds** (Gunshot wound right elbow, left wrist); denies: bruises, change in color, change in hair/nails, dryness, laceration, lesions, lumps, rash, others

**Allergic/Immunocompromised:** denies: Difficulty Healing, Frequent Infections, Hives, Itching, others

**Hematologic/Lymphatic:** denies: anemia, blood clots, easy bleeding, easy bruising, swollen glands, others

**Endocrine:** denies: excessive hunger, excessive sweating, excessive thirst, excessive urination, flushing, intolerance to cold, intolerance to heat, unexplained weight gain, unexplained weight loss, others

**Psychiatric:** denies: anxiety, bipolar disorder, depression, hopeless, panic disorder, schizophrenia, sleepless, suicidal, others

## Physical Exam

**General Appearance:** Mild Distress, Normal

**HEENT:** Head (NCAT), Normal ENT Inspection, Pharynx Normal

**Neck:** Non-Tender, Normal, Normal Inspection

**Respiratory:** Chest Non-Tender, Lungs Clear, No Accessory Muscle Use, No Respiratory Distress, Normal Breath Sounds

**Cardiovascular:** No Edema, No JVD, No Murmur, No Gallop, Normal Peripheral Pulses, Regular Rate/Rhythm

**Breast Exam:** Deferred

**Gastrointestinal:** No Organomegaly, Non Tender, No Pulsatile Mass, Normal Bowel Sounds, Soft

**Genitalia:** Deferred

**Pelvic:** Deferred

**Rectal:** Deferred

**Extremities:** Normal capillary refill, Normal range of motion, Other (Gauze dressings removed from right elbow and left wrist/hand, # 2, 3.0cm long elliptical shallow ulcerations appeared just distal to the right elbnow, hemostatic and without visible debris, #2, 1.0cm wounds appreciatred, no active bleeding or drainage witniessed, lateral aspect of left hand with few, scattered abrasions with scant dried blood present, but no active bleeding or debris visualized, 2+ radial pulses bilaterally, normal sensation in the bilateral hands and 5/5 grip strength)

**Musculoskeletal :**

 **Apperance:** Normal

**Neurologic:** Alert, CNs II-XII nml as Tested, No Motor Deficits, Normal Affect, Normal Mood, No Sensory Deficits

**Cerebellar Function:** Normal

**Reflexes:** Normal

**Skin:** Dry, Normal Color, Warm

**Peripheral Pulses:** 2+ Radial (R), 2+ Radial (L)

**Lymphatic:** No Adenopathy

## Was a procedure done?

**Was a procedure done?:** No

**Sedation?:** No

## Differential Diagnosis

**Multiple Trauma:** Fractures, Foreign Body, Other (Gunshot wound)

COSB008923

EMERGENCY DEPT REPORT Name: BOTTEN SR,JONATHAN Acct: ▮▮▮▮▮▮▮

**X-Ray, Labs, Meds, VS**

**Vital Signs**

| Date Time | Temp | Pulse | Resp | B/P (MAP) | Pulse Ox | O2 Delivery | O2 Flow Rate | FiO2 |
|---|---|---|---|---|---|---|---|---|
| 2/17/21 05:24 | | 74 | 20 | | 96 | Room Air | | |
| 2/17/21 05:24 | | 74 | | | | | | |
| 2/17/21 04:48 | 98.3 | 74 | 18 | | 96 | | | |

**Lab**

| Test | 2/17/21 04:47 | Range/Units |
|---|---|---|
| White Blood Count | 14.9 H | 4.4-10.8 10^3/uL |
| Red Blood Count | 5.00 | 4.5-5.90 10^6/uL |
| Hemoglobin | 15.9 | 13.5-17.5 g/dL |
| Hematocrit | 45.8 | 41.0-53.0 % |
| Mean Corpuscular Volume | 91.6 | 80.0-100.0 fL |
| Mean Corpuscular Hemoglobin | 31.8 | 28.0-32.0 pg |
| Mean Corpuscular Hemoglobin Concent | 34.7 | 32.0-36.0 g/dL |
| Red Cell Distribution Width | 13.6 | 11.8-14.3 % |
| Platelet Count | 228 | 140-450 10^3/uL |
| Neutrophils (%) (Auto) | 58.5 | 37.0-80.0 % |
| Lymphocytes (%) (Auto) | 30.6 | 10.0-50.0 % |
| Monocytes (%) (Auto) | 6.7 | 0.0-12.0 % |
| Eosinophils (%) (Auto) | 3.6 | 0.0-7.0 % |
| Basophils (%) (Auto) | 0.6 | 0.0-2.0 % |
| Neutrophils # (Auto) | 8.7 H | 1.6-8.6 10^3/uL |
| Lymphocytes # (Auto) | 4.5 | 0.4-5.4 10^3/uL |
| Monocytes # (Auto) | 1.0 | 0-1.3 10^3/uL |
| Eosinophils # (Auto) | 0.5 | 0-0.8 10^3/uL |
| Basophils # (Auto) | 0.1 | 0-0.2 10^3/uL |
| Nucleated Red Blood Cells | 0.1 | % |
| Prothrombin Time | 10.6 | 9.4-11.8 sec |
| Prothrombin Time INR | 1.00 | 0.9-1.15 |
| Activated Partial Thromboplast Time | 25.6 | 23.0-31.2 sec |
| Sodium Level | 139 | 136-145 mmol/L |
| Potassium Level | 3.8 | 3.5-5.1 mmol/L |
| Chloride Level | 105 | 98-107 mmol/L |
| Carbon Dioxide Level | 26 | 21-32 mmol/L |
| Anion Gap | 8 | 5-15 |
| Blood Urea Nitrogen | 16 | 7-18 mg/dL |
| Creatinine | 1.25 | 0.700-1.30 mg/dL |
| Estimated GFR (African American) | 82 | mL/min |
| Estimated GFR (Non-African American | 68 | mL/min |
| BUN/Creatinine Ratio | 12.8 | |
| Serum Glucose | 159 H | 74-106 mg/dL |
| Calcium Level | 8.4 L | 8.5-10.1 mg/dL |

COSB008924

EMERGENCY DEPT REPORT Name: BOTTEN SR,JONATHAN Acct: ▮▮▮▮▮

| Total Bilirubin | Pending | |
| Aspartate Amino Transferase (AST) | Pending | |
| Alanine Aminotransferase (ALT) | Pending | |
| Alkaline Phosphatase | Pending | |
| Total Protein | Pending | |
| Albumin | 4.0 | 3.4-5.0 g/dL |
| Plasma/Serum Blood Alcohol | < 3.0 | 0-5 mg/dL |

### Current Medications

| Medications (Trade) | Dose Ordered | Sig/Sch Route | Start Time Stop Time | Status | Last Admin |
|---|---|---|---|---|---|
| Cefazolin Sodium | 50 ml @ 100 mls/hr | ONCE ONCE IV | 2/17/21 04:45 2/17/21 05:14 | DC | 2/17/21 04:54 |
| Diphtheria/ Tetanus/Acell Pertussis (Boostrix T-Dap) | 0.5 ml | ONCE ONCE IM | 2/17/21 04:45 2/17/21 04:46 | DC | 2/17/21 04:54 |
| Sodium Chloride | 1,000 ml @ 1,000 mls/hr | Q1H ONCE IV | 2/17/21 04:45 2/17/21 05:44 | DC | 2/17/21 04:53 |
| Fentanyl Citrate | 25 mcg | ONCE ONCE IV | 2/17/21 05:00 2/17/21 05:01 | DC | 2/17/21 05:21 |

Vital signs reviewed from the time of arrival to the emergency department and found to be unremarkable. Patient physical exam was remarkable for 4 isolated wounds immediately distal to the right elbow as described in my physical exam. Additionally patient found to have abrasions present over the lateral aspect of the left hand. Labs obtained and pending review. X-ray of the right elbow as well as the left wrist and hand all found to be without fracture patient had dressings applied to the wound sites and was given a tetanus vaccine. Ancef 1 g IV also given as well as fentanyl 25 mg IV x1 labs found to be within normal limits.

Patient given prescriptions for Keflex to be taken 3 times daily for a week, ibuprofen 600 mg tablets to be taken every 6 hours as needed, and Norco 5-325 mg tablets with a total number of 12 available to him to take for breakthrough pain.

Wound care instructions provided to patient including keeping the areas clean and dry. Instructed him to follow-up with his primary care physician within the next 5 days for reevaluation. Return precautions provided.
**Images Reviewed?:** Images reviewed and evaluated by me
**Time of 1ST Reevaluation:** 05:45
**Reevaluation 1ST:** Unchanged
**Patient Education/Counseling:** Diagnosis, Treatment, Prognosis, Need For Follow Up
**Family Education/Counseling:** No Family Present

## Departure 1
**Departure**
**Time of Disposition:** 05:58
**Impression:**
   **Primary Impression:**
   Gunshot wound of multiple sites of right upper extremity
   **Qualified Codes:** S41.131A - Puncture wound without foreign body of right upper arm, initial encounter;
   W34.00XA - Accidental discharge from unspecified firearms or gun, initial encounter
   **Additional Impression:**
   Gunshot wound of multiple sites of left upper extremity
   **Qualified Codes:** S41.132A - Puncture wound without foreign body of left upper arm, initial encounter;
   W34.00XA - Accidental discharge from unspecified firearms or gun, initial encounter
**Disposition:** 01 DC HOME SELF CARE/HOMELESS
**Condition:** Stable
**Discharged With:** Self

EMERGENCY DEPT REPORT Name: BOTTEN SR,JONATHAN Acct:

## Critical Care Note
**Critical Care Time?:**  Yes (35 min-critical care time only)
**Critical care comment:**
Authorized and Performed by: Robert J Leonard, MD
Total critical care time: 45 minutes
Due to a high probability of clinically significant, life threatening deterioration, the patient required my highest level of
preparedness to intervene emergently and I personally spent this critical care time directly and personally managing
the patient. This critical care time included obtaining a history; examining the patient; pulse oximetry; ordering and
review of studies; arranging urgent treatment with development of a management plan; evaluation of patient's
response to treatment; frequent reassessment; and, discussions with other providers.
This critical care time was performed to assess and manage the high probability of imminent, life-threatening
deterioration that could result in multi-organ failure. It was exclusive of separately billable procedures and treating
other patients and teaching time.
Please see MDM section and the rest of the note for further information on patient assessment and treatment.

## Stability
**Stability form required:**  No

## SCRIBE1
**Provider Statement:**

The above service was scribed on my behalf by the person named below and I attest to the accuracy of the note.


CARRILLO,RUSSELL                                         Feb 17, 2021 05:06
LEONARD,ROBERT J MD                                      Feb 17, 2021 06:00

TRANSCRIBED BY:CARRILLO,RUSSELL
TRANSCRIBED DATE/TIME:02/17/21 0506

ELECTRONICALLY SIGNED BY:LEONARD, ROBERT J MD  02/17/21 0601
ELECTRONICALLY CO-SIGNED BY:LEONARD,ROBERT J MD02/17/21 0601

16850 Bear Valley Rd, Victorville, California 92395
Yvonne S Noronha, M.D., Laboratory Medical Director
(760) 241-8000

--------------------------------------------------------------------------------

PATIENT: BOTTEN SR,JONATHAN          ACCT:          7    LOC:ER          U:M000108329
                                     AGE/SX                ROOM:           REG:02/17/21
REG DR:  LEONARD,ROBERT J MD         DOB:              BED:            DIS:
                                     STATUS:                TLOC:
--------------------------------------------------------------------------------

### *** HEMATOLOGY ***

--------------------------------------------------------------------------------

| Date | 2/17/2021 | | | | | |
|------|-----------|---|---|---|-----------|-------|
| Time | 0447 | | | | Reference | Units |

--------------------------------------------------------------------------------

| | | | | | Reference | Units |
|------|------|---|---|---|-----------|-------|
| WBC | 14.9 | H | | | (4.4-10.8) | 10^3/uL |
| NEUT% (auto) | 58.5 | | | | (37.0-80.0) | % |
| LYMPH % (auto | 30.6 | | | | (10.0-50.0) | % |
| MONO% (auto) | 6.7 | | | | (0.0-12.0) | % |
| EOS% (auto) | 3.6 | | | | (0.0-7.0) | % |
| BASO% (auto) | 0.6 | | | | (0.0-2.0) | % |
| NRBC | 0.1 | | | | | % |
| Neut# (auto) | 8.7 | H | | | (1.6-8.6) | 10 ^3/u |
| LYMPH# (AUTO) | 4.5 | | | | (0.4-5.4) | 10 ^3/u |
| MONO# (AUTO) | 1.0 | | | | (0-1.3) | 10 ^3/u |
| EOS# (AUTO) | 0.5 | | | | (0-0.8) | 10 ^3/u |
| BASO# (AUTO) | 0.1 | | | | (0-0.2) | 10 ^3/u |
| RBC | 5.00 | | | | (4.5-5.90) | 10^6/uL |
| HGB | 15.9 | | | | (13.5-17.5) | g/dL |
| HCT | 45.8 | | | | (41.0-53.0) | % |
| MCV | 91.6 | | | | (80.0-100.0) | fL |
| MCH | 31.8 | | | | (28.0-32.0) | pg |
| MCHC | 34.7 | | | | (32.0-36.0) | g/dL |
| RDW | 13.6 | | | | (11.8-14.3) | % |
| PLT | 228 | | | | (140-450) | 10^3/uL |

### *** COAGULATION ***

--------------------------------------------------------------------------------

| Date | 2/17/2021 | | | | | |
|------|-----------|---|---|---|-----------|-------|
| Time | 0447 | | | | Reference | Units |

--------------------------------------------------------------------------------

| | | | | | | Reference | Units |
|---------|---------|---|---|---|---|-------------|------|
| Protime | 10.6 | | | | | (9.4-11.8) | sec |
| INR | 1.00(a) | | | | | (0.9-1.15) | |
| PTT | 25.6 | | | | | (23.0-31.2) | sec |

NOTES:  (a)     CONDITIONS              INR

        Venous Thromboembolism        2-3
        Acute Myocardial Infarction   2-3
        Atrial Fibrilation            2-3
        Rheumatic Heart Disease       2-3
        BioProsthetic Heart Valve     2-3
        Mechanical Heart Valve      2.5-3.5


                    ** CONTINUED ON NEXT PAGE **

COSB008927

```
TWP FCVG< 2413:143                                                              RCIG 4
RUN TIME: 0205
```

DESERT VALLEY HOSPITAL CLINICAL LABORATORY
16850 Bear Valley Rd, Victorville, California 92395
Yvonne S Noronha, M.D., Laboratory Medical Director
(760) 241-8000

--------------- ███████████ ------------------------------------
                ███████████

```
Patient: BOTTEN SR,JONATHAN          V00001808857    (Continued)
```
-------------------------------------------------------------------------------

*** CHEMISTRY ***

-------------------------------------------------------------------------------

| Date | 2/17/2021 | | | | |
|------|-----------|--|--|-----------|------|
| Time | 0447 | | | Reference | Units |

-------------------------------------------------------------------------------

| | | | | | |
|------|------|--|--|-----------|------|
| NA | 139 | | | (136-145) | mmol/L |
| K | 3.8 | | | (3.5-5.1) | mmol/L |
| CL | 105 | | | (98-107) | mmol/L |
| CO2 | 26 | | | (21-32) | mmol/L |
| ANION GAP | 8 | | | (5-15) | |
| GLU | 159 | H | | (74-106) | mg/dL |
| BUN | 16 | | | (7-18) | mg/dL |
| SCREAT | 1.25 | | | (0.700-1.30) | mg/dL |
| ALK PHOS | 90 | | | (45-117) | U/L |
| AST/SGOT | 30 | | | (15-37) | U/L |
| ALT/SGPT | 60 | | | (16-61) | U/L |
| CA | 8.4 | L | | (8.5-10.1) | mg/dL |
| TOTAL BILI | 0.6(b) | | | (0.2-1.0) | mg/dL |
| TP | 7.7 | | | (6.4-8.2) | g/dL |
| ALB | 4.0 | | | (3.4-5.0) | g/dL |
| BUN/CREAT RATI | 12.8 | | | | |
| GFRAA | 82 | | | | mL/min |
| GFRNAA | 68(c) | | | | mL/min |

```
NOTES:  (b)  Use of this assay is not recommended for patients undergoing
             treatment with eltrombopag due to the potential for falsely
             elevated results.
        (c)  INTERPRETATIVE DATA:
               NORMAL: Greater than or equal to 60 ml/min/1.73 meters sq
               ABNORMAL: Less than 60 ml/min/1.73 meters sq

             GFR units are mL/min/1.73 meters sq.
             All GFR values are normalized to an average surface area of
             1.73 meters squared.

             DISCLAIMER:

             MDRD equation has not been validated for use :
             1. Individuals 17 yrs of age and younger.
             2. Patients >70 yrs. of age.
             3. Pregnant women.
             4. Patients with extreme body size, muscle mass or
                nutritional status.
             5. Patients with serious comorbid conditions.

             Application of the equation to these patient groups may lead
             to errors in GFR estimations. The GFR is provided for use as
             clinically indicated.
```

COSB008928

```
TWP FCVG< 2413:143                                                    RCIG 5
RUN TIME: 0205
```

                    DESERT VALLEY HOSPITAL CLINICAL LABORATORY
                    16850 Bear Valley Rd, Victorville, California 92395
                    Yvonne S Noronha, M.D., Laboratory Medical Director
                              (760) 241-8000

```
-----------------------------------        ----------------------------------
Patient: BOTTEN SR,JONATHAN            V00001808857     (Continued)
----------------------------------------------------------------------------
```

                        *** CHEMISTRY (Continued) ***
```
----------------------------------------------------------------------------
Date        2/17/2021
Time          0447                              Reference    Units
----------------------------------------------------------------------------

ALCOHOL,BLOOD |    < 3.0   |            |          | (0-5)       mg/dL


----------------------------------------------------------------------------
```

                    COLLECTED: Feb 17, 2021 5:39am

```
    BLOOD TYPE              | O NEG
    AB SCRN INTERP.         | NEGATIVE
```

                    ** END OF REPORT **

DESERT VALLEY HOSPITAL
16850 Bear Valley Road, Victorville, CA - 92395
Ph: (760) 241 - 8000

DIAGNOSTIC IMAGING
Diagnostic Imaging Report : 0217-0016
Signed

PATIENT: BOTTEN SR,JONATHAN        ACCT: ████████████        UNIT:
M000108329
DOB: █████████                     LOC: ER                   ROOM / BED:  /
AGE / SEX: 40 / M                  ADM STATUS: REG ER         SERVICE DT:
02/17/21 0446

ORDERING PHYSICIAN: LEONARD,ROBERT J MD
PROCEDURE(s): LWRI - L WRIST 3+ VIEW XRAY
REASON: GSW
ORDER NUMBER(s): 0217-0028, ACCESSION NUMBER(s): 1460378.004PAIDVH


PROCEDURE:    Radiographs of the left wrist

 CLINICAL INDICATION:  Gunshot wound

 TECHNIQUE:    3 views of the left rib are submitted

 COMPARISON:    None

 FINDINGS:

No acute fracture or dislocation is seen. Joint spaces are maintained. Shrapnel
is seen about the
ulnar aspect of the hand and of the distal forearm on these images.


Soft tissues are unremarkable

 IMPRESSION:    No acute fracture; shrapnel as above.


 RPTAT: HSLC

DICTATED BY: CAMPEAS,SUSAN L MD
DICTATED DATE/TIME: 02/17/21 0521

SIGNED BY: CAMPEAS, SUSAN L MD
SIGNED DATE/TIME: 02/17/21 0522

CC:

COSB008930

DESERT VALLEY HOSPITAL
16850 Bear Valley Road, Victorville, CA - 92395
Ph: (760) 241 - 8000

DIAGNOSTIC IMAGING
Diagnostic Imaging Report : 0217-0014
Signed

PATIENT: BOTTEN SR,JONATHAN      ACCT: █████████      UNIT:
M000108329
DOB: █████████                    LOC: ER               ROOM / BED:  /
AGE / SEX: 40 / M                 ADM STATUS: REG ER     SERVICE DT:
02/17/21 0446

ORDERING PHYSICIAN: LEONARD,ROBERT J MD
PROCEDURE(s): LHAN - L HAND 3V XRAY
REASON: GSW
ORDER NUMBER(s): 0217-0027, ACCESSION NUMBER(s): 1460378.003PAIDVH


PROCEDURE:    Radiographs of the left hand

 CLINICAL INDICATION:  Gunshot wound

 TECHNIQUE:    3 views of the left hand are submitted

 COMPARISON:    None

 FINDINGS:

 No acute fracture or dislocation is seen. A ring overlies the mid fourth
proximal phalange limiting
assessment. Joint spaces are maintained. Shrapnel is seen in the soft tissues
about the ulnar aspect
of the hand.


 Soft tissues are unremarkable

 IMPRESSION:    No acute fracture; shrapnel as above.



 RPTAT: HSLC

DICTATED BY: CAMPEAS,SUSAN L MD
DICTATED DATE/TIME: 02/17/21 0520

SIGNED BY: CAMPEAS, SUSAN L MD
SIGNED DATE/TIME: 02/17/21 0520

CC:

COSB008931

DESERT VALLEY HOSPITAL
16850 Bear Valley Road, Victorville, CA - 92395
Ph: (760) 241 - 8000

DIAGNOSTIC IMAGING
Diagnostic Imaging Report : 0217-0011
Signed

PATIENT: BOTTEN SR,JONATHAN      ACCT: ▮▮▮▮▮▮▮              UNIT:
M000108329
DOB: ▮▮▮▮▮▮                        LOC: ER                   ROOM / BED:  /
AGE / SEX: 40 / M                 ADM STATUS: REG ER         SERVICE DT:
02/17/21 0446

ORDERING PHYSICIAN: LEONARD,ROBERT J MD
PROCEDURE(s): RELB3 - R ELBOW 3 VIEW XRAY
REASON: GSW
ORDER NUMBER(s): 0217-0026, ACCESSION NUMBER(s): 1460378.002PAIDVH


PROCEDURE:    Radiographs of the right elbow

 CLINICAL INDICATION:   Gunshot wound

 TECHNIQUE:    3 views of the right elbow are submitted

 COMPARISON:    None

 FINDINGS:

 No acute fracture or dislocation is seen. Joint spaces are maintained. Again shrapnel is seen in
the surrounding soft tissues.


 Soft tissues are unremarkable

 IMPRESSION:    No acute fracture; shrapnel of the soft tissues.



 RPTAT: HSLC

DICTATED BY: CAMPEAS,SUSAN L MD
DICTATED DATE/TIME: 02/17/21 0516

SIGNED BY: CAMPEAS, SUSAN L MD
SIGNED DATE/TIME: 02/17/21 0516

CC:

COSB008932

DESERT VALLEY HOSPITAL
16850 Bear Valley Road, Victorville, CA - 92395
Ph: (760) 241 - 8000

DIAGNOSTIC IMAGING
Diagnostic Imaging Report : 0217-0010
Signed

PATIENT: BOTTEN SR,JONATHAN       ACCT:                        UNIT:
M000108329
DOB:                              LOC: ER                      ROOM / BED:  /
AGE / SEX: 40 / M                 ADM STATUS: REG ER           SERVICE DT:
02/17/21 0446

ORDERING PHYSICIAN: LEONARD,ROBERT J MD
PROCEDURE(s): RFOR - R FOREARM XRAY
REASON: GSW
ORDER NUMBER(s): 0217-0025, ACCESSION NUMBER(s): 1460378.001PAIDVH


PROCEDURE:    Radiographs of the right forearm

 CLINICAL INDICATION: Gunshot wound

 TECHNIQUE:    2 views of the right forearm are submitted

 COMPARISON:    None

 FINDINGS:

 No acute fracture or dislocation is seen. Joint spaces are maintained. Shrapnel
is seen in the soft
tissues.


 Soft tissues are unremarkable

 IMPRESSION:    No fracture; shrapnel of the soft tissues.



 RPTAT: HSLC

DICTATED BY: CAMPEAS,SUSAN L MD
DICTATED DATE/TIME: 02/17/21 0514

SIGNED BY: CAMPEAS, SUSAN L MD
SIGNED DATE/TIME: 02/17/21 0515

CC:

# Exhibit DD

1  LAW OFFICES OF DALE K. GALIPO
   Dale K. Galipo, Esq. (Bar No. 144074)
2  dalekgalipo@yahoo.com
   Hang D. Le, Esq. (Bar No. 293450)
3  hlee@galipolaw.com
   21800 Burbank Boulevard, Suite 310
4  Woodland Hills, California 91367
   Telephone: (818) 347-3333
5  Facsimile: (818) 347-4118
   Attorney for Plaintiffs
6

7

8               SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                 FOR THE COUNTY OF SAN BERNARDINO

10

11 JONATHAN WAYNE BOTTEN, SR., et al.,    )  Case No.: CIVSB2131572
                                          )
12          Plaintiffs,                    )
                                          )
13      vs.                                )  **RESPONSES BY PLAINTIFF JONATHAN
                                          )  WAYNE BOTTEN SR. TO
14 STATE OF CALIFORNIA, et al.,           )  INTERROGATORIES (SET ONE)**
                                          )
15          Defendants.                    )
                                          )
16  _____   )
                                          )
17 **PROPOUNDING PARTY**:      Defendant, COUNTY OF SAN BERNARDINO

18 **RESPONDING PARTY**:       Plaintiff, JONATHAN WAYNE BOTTEN SR.

19 **SET NUMBER**:             One

20 **TO PROPOUNDING PARTY AND THE ATTORNEY(S) OF RECORD**:

21        Plaintiff has not fully completed an investigation of the facts relating to this case, has not fully

22 completed discovery in this action and has not completed trial preparation.  All of the answers contained

23 herein are based only upon such information and documents which are presently available to, and

24 specifically known to this responding party and disclose only those contentions which presently occur

25 to such responding party.

26        It is anticipated that further discovery, independent investigation, legal research and analysis

27 will supply additional facts, add meaning to the known facts, as well as establish entirely new factual

28 conclusions and legal contentions, all of which may lead to substantial additions to, changes in, and

_____
      **RESPONSES BY PLAINTIFF JONATHAN WAYNE BOTTEN SR. TO INTERROGATORIES (SET ONE)**

1  **INTERROGATORY 11:**

2      State each and every offense for which YOU have been arrested, including the date(s) of

3  arrest, arresting agency, case number, and disposition of charges.

4  **RESPONSES TO INTERROGATORY 11:**

5      Plaintiff objects to this Interrogatory on the basis that it is not reasonably calculated to lead to

6  the discovery of admissible evidence. Without waiving the foregoing objection, Plaintiff responds as

7  follows:

8      1.  Domestic Violence (July or August of 2006) – No charges. After diligent search and

9          reasonable inquiry, Plaintiff is unable to locate information regarding arresting agency and

10          case number at this time.

11      2.  Domestic Violence (September 2006) – Plaintiff pled no contest and received summary

12          probation for 1 year. After diligent search and reasonable inquiry, Plaintiff is unable to

13          locate information regarding arresting agency and case number at this time.

14  As discovery is ongoing, Plaintiff reserves the right to amend and/or supplement this response.

15

16  **INTERROGATORY 12:**

17      If YOU were ever convicted of a crime, then for each conviction state the city and state

18  where YOU were convicted, the date of conviction, offense, and the court and case number.

19  **RESPONSES TO INTERROGATORY 12:**

20      Plaintiff was convicted of "Inflicting Corporal Punishment on a Spouse without Injury" in 2006

21  in San Bernardino Superior Court.  After diligent search and reasonable inquiry, Plaintiff is unable to

22  locate information the case number and exact date of conviction at this time.

23  As discovery is ongoing, Plaintiff reserves the right to amend and/or supplement this response.

24

25  **INTERROGATORY 13:**

26      IDENTIFY each and every witness to any of the events surrounding this lawsuit, including

27  witnesses to liability and damages/injuries, IDENTIFYING each such witness by their name,

28  address, and telephone number and providing a brief summary of their knowledge relevant to this

**RESPONSES BY PLAINTIFF JONATHAN WAYNE BOTTEN SR. TO INTERROGATORIES (SET ONE)**

1  lawsuit.

2  **<u>RESPONSES TO INTERROGATORY 13</u>:**

3     1.  Plaintiff – facts and circumstances surrounding the incident; damages.

4     2.  Jonathan Wayne Botten, Jr. – c/o Plaintiffs' counsel; facts and circumstances surrounding the

5         incident; damages.

6     3.  Tanja Dudek-Botten – c/o Plaintiffs' counsel; facts and circumstances surrounding the incident;

7         damages.

8     4.  Annabelle Botten – c/o Plaintiffs' counsel; facts and circumstances surrounding the incident;

9         damages.

10    5.  Neighbor Sal (last name unknown) – 18010 Catalpla St., Hesperia, CA; (951) 403-4532; facts

11        and circumstances surrounding the incident.

12    6.  Neighbors (names and contact information currently unknown)

13    7.  Isaiah Kee – c/o State defense counsel; facts and circumstances surrounding the incident.

14    8.  Michael Blackwood – c/o State defense counsel; facts and circumstances surrounding the

15        incident.

16    9.  Bernardo Rubalcava – c/o State defense counsel; facts and circumstances surrounding the

17        incident.

18    10. Robert Vaccari – c/o County defense counsel; facts and circumstances surrounding the

19        incident.

20    11. Jake Adams – c/o County defense counsel; facts and circumstances surrounding the incident.

21  As discovery is ongoing, Plaintiff reserves the right to amend and/or supplement this response.

22

23  **<u>INTERROGATORY 14</u>:**

24       If YOU are seeking damages for lost income or lost earning capacity, state the amount of

25  YOUR claim and explain how that amount was calculated.

26  //

27  //

28  //

**RESPONSES BY PLAINTIFF JONATHAN WAYNE BOTTEN SR. TO INTERROGATORIES (SET ONE)**

physical therapy needed to help rehabilitate his arm. As discovery is ongoing, Plaintiff reserves the

right to amend and/or supplement this response.

**INTERROGATORY 18:**

If YOU are seeking property damages, state the amount of YOUR claim and explain how

YOU calculated this figure.

**RESPONSES TO INTERROGATORY 18:**

Plaintiff is not seeking property damages.

As discovery is ongoing, Plaintiff reserves the right to amend and/or supplement this response.

**INTERROGATORY 19:**

If YOU seeking any other damages not already described in interrogatories 14-18,

IDENTIFY the type of damages, state the amount of damages, and explain how the figure was

calculated.

**RESPONSES TO INTERROGATORY 19:**

Plaintiff seeks compensatory damages of approximately $700. This is calculated based on the

amount of gas Plaintiff had to expend driving from Hesperia to Loma Linda to be with his son during

his son's stay at the hospital and the hotel bill incurred while Plaintiff stay near his son's hospital. As

discovery is ongoing, Plaintiff reserves the right to amend and/or supplement this response.

DATED:  April 3, 2023          THE LAW OFFICES OF DALE K. GALIPO

BY:  _____
                                 Dale K. Galipo
                                 Hang D. Le
                                 Attorneys for Plaintiffs

**RESPONSES BY PLAINTIFF JONATHAN WAYNE BOTTEN SR. TO INTERROGATORIES (SET ONE)**

*Jonathan Wayne Botten, Sr., et al. v. State of California, et al.*
San Bernardino Superior Court
Case No. CIVSB2131572

I, Jonathan Wayne Botten, Sr., declare as follows:

    I am a Plaintiff in the above-entitled matter. I have read the responses to the propounded discovery as identified below. I know their content and based on my knowledge and/or on my information and belief, I believe them to be true.

PLAINTIFF JONATHAN WAYNE BOTTEN, SR.'S RESPONSES TO DEFENDANT COUNTY OF SAN BERNARDINO'S INTERROGATORIES, SET ONE

    I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct, and that this declaration is executed on

___4/1/2023___, at ___Hesperia_____, California.

DocuSigned by:

_____
Jonathan Wayne Botten, Sr.

# Exhibit EE

1  LAW OFFICES OF DALE K. GALIPO
   Dale K. Galipo, Esq. (Bar No. 144074)
2  dalekgalipo@yahoo.com
   Hang D. Le, Esq. (Bar No. 293450)
3  hlee@galipolaw.com
   21800 Burbank Boulevard, Suite 310
4  Woodland Hills, California 91367
   Telephone: (818) 347-3333
5  Facsimile: (818) 347-4118
   Attorney for Plaintiffs
6

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                 FOR THE COUNTY OF SAN BERNARDINO

10

11 JONATHAN WAYNE BOTTEN, SR., et al.,    ) Case No.: CIVSB2131572
                                          )
12          Plaintiffs,                   )
                                          )
13     vs.                                ) **RESPONSES BY PLAINTIFF JONATHAN**
                                          ) **WAYNE BOTTEN, SR. TO SPECIAL**
                                          ) **INTERROGATORIES (SET ONE)**
14 STATE OF CALIFORNIA, et al.,           )
                                          )
15          Defendants.                   )
                                          )
16 ─────────────────────────────         )

17 **PROPOUNDING PARTY**:     Defendant, COUNTY OF SAN BERNARDINO

18 **RESPONDING PARTY**:      Plaintiff, JONATHAN WAYNE BOTTEN, SR.

19 **SET NUMBER**:            One

20 **TO PROPOUNDING PARTY AND THE ATTORNEY(S) OF RECORD**:

21         Plaintiff has not fully completed an investigation of the facts relating to this case, has not fully

22 completed discovery in this action and has not completed trial preparation. All of the answers

23 contained herein are based only upon such information and documents which are presently available

24 to, and specifically known to this responding party and disclose only those contentions which presently

25 occur to such responding party.

26         It is anticipated that further discovery, independent investigation, legal research and analysis

27 will supply additional facts, add meaning to the known facts, as well as establish entirely new factual

28 conclusions and legal contentions, all of which may lead to substantial additions to, changes in, and

───────────────────────────────────────────────
    RESPONSES BY PLAINTIFF JONATHAN WAYNE BOTTEN, SR. TO SPECIAL INTERROGATORIES (SET ONE)

**SPECIAL INTERROGATORY 5:**

If you exchanged any words with any peace officer during the INCIDENT, state the exact words spoken by all parties to the conversation.

**RESPONSES TO SPECIAL INTERROGATORY 5:**

Plaintiff exchanged the following words with SBSD deputies:

"We need help. We need help. Get over here. Jump my fence, you're good. Jump my fence."

"Hey do you mind if I smoke this cigarette."

Plaintiff exchanged the following words with a CHP officer:

"I didn't see him have a gun."

As discovery is ongoing, Plaintiff reserves the right to amend and/or supplement this response.

**SPECIAL INTERROGATORY 6:**

IDENTIFY every healthcare provider who treated YOU following the INCIDENT by providing their full name, address and telephone number.

**RESPONSES TO SPECIAL INTERROGATORY 6:**

After diligent search and reasonable inquiry, Plaintiff is unable to locate the names of the healthcare providers who treated Plaintiff following the incident at this time. As discovery is ongoing, Plaintiff reserves the right to amend and/or supplement this response.

**SPECIAL INTERROGATORY 7:**

If you obtained medical care as a result of the INCIDENT, IDENTIFY each healthcare provider YOU consulted by providing their full name, address and telephone number. (Whenever the term "IDENTIFY" is used in an interrogatory, it means to provide the last known name, address and telephone number of the person or entity to which it pertains.)

//

//

//

**RESPONSES TO SPECIAL INTERROGATORY 7:**

After diligent search and reasonable inquiry, Plaintiff is unable to locate the names of the healthcare providers who treated Plaintiff following the incident at this time. As discovery is ongoing, Plaintiff reserves the right to amend and/or supplement this response.

**SPECIAL INTERROGATORY 8:**

State all facts that support YOUR contention that YOU suffered a battery as a result of the INCIDENT.

**RESPONSES TO SPECIAL INTERROGATORY 8:**

The officers shot the subject they were attempting to detain numerous times even though the subject did not brandish a weapon and did not pose an immediate threat of death or serious bodily injury. When the officers shot at the subject, they also shot Plaintiff. As discovery is ongoing, Plaintiff reserves the right to amend and/or supplement this response.

**SPECIAL INTERROGATORY 9:**

If YOU contend that any peace officers used excessive or unreasonable force related to the INCIDENT, state all facts that support YOUR contention.

**RESPONSES TO SPECIAL INTERROGATORY 9:**

The officers shot the subject they were attempting to detain numerous times even though the subject did not brandish a weapon and did not pose an immediate threat of death or serious bodily injury. When the officers shot at the subject, they also shot Plaintiff. As discovery is ongoing, Plaintiff reserves the right to amend and/or supplement this response.

**SPECIAL INTERROGATORY 10:**

If YOU contend that any peace officers' conduct related to the INCIDENT was negligent, state all facts that support YOUR contention.

//

//

**RESPONSES BY PLAINTIFF JONATHAN WAYNE BOTTEN, SR. TO SPECIAL INTERROGATORIES (SET ONE)**

1 | under state law.

2 | **RESPONSES TO SPECIAL INTERROGATORY 13:**

3 |       The officers shot the subject they were attempting to detain numerous times even though the

4 | subject did not brandish a weapon and did not pose an immediate threat of death or serious bodily

5 | injury. The officers did not issue a warning that they were going to use deadly force prior to shooting.

6 | Moreover, the officers failed to secure the scene and shot indiscriminately, striking his wife, son, and

7 | Plaintiff. As discovery is ongoing, Plaintiff reserves the right to amend and/or supplement this

8 | response.

9 |

10 |

11 | DATED:  April 3, 2023         THE LAW OFFICES OF DALE K. GALIPO

12 |

13 |                  BY:  _____

14 |                      Dale K. Galipo

14 |                      Hang D. Le

15 |                      Attorneys for Plaintiffs

**RESPONSES BY PLAINTIFF JONATHAN WAYNE BOTTEN, SR. TO SPECIAL INTERROGATORIES (SET ONE)**

*Jonathan Wayne Botten, Sr., et al. v. State of California, et al.*
San Bernardino Superior Court
Case No. CIVSB2131572

I, Jonathan Wayne Botten, Sr., declare as follows:

I am a Plaintiff in the above-entitled matter. I have read the responses to the propounded discovery as identified below. I know their content and based on my knowledge and/or on my information and belief, I believe them to be true.

PLAINTIFF JONATHAN WAYNE BOTTEN, SR.'S RESPONSES TO DEFENDANT COUNTY OF SAN BERNARDINO'S SPECIAL INTERROGATORIES, SET ONE

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct, and that this declaration is executed on

_____4/1/2023_____, at _____Hesperia_____, California.

DocuSign by:
_____
4C4FF718C09C435...

Jonathan Wayne Botten, Sr.

# Exhibit FF

**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo, Esq. (Bar No. 144074)
dalekgalipo@yahoo.com
Hang D. Le, Esq. (Bar No. 293450)
hlee@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California, 91367
Telephone: (818) 347-3333
Facsimile: (818) 347-4118

Attorneys for Plaintiffs
JONATHAN WAYNE BOTTEN, SR.,
TANJA DUDEK-BOTTEN, ANNABELLE BOTTEN,
AND J.B.

# UNITED STATES DISTRICT COURT FOR THE
## CENTRAL DISTRICT OF CALIFORNIA

JONATHAN WAYNE BOTTEN, SR.;
TANJA DUDEK-BOTTEN;
ANNABELLE BOTTEN; and J.B., a
minor, by and through his guardian
JONATHAN WAYNE BOTTEN, SR.,

                Plaintiffs,

     vs.

STATE OF CALIFORNIA; COUNTY
OF SAN BERNARDINO; ISAIAH
KEE; MICHAEL BLACKWOOD;
BERNARDO RUBALCAVA; ROBERT
VACCARI; JAKE ADAMS; and DOES
1-10, inclusive,

                Defendants.

Case No. 5:23-cv-00257-KK-SHK

*Honorable Kenly Kiya Kato*

**PLAINTIFFS' SECOND
SUPPLEMENTAL RULE 26(f)
DISCLOSURES**

Pursuant to Federal Rule of Civil Procedure 26, Plaintiffs JONATHAN WAYNE BOTTEN, SR.; TANJA DUDEK-BOTTEN; ANNABELLE BOTTEN; and J.B., a minor, by and through his guardian JONATHAN WAYNE BOTTEN, SR., hereby makes the following supplemental disclosures of witnesses, documents, and damages known at this time.

## I.   WITNESSES

Based on the information currently known to Plaintiffs, the following persons have knowledge of facts that Plaintiffs may use to support their material allegations. The subjects of information specified are those of which Plaintiffs are currently aware of or Plaintiffs reasonably believe are within the knowledge of the identified individuals.

| Name | Contact Information | Subject Matter(s) |
|---|---|---|
| 1. Jonathan Wayne Botten | c/o Plaintiffs' counsel | The facts and circumstances relating to the officer-involved shooting of Decedent, which occurred on February 17, 2021 and is the subject of this lawsuit; damages. |
| 2. Tanja Dudek-Botten | c/o Plaintiffs' counsel | The facts and circumstances relating to the officer-involved shooting of Decedent, which occurred on February 17, 2021 and is the subject of this lawsuit; damages. |
| 3. Annabelle Botten | c/o Plaintiffs' counsel | The facts and circumstances relating to the officer-involved shooting of Decedent, which occurred on February 17, 2021 and is the subject of this lawsuit; damages. |

| 4. J.B. through his guardian Jonathan Wayne Botten | c/o Plaintiffs' counsel | The facts and circumstances relating to the officer-involved shooting of Decedent, which occurred on February 17, 2021 and is the subject of this lawsuit; damages. |
|---|---|---|
| 5. Isaiah Kee | c/o Defense counsel for State | The facts and circumstances relating to the officer-involved shooting of Decedent, which occurred on February 17, 2021 and is the subject of this lawsuit. |
| 6. Michael Blackwood | c/o Defense counsel for State | The facts and circumstances relating to the officer-involved shooting of Decedent, which occurred on February 17, 2021 and is the subject of this lawsuit. |
| 7. Bernardo Rubalcava | c/o Defense counsel for State | The facts and circumstances relating to the officer-involved shooting of Decedent, which occurred on February 17, 2021 and is the subject of this lawsuit. |
| 8. Robert Vaccari | c/o Defense counsel for County | The facts and circumstances relating to the officer-involved shooting of Decedent, which occurred on February 17, 2021 and is the subject of this lawsuit. |
| 9. Jake Adams | c/o Defense counsel for County | The facts and circumstances relating to the officer-involved shooting of Decedent, which occurred on February 17, 2021 and is the subject of this lawsuit. |
| 10. Joseph Edward Fargusson, M.D. | Loma Linda University Health, 11234 Anderson St., Loma Linda, CA 92345; (909) 558-4000. | Plaintiff Dudek-Botten's injuries, medical treatment and care that was provided to Plaintiff Dudek-Botten for her |

| | | injuries, any prognosis regarding Plaintiff Dudek-Botten's injuries; damages. |
|---|---|---|
| 11.Jon Boyd Roper, M.D. | Loma Linda University Health, 11234 Anderson St., Loma Linda, CA 92345; (909) 558-4000. | Plaintiff Dudek-Botten's injuries, medical treatment and care that was provided to Plaintiff Dudek-Botten for her injuries, any prognosis regarding Plaintiff Dudek-Botten's injuries; damages. |
| 12.Heather Marie Tassone, D.O. | Loma Linda University Health, 11234 Anderson St., Loma Linda, CA 92345; (909) 558-4000. | Plaintiff Dudek-Botten's injuries, medical treatment and care that was provided to Plaintiff Dudek-Botten for her injuries, any prognosis regarding Plaintiff Dudek-Botten's injuries; damages. |
| 13.Shannon Kiang, M.D. | Loma Linda University Health, 11234 Anderson St., Loma Linda, CA 92345; (909) 558-4000. | Plaintiff Dudek-Botten's injuries, medical treatment and care that was provided to Plaintiff Dudek-Botten for her injuries, any prognosis regarding Plaintiff Dudek-Botten's injuries; damages. |
| 14.Bailey Ann Wentworth, M.D. | Loma Linda University Health, 11234 Anderson St., Loma Linda, CA 92345; (909) 558-4000. | Plaintiff Dudek-Botten's injuries, medical treatment and care that was provided to Plaintiff Dudek-Botten for her injuries, any prognosis regarding Plaintiff Dudek-Botten's injuries; damages. |
| 15.Nicole Depolo, M.D. | Loma Linda University Health, 11234 Anderson St., Loma Linda, CA 92345; (909) 558-4000. | Plaintiff Dudek-Botten's injuries, medical treatment and care that was provided to Plaintiff Dudek-Botten for her injuries, any prognosis regarding Plaintiff Dudek-Botten's injuries; damages. |
| 16.Daniel Paul Srikureja, M.D. | Loma Linda University Health, 11234 Anderson | Plaintiff J.B.'s injuries, medical treatment and care that was provided to Plaintiff |

| | | | |
|---|---|---|---|
| | St., Loma Linda, CA 92345; (909) 558-4000. | J.B. for his injuries, any prognosis regarding Plaintiff J.B.'s injuries; damages. |
| 17. Andrew James Davis, M.D. | Loma Linda University Health, 11234 Anderson St., Loma Linda, CA 92345; (909) 558-4000. | Plaintiff J.B.'s injuries, medical treatment and care that was provided to Plaintiff J.B. for his injuries, any prognosis regarding Plaintiff J.B.'s injuries; damages. |
| 18. Amanda MacQuoid, M.D. | Loma Linda University Health, 11234 Anderson St., Loma Linda, CA 92345; (909) 558-4000. | Plaintiff J.B.'s injuries, medical treatment and care that was provided to Plaintiff J.B. for his injuries, any prognosis regarding Plaintiff J.B.'s injuries; damages. |
| 19. Gregory James Jutzy, M.D. | Loma Linda University Health, 11234 Anderson St., Loma Linda, CA 92345; (909) 558-4000. | Plaintiff J.B.'s injuries, medical treatment and care that was provided to Plaintiff J.B. for his injuries, any prognosis regarding Plaintiff J.B.'s injuries; damages. |
| 20. Katherine Sigrid Burruss, M.D. | Loma Linda University Health, 11234 Anderson St., Loma Linda, CA 92345; (909) 558-4000. | Plaintiff J.B.'s injuries, medical treatment and care that was provided to Plaintiff J.B. for his injuries, any prognosis regarding Plaintiff J.B.'s injuries; damages. |
| 21. Unidentified EMT/Paramedics who responded to the scene | Information unknown at this time | Plaintiffs Botten, Sr, Dudek-Botten, and J.B.'s injuries and medical treatment at the scene and en route to the hospital, medical expenses, and any information given to them regarding the circumstances of the detention and use of force. |
| 22. Unidentified law enforcement officers who responded to the scene | Information unknown at this time | The facts and circumstances relating to the officer-involved shooting, which occurred on February 17, |

| | | |
|---|---|---|
| | | 2021 and is the subject of this lawsuit. |
| 23. Other persons whose identities appear in the reports disclosed (see below) are incorporated by reference as though specifically identified | | |

Plaintiffs' investigation of this matter is not yet complete and Plaintiffs have not concluded discovery in this matter. Plaintiffs reserve the right to identify additional individuals with such knowledge as such persons become known to Plaintiffs, or the information they possess becomes relevant to the claims or defenses or any party, pursuant to Rule 26(e).

## II.    <u>DOCUMENTS</u>

Plaintiffs identify the following documents or categories of documents that they may use to support their material claims and defenses:

1. Medical records and billing for Jonathan Wayne Botten, Sr.;

2. Medical records and billing for Tanja Dudek-Botten;

3. Medical records and billing for J.B.;

4. San Bernardino County Sheriff's Department Lethal Force Encounter Investigation;

5. California Highway Patrol Critical Incident Report;

6. Witness videos of the incident;

7. Photographs of the incident scene;

8. Photographs of Plaintiffs Jonathan Wayne Botten, Sr., Tanja Dudek-Botten, and J.B.'s injuries.

9. **Counseling Attendance/Treatment Summary for Annabelle Botten;**

10. **Additional medical billing for Jonathan Wayne Botten, Sr.**;

11. **Additional photographs of J.B.'s injuries**;

12. **Photograph of metal fragments extracted from Tanja Dudek-Botten's wounds**;

13. **Additional witness video of the incident**.

Plaintiffs' investigation of this matter is not yet complete and Plaintiffs have not concluded their discovery in this matter. Plaintiffs reserve the right to identify additional categories of documents as they become known to Plaintiffs or they become relevant to the claims or defenses of any party, pursuant to Rule 26(e). Plaintiffs further incorporate by reference all documents listed in Defendants' Initial Disclosures.

## III.   <u>DAMAGES</u>

Plaintiffs seek general and special compensatory damages, including but not limited to:

1. Compensatory damages:

    a.  Jonathan Wayne Botten, Sr. – In excess of $15,000 in past and future medical expenses. Based on the current information Plaintiff has, Plaintiff currently has medical expenses totaling approximately $1,500. This is calculated based on the liens issued on behalf of Desert Valley Medical Group. Plaintiff anticipates that he has additional outstanding bills. Plaintiff estimates that he will incur approximately $5,000-$10,000 in additional medical expenses. This is calculated based on his current problems with his right arm and estimate of the physical therapy needed to help rehabilitate his arm. Plaintiff Botten Sr. further estimates that he incurred approximately $700 in gas and lodging expenses during the week he had to spend with his son, J.B., while J.B. was in a hospital in Loma Linda.

    b.  Tanja Dudek-Botten – In excess of $1.1 million in past and future

medical expenses. Based on the current information available to Plaintiff, Plaintiff seeks approximately $100,000 in damages for medical expenses. This amount was calculated based on the medical bills currently available to Plaintiff. Plaintiff seeks in excess of $1 million in future medical expenses. Plaintiff currently cannot see well out of her left eye and has a hard time hearing out of her left ear. Additionally, there is still a big piece of metal in her rotary cuff. Plaintiff anticipates that further treatment and/or accommodations for her ongoing injuries will exceed $1 million.

    c. J.B. – In excess of $500,000 in past and future medical expenses. Plaintiff is currently seeking approximately $500,000 in damages for medical expenses. This amount was calculated by totaling up all the medical bills Plaintiff has incurred as a result of the Incident.

2. Medical expenses:

    a. Jonathan Wayne Botten, Sr. – Approximately $15,000. Based on the current information Plaintiff has, Plaintiff currently has medical expenses totaling approximately $1,500. This is calculated based on the liens issued on behalf of Desert Valley Medical Group. Plaintiff anticipates that he has additional outstanding bills that approximately total $3,500. Plaintiff estimates that he will incur approximately $5,000-$10,000 in additional medical expenses. This is calculated based on his current problems with his right arm and estimate of the physical therapy needed to help rehabilitate his arm.

    b. Tanja Dudek-Botten – In excess of $1.1 million in past and future medical expenses. Based on the current information available to Plaintiff, Plaintiff seeks approximately $100,000 in damages for medical expenses. This amount was calculated based on the medical bills currently available to Plaintiff. Plaintiff seeks in excess of $1

1          million in future medical expenses. Plaintiff currently cannot see well

2          out of her left eye and has a hard time hearing out of her left ear.

3          Additionally, there is still a big piece of metal in her rotary cuff.

4          Plaintiff anticipates that further treatment and/or accommodations for

5          her ongoing injuries will exceed $1 million.

6       c.  J.B. – In excess of $500,000 in past and future medical expenses.

7          Plaintiff is currently seeking approximately $500,000 in damages for

8          medical expenses. This amount was calculated by totaling up all the

9          medical bills Plaintiff has incurred as a result of the Incident.

10  3.  Lost wages – Plaintiff Jonathan Wayne Botten Sr. seeks approximately

11      $4,300 in lost wages as a result of missing work for one month after the

12      incident. This is calculated based on his biweekly salary of approximately

13      $2,100-$2,200.

14  4.  Emotional distress damages;

15  5.  Attorneys' fees;

16  6.  Punitive damages against individual defendants;

17  7.  Costs;

18  8.  Treble damages under the Bane Act.

19  Plaintiffs' investigation of this matter is not yet complete and Plaintiffs have not

20  concluded discovery in this matter. Plaintiffs reserve the right to supplement or

21  amend their prayer for relief and nature and scope of damages, pursuant to Rule

22  26(c). Plaintiffs further reserve the right to supplement and/or amend their Rule 26

23  Disclosures as additional information becomes available, through discovery or

24  otherwise.

25  //

26  //

27  //

28  //

1    DATED:  December 23, 2024         LAW OFFICES OF DALE K. GALIPO

2

3                                       By _____

4                                          Dale K. Galipo
                                           Hang D. Le
5                                          Attorneys for Plaintiffs

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5:23-cv-00257-KK-SHK

# Exhibit GG

1  | **LAW OFFICES OF DALE K. GALIPO**
2  | Dale K. Galipo, Esq. (Bar No. 144074)
   | dalekgalipo@yahoo.com
3  | Hang D. Le, Esq. (Bar No. 293450)
   | hlee@galipolaw.com
4  | 21800 Burbank Boulevard, Suite 310
   | Woodland Hills, California, 91367
5  | Telephone: (818) 347-3333
   | Facsimile: (818) 347-4118

6  | Attorneys for Plaintiffs
7  | JONATHAN WAYNE BOTTEN, SR.,
   | TANJA DUDEK-BOTTEN, ANNABELLE BOTTEN,
   | AND J.B.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JONATHAN WAYNE BOTTEN, SR.; TANJA DUDEK-BOTTEN; ANNABELLE BOTTEN; and J.B., a minor, by and through his guardian JONATHAN WAYNE BOTTEN, SR., | Case No. 5:22-cv-00949-KK-SHK |
| | [Consolidated for purposes of discovery with *L.C., et al. v. State of California, et al.*, Case No. 5:22-cv-00949-KK-SHK] |
| Plaintiffs, | *Honorable Kenly Kiya Kato* |
| vs. | *Mag. Judge Shashi H. Kewalramani* |
| STATE OF CALIFORNIA; COUNTY OF SAN BERNARDINO; ISAIAH KEE; MICHAEL BLACKWOOD; BERNARDO RUBALCAVA; ROBERT VACCARI; JAKE ADAMS; and DOES 1-10, inclusive, | **PLAINTIFFS' RULE 26 INITIAL EXPERT DISCLOSURES** |
| Defendants. | |

-1-

1    Pursuant to Federal Rule of Civil Procedure 26, Jonathan Wayne Botten, Sr.,

2   Tanja Dudek-Botten, Annabelle Botten, and J.B., a minor by and through his

3   guardian *ad litem* Jonathan Wayne Botten, Sr., hereby make their initial expert

4   disclosures pursuant to Rule 26(a)(2)(A) and (C) of the Federal Rules of Civil

5   Procedure as follows:

6   **<u>RETAINED EXPERTS</u>**

7    Plaintiffs disclose the following retained expert witnesses who may be called

8   upon to give expert testimony at trial pursuant to Rule 26(a)(2)(A) of the Federal

9   Rules of Civil Procedure:

10    1.  **Roger Clark**  - Police Practices Expert

11       10207 Molino Road

12       Santee, CA 92071

13       (203) 351-2458

14   Mr. Clark's Rule 26 report, C.V., fee schedule, and list of prior sworn testimony are

15   collectively attached hereto as "Exhibit 1."

16    2.  **Matthew Kimmis** – Video Analysis and Graphics Expert

17       2458 Maplewood Drive SE

18       Grand Rapids, MI 49506

19       (415) 225-3962

20   Mr. Kimmis's Rule 26 Report, C.V., fee schedule, and list of prior sworn testimony

21   are collectively attached hereto as "Exhibit 2."

22   //

23   //

24   //

25   //

26   //

27   //

28   //

**NON-RETAINED EXPERTS**

Plaintiffs further identify expert witnesses who may present evidence pursuant to Rules 702, 703, or 705 of the Federal Rules of Evidence, but who are not retained by Plaintiffs to provide expert testimony. Plaintiffs hereby disclose the following witnesses and submit the following summaries of the witness' expected testimony pursuant to Rule 26(a)(2)(A) and (C):

1. Sergeant Robert Ripley – San Bernardino Sheriff's Department, Specialized Investigations Division
   c/o County Defense Counsel

Sergeant Ripley was the main detective who processed the incident scene and undertook the crime scene investigation. Sergeant Ripley also conducted the interview of Deputy Adams and two witness interviews. Sergeant Ripley worked alongside Crime Scene Specialist Christopher Hermosillo in processing the incident scene and documented all the evidence found in a report. Sergeant Ripley also took measurements of various physical evidence. Sergeant Ripley is expected to testify regarding all the evidence that he found at the scene in relation to the incident, including but not limited to bullet casings, bullets, bullet strikes, weapons, blood stains, and Mr. Puga's body position and final resting place.

2. Christopher Hermosillo – San Bernardino Sheriff's Department Crime Scene Specialist
   c/o County Defense Counsel

Mr. Hermosillo was the Crime Scene Specialist who assisted Sergeant Ripley with the crime scene investigation. Mr. Hermosillo took photographs of the scene, labeled evidence found at the scene, photographed each item of evidence prior to it being measured and collected as evidence, measured evidence, and attempted to determine bullet trajectories of found bullet entry/exit holes. Mr. Hermosillo further took photographs of significant aspects of Mr. Puga's autopsy and collected samples of Mr. Puga's head hair, fingernail clippings, blood and fingerprints and other

evidence. Mr. Mr. Hermosillo also processed collected evidence at the crime lab.
Mr. Hermosillo is expected to testify regarding the evidence observed and collected
at the scene, the evidence observed and collected at Mr. Puga's autopsy, and
evidence processed at the crime lab.

     3.  Joseph Edward Fargusson, M.D.- Physician at Loma Linda University
        Health
        Loma Linda University Health
        11234 Anderson St.
        Loma Linda, CA 92345
        (909) 558-4000

Dr. Fargusson was a physician at Loma Linda University Health who treated Tanja
Dudek-Botten when she was brought in on February 17, 2021, after the shooting
incident. Dr. Fargusson provided medical care and treatment to Mrs. Botten. Dr.
Fargusson is expected to testify to his observations of Mrs. Botten's injuries and
diagnoses at the hospital, and any medical treatment or care provided to Mrs.
Botten.

     4.  Jon Boyd Roper, M.D. - Physician at Loma Linda University Health
        Loma Linda University Health
        11234 Anderson St.
        Loma Linda, CA 92345
        (909) 558-4000

Dr. Roper was a physician at Loma Linda University Health who treated Tanja
Dudek-Botten when she was brought in on February 17, 2021, after the shooting
incident. Dr. Roper also treated Mrs. Botten when she came in on March 13, 2021 in
relation to the injuries she sustained on February 17, 2021. Dr. Roper provided
medical care and treatment to Mrs. Botten. Dr. Roper is expected to testify to his
observations of Mrs. Botten's injuries and diagnoses at the hospital, and any medical
treatment or care provided to Mrs. Botten.

1     5.  Heather Marie Tassone, D.O. - Physician at Loma Linda University Health

2         Loma Linda University Health

3         11234 Anderson St.

4         Loma Linda, CA 92345

5         (909) 558-4000

6  Dr. Tassone was a physician at Loma Linda University Health who treated Tanja

7  Dudek-Botten when she was brought in on February 17, 2021, after the shooting

8  incident. Dr. Tassone provided medical care and treatment to Mrs. Botten. Dr.

9  Tassone is expected to testify to her observations of Mrs. Botten's injuries and

10  diagnoses at the hospital, and any medical treatment or care provided to Mrs.

11  Botten.

12     6.  Shannon Kiang, M.D. - Physician at Loma Linda University Health

13         Loma Linda University Health

14         11234 Anderson St.

15         Loma Linda, CA 92345

16         (909) 558-4000

17  Dr. Kiang was the resident physician at Loma Linda University Health who treated

18  Tanja Dudek-Botten when she was brought in on February 17, 2021, after the

19  shooting incident. Dr. Kiang provided medical care and treatment to Mrs. Botten.

20  Dr. Kiang is expected to testify to her observations of Mrs. Botten's injuries and

21  diagnoses at the hospital, and any medical treatment or care provided to Mrs.

22  Botten.

23  //

24  //

25  //

26  //

27  //

28  //

1      7.  Bailey Ann Wentworth, M.D. - Physician at Loma Linda University

2          Health

3          Loma Linda University Health

4          11234 Anderson St.

5          Loma Linda, CA 92345

6          (909) 558-4000

7   Dr. Wentworth was a physician at Loma Linda University Health who treated Tanja

8   Dudek-Botten when she was brought in on February 17, 2021, after the shooting

9   incident. Dr. Wentworth provided medical care and treatment to Mrs. Botten. Dr.

10  Wentworth is expected to testify to her observations of Mrs. Botten's injuries and

11  diagnoses at the hospital, and any medical treatment or care provided to Mrs.

12  Botten.

13     8.  Nicole Depolo, M.D. - Physician at Loma Linda University Health

14         Loma Linda University Health

15         11234 Anderson St.

16         Loma Linda, CA 92345

17         (909) 558-4000

18  Dr. Depolo was a physician at Loma Linda University Health who treated Tanja

19  Dudek-Botten when she was brought in on February 17, 2021, after the shooting

20  incident. Dr. Depolo provided medical care and treatment to Mrs. Botten. Dr.

21  Depolo is expected to testify to her observations of Mrs. Botten's injuries and

22  diagnoses at the hospital, and any medical treatment or care provided to Mrs.

23  Botten.

24  //

25  //

26  //

27  //

28  //

9.  Daniel Paul Srikureja, M.D. - Physician at Loma Linda University Health

Loma Linda University Health

11234 Anderson St.

Loma Linda, CA 92345

(909) 558-4000

Dr. Srikureja was a physician at Loma Linda University Health who treated Tanja Dudek-Botten and J.B. when they were brought in on February 17, 2021, after the shooting incident. Dr. Srikureja provided medical care and treatment to Mrs. Botten and J.B. Dr. Srikureja is expected to testify to his observations of Mrs. Botten's injuries and diagnoses at the hospital, and any medical treatment or care provided to Mrs. Botten. Dr. Srikureja is also expected to testify to his observations of J.B.'s injuries and diagnoses at the hospital, and any medical treatment or care provided to J.B.

10. Jose Jesurajan, M.D. - Physician at Loma Linda University Health

Loma Linda University Health

11234 Anderson St.

Loma Linda, CA 92345

(909) 558-4000

Dr. Jesurajan was a physician at Loma Linda University Health who treated Tanja Dudek-Botten when she came in on March 13, 2021 in relation to the injuries she sustained on February 17, 2021. Dr. Jesurajan performed a hand surgery consult on Mrs. Botten. Dr. Jesurajan is expected to testify regarding the circumstances surrounding the order of the consult, his observations of Mrs. Botten's injuries and diagnoses at the hospital, and any recommendations he may have provided.

//

//

//

//

1        11. Jennifer Elizabeth Raee-Nielson, M.D. - Physician at Loma Linda

2            University Health

3            Loma Linda University Health

4            11234 Anderson St.

5            Loma Linda, CA 92345

6            (909) 558-4000

7 Dr. Raee-Nielson was a physician at Loma Linda University Health who treated

8 Tanja Dudek-Botten when she came in on March 13, 2021 in relation to the injuries

9 she sustained on February 17, 2021. Dr. Raee-Nielson is expected to testify

10 regarding her observations of Mrs. Botten's injuries and diagnoses at the hospital,

11 and any treatment or medical care she provided Mrs. Botten.

12        12. Jon Miller, M.D. – Radiologist at Loma Linda University Health

13            Loma Linda University Health

14            11234 Anderson St.

15            Loma Linda, CA 92345

16            (909) 558-4000

17 Dr. Miller was a radiologist at Loma Linda University Health who treated Tanja

18 Dudek-Botten when she came in on March 13, 2021 in relation to the injuries she

19 sustained on February 17, 2021. Dr. Miller is expected to testify regarding his

20 observations of Mrs. Botten's injuries and diagnoses at the hospital, and any

21 treatment or medical care he provided Mrs. Botten.

22 //

23 //

24 //

25 //

26 //

27 //

28 //

1        13. Andrew James Davis, M.D. - Physician at Loma Linda University Health

2           Loma Linda University Health

3           11234 Anderson St.

4           Loma Linda, CA 92345

5           (909) 558-4000

6    Dr. Davis was a physician at Loma Linda University Health who treated J.B. when

7    he was brought in on February 17, 2021, after the shooting incident. Dr. Davis

8    provided medical care and treatment to J.B. Dr. Davis is expected to testify to his

9    observations of J.B.'s injuries and diagnoses at the hospital, and any medical

10   treatment or care provided to J.B.

11       14. Amanda MacQuoid, M.D. - Physician at Loma Linda University Health

12          Loma Linda University Health

13          11234 Anderson St.

14          Loma Linda, CA 92345

15          (909) 558-4000

16   Dr. MacQuoid was a physician at Loma Linda University Health who treated J.B.

17   when he was brought in on February 17, 2021, after the shooting incident. Dr.

18   MacQuoid provided medical care and treatment to J.B. Dr. MacQuoid is expected to

19   testify to her observations of J.B.'s injuries and diagnoses at the hospital, and any

20   medical treatment or care provided to J.B.

21       15. Ali Kemal Ozcan, M.D. - Physician at Loma Linda University Health

22          Loma Linda University Health

23          11234 Anderson St.

24          Loma Linda, CA 92345

25          (909) 558-4000

26   Dr. Ozcan was a physician at Loma Linda University Health who treated J.B. when

27   he was brought in on February 17, 2021, after the shooting incident. Dr. Ozcan

28   provided medical care and treatment to J.B. Dr. Ozcan is expected to testify to his

1  observations of J.B.'s injuries and diagnoses at the hospital, and any medical

2  treatment or care provided to J.B.

3       16. Gregory James Jutzy, M.D. - Physician at Loma Linda University Health

4          Loma Linda University Health

5          11234 Anderson St.

6          Loma Linda, CA 92345

7          (909) 558-4000

8  Dr. Jutzy was a physician at Loma Linda University Health who treated J.B. when

9  he was brought in on February 17, 2021, after the shooting incident. Dr. Jutzy

10  provided medical care and treatment to J.B, including a pediatric cardiology consult.

11  Dr. Jutzy is expected to testify to his observations of J.B.'s injuries and diagnoses at

12  the hospital, and any medical treatment or care provided to J.B.

13       17. Katherine Sigrid Burruss, M.D. - Physician at Loma Linda University

14          Health

15          Loma Linda University Health

16          11234 Anderson St.

17          Loma Linda, CA 92345

18          (909) 558-4000

19  Dr. Burruss was a physician at Loma Linda University Health who treated J.B. when

20  he was brought in on February 17, 2021, after the shooting incident. Dr. Burruss

21  provided medical care and treatment to J.B, including acute care surgery. Dr.

22  Burruss is expected to testify to his observations of J.B.'s injuries and diagnoses at

23  the hospital, and any medical treatment or care provided to J.B.

24  //

25  //

26  //

27  //

28  //

18. Carlo Adil Manalo, M.D. - Physician at Loma Linda University Health

    Loma Linda University Health

    11234 Anderson St.

    Loma Linda, CA 92345

    (909) 558-4000

Dr. Manalo was a physician at Loma Linda University Health who treated J.B. when he was brought in on February 17, 2021, after the shooting incident. Dr. Manalo provided medical care and treatment to J.B, including CT scans and X-rays. Dr. Manalo is expected to testify to his observations of J.B.'s injuries and diagnoses at the hospital, and any medical treatment or care provided to J.B.

19. Lauren Nicole Danlag, PT – Physical Therapist at Loma Linda University Health

    Loma Linda University Health

    11234 Anderson St.

    Loma Linda, CA 92345

    (909) 558-4000

Ms. Danlag was a physical therapist at Loma Linda University Health who evaluated J.B. during his stay at the hospital and provided physical therapy recommendations. Ms. Danlag is expected to testify as to her evaluation and her recommendations for physical therapy.

20. Robert J. Leonard, M.D. – Physician at Desert Valley Hospital

    Desert Valley Hospital

    16850 Bear Valley Road

    Victorville, CA 92395

    (760) 241-8000

Dr. Leonard treated Jonathan Wayne Botten, Sr. at Desert Valley Hospital on February 17, 2021, after he was brought in after the shooting incident. Dr. Leonard provided medical care and treatment to Mr. Botten. Dr. Leonard is expected to

1  testify to his observations of Mr. Botten's injuries and diagnoses at the hospital, and

2  any medical treatment or care provided to Mr. Botten.

3          21. Susan L. Campeas, M.D. – Physician at Desert Valley Hospital

4              Desert Valley Hospital

5              16850 Bear Valley Road

6              Victorville, CA 92395

7              (760) 241-8000

8  Dr. Campeas treated Jonathan Wayne Botten, Sr. at Desert Valley Hospital on

9  February 17, 2021, after he was brought in after the shooting incident. Dr. Campeas

10 provided medical care and treatment to Mr. Botten, including taking radiographs of

11 Mr. Botten's wrist, left hand, right elbow, and right forearm. Dr. Campeas is

12 expected to testify to his observations of Mr. Botten's injuries and diagnoses at the

13 hospital, and any medical treatment or care provided to Mr. Botten.

14         22. Janel Hillstrom, FNP

15             Mesa View Medical

16             1301 Bertha Howe Ave., Ste. 1

17             Mesquite, NV 89027

18             (702) 346-0800

19 Ms. Hillstrom is a nurse practitioner who treated J.B. after he visited Mesa View

20 Medical Urgent Care in 2022 for wounds exacerbated by his gunshot wounds and

21 injuries sustained from the February 17, 2021 incident. Ms. Hillstrom is expected to

22 testify to her observations of J.B.'s injuries, condition, and diagnoses at the hospital,

23 and any medical treatment or care provided to J.B.

24 //

25 //

26 //

27 //

28 //

23. Sarah Schmotzer – Therapist

   Renewing Hope Family Counseling Center, Inc.

   24910 Las Brisas Rd, Ste 117

   Murrieta, CA 92562

   (951) 465-3664

Ms. Schmotzer is a therapist at Renewing Hope Family Counseling Center, Inc. who treated Annabelle Botten from June 2023 to November 2024 for mental health and emotional distress related to the February 17, 2021, incident. Ms. Schmotzer diagnosed Ms. Botten with depression and PTSD resulting from witnessing the 2021 shooting and her family members being seriously injured from the shooting. Ms. Schmotzer is expected to testify regarding her observations and diagnoses of Ms. Botten and any treatment she provided to Ms. Botten.

24. Juan Cobian – San Bernardino County Fire Department Firefighter

   Paramedic

   Fire Station #302

   17288 Olive Street

   Hesperia, CA

Mr. Cobian is a Paramedic for the County of San Bernardino Fire Department, Fire Station #302. Mr. Cobian was one of the EMT-Paramedics who responded to the scene of the incident and treated Tanja Dudek-Botten. Mr. Cobian is expected to testify to Mrs. Botten's injuries at the scene, any medical treatment he provided to Mrs. Botten, and any information he received regarding the incident.

25. Noah Haney – San Bernardino County Fire Department Firefighter EMT

   Fire Station #302

   17288 Olive Street

   Hesperia, CA

Mr. Haney is an EMT for the County of San Bernardino Fire Department, Fire Station #302. Mr. Haney was one of the EMT-Paramedics who responded to the

scene of the incident and treated Tanja Dudek-Botten. Mr. Haney is expected to testify to Mrs. Botten's injuries at the scene, any medical treatment he provided to Mrs. Botten, and any information he received regarding the incident.

26. Carlos Topete – San Bernardino County Fire Department Firefighter
   Paramedic
   Fire Station #22
   12398 Tamarisk Road
   Victorville, CA

Mr. Topete is a Paramedic for the County of San Bernardino Fire Department, Fire Station #22. Mr. Topete was one of the EMT-Paramedics who responded to the scene of the incident and treated Tanja Dudek-Botten. Mr. Topete is expected to testify to Mrs. Botten's injuries at the scene, any medical treatment he provided to Mrs. Botten, and any information he received regarding the incident.

27. Jeremy Pendergraft – San Bernardino County Fire Department Firefighter
   Paramedic
   Fire Station #22
   12398 Tamarisk Road
   Victorville, CA

Mr. Topete is a Paramedic for the County of San Bernardino Fire Department, Fire Station #22. Mr. Topete was one of the EMT-Paramedics who responded to the scene of the incident. Mr. Topete is expected to testify to Hector Puga's injuries at the scene, any medical treatment he provided to Mr. Puga, and any information he received regarding the incident.

//
//
//
//
//

28. Michael Doucette – San Bernardino County Fire Department Firefighter
Paramedic

Fire Station #302

17288 Olive Street

Hesperia, CA

Mr. Doucette is a Paramedic for the County of San Bernardino Fire Department, Fire Station #302. Mr. Doucette was one of the EMT-Paramedics who responded to the scene of the incident and treated J.B. Mr. Doucette is expected to testify to J.B.'s injuries at the scene, any medical treatment he provided to J.B., and any information he received regarding the incident.

29. Michael Stachowicz - San Bernardino County Fire Department Firefighter

Fire Station #302

17288 Olive Street

Hesperia, CA

Mr. Stachowicz is a Paramedic for the County of San Bernardino Fire Department, Fire Station #302. Mr. Stachowicz was one of the EMT-Paramedics who responded to the scene of the incident. Mr. Stachowicz is expected to testify to J.B.'s injuries at the scene, any medical treatment he observed being provided to J.B., and any information he received regarding the incident.

30. Andrew Walk – San Bernardino County Fire Department EMT (John Jr.)

Fire Station #302

17288 Olive Street

Hesperia, CA

Mr. Walk is an EMT for the County of San Bernardino Fire Department, Fire Station #302. Mr. Walk was one of the EMT-Paramedics who responded to the scene of the incident and treated J.B. Mr. Walk is expected to testify to J.B.'s injuries at the scene, any medical treatment he provided to J.B., and any information he received regarding the incident.

31. Marc Chappell - San Bernardino County Fire Department EMT

   Fire Station #302

   17288 Olive Street

   Hesperia, CA

Mr. Chappell is an EMT for the County of San Bernardino Fire Department, Fire Station #302. Mr. Chappell was one of the EMT-Paramedics who responded to the scene of the incident and treated Jonathan Wayne Botten, Sr. Mr. Chappell is expected to testify to Mr. Botten's injuries at the scene, any medical treatment he provided to Mr. Botten, and any information he received regarding the incident.

32. Daniel Rios - San Bernardino County Fire Department Firefighter

   Paramedic

   Fire Station #302

   17288 Olive Street

   Hesperia, CA

Mr. Rios is a Paramedic for the County of San Bernardino Fire Department, Fire Station #302. Mr. Rios was one of the EMT-Paramedics who responded to the scene of the incident and treated Jonathan Wayne Botten, Sr. Mr. Rios is expected to testify to Mr. Botten's injuries at the scene, any medical treatment he provided to Mr. Botten, and any information he received regarding the incident.


DATED:  January 30, 2025          LAW OFFICES OF DALE K. GALIPO


                                  By _____
                                      Dale K. Galipo
                                      Hang D. Le
                                      Attorneys for Plaintiffs

# Exhibit HH

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

L.C., a minor by and through )
her guardian ad litem Maria )
Cadena; et al., )
)
            Plaintiff, )
)
    vs. ) Case No.
) 5:22-cv-00949-KK-(SHKx)
STATE OF CALIFORNIA; COUNTY )
OF SAN BERNARDINO; et al., )
)
            Defendants. )
_____ )

VIDEOCONFERENCE DEPOSITION OF BETZABETH GONZALEZ
Taken on Monday, December 30, 2024, at 10:20 a.m.

REPORTED BY:
NICOLE JOHNSON
CSR No. 13030

---

1   UNITED STATES DISTRICT COURT
2   CENTRAL DISTRICT OF CALIFORNIA
3
4
5   L.C., a minor by and through )
    her guardian ad litem Maria )
6   Cadena; et al., )
    )
7             Plaintiff, )
    )
8       vs. ) Case No.
    ) 5:22-cv-00949-KK-(SHKx)
9   STATE OF CALIFORNIA; COUNTY )
    OF SAN BERNARDINO; et al., )
10    )
              Defendants. )
11  _____ )
12
13
14
15
16         Deposition of BETZABETH GONZALEZ, taken on
17  behalf of the defendants, via Zoom videoconferencing, at
18  10:20 a.m., Monday, December 30, 2024, before Nicole
19  Johnson, CSR #13030, as a Certified Shorthand Reporter
20  within and for the County of Orange, State of California.
21
22
23
24
25

---

1   APPEARANCES:
2
3   For the Plaintiffs:
4   LAW OFFICES OF DALE K. GALIPO
    BY: Marcel Sincich
5   21800 Burbank Boulevard
    Suite 310
6   Woodland Hills, California 91367
    (818) 347-3333
7   msincich@galipolaw.com
8
9   For the Defendants
    County of San Bernardino, Vaccari, Adams:
10
    LYNBERG & WATKINS
11  BY: Amy Margolies
    1100 Town & Country Road
12  Suite 1450
    Orange, California 92868
13  (714) 937-1010
    amargolies@lynberg.com
14
15
16  For the Defendants
    State of California, Kee, Blackwood, Rubalcava:
17
    OFFICE OF THE ATTORNEY GENERAL
18  BY: Diana Esquivel
    1300 I Street
19  Suite 125
    Sacramento, California 95814
20  (916) 210-7320
    diana.esquivel@doj.ca.gov
21
22
23
24  The Videographer:  Ed Gallo
25

---

1                    INDEX
2   Examination                      Page
3   Attorney Margolies            6, 110
4   Attorney Esquivel        63, 121, 132
5   Attorney Sincich            87, 130
6
7
8                  EXHIBITS
9   Exhibit        Description         Page
10  52 Notice of Deposition, 7 pgs              7
11  15 Bates-stamped COSB105, 1 pg (previously marked)  29
12  16 Bates-stamped COSB3236, 1 pg (previously marked) 31
13  53 Video                         48
14  54 Color Photograph, 1 pg              69
15
16
17          CONFIDENTIAL TRANSCRIPT
18           (Separately Bound)
19              Page 112
20
21
22
23
24
25

1           Monday, December 30, 2024
2                    ooOoo
3
4           THE VIDEOGRAPHER:  We are on the record.  My
5    name is Ed Gallo.  I'm contract by Dean Jones.  Today is
6    December 30th of 2024.  The time is 10:20 a.m. Pacific
7    Time.  This video deposition is taken via Zoom.
8           The name of the case is L.C. versus State of
9    California filed in United States District Court, Central
10   District of California.  Case Number CV-00949 [sic].  This
11   is Volume 1 in the videotaped deposition of Betzabeth
12   Gonzalez.
13          The deposition is taken by attorney Amy
14   Margolies.  Would the attorneys introduce themselves and
15   state who you represent.
16          ATTORNEY MARGOLIES:  Amy Margolies from Lynberg
17   and Watkins on behalf of the County of San Bernardino and
18   Deputy Adams and Vaccari.
19          ATTORNEY SINCICH:  Good morning.  My name is
20   Marcel Sincich.  I'm from the law offices of Dale K.
21   Galipo, and I represent the plaintiffs in this matter.
22          ATTORNEY ESQUIVEL:  Good morning.  Diana
23   Esquivel on behalf of defendant State of California by and
24   through the California Highway Patrol, Officers Blackwood,
25   Kee, and Rubalcava.

5

1           THE VIDEOGRAPHER:  The court reporter today is
2    Nicole Johnson.  Would reporter please swear in the
3    witness.
4
5                    ooOoo
6           BETZABETH GONZALEZ,
7    was called as a witness, and having been
8       first duly sworn by the Certified
9       Shorthand Reporter in accordance with
10      CCP Section 2094, testified as follows:
11
12          THE WITNESS:  Yes.
13          THE REPORTER:  Thank you.
14
15             EXAMINATION
16   BY ATTORNEY MARGOLIES:
17      Q.  Good morning, Ms. Gonzalez.  Thank you for being
18   here today.
19      A.  Good morning.
20      Q.  I'm going to show you a notice of deposition.
21   If you could just confirm for me that this is the same
22   notice that you received to be here today.
23          I do not know what exhibit number we left off
24   on.  According to my notes I believe we are on 52.  If
25   either counsel knows?

6

1           ATTORNEY ESQUIVEL:  That's my understanding as
2    well, that the next number in line should be 52.
3           ATTORNEY MARGOLIES:  Thank you, Ms. Esquivel.
4    We're going to mark this as Exhibit 52 then.  It
5    will be your notice of deposition.
6           (Exhibit 52 was marked for identification
7            by the shorthand reporter.)
8    BY ATTORNEY MARGOLIES:
9       Q.  Do you see a deposition on your screen,
10   Ms. Gonzalez?  I think you're muted.
11      A.  I do.
12      Q.  Thank you.  I'm going to scroll down.  And does
13   this appear to you to be the same notice of deposition
14   that you received to be here today?
15      A.  It is.
16      Q.  I'm going to stop sharing my screen now.
17          Ms. Gonzalez, have you ever had your deposition
18   taken before?
19      A.  No.
20      Q.  Have you ever testified in court before?
21      A.  No.
22      Q.  You're doing a great job of this.  There's just
23   a few ground rules I want to go over with you.  One is
24   that you answer audibly with yes or no, instead of shaking
25   and nodding of the head because we have a court reporter

7

1    here.  Does that make sense?
2       A.  Yes.
3       Q.  And also because we have a court reporter, it
4    really helps if just one of us is speaking at a time.  So
5    if you could allow the attorneys to finish their question
6    before giving your answer.
7       A.  Okay.
8       Q.  And then we will try our best to make sure that
9    we allow you to finish your answer before we ask our next
10   question.  Okay?
11      A.  Okay.
12      Q.  Okay.  The only other rule is that you're honest
13   and truthful today.  You just took an oath.  And you
14   understand that even though we are on Zoom, the oath that
15   you gave carries the same weight as if you were in a court
16   of law and that you're obligated to tell the truth today.
17      A.  I understand.
18      Q.  Is there any reason that you would not be able
19   to tell us the truth today?
20      A.  No.
21      Q.  One final thing, we know that this was many
22   years ago and so we don't want any guesses, but we are
23   entitled to your best recollection and best estimates.
24   Does that make sense?
25      A.  Yes.

8

2 (Pages 5 to 8)

1  don't remember how soon I saw the GoFundMe after
2  everything happened. But, yeah.
3      Q. Okay. And did you make any contributions to
4  that GoFundMe page?
5      A. I don't believe so. I don't remember, to be
6  honest.
7      Q. And you mentioned that the neighbor in front of
8  you, if you're facing northbound on Peach Street, is
9  Clarita Snell; correct?
10     A. Yes.
11     Q. And I understood you to say that you did ask her
12  about the incident; is that correct?
13     A. Yes.
14     Q. Okay. And is she the one that slept through the
15  whole incident?
16     A. Yes.
17     Q. Okay. Other than Ms. Snell, did you talk to any
18  of your other neighbors around you?
19     A. No.
20        ATTORNEY ESQUIVEL: So I'm going to show you,
21  and we'll mark this as -- I believe the next in line is
22  54. And I'm going to share my screen with you so you can
23  take a look at this.
24        (Exhibit 54 was marked for identification
25        by the shorthand reporter.)

69

1  BY ATTORNEY ESQUIVEL:
2      Q. So there should be a photograph up on your
3  screen. Do you see that?
4      A. Yes.
5      Q. And for identification purposes, this is
6  COSB001570. That's the Bates-stamp number.
7        On this photograph, it's my understanding that
8  this is a photograph of Ms. -- of the house on the corner
9  of -- I'm going to say the southwest corner of the
10  intersection of Peach and Catalpa. Is this immediately
11  right at the -- I would say, center right side of the
12  photograph, is that Ms. Snell's house?
13     A. Yes.
14     Q. And behind that, I see two buildings and then a
15  white house. Are the two small buildings -- I don't know
16  if you can see my cursor?
17     A. I can.
18     Q. It's crosshairs. Can you see that?
19     A. Yes.
20     Q. There's a small building with the brown pitched
21  roof. And then there's another same color, kind of like a
22  tannish brown building, but this has what looks like those
23  terra cotta type tiles. Are these two buildings part of
24  Ms. Snell's residence? Or are those your buildings of
25  your residence?

70

1      A. Only the first -- the first shed with the brown
2  roof, it's in her property. That's hers. And then the
3  shed with the lighter gray roof, that's in my property.
4  And then the house that you're referring to, that's behind
5  my house. So my -- huh?
6      Q. I'm sorry. So the building that has the terra
7  cotta tile type roofing, the one that I have the
8  crosshairs on, is that your residence?
9      A. No. That's the house behind me.
10     Q. Oh, okay. So it's just a bad angle. To me it
11  looks like it's in a row. But you're saying it's actually
12  behind your house?
13     A. Correct.
14     Q. Okay. And then the white one that looks like
15  it's behind it -- but, again, it just might be the angle
16  with the two windows where the crosshairs are on it now
17  and with the brown roof, that's your house?
18     A. Yes.
19     Q. Okay. From this angle, can you see the bathroom
20  window that you were filming through?
21     A. You can see it slightly right above the -- the
22  police car's siren, the white police car siren. Right
23  there where you're pointing at.
24     Q. Okay.
25     A. You can see it slightly there.

71

1      Q. Okay. So there's a vent near the pitch of the
2  roof. So just below that, there's a little dark spot.
3  You're saying that's the bathroom window?
4      A. Correct.
5      Q. Okay. I am going to -- I think I have to stop
6  sharing -- show you another angle. So before I show you
7  the next photograph, you testified earlier that about
8  somewhere between five to ten minutes after the shooting
9  stopped, you exited your house and looked northbound on --
10  looked down northbound on Peach Street; correct?
11     A. Yes.
12     Q. Did you walk -- I mean, I don't know if there
13  are well-defined sidewalks in this area.
14     A. No.
15     Q. How far down did you walk down your -- I don't
16  know if you want to call it a walkway or -- to get a
17  better view of what was happening down the street on Peach
18  Street?
19     A. Just to the first fence that's inside my house.
20  So, like, maybe, like, I don't know, like, ten steps out
21  of my house.
22     Q. Okay. So I am going to share my video -- my
23  screen with you again. And I'm not going to have this
24  marked because it's a very lengthy video. But I'm going
25  to identify it. So do you see a picture up on your

72

```
 1                    REPORTER'S CERTIFICATION

 2

 3   I, Nicole Johnson, do hereby certify:

 4            That I am a licensed Certified Shorthand

 5   Reporter, duly qualified and certified as such by the

 6   State of California.

 7            That prior to being examined, the witness named

 8   in the foregoing deposition was duly sworn to testify

 9   under oath.

10            That the preceding deposition was recorded

11   stenographically by me at the time and place herein

12   mentioned; and that the preceding pages constitute a

13   complete and accurate record of the testimony given by the

14   aforementioned witness.

15            That I am a neutral party, in no way interested

16   in the outcome of said action, and that I am not related

17   to or otherwise connected with any of the parties involved

18   with this matter, or their respective counsel.

19

20   Dated:  January 10, 2025

21

22

23   _____

24   Nicole Johnson, CSR No. 13030

25
```



EXHIBIT

54